Vol. 2 - 1

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF IDAHO

3   UNITED STATES OF AMERICA,    )
                                 )   Case No. 4:17-cr-328-BLW
4              Plaintiff,        )
                                 )   Pocatello, Idaho
5        vs.                     )   October 18, 2018
                                 )   8:41 a.m.
6   TRAVIS M. NEWBOLD,           )
                                 )   Jury Trial, Volume 2
7              Defendant.        )
    _____)

8                     TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE B. LYNN WINMILL
       UNITED STATES DISTRICT COURT CHIEF JUDGE, AND A JURY
10

11  APPEARANCES:

12  For the Government:

13              BRYAN J. WHEAT
                Special Assistant U.S. Attorney
14              United States Attorney's Office
                District of Idaho
15              801 E. Sherman #192
                Pocatello, ID 83201
16              208-478-4166

17  For the Defendant:

18              STEVEN V. RICHERT
                Federal Defender Services of Idaho, Inc.
19              757 North 7th Avenue
                Pocatello, ID 83201
20              208-478-2046

21  Also present:  Special Agent Andy Robertson

22

23  Court Reporter:  Katherine Eismann, CRR, RDR
                     katherine_eismann@id.uscourts.gov
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

1          (Thursday, October 18, 2018, 8:41 a.m.)

2                          --oOo--

3                    P R O C E E D I N G S

4       (Jury in.)

5            THE COURT:  Thank you.  Please be seated.

6            COURTROOM DEPUTY:  The Court will now hear Criminal

7    Case 17-328, United States of America versus Travis M. Newbold

8    for day two of jury trial.

9            THE COURT:  I will note that the jury is present.  I

10   believe we are ready to call the government's next witness.

11           Mr. Wheat.

12           MR. WHEAT:  Yes, Your Honor.  We would call Ms. Clara

13   Sutherland.  She's right outside in the witness area.

14           THE COURT:  All right.

15           Ms. Sutherland, would you come before the clerk and

16   be sworn?

17           COURTROOM DEPUTY:  Please raise your right hand.  You

18   do solemnly swear the testimony you are about to give will be

19   the truth, the whole truth, and nothing but the truth, so help

20   you God?

21           THE WITNESS:  I do.

22           COURTROOM DEPUTY:  Please take a seat in the witness

23   stand.

24                      CLARA SUTHERLAND,

25   having been duly sworn, was examined and testified as follows:

Clara Sutherland - Direct

1          COURTROOM DEPUTY:  Please state your complete name
2     and spell your name for the record.
3          THE WITNESS:  Clara Sutherland.  C-L-A-R-A
4     S-U-T-H-E-R-L-A-N-D.
5          THE COURT:  Mr. Wheat, you may inquire.
6          MR. WHEAT:  Thank you.
7                       DIRECT EXAMINATION
8     BY MR. WHEAT:
9     Q.   Good morning, Miss Sutherland.  How are you?
10    A.   Good, thank you.
11    Q.   Thank you for being here.
12    A.   You bet.
13    Q.   Would you mind telling the jury, I guess, a little bit
14    about yourself, who you are, and what you do for a living now,
15    I guess?
16    A.   Well, I'm retired.  I retired January 28th from the postal
17    service.  I was there 32 years.  That's my life.  So, I live in
18    Pocatello.  Been here forever, and I --
19    Q.   Thank you.
20    A.   -- just do whatever I want to now.
21    Q.   Well, on October 25th of 2017, were you retired back then?
22    A.   No.
23    Q.   What did you do back then?
24    A.   I was a supervisor -- supervisor customer service for the
25    postal service.

Vol. 2 - 4

Clara Sutherland - Direct

1  Q.   What does a supervisor in customer service for the postal
2  service do?
3  A.   Well, my role was that I did retail, primarily retail.  We
4  had a -- we have three offices in Pocatello and a contract
5  station.  So, I did -- that was my -- my role there in
6  Pocatello.  Also, I was over rural carrier associates, rural
7  carriers, and -- and I'm very nervous.
8  Q.   Well, I just have a few quick questions for you.
9  A.   Okay.
10 Q.   Which post office did you work for?
11 A.   I supervised all three.
12 Q.   You supervised all three?
13 A.   So I was primarily -- I domiciled out of the main office
14 at 730 East Clark Street.  I supervised over Bannock Station,
15 the one on Main Street, and I was also at the Gateway Station
16 on Flandro.
17 Q.   Were you working on October 25th?
18 A.   Yes.
19 Q.   Where were you working on October 25th?
20 A.   I was working out at the Pocatello, the 730 East Clark
21 Street post office.
22 Q.   Okay.
23 A.   That is where my office is.
24 Q.   And did you come into contact with postal inspectors that
25 day?

Clara Sutherland - Direct

1    A.   Yes.

2    Q.   And what was the purpose of that?

3    A.   There was a package that was questioned, and we were to --

4    they were asking us to make sure that if anyone came in for

5    this package to alert them.  They were in the office at the

6    time, the postal inspectors were.

7    Q.   And did you encounter the package they discussed?

8    A.   Yes.

9    Q.   When did you encounter it?

10   A.   When the customer came to pick it up.

11   Q.   Okay.  Who was the customer that came to pick it up?

12   A.   I don't recall the name right now, but it's on the

13   package.

14   Q.   Okay.

15   A.   He signed for it.

16   Q.   So, could you just tell the jury about what you did?  When

17   you noticed -- I'm guessing, by what you say -- well, you

18   indicated that the customer came in to pick up the package.

19   What did you do when the customer came in?  Could you just kind

20   of paint a picture for them?

21   A.   So, any time that we -- I do lobby sweeps.  So, lobby

22   sweeps are when if it's too busy at the window where there's

23   a -- where a customer needs assistance, you go out and say,

24   "Does anyone need assistance with anything?"

25            My office actually has a TV in there, so I can

Clara Sutherland - Direct

1   monitor what is going on.  I noticed the customer was out at

2   the window, and so I went out to see if he needed assistance.

3   So, when I did that, he presented me with two -- the notices

4   that was left at his residence, and it's a PS Form 3839.  It's

5   a peach notice.

6          I got those two notices, recognized the address, and

7   asked for his ID, because that's usually what we do anyway with

8   a package.  It's a package that requires a signature, so ID is

9   required.  I got his driver's license, took that, and then went

10  back to the parcel section is where we would have the parcels.

11         At that time, actually, the postal inspectors were

12  there, and I alerted them that this -- is this the package that

13  was in question, and they told me it was.

14         They gave me the package.  I then took that package

15  up to the front, asked the customer to sign the -- the form,

16  the PS 3849.  I removed the label, because it's an express mail

17  label which is detachable.  So, I took that off, gave him the

18  package, and then he left the post office.

19  Q.   Thank you, Ms. Sutherland.  Do you remember what the

20  individual's name and/or address was that came in?

21  A.   I think the first name was Trever.  I'm not quite sure.

22  The address was the 551 West --

23  Q.   Is there something that would help refresh your memory?

24  A.   The notice, the Form PS 3849.

25         MR. WHEAT:  Your Honor, could I mute the jury for

Vol. 2 - 7

Clara Sutherland - Direct

1   just a second?

2            THE COURT:  I'm sorry?

3            MR. WHEAT:  May I mute the jury for just a second,

4   please?

5            THE COURT:  Yes.

6            MR. WHEAT:  Their visuals I guess I should say.

7   Thanks.

8   Q.   I'm going to show you what's marked Plaintiff's

9   Exhibit 31.

10  A.   Okay.

11  Q.   And if -- when you are done looking at that, if you could

12  just look up at me, I'm going to show you two sides.

13           THE COURT:  Counsel, 31 has been admitted, so it can

14  be shown to the jury.

15           MR. WHEAT:  Okay.  In that case, I guess we don't

16  need to mute.  Thanks, Your Honor.

17  Q.   Have you had a chance to look at that Ms. Sutherland?

18  A.   Yes.

19  Q.   Does that refresh your memory?

20           THE COURT:  Can you zoom in?  It might help.

21  BY MR. WHEAT:

22  Q.   Oh, absolutely.

23  A.   It was the 551 West Pine, and it's Travis Newbold.

24  Q.   Is that the confirmation slip you received that day?

25  A.   Yes, I actually received two of them.

Vol. 2 - 8

Clara Sutherland - Direct

1    Q.    Oh, two of them?

2    A.    Yes.

3    Q.    Okay.  I'm going to show you two parts of the Exhibit 31.

4    I guess I'm going to have to zoom out.

5          Do you recognize those?

6    A.    Yes.

7    Q.    What are those?

8    A.    Those are the PS Form 3849s with left notice of an

9    article.

10   Q.    Okay.  Now, Ms. Sutherland, what did you do when he

11   brought these slips?  Did you get verification in addition to

12   the signature?

13         Sorry about that.  Is there anything else you do

14   besides have the individual sign?  Did you check any ID or --

15   A.    I asked him for his ID, yes, his driver's license.  He

16   gave me that.  Presented that to me.

17   Q.    Okay.  Thank you.  And then he took the package?

18   A.    Yes.

19   Q.    Okay.  And then left?

20   A.    Yes.

21   Q.    Okay.  And did you verify that the package was the same

22   address and tracking number as what was on this PS --

23   A.    Yes.

24   Q.    -- 3849?  And do you remember what this individual looked

25   like?

Vol. 2 - 9

Clara Sutherland - Direct

1  A.   I remember he had -- he had short, dark hair that I

2  recall, and I just remember that he had a red shirt on, red

3  polo shirt.  I remember that.

4  Q.   Were you able to see his build, Miss Sutherland?

5            MR. RICHERT:  Relevance.

6            THE COURT:  What's the objection?

7            MR. RICHERT:  Relevance.

8            THE COURT:  Overruled.

9            THE WITNESS:  Just -- I don't know.  He just looked

10  like a guy.

11  BY MR. WHEAT:

12  Q.   Okay.

13  A.   I don't pay attention to that.  He was relative -- I would

14  guess he was probably around in his 40s or something.  I don't

15  know.  And wasn't really tall, probably -- but then I'm short,

16  so it's hard to tell, and there was a counter in front of me

17  when I am handing out the packages.  But he was probably 5-8,

18  5-9, something like that.

19  Q.   And how long has it been since you thought about this

20  particular event?

21  A.   Well, I don't think about it at all, actually.  I mean, I

22  hand out -- but I do recall that I was -- I remember the

23  situation only because it was -- and I -- where we had to

24  isolate the package, and it was -- so, I do remember some --

25  the incident for that day.

Clara Sutherland - Direct

1   Q.   Sure.

2   A.   What happened that day.

3   Q.   Okay.  Great.  And do you recognize the individual that

4   came to pick up the package here in the courtroom?

5   A.   No, he looked -- no, I don't see anybody in here that

6   looks like him to me.

7   Q.   Okay.  But how long ago was it since this event and when

8   you thought about it again, I guess?

9   A.   When I was contacted.

10  Q.   Okay.  When was that?

11  A.   That was, I think, a week ago.

12        MR. WHEAT:  Okay.  Nothing further for

13  Ms. Sutherland.  Thank you.

14        THE COURT:  Mr. Richert, any cross?

15        MR. RICHERT:  No.

16        THE COURT:  All right.  Ms. Sutherland, you may step

17  down.

18        I assume the witness can be released from any

19  subpoena.

20        MR. WHEAT:  Yes, she may.  Thank you.

21        THE WITNESS:  Thank you.

22        THE COURT:  Call your next witness.

23        MR. WHEAT:  Detective Nick Edwards from Pocatello

24  police.

25        THE COURT:  Detective Edwards, would you come before

Nicholas Cloise Edwards - Direct

1    the clerk and be sworn?

2            COURTROOM DEPUTY:  Please raise your right hand.  You

3    do solemnly swear the testimony you are about to give will be

4    the truth, the whole truth, and nothing but the truth, so help

5    you God?

6            THE WITNESS:  Yes.

7            COURTROOM DEPUTY:  Please take a seat in the witness

8    stand.

9                        NICHOLAS CLOISE EDWARDS,

10   having been duly sworn, was examined and testified as follows:

11           COURTROOM DEPUTY:  Please state your complete name

12   and spell your name for the record.

13           THE WITNESS:  Nicholas Cloise Edwards.

14   N-I-C-H-O-L-A-S E-D-W-A-R-D-S.

15           THE COURT:  You may inquire.

16           MR. WHEAT:  Thank you.

17                       DIRECT EXAMINATION

18   BY MR. WHEAT:

19   Q.   Good morning, Detective Edwards.

20   A.   Good morning.

21   Q.   Could you please tell the jury a little bit about

22   yourself?  What do you do for a job?  How long you have been

23   doing it?  What's your current assignment?

24   A.   Absolutely.  I have been with the Pocatello Police

25   Department for the last 14 years.  I have been currently

1    assigned to the Investigations Division, specifically assigned

2    to Narcotics Task Force.  I am part of the HIDA task force in

3    Bannock County, the High Intensity Drug Trafficking Task Force

4    that they recently stood up.

5             I'm also the SWAT or Special Weapons and Tactics

6    Commander for the Pocatello Police Department.

7    Q.   Thank you.  And you are currently in narcotics

8    investigations?

9    A.   I am.

10   Q.   And do you have any special training and experience that

11   comes with that assignment that helped you qualify for it?

12   A.   I do.  I have been to a basic narcotics course when I

13   first got assigned to the narcotics task force.  Since then

14   I've attended covert ops training conferences, informant

15   handling conferences, other various narcotics training among

16   lots of other training.  But, yep, those are the ones specific

17   to the narcotics unit.

18   Q.   And how about in-the-field experience?  How many years do

19   you have in the field of investigating?

20   A.   Specifically in narcotics, three years in narcotics in the

21   field.  It's a plainclothes assignment, so I don't wear a

22   traditional police uniform.  Yeah.

23   Q.   Thanks.  Well, were you working as a detective for

24   Pocatello police on October 25th, 2017?

25   A.   I was, yes.

Nicholas Cloise Edwards - Direct

1    Q.   What were your assignments that day?

2    A.   I was assisting the Department of Homeland Security in a

3    controlled delivery of a controlled substance, illegal

4    controlled substance.

5    Q.   Okay.  And where was this controlled delivery designed to

6    take place?

7    A.   It took place in the post office in Pocatello at 730 East

8    Center, East Clark.

9    Q.   Were you involved in the coordination of this controlled

10   delivery?

11   A.   I was, yes.

12   Q.   And were you involved in a coordination of notification

13   about this controlled delivery?

14   A.   Yes.

15   Q.   Okay.  What was the notification process?

16   A.   Prior to that?

17   Q.   (Nods head.)

18   A.   Okay.  I was contacted on October 10th by Special Agent

19   Robertson, who asked me to assist him in an investigation that

20   he was conducting.  So, that's really when it started on my end

21   was October 10th.

22          Prior to that, we had different conversations, myself

23   and Special Agent Robertson.  On October 23rd, I drafted an

24   affidavit for a search warrant in a -- what we call an

25   anticipatory search warrant.  On October 23rd, it was signed by

Nicholas Cloise Edwards - Direct

1    Judge Clark.  And that search warrant then was ultimately

2    executed on the 25th of October.

3    Q.   I want to talk to you about delivering of notification

4    slips to Mr. Newbold.

5    A.   Okay.

6    Q.   Do you know about whether there were notification slips

7    delivered to Mr. Newbold?

8    A.   There was.

9    Q.   Do you know what dates they were delivered?

10   A.   One was on the 24th of October.

11   Q.   And what time was it delivered?

12   A.   I can't remember.

13   Q.   Did you have an idea of what time you wanted it delivered?

14   A.   Yeah, we wanted it delivered in the morning -- or,

15   correction -- in the evening.

16   Q.   Why did you want it delivered in the evening?

17   A.   So that we had time to plan.

18   Q.   Okay.  Plan for what?

19   A.   The controlled deliver the following day.

20   Q.   Okay.

21   A.   We could control the delivery, what was going to happen,

22   where it was going to take place, those things.

23   Q.   Okay.  So, when did you want the package --

24   A.   Early morning the 25th.

25   Q.   Okay.  And that would be so that you could be there?

Nicholas Cloise Edwards - Direct

1    A.    Correct.

2    Q.    Okay.  So, on the 25th, were you there at the post office?

3    A.    I was.

4    Q.    And what were you doing at the post office?

5    A.    So, we -- I was assigned inside of the post office.  I was

6    just around the corner.  If you are familiar with the Pocatello

7    post office, it's kind of an L-shape when you walk into the

8    main lobby.  And then you go to the right as you walk into the

9    counter where you pick up the packages.  I was off to the left

10   where the P.O. boxes were at, myself and -- I was there on that

11   side.

12   Q.    Are you familiar with Mr. Travis Newbold?

13   A.    I am.

14   Q.    Do you recognize him here in the courtroom?

15   A.    I do.

16   Q.    Could you point him out?

17   A.    He's wearing a light blue shirt, a vest, glasses.

18   Q.    Where is he sitting?

19   A.    To my left.

20   Q.    Okay.

21   A.    Yeah.

22   Q.    So, how long have you known Mr. Newbold?

23   A.    I have known of Mr. Newbold since about 2013, I believe.

24   Q.    So, did you recognize him that day?

25   A.    I did.

1    Q.    Okay.  And when did you first see him?

2    A.    I saw him when he was coming out of the post office after

3    having picked up a package.

4    Q.    Okay.  And what happened next?

5    A.    I had been notified on radio that he had taken possession

6    of a controlled substance and that the plan was then to detain

7    him at that point.  And I came out, identified myself as a

8    police officer.  I was wearing a vest that was clearly marked

9    as a police officer.  I identified myself as a police officer

10   and detained him at that point in the -- I'll call it a

11   breezeway or the first entry into the post office.

12          He had actually left where he picked up the package,

13   went through those doors, went to leave out of the exterior of

14   the post office, and I contacted him in that first entryway and

15   detained him at that point.  Placed him into handcuffs.

16   Q.    Okay.  Okay.  And then you said when he walked out, he

17   was -- was he holding anything when he walked out?

18   A.    Well, he was holding the package that he had picked up,

19   and he dropped it as I approached him.

20   Q.    Okay.  And did you recover a phone at that time from

21   Mr. Newbold?

22   A.    We did.  I -- after handcuffing him, I searched him for

23   weapons, removed the things from him.  We detained him, and he

24   was actually turned over into the custody of a patrol officer,

25   a uniformed patrol officer.

Nicholas Cloise Edwards - Direct

1        In common practice, our vehicles, we can't transport.
2    We have unmarked police cars, and so his was --
3    Q.   Because what kind of car you drive, Detective Edwards?
4    A.   It's an unmarked.  It's an unmarked vehicle.  It does not
5    look like a police car.  It doesn't have any of the emergency
6    equipment in it.
7    Q.   Okay.
8    A.   So, he was turned over into the custody of a patrol
9    uniformed officer.  The practice is to turn any personal
10   property over, and they put it in a temporary evidence bag that
11   goes with the person that's being detained.
12   Q.   Okay.
13   A.   So his property that was on him was turned over to the
14   police, Officer Ballard.
15   Q.   Okay.  And did you see that phone later in this day?
16   A.   I did.
17   Q.   And where did you see it?
18   A.   Back at the Pocatello Police Department, which is
19   Mr. Newbold was transported to.  He was taken to the Pocatello
20   Police Department.
21   Q.   And did that phone have password protection?
22   A.   It did.
23   Q.   Okay.  Was it ever unlocked?
24   A.   It was.
25   Q.   Who unlocked it?

Nicholas Cloise Edwards - Cross

1   A.    Mr. Newbold.

2              MR. WHEAT:  Okay.  Thank you.  Nothing further.

3              THE COURT:  Cross?

4                      CROSS-EXAMINATION

5   BY MR. RICHERT:

6   Q.    Detective Edwards, you mentioned that on the 23rd of

7   October, a couple days before Mr. Newbold's arrest, you

8   prepared an affidavit?

9   A.    Yes, sir.

10  Q.    That affidavit -- the purpose of preparing that was to

11  submit that affidavit to a local judge to have the judge sign

12  off on a search warrant of Mr. Newbold's house?

13  A.    Correct.

14  Q.    Now, I have that affidavit or a copy of it here.  Oh, I

15  guess I should have asked first off, you know steroids are not

16  narcotics; correct?

17  A.    Correct.

18  Q.    And your training is in narcotics?

19  A.    Well, it's controlled substance, so --

20  Q.    Well, you told us you're on the narcotics task force, so I

21  just want to make it clear that steroids are not a narcotic.

22  A.    Okay.

23  Q.    Correct?

24  A.    If you -- I'd have to look at it exactly where it falls

25  in, but it is a controlled substance, I think is the more

Nicholas Cloise Edwards - Cross

1  appropriate term.

2  Q.   I agree with that.

3  A.   Okay.

4  Q.   So, when you submitted your affidavit to -- I think you

5  said Judge Clark?

6  A.   Correct.

7  Q.   Part of that affidavit includes that you told the judge

8  "It's common for drug traffickers to front drugs, which is to

9  provide drugs to a distributor on a consignment, and for

10 distributors to front money to their sources of drug supply."

11 Do you remember that?

12 A.   I do.

13 Q.   Did you find any indication that Mr. Newbold fronted drugs

14 to anyone?

15 A.   No.

16 Q.   Individuals involved in the distribution of controlled

17 substances usually maintain books, records, notes, receipts,

18 ledgers, bank records, and money orders and other documents

19 evidencing their unlawfully drug trafficking.

20        You know that Mr. Newbold's house was searched

21 because you prepared and obtained the search warrant to do so;

22 right?

23 A.   Correct.

24 Q.   Did you find any of that?

25 A.   No.

Nicholas Cloise Edwards - Cross

1    Q.    Individuals involved in the distribute of controlled

2    substances often, more often than not, maintain addresses or

3    telephone numbers and books or papers, electronic storage

4    media, such as computers and cell phones for personal data

5    assistance to reflect names, addresses, telephone numbers of

6    their drug customers and associates.

7              Did you find any of that?

8    A.    Yes.

9    Q.    What did you find?

10   A.    Well, I didn't find anything.  I was not at the search

11   warrant, but the officers that conducted the search warrant

12   did.  They found computers, telephones, other items.

13   Q.    Did you -- did anyone search the computer?

14   A.    To my knowledge, no.

15   Q.    Did anyone search the cell phones?

16   A.    Yes.  There -- the cell phone was searched.  A cell phone

17   was searched.

18   Q.    And to your knowledge, what was -- did the computer

19   reflect any names, addresses, telephone numbers of drug

20   customers?

21   A.    The computer?

22   Q.    Uh-huh.

23   A.    We didn't search the computer.

24   Q.    Did you find in the house any written material that

25   indicated names, addresses of customers?

1   A.   Not to my knowledge off the top of my head, no.

2   Q.   You told Judge Clark, in your affidavit, "Individuals

3   involved in the distribution of illegal control substances,

4   including steroids, commonly maintain amounts of money,

5   financial instruments, jewelry, and valuables which are

6   proceeds from the intended to be used to facilitate drug

7   transactions."

8            As part of the search, did you find a large amount of

9   money?

10  A.   Those that searched did, yes.

11  Q.   What did they find?

12  A.   I believe it was $740 is what they found.

13  Q.   Jewelry?

14  A.   Not to my knowledge, no.  If they did, it was not

15  collected.

16  Q.   The affidavit goes on -- and for whatever reason, I'm

17  missing a page, but -- so, what you would have expected to

18  find, what you told Judge Clark, you really didn't find much?

19  A.   No, not true.

20  Q.   Oh, you found a computer, but you didn't search it?

21  A.   Right.  That's true.

22  Q.   Cell phone that was searched later?

23  A.   Okay.

24  Q.   You found $740?

25  A.   We did.

1    Q.   And you found what we have seen before now, steroids and
2    steroid packaging?
3    A.   Say that again, that last part.  You found what?
4    Q.   Steroids and steroid packaging?
5    A.   Correct.  We found that.
6    Q.   Is it common practice for the Pocatello Police Department
7    to get what you termed as an anticipatory search warrant?
8    A.   We do get them.  If it's common -- I don't know if it's
9    common, but we -- they are not uncommon by any stretch.
10   Q.   So, in other words, you go to a judge and say, you know,
11   "We're going to arrest somebody, so we want to search his house
12   at the time of the arrest," rather than come to the magistrate
13   or the judge at the time of the arrest?
14   A.   Not like that, but we'll detain people for officer safety
15   purposes and other reasons to execute search warrants, yes.
16   That's common.
17            MR. RICHERT:  That's all the questions I have right
18   now.
19            THE COURT:  Redirect.
20            MR. WHEAT:  Thanks.
21                     REDIRECT EXAMINATION
22   BY MR. WHEAT:
23   Q.   Detective Edwards, Mr. Richert asked you whether you
24   found -- and I want to make sure I get this right -- whether
25   you found what you expected to find in that house.  Did you

1    find some of what you -- or was -- in that house, was there

2    found what you expected to have found in that house?

3    A.   Absolutely, yes.

4    Q.   What did that include?

5    A.   Significant amount of controlled substances and items that

6    would -- are consistent with drug trafficking, to include

7    vials, bindles, baggies.  I usually say bindles, baggies, and

8    syringes.

9    Q.   Did you find bindles or baggies though?

10   A.   No, but we found capsules.  We found containers.  We found

11   items for packaging, yes.

12   Q.   What kind of capsules?

13   A.   Pill capsules, rubber plastic capsules.

14   Q.   And what kind of -- what else did you find?

15   A.   Again, to make it clear, I was not at the search warrant.

16   I did not find these things.

17   Q.   But have you examined the evidence?

18   A.   But I have examined the evidence.  I know what was found.

19   They found powders that were tested.  We found -- as controlled

20   substances, a significant amount.  I think, at one point, it

21   was nine-and-a-half pounds of powders.  We had glass vials both

22   large -- or I say large -- bigger, about that big, and then we

23   had some smaller ones as well.

24        There were rubber stoppers, caps to contain the

25   items, and then over 150 vials of liquid, later to be found

1    controlled substances.

2    Q.   And when you say nine-and-a-half pounds, you are not sure

3    on that amount?

4    A.   No, that was a quick math in my head when we were doing it

5    how much powder we found.

6    Q.   Okay.  But that's not --

7    A.   No.

8    Q.   Okay.  That's not what you are testifying to?

9    A.   Correct.

10   Q.   All right.  And based on your training and experience,

11   Mr. Steve -- you know, Mr. Richert asked you about what you

12   didn't find.  Based on your training and experience, why might

13   you not find indicia of drug trafficking at a house where

14   there's other evidence?

15   A.   Well, the common practice is try to conceal it to void

16   what you are doing if you are trafficking illegal narcotics or

17   illegal controlled substances.

18   Q.   So, would that include records?

19   A.   Yeah, absolutely.

20   Q.   And ledgers?

21   A.   Yep.

22   Q.   Okay.  And is that something that someone would normally

23   hide in this practice?

24   A.   Sure.

25            MR. WHEAT:  Thank you.  Nothing further.

Vol. 2 - 25

Nicholas Cloise Edwards - RX

1          THE COURT:  Recross.

2                         RECROSS-EXAMINATION

3   BY MR. RICHERT:

4   Q.   Detective Edwards, were you at all investigating

5   Mr. Newbold before October for trafficking in steroids?

6   A.   Was I personally?

7   Q.   Yes.

8   A.   It's kind of a gray area, and I will explain if allowed

9   to.

10  Q.   Well, I'm not sure I want you to.

11  A.   Okay, then I won't answer.

12  Q.   Do you have any evidence that Mr. Newbold trafficked

13  steroids?

14  A.   Prior to this?

15  Q.   In October of 2017.

16          MR. WHEAT:  Your Honor, may I have just a second?

17      (Off-the-record discussion.)

18  BY MR. RICHERT:

19  Q.   In October of 2017 is my question.

20  A.   Can you repeat the question at this point?

21  Q.   Were you investigating Mr. Newbold for trafficking in

22  October of 2017?  Excuse me.  Before October 10th?

23  A.   No.

24  Q.   Did you conduct any controlled buys?

25  A.   I have not, no.  On Mr. Newbold, to clarify.

Nicholas Cloise Edwards - RX

1  Q.   That's -- I'm sorry.

2  A.   Okay.

3  Q.   In 2017?

4  A.   Correct.

5         MR. RICHERT:  No, further questions.

6         THE COURT:  May the witness step down?

7         MR. WHEAT:  May I just have a second, Your Honor?

8         THE COURT:  Yes.

9         MR. WHEAT:  Can we have a quick sidebar?

10        THE COURT:  Yes.

11        MR. WHEAT:  Thank you.

12     (Sidebar.)

13        MR. WHEAT:  I guess I'm just asking if that was

14 sufficient basis to open the door to the prior investigation

15 regarding distribution of a controlled substance.

16        THE COURT:  Well, the fact of the conviction, I have

17 already ruled, would be relevant.  I don't know.  I mean, you

18 can just offer -- I don't know how you can do it.  You can just

19 offer the convict.

20        The investigation itself, that's a different issue.

21 I'd have to know exactly the circumstances, and I'd have to

22 evaluate that separately.  But his prior conviction, I don't

23 know how you are going to prove -- if you've got a certified

24 copy of the conviction or something to that effect, I assume

25 that's what you are going to do anyway.

Nicholas Cloise Edwards - Further Redirect

1              Mr. Richert, do you want to -- I mean, I am not
2    asking you to waive your objection, but --
3              MR. RICHERT:  I still have the objection.  So, I
4    would assume that's how it was going to be --
5              THE COURT:  Yeah.
6              MR. RICHERT:  -- introduced.
7              MR. WHEAT:  Okay.
8              THE COURT:  Okay.
9         (End of sidebar.)
10             THE COURT:  Any further questions for this witness,
11   Mr. Wheat?
12             MR. WHEAT:  We are obtaining a document real quick if
13   I could just have one minute.
14             THE COURT:  Yes.
15             MR. WHEAT:  I apologize, Your Honor.  I apologize for
16   making everybody wait.
17             Here we go.  I actually had it the whole time, Your
18   Honor.  I apologize.
19                      FURTHER REDIRECT EXAMINATION
20             MR. WHEAT:  Your Honor, may I show Detective Edwards
21   something on the overhead?
22             THE COURT:  Yes.  The evidence -- or the jury
23   projector is off or the jury monitor is off.
24             MR. WHEAT:  Thank you.
25

1    BY MR. WHEAT:

2    Q.   Detective Edwards, I'm showing you on the overhead what

3    will be marked as Government's Exhibit 95.  Do you see it up

4    there?

5    A.   I can.

6    Q.   Do you recognize Government's Exhibit 95?

7    A.   I do.

8    Q.   How do you recognize it?

9    A.   That's the minute of entry and judgment of conviction.

10   Q.   But how do you recognize it personally?

11   A.   Can you scroll down?

12   Q.   Absolutely.

13   A.   And the other side of it?

14   Q.   Would it help if you examined it in your hand?

15   A.   Yeah, can I?  Is that appropriate?

16   Q.   You bet.  Yes.

17           THE COURT:  Yeah.  Mr. Metcalf, if you would.

18   BY MR. WHEAT:

19   Q.   Do you know where this document came from?

20   A.   I actually don't, no.  I'm not sure which one this one is.

21   I have not seen this.

22   Q.   Oh, you haven't seen this one?  Okay.  Better get you the

23   right one then.

24           Jury is muted?

25           Have you seen this one?

1    A.    I have not seen that one either.

2    Q.    Okay.  Detective Edwards, do you know what that document

3    says?

4    A.    I do from reading it, yes.

5    Q.    Okay.  And is that a certified copy?

6    A.    It is.

7    Q.    Do you know who picked up that certified copy?

8    A.    I am not sure who picked it up.  I would have to look at

9    it.  Um, deputy clerk?

10   Q.    Okay.  What does it say up in the top of that copy?

11   A.    Detective -- I can't read the writing on the name.  I

12   don't know.

13   Q.    Okay.  But does it say something about a certification?

14   A.    Okay.  Yes.  Do you want me to read that?

15   Q.    What does that say?

16   A.    "Certified that the foregoing is a full, true, and correct

17   copy of an instrument as the same now remains on file and of

18   record in my office.  Witness this date, 17 October 2018."

19   Q.    Okay.  And is there a, like, stamp on there?

20   A.    There is.

21   Q.    And is it, like, raised?

22   A.    It is.

23   Q.    Okay.  Thanks.  So, to your knowledge, can you say what

24   that is?

25   A.    It's a conviction -- certified conviction.

1  Q.   Okay.  For whom?

2  A.   Travis Newbold.

3  Q.   Okay.  And what date is that conviction?

4  A.   The conviction itself, the 15th day of January.

5  Correction.  I am looking at the wrong one.  The 9th day of

6  March 2015.

7            MR. WHEAT:  Okay.  I would move to admit Government's

8  Exhibit 95.

9            THE COURT:  Subject to the prior Court ruling, is

10  there any other objection to the exhibit?

11            MR. RICHERT:  No.

12            THE COURT:  All right.  The exhibit -- I'm sorry.

13  What is the number again, counsel?

14            MR. WHEAT:  We will mark it as 95, please, Your

15  Honor.

16            THE COURT:  Exhibit 95 may be admitted and may be

17  published to the jury.

18            MR. WHEAT:  Okay.  Thank you.

19       (Exhibit 95 admitted.)

20  BY MR. WHEAT:

21  Q.   Detective Edwards -- may I have that document back?

22  A.   Yeah, absolutely.

23  Q.   What does that indicate the offense of conviction is?

24  A.   Guilty to the charge of one count, delivery of a

25  controlled substance, anabolic steroids.

1  Q.   What was the date?

2  A.   The date was 15 January 2015.

3            MR. WHEAT:  Thank you.  Nothing further.

4            THE COURT:  Anything else?

5            MR. RICHERT:  No.

6            THE COURT:  All right.  You may step down.  Thank

7  you.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  Call your next witness.

10            MR. WHEAT:  Will do, Your Honor.  We will call

11  Special Agent Brad Roedel.

12            THE COURT:  Sir, would you step before the clerk and

13  be sworn.

14            COURTROOM DEPUTY:  Please raise your right hand.

15            You do solemnly swear the testimony you are about to

16  give will be the truth, the whole truth, and nothing but the

17  truth, so help you God?

18            THE WITNESS:  Yes.

19            COURTROOM DEPUTY:  Please take a seat in the witness

20  stand.

21                      BRADLEY J. ROEDEL,

22  having been duly sworn, was examined and testified as follows:

23            COURTROOM DEPUTY:  Please state your complete name

24  and spell your name for the record.

25

Bradley J. Roedel - Direct

1        THE WITNESS:  Bradley J. Roedel.  R-O-E-D-E-L.

2        THE COURT:  You may inquire.

3                    DIRECT EXAMINATION

4   BY MR. WHEAT:

5   Q.   Good morning, Special Agent Roedel.

6   A.   Good morning.

7   Q.   Could you please just go ahead and tell the jury a little

8   bit about yourself, what you do, and what your training and

9   experience is to do what you do?

10  A.   Sure.  I'm a Special Agent for Homeland Security

11  Investigations.  I'm currently assigned to Idaho Falls, Idaho.

12  I have been here for approximately 12 years.

13          Prior to being a Special Agent for Homeland Security,

14  I was a Special Agent for the United States Customs Service.

15  And prior to that, I was a Deputy Sheriff for Utah County

16  Sheriff's Department in the Provo area in Utah.

17  Q.   Do you have some special training and experience that

18  qualifies you for that job?

19  A.   I do.  I completed the POST training in Utah for a

20  detention officer and also for special functions.  And in

21  addition, I completed the training at the Federal Law

22  Enforcement Training Center in Brunswick, Georgia, for federal

23  agents.  And that was approximately four-and-a-half months

24  long.  And in addition to those responsibilities, I'm also a

25  computer forensic examiner for Homeland Security

Bradley J. Roedel - Direct

1  Investigations, and I've done that for approximately 14 years

2  or more.

3  Q.   Special Agent Roedel, were you working in your capacity as

4  a Special Agent on October 25th of 2017?

5  A.   Yes, I was.

6  Q.   And what were your assigned duties that day?

7  A.   That particular day, I was assigned to a group that was

8  conducting an investigation of a package that came into the

9  United States that contained anabolic steroids.

10  Q.   Did you assist with the execution of a search warrant?

11  A.   I did.

12  Q.   Which particular execution did you assist with?

13  A.   I assisted with the search warrant of 551 West Pine which

14  was the residence of Travis Newbold.

15  Q.   What was your role in that search?

16  A.   In that particular search, if I recollect correctly, I was

17  assigned as a -- to search the house.  And then also as a

18  computer forensic examiner, I'm in charge of looking for

19  electronic media, finding it, and triaging those particular

20  items.  There are specialized techniques that are used when you

21  find electronic media, such as cell phones, or computers, or

22  different things.

23  Q.   Okay.  And which part of that -- did you search a certain

24  part of the house?

25  A.   I did.  I was mainly in the kitchen area, because that's

Vol. 2 - 34

Bradley J. Roedel - Direct

1   where we found electronic devices such as the computer and some

2   other things that were right on the desk.

3   Q.   Special Agent Roedel, did you have a chance to examine

4   Plaintiff's Exhibits 61, 62, 72 and 73?

5   A.   I did, yes.

6   Q.   What are those four exhibits?

7   A.   They are pictures of the kitchen area of that residence,

8   and also one of them is of a black scale that I found that was

9   also near the computer.

10  Q.   And do those pictures fairly and accurately depict the

11  scene of the search that you executed?

12  A.   Yes, they do.

13  Q.   Okay.  And what was the address of the search again?

14  A.   551 West Pine, Pocatello, Idaho.

15          MR. WHEAT:  Thank you.  I would move to admit

16  Plaintiff's Exhibit 61, 62, 72 and 73, Your Honor.

17          THE COURT:  Any objection?

18          MR. RICHERT:  No.

19          THE COURT:  All right.  The exhibits will be admitted

20  and may be published to the jury.

21      (Exhibits 61, 62, 72, and 73 admitted.)

22  BY MR. WHEAT:

23  Q.   Special Agent Roedel, could you explain to the jury what

24  that is a -- what is shown in Exhibit 61?

25  A.   Yes, I can.  That's a picture of the inside of the

Bradley J. Roedel - Direct

1  residence and the kitchen area where I searched.  Sorry.  It's
2  going in and out of focus.  In the background, I can see the
3  desk area where the computer was found, and I was searching
4  this general area.
5  Q.   Okay.  And could you tell the jury about what's shown in
6  62?
7  A.   Yes, I can.  Again, it's a -- it's a closer-up picture of
8  the desk where there is a computer screen you can see.  You can
9  also see a printer and different items on a desk.
10 Q.   How about 72, Plaintiff's Exhibit 72?  Can you see it up
11 there?
12 A.   Yes, I can see it.  Thank you.  It's -- again, it's a
13 close-up of the right side of the desk.  And on the shelf on
14 the right-hand side, there's a Dymo scale.  It's a black scale.
15 Q.   Okay.  Thank you.  And how about Plaintiff's Exhibit 73?
16 A.   Again, that's a close-up of the Dymo scale, a close-up one
17 showing the model, and it's a black scale.
18 Q.   Okay.  Thank you.  And before you came to court, did you
19 have the opportunity to examine Plaintiff's Exhibit 94?
20 A.   Yes, I did.
21 Q.   What is Plaintiff's Exhibit 94?
22 A.   It's an Apple iPhone.
23 Q.   Okay.  And how are you familiar with that?
24 A.   That particular phone was seized as part of the
25 investigation, and I am familiar with this phone because as a

Vol. 2 - 36

Bradley J. Roedel - Direct

1   computer forensic examiner, generally, one of my jobs would be
2   to extract data from the electronic devices that we seize or
3   that we are investigating.
4           And in this particular device, I was unable to do
5   that, because it was passcode protected.  And in my lab, my
6   forensic lab in Idaho Falls, I do not have the technology to do
7   that.
8   Q.   So, what did you have to do?
9   A.   So, in this particular case, I contacted our Cyber Crime
10  Center, which is located in Virginia, and I inquired about a
11  device that is able to break the passcodes of iPhone devices so
12  that we can extract the data.
13          And they told me they were putting that technology
14  out to the field offices, but it had not been done yet, and I
15  needed to wait until the particular device was sent out.  And
16  at a later date, we sent the device out to our forensic
17  laboratory in San Diego, where I used to work, and they have
18  the technology to break it.
19          But initially, they didn't have the device either and
20  they had to wait for it to be sent from our Cyber Crimes Center
21  to the lab in San Diego.
22  Q.   So, did that cause a delay then from the time when the
23  phone was recovered until to when it was searched?
24  A.   It certainly did, yes.
25          MR. WHEAT:  Thank you very much.

Bradley J. Roedel - Direct

1        Your Honor, I'd move for the admission of Plaintiff's

2    Exhibit 94.

3              THE COURT:  That is phone itself?

4              MR. WHEAT:  It is, Your Honor.

5              THE COURT:  Any objection?

6              MR. RICHERT:  No.

7              THE COURT:  94 will be admitted.

8              MR. WHEAT:  Thank you.  It's in a bag.  We will make

9    that available for the jury later.

10        (Exhibit 94 admitted.)

11             MR. WHEAT:  I have got one more exhibit, Your Honor.

12   Thank you.  A lot of moving parts.

13   Q.   Special Agent Roedel, did you also examine Plaintiff's

14   Exhibit 26 before coming to court?

15   A.   Yes, I did.

16   Q.   What is Plaintiff's Exhibit 26?

17   A.   It is the black Dymo scale that I found during the search

18   warrant of Newbold's residence.

19   Q.   What's it contained in now?

20   A.   A brown paper bag.

21   Q.   Okay.  And does that fairly and accurately depict the

22   scale that you found at the residence in the kitchen and the

23   one depicted in these pictures?

24   A.   Yes, it does.

25   Q.   And specifically, I'm referring to 62 -- 63, 72 and 70 --

Vol. 2 - 38

Bradley J. Roedel - Direct

1   or, 61, 62 -- I better slow down -- and 72 and 73?

2   A.   Yes.

3         MR. WHEAT:   Okay.  Your Honor, I'd move to admit

4   Plaintiff's Exhibit 26.

5         THE COURT:   I'm sure that's Exhibit 26?  All right.

6   Any objection?

7         MR. RICHERT:   No.

8         THE COURT:   Exhibit 26 -- now, just so I am clear, I

9   think the question was asked whether it fairly depicts what you

10  seized.  This is actually what was seized; is that correct?

11        THE WITNESS:   That's correct, Your Honor.

12        THE COURT:   Exhibit 26 will be admitted and may be,

13  at counsel's option, published to the jury.

14      (Exhibit 26 admitted.)

15  BY MR. WHEAT:

16  Q.   Okay.  Based on your training and experience, what does a

17  scale tend to depict, Special Agent Roedel?

18  A.   Well, part of my training and also my experience working

19  in San Diego in narcotics, the importation of controlled

20  substances and also the distribution of all types of controlled

21  substances, scales are often found in the residences of people

22  who are distributing illegal drugs.

23  Q.   Okay.  Thank you.  I really should have had this taken

24  care of.  Sorry.

25        All right.  It was actually open on the other end.

Vol. 2 - 39

Bradley J. Roedel - Cross

1    Okay.

2              Is that the same scale?

3    A.   Yes, it is.

4              MR. WHEAT:  Okay.  Thank you.  I have nothing further

5    for Special Agent Roedel.  Thank you.

6              THE COURT:  Cross.

7              MR. RICHERT:  Yes, please.

8                        CROSS-EXAMINATION

9    BY MR. RICHERT:

10   Q.   Agent Roedel, you used a term that you -- when you look

11   for electronic media, you triage it.  What does that mean?

12   A.   When we do a search warrant, sometimes electronic media is

13   found on.  For example, a computer could be found on.  And if

14   sophisticated programs are running on the computer, such as

15   disc encryption, we have to triage that and actually take steps

16   to acquire the data on-site.  Otherwise, we potentially lose

17   that information if we power off the device.

18   Q.   Was the computer we see on Mr. Newbold's desk on or off?

19   A.   My recollection is that it was off.

20   Q.   Off?

21   A.   Yes, sir.

22   Q.   So, you didn't have to worry about losing anything?

23   A.   That's my -- that's my recollection, sir.

24   Q.   Okay.  Now, did you, at some point, seize that computer?

25   A.   It was seized as part of the search warrant.

Bradley J. Roedel - Cross

1   Q.   Did you, at some point, or you or anyone else, review the
2   computer and its contents?
3   A.   Not to my knowledge.  I did not.
4   Q.   Do you know if anyone did?
5   A.   I do not.
6   Q.   So, do we have any indication at all that this computer
7   has anything to do with drug trafficking?
8   A.   I don't know.
9   Q.   Now, in Exhibit 72, which I will show you is a photograph
10  of the desk.  Wow.  That's worse than my eyes.  The scale we
11  are talking about, the Dymo scale, was at the back of the
12  drawer in the desk?
13  A.   Well, actually, sir, there's a shelf right above the desk.
14  And so the Dymo labeler is actually right on the shelf above
15  the drawer.  If you can -- if you can see it, there's a --
16  there's a shelf there, and it's -- there's an open area where a
17  printer could be put or other items.
18  Q.   But this scale was at the back of the drawer?
19  A.   Well, it was not in the drawer, sir.  It was on the shelf.
20  Q.   Okay.
21  A.   The drawer is certainly open.  I searched that area, but
22  it is actually -- it's resting on top of the shelf.
23  Q.   Mr. Wheat showed this to you?
24  A.   Yes, sir.
25  Q.   And the photograph on Exhibit 73 suggests that this is an

Bradley J. Roedel - Cross

1    old, well-worn scale; does it not?

2    A.   It appears to have some use.

3    Q.   And I've got it now in my hand.  And if Mr. Metcalf could

4    deliver it to you.

5    A.   Thank you.

6    Q.   Now, there's an off button on the far right.  That button

7    looks like it's been broken; does it not?

8    A.   It appears that it is partially damaged, yes.

9    Q.   And the on button in the middle also looks to be damaged?

10   A.   That is correct.  It looks well used.

11   Q.   And the machine itself, the scale is pretty well scuffed

12   up; is it not?

13   A.   It does appear to have some use.  It appears that there's

14   some things on it.  There's some rings and some residue on it.

15   Q.   Can we -- by looking at its condition, can we determine

16   how old that scale might be?

17   A.   I do not know the answer to that.

18   Q.   It's not new?

19   A.   It is not a new scale.

20   Q.   Other than the computer, did you find any other electronic

21   media relevant to -- any other electronic media in the kitchen?

22   A.   I would have to refer to the evidence list.  I recall the

23   computer on the desk.  I recall the scale.  I know there were

24   some other items that were seized.  I don't recall where those

25   were.

Vol. 2 - 42

Bradley J. Roedel - Cross

1    Q.   Do you remember if they were electronic media?

2    A.   I remember that there was an iPad recovered.  I do not

3    know where.  And I don't remember whether or not there was some

4    media, if you are referring to such as a thumb drive, or CDs,

5    or optical discs.

6    Q.   Anything that you refer to as electronic media?

7    A.   I don't recall recovering anything else in that area, but

8    I would have reviewed the evidence listed, the items that were

9    seized to be sure.

10   Q.   Okay.  And it was your assignment primarily to look for

11   electronic media?

12   A.   Yes, I was working at the computer area.

13              MR. RICHERT:  No further questions.

14              THE COURT:  Any redirect?

15              MR. WHEAT:  No, Your Honor.  Thank you.

16              THE COURT:  All right.  You may step down, Agent.

17   Thank you.

18              THE WITNESS:  Sure.

19              THE COURT:  Call your next witness.

20              MR. WHEAT:  So, Your Honor, I wonder if it would be

21   okay -- this is a point where we need to haul in a whole bunch

22   of evidence.  I know it's kind of quick for a break, but would

23   it be okay if we had a quick recess so that we could --

24              THE COURT:  Well, okay.  The breaks sometimes don't

25   necessarily line up the way we would want them to, because it

Vol. 2 - 43

Bradley J. Roedel - Cross

1    just makes sense, on occasion, to break differently.

2            We have been going an hour, so let's -- we will call

3    this a 10-minute break, and then I'm not sure how -- I'll find

4    out when the meal is being brought in for the jury, but we'll

5    take a 10-minute break at this point and then kind of play it

6    by ear.  We may have another break later this morning.

7            Ladies and gentlemen, I will again admonition you not

8    to discuss the case among yourselves or with anyone else, nor

9    should you form or express any opinions about the case until it

10   is finally submitted to you.

11           We will be in recess for 10 minutes.

12      (Recess 9:33 a.m.  Resumed 9:50 a.m.  Jury in.)

13           THE COURT:  Thank you.  Please be seated.

14           I will note that the jury is present.

15           Mr. Wheat, you may call your next witness.

16           MR. WHEAT:  Thank you, Your Honor.  The United States

17   would call Detective Bryan Harris from the Pocatello Police

18   Department.

19           THE COURT:  Officer Harris, would you step before the

20   clerk and be sworn.

21           COURTROOM DEPUTY:  Please raise your right hand.

22           You do solemnly swear the testimony you are about to

23   give will be the truth, the whole truth, and nothing but the

24   truth, so help you God?

25           THE WITNESS:  I do.

Bryan Harris - Direct

1          COURTROOM DEPUTY:  Please take a seat in the witness
2    stand.
3                        BRYAN HARRIS,
4    having been duly sworn, was examined and testified as follows:
5          COURTROOM DEPUTY:  Please state your complete name
6    and spell your name for the record.
7          THE WITNESS:  Bryan Harris, B-R-Y-A-N H-A-R-R-I-S.
8          THE COURT:  You may inquire, Mr. Wheat.
9                      DIRECT EXAMINATION
10   BY MR. WHEAT:
11   Q.   Hello, Detective Harris.  Would you please tell the jury a
12   little bit about yourself and what you do for a living?
13   A.   I am currently assigned to the Patrol Division as sergeant
14   in the Patrol Division.  Prior to that, I worked in the
15   Detective Division for eight years.  Six of those years I spent
16   in the Narcotics Unit, if you want to call it that.
17         THE COURT:  Would you make sure the microphone is
18   pointed right at you and speak a little more -- there.  Thank
19   you.  Go ahead.
20         THE WITNESS:  So, I spent eight years in the
21   Detective Division.  Six years of that was spent in the
22   Narcotics Unit, two years in General Investigations.
23   BY MR. WHEAT:
24   Q.   And are you familiar with -- were you working as a --
25   where were you working on October 25th?

Bryan Harris - Direct

1    A.   I was assigned to the Narcotics Unit.

2    Q.   Okay.  Do you have specialized training and experience

3    that qualified you to work in the Narcotics Unit?

4    A.   I do.

5    Q.   What is that?

6    A.   I started with the Basic Narcotics School, which is an

7    80-hour course specifically -- specifically geared towards

8    narcotics investigations.  And since that time, I've had

9    various other training in different aspects of investigations.

10   I am currently a POST-certified instructor in drug

11   investigations and drug identification.

12   Q.   Thank you, Detective Harris.  I'd like to ask you a few

13   questions about your activities on October 25th, 2017.  Were

14   you working that day?

15   A.   I was.

16   Q.   What did you do that day as part of your job?

17   A.   That day we served a search warrant on a residence on West

18   Pine in Pocatello.

19   Q.   Specifically, which address?

20   A.   I believe it was 551.

21   Q.   Okay.  551 what?  West Pine?

22   A.   West Pine.

23   Q.   Okay.  Thanks.  If I can just have a second here.

24        Okay.  Detective Harris, I'm going to ask you this.

25   Did you have a chance to examine the evidence in this

1  particular case?

2  A.   I have.

3  Q.   And in particular, have you examined photographs labeled

4  Plaintiff's Exhibit 32 through 55?

5  A.   I have.

6  Q.   And how about photos marked as Plaintiff's Exhibits 57

7  through 60 and 63 through 71?

8  A.   Yes.

9  Q.   And what are those?

10  A.   Those are photographs that were taken during the execution

11  of the search warrant.

12  Q.   How do you recognize those?

13  A.   I recognize them because I was there and watched the

14  photographs being taken.

15  Q.   And do they fairly and accurately depict the scene of the

16  search?

17  A.   They do.

18  Q.   And the state of the items found during that search?

19  A.   Yes.

20  Q.   And the state of the rooms found when you did that search?

21  A.   Yes.

22        MR. WHEAT:   Okay.  I'd move to exhibit -- admit

23  Exhibits 32 through 55, 57 through 60, and 63 through 71, Your

24  Honor.

25        THE COURT:   63 through 71?

Vol. 2 - 47

Bryan Harris - Direct

1    MR. WHEAT:  Yes, Your Honor.

2    THE COURT:  Is there any objection?

3    MR. RICHERT:  No.

4    THE COURT:  All right.  Exhibits 33 through 55,

5  Exhibits 57 through 60, and Exhibits 64 through 71 will be

6  admitted and may be published.

7    MR. WHEAT:  Thank you, Your Honor.  Is there a way --

8    THE COURT:  Just a moment.  I may have misspoke.  63

9  through 71.

10    MR. WHEAT:  That's correct.

11    THE COURT:  Just a moment.  It is 32 -- if I said 33,

12  I misspoke.  So, it's 32 through 55, 57 through 60, and 63

13  through 71.

14    (Exhibits 32 through 55, 57 through 60 and 63 through 71

15  admitted.)

16  BY MR. WHEAT:

17  Q.   Detective Harris, more of this.  Have you had a chance to

18  exhibit -- examine some physical evidence in this case?

19  A.   I have.

20  Q.   Have you examined what's marked as Plaintiff's Exhibits 18

21  through 25?

22  A.   Yes, I believe so.  Can I check the list and --

23  Q.   Yes, you can.  In fact, if I can show you on the Elmo.

24  A.   Yes, I have examined those.

25  Q.   Okay.  Great.  Thank you.  And what are those?

Bryan Harris - Direct

1    A.    Those are items that were located in the northeast bedroom

2    of the residence at 551 West Pine.

3    Q.    And did you search the northeast bedroom at that

4    residence?

5    A.    I did.

6    Q.    Okay.  And by the way, do you know who lives at that

7    residence or who lived at that residence at the time?

8    A.    Travis Newbold.

9    Q.    And in general terms, how were you familiar with it?  How

10   long had you known that, I guess?

11   A.    At that point, for at least five years.

12   Q.    Okay.  Had you encountered him at that residence before?

13   Just a yes or no.

14   A.    Yes.

15   Q.    Okay.  Thank you.  And I'm going to also ask you the same

16   question.  Have you examined the physical Exhibits 1 through 6,

17   7.1 through 7.14, and 8 through 15?

18   A.    Yes, I have.

19   Q.    What are those?

20   A.    Those were also items that were located in that same

21   bedroom during the search.

22   Q.    Okay.  Okay.  Thank you.  And do those -- were those -- do

23   those items -- are those the items you found during this search

24   of this residence?

25   A.    Yes, they are.

Bryan Harris - Direct

1    Q.   Okay.  Thank you very much.

2              I would move to admit those exhibits.

3              THE COURT:  They have already been admitted, I

4    believe, counsel.

5              MR. WHEAT:  Oh, I guess they have.

6              THE COURT:  Did you say Exhibits 1 through 15?

7              MR. WHEAT:  Correct, Your Honor.  And I guess I did

8    say 18 through 25.  I don't think the Court has seen those,

9    but --

10             THE COURT:  No, 18 through 25 I have not.  So

11   let's -- so, are you offering Exhibits 18 through 25?

12             MR. WHEAT:  Yes, please, Your Honor.

13             THE COURT:  Any objection?

14             MR. RICHERT:  No.

15             THE COURT:  Exhibits 18 through 25 will be admitted.

16             MR. WHEAT:  Thank you.

17        (Exhibits 18 through 25 admitted.)

18             MR. WHEAT:  Your Honor, could I go ahead and use the

19   VGA connection on the overhead?  Sorry to throw you for a loop.

20   There it is.

21   Q.   Sergeant, what I have put up on the screen is what's

22   marked as Plaintiff's Exhibit 32.  What is Plaintiff's

23   Exhibit 32?  What's depicted?

24   A.   That's an overall view of the front of the residence from

25   across the street.

Bryan Harris - Direct

1    Q.    Which residence?

2    A.    The 551 West Pine.

3    Q.    Okay.  And showing you Plaintiff's Exhibit 33, what is

4    that?

5    A.    That is the driveway leading up -- or the fence along the

6    driveway.  The driveway is on the east side and then the

7    stencil there, I believe, is a reference to a construction

8    company.

9    Q.    Okay.  And what's that say in the big letters?

10   A.    "Big T."

11   Q.    Okay.  Thanks.  Showing you Plaintiff's Exhibit 34, do you

12   recognize Plaintiff's Exhibit 34?

13   A.    That is the northeast bedroom from the doorway.

14   Q.    Okay.  And let's see if this works here.  I am pointing

15   here at something green, and it looks like there's a door open.

16   What is that?

17   A.    That's actually a safe in the corner, if I -- it's a

18   little hard to see, so --

19   Q.    Okay.  Do you recognize that?

20   A.    Yes.

21   Q.    What is that?

22   A.    That's the same bedroom, just a little closer to that

23   particular corner.

24   Q.    Okay.  Are there things shown in this picture that you

25   found when you searched this bedroom?

Bryan Harris - Direct

1   A.   Yes.

2   Q.   Okay.  Could you point out some of the things that you can

3   recognize for the jury as having been found?

4   A.   First of all, if you look at the open drawer, there's a

5   cardboard box in that drawer.  The significant of that is it

6   had a shipping label, which was similar to the one that was on

7   the package that was intercepted.

8            The safe contains several items including a duffel

9   bag.  In the duffel bag, there were multiple glass vials.

10  There is a pill bottle that you can see on the top, the

11  prescription bottle, which has a prescription for Travis

12  Newbold.

13           In the middle, there's some documents.  Some of those

14  documents were notebooks that contained information on what

15  appeared to be how to make steroids.  There was also some copy

16  or some photocopied paper that had recipes on how to make

17  steroids.

18  Q.   Okay.  Thank you.  Switch.  Is that the same safe?

19  A.   Yes, it is.

20  Q.   Okay.  And tell me if you've already been there.  Up here,

21  were these recovered?

22  A.   Yes.

23  Q.   What are those again?

24  A.   First there's the prescription bottle.  Next to that are

25  two glass vials containing an amber liquid.  Behind those there

Bryan Harris - Direct

1   are -- there are caps that fit on top of those vials.

2   Q.   Okay.  And are you looking back here where I am pointing

3   with the blue and white things?

4   A.   Yeah.

5   Q.   Okay.  And there's a box there.  Did you look inside the

6   box?

7   A.   I did.

8   Q.   Okay.  Just going through, what's the name on that

9   prescription bottle?

10             THE COURT:  Counsel, when you are referring -- would

11  you make sure we are referring to what the exhibit number is

12  the jury is seeing each time?

13             MR. WHEAT:  Absolutely.

14             THE COURT:  That was Exhibit 39, and I think you just

15  went to Exhibit 40.

16             MR. WHEAT:  Okay.

17  Q.   Yes.  I'm showing Exhibit 39.  I am now switching to

18  Exhibit 40.  What is that a picture of?

19  A.   That's the prescription bottle with Travis Newbold's name

20  on it.

21  Q.   And that was found on the shelf you say?

22  A.   Yes.

23  Q.   In the safe?

24  A.   Yes.

25  Q.   Okay.  And what is that?

Bryan Harris - Direct

1    A.    That's a Nevada driver's license in Travis Newbold's name.

2    Q.    Where was that found?

3          THE COURT:  Counsel, it's Exhibit 41 again.

4          MR. WHEAT:  Thank you, Your Honor.

5          THE COURT:  We need to keep the record clear as to

6    what the jury is seeing.

7          MR. WHEAT:  Will do, Your Honor.

8    Q.    Exhibit 41, that's a driver's license?

9    A.    Correct.

10   Q.    Where was that driver's license found?

11   A.    It was located in the blue tin box that was in the earlier

12   photograph.

13   Q.    Did you recover that and put it into evidence?

14   A.    I don't believe we took the licenses and put them into

15   evidence.

16   Q.    Why wouldn't you do that?

17   A.    We don't have a reason to take anybody's identification at

18   that point.

19   Q.    Okay.

20   A.    So --

21   Q.    But does this photograph accurately depict what you found

22   there at the scene?

23   A.    Yes, it does.

24   Q.    Okay.  I'm showing you Plaintiff's Exhibit 42.  Do you

25   recognize Plaintiff's Exhibit 42?

Bryan Harris - Direct

1  A.    I do.

2  Q.    What is that?

3  A.    That's an Idaho driver's license in the name of Travis

4  Newbold.

5  Q.    Okay.  Showing you Plaintiff's Exhibit 43, what's that?

6  A.    Those are the two vials that were on the shelf with the

7  amber-colored liquid in them.

8  Q.    Okay.  Thank you.  And Plaintiff's Exhibit 44?

9  A.    Those are the caps that go on top of those glass vials.

10  Q.    And Plaintiff's Exhibit 45?

11  A.    The blue and white capsules are empty, like, gel caps that

12  are typically used, filled with whatever, and they dissolve

13  when they're ingested.

14  Q.    Okay.  They were empty?

15  A.    They were.

16  Q.    Okay.  And then I'm showing you Plaintiff's Exhibit 46.

17  What's that?

18  A.    That's the blue tin box that was located in the top that

19  was -- in the top of the safe and the contents that were in it.

20  Q.    Okay.  And what -- what else was in that safe?  I guess

21  there's -- there's some -- I'm pointing at what looks to be

22  some money; correct?

23  A.    There was money.

24  Q.    Okay.

25  A.    The blue thing at the edge down there is a passport.

Bryan Harris - Direct

1    There was also a birth certificate and the two driver's

2    licenses.

3    Q.   Did you observe the name on those?

4    A.   Yes, they were Travis Newbold.

5    Q.   And why didn't you recover those items?

6    A.   Again, we don't have reason to take personal documents.

7    Q.   Okay.  Now I'm going to direct your attention to some

8    physical exhibits, please, if I may, please, Sergeant.

9    Sergeant, if you could, do you have Exhibit 18 up there with

10   you?

11   A.   Yes, it's over here on the floor.

12   Q.   Okay.  Do you mind -- I guess it's going to be a little

13   difficult, and if you need someone to help you, we can get

14   someone.

15   A.   I can find it.  I just -- let me put some gloves on first.

16   Q.   Oh, thank you.

17   A.   You said 18?

18   Q.   18 through 25 specifically, Sergeant.  What you are going

19   to find is the vials and the stoppers and things.

20   A.   That's what they are.  I believe that's all of them.

21   Q.   Okay.  Thank you.

22            MR. WHEAT:  Your Honor, we probably can't pick him up

23   standing up there; can we?

24            THE COURT:  I'm not sure what they are.

25            MR. WHEAT:  The evidence.

Bryan Harris - Direct

1           THE COURT:  I don't know why you can't.

2           MR. WHEAT:  Just --

3           THE COURT:  If they have been admitted, you can show

4     them to the jury, and however you want to use them is fine.

5     BY MR. WHEAT:

6     Q.   Okay.  Why don't you just -- if you could just go through

7     those, Sergeant.  I know there's kind of a microphone thing

8     going on here, but --

9     A.   I will try and speak loud.

10          THE COURT:  Here.  We have a microphone we can bring

11    over.

12          MR. WHEAT:  Perfect.  Thank you.

13          COURTROOM DEPUTY:  Dave, you have to turn it on the

14    bottom.  There's a red button.  Push it.

15    BY MR. WHEAT:

16    Q.   All right.  Go ahead and go through them, Sergeant.  If

17    you have 18 in front of you, could you hold that -- what's

18    depicted in 18 in front of you?

19    A.   So, this is actually the exhibits marked 18 and 19.  These

20    are the glass vials that were in the case.  That were in the

21    safe I should say.  And you see they are two different sizes.

22    Q.   And what -- could you tell the jury about those?  What

23    kinds of vials are they?  They are glass, but how big and how

24    do they match up with the rest of the evidence?

25    A.   I don't know their exact capacity, but they are the same

Bryan Harris - Direct

1    size as the two vials that were located on the top shelf that
2    had the liquid in them.
3    Q.   Okay.  And do they have any accessories that you found
4    with them that you think would go together?
5    A.   Yes, the stoppers and the -- the caps.
6    Q.   Okay.  The stoppers, would you hold those up?  What number
7    is that?
8    A.   It's Exhibit 21.
9    Q.   Okay.  Could you show the jury that exhibit?
10            Okay.  And could you show them the other part that
11   you -- you indicated?
12   A.   Yes, these are metal caps that go on the top of the vials.
13   The stoppers are put inside before they are placed on the vile.
14   Q.   Okay.  And have you seen those metal caps before in your
15   investigation experience?
16   A.   I have in -- a couple of times.
17   Q.   Okay.  What are they typically used for?
18   A.   Typically, they are used to seal the vile, and then a
19   needle can be placed through the rubber stopper withdrawing
20   whatever's inside.  And then when you remove the needle, it
21   seals back up.
22   Q.   Okay.  Thank you.  Could you look at Exhibit 22?  What's
23   Exhibit 22?
24   A.   Exhibit 22 are the empty gelatin capsules.
25   Q.   Okay.  And how many of those are there approximately?

Bryan Harris - Direct

1    A.    Well, there's two bags of 500 count, so a thousand.

2    Q.    Okay.  Thank you.  And then is there an Exhibit 23 up

3    there?

4    A.    Yeah.

5    Q.    What is that?

6    A.    These are different types of -- they are large syringes, I

7    guess you would call them.

8    Q.    Okay.  Thank you.  And then 24?

9    A.    24 are the two vials that were located on the shelf with

10   the liquid inside.

11   Q.    Okay.  Thank you.  Could you also take a look at 25,

12   Plaintiff's Exhibit 25.  Specifically, it's that box.  And

13   where was this box found?

14   A.    It was in the dresser drawer that the photograph showed.

15   Q.    Okay.  And the rest of the items, 18 through 24, were

16   found where again?

17   A.    In the safe.

18   Q.    Okay.  And that box 25, could you show the jury and

19   explain what you mean by a box from China, I think is what you

20   said earlier?

21   A.    Well, the shipping label that's on here says "EMS" and

22   then has some characters, which says "China Post Group," which

23   we, I guess, deduced was Chinese writing.  None of us are

24   fluent in that.

25             So, this shipping label was the same as or similar to

Bryan Harris - Direct

1    the package that was received at the Post Office, and that's

2    why we seized the box.

3    Q.   Okay.  Thank you, Sergeant Harris.  Okay.  I'm going to

4    direct your attention to what's on the bottom, that big

5    envelope there.  What is that marked as?

6    A.   Marked as 96.

7           MR. WHEAT:  May I have a second to just confer with

8    the clerk, Your Honor?

9           THE COURT:  Yes.

10          MR. WHEAT:  Make sure I get this right.

11          THE COURT:  You may approach.  What is it you want?

12   Yes.

13       (Pause in the proceedings.)

14   BY MR. WHEAT:

15   Q.   Okay.  You are looking at what's marked as Government's

16   Exhibit 96.  Will you just leave it in the bag for the time

17   being, but have you examined that?

18   A.   I have.

19   Q.   What is it?

20   A.   Those are the documents, notebooks that were found in the

21   safe.

22   Q.   And what do you recognize them to be?

23   A.   The documents that were found in the safe were -- as I

24   explained earlier, they appeared to be recipes for making

25   steroids.

Bryan Harris - Direct

1  Q.   Okay.  Thank you.  And where did you say those were found?

2  A.   They are on the middle shelf there.

3  Q.   Okay.  Thanks.  Now, could you take those out --

4           THE COURT:  Counsel, you now have Exhibit 37?

5           MR. WHEAT:  It's 97.  Excuse me.  I'm sorry, Judge.

6           THE COURT:  Exhibit 37 is what's on the screen for

7  the jury?

8           MR. WHEAT:  Yes.  And then I'd move to Exhibit --

9  admit Plaintiff's Exhibit 96.

10           THE COURT:  Any objection?

11           MR. RICHERT:  None.

12           THE COURT:  Exhibit 96 will be admitted.

13       (Exhibit 96 admitted.)

14  BY MR. WHEAT:

15  Q.   Can you go ahead and take those out and show the jury?

16  A.   Do you want --

17  Q.   Nope.  That's all right.  You can put them right back now.

18           Okay, Sergeant.  We have given you a tall order so

19  far.  Can I have you reload real quick, and we are going to go

20  through the Exhibits 1 through 15.

21  A.   Yep.

22  Q.   Thank you.  Could you grab the Exhibits 1 through 15?

23  A.   I am going to move this.

24  Q.   No problem.  Do you need any help, Sergeant?

25  A.   I think that's it.

Vol. 2 - 61

Bryan Harris - Direct

1   Q.   Okay.  Doing great.

2   A.   I might run out of room.

3   Q.   Okay.  I am going to direct your attention to Exhibit 1,

4   if I may, please.

5           Okay.  Could you show them the contents of Exhibit 1?

6   Do you know what Exhibit 1 is?

7   A.   Exhibit 1 is some of the powder that was found in the safe

8   in some ceramic jars or some canisters.

9   Q.   Okay.  Thank you.  And for reference -- okay.  Can you

10  show them Exhibit 2?  Do you know what Exhibit 2 is?

11  A.   Exhibit 2 is also powders that were found in the canisters

12  that were in the safe.

13  Q.   Okay.  And is there a picture associated with that that

14  you took at the scene?

15  A.   I --

16  Q.   I'm showing Exhibit 38 on the screen, Your Honor.

17  A.   I am not sure --

18  Q.   Okay.  Thanks.

19  A.   -- where that's at.

20  Q.   Okay.

21  A.   We did -- we took pictures of the canisters in the box,

22  but the powder was then separated so that it could be sent for

23  testing.

24  Q.   Okay.  And were they found in boxes, that powder?

25  A.   The canisters were in a cardboard box.

Bryan Harris - Direct

1    Q.    Okay.  Do you have that with you?

2    A.    Yes.

3    Q.    Okay.  One second.

4              And for the Court's record, I just admitted

5    Exhibit 96; is that accurate?

6              THE COURT:  Yes.

7    BY MR. WHEAT:

8    Q.    Okay.  Thank you.  I'm showing you what we are going to

9    mark as Exhibit 97.  You're taking a look at that box; correct?

10   A.    Yes.

11   Q.    And what is that again?

12   A.    This is the box where the canisters that contains these

13   powders.

14   Q.    Which powders?

15   A.    The -- so far, we showed Exhibit 1, Exhibit 2.

16   Q.    And which other powders?

17   A.    Through Exhibit 6.

18   Q.    Okay.  And where was that found, that box of powders?

19   A.    The box was in the safe.

20             MR. WHEAT:  Okay.  Thank you.  I would move to

21   exhibit this box of containers as Plaintiff's Exhibit 97, Your

22   Honor.

23             THE COURT:  Any objection?

24             MR. RICHERT:  Nope.

25             THE COURT:  97 will be admitted.

Bryan Harris - Direct

1         (Exhibit 97 admitted.)

2    BY MR. WHEAT:

3    Q.   Okay.  I'm going have you mark that, if that's all right,

4    Sergeant.  Put that sticker on the top there.

5              Okay.  Now, can you take us through the rest of, you

6    know, 3 through 6?

7    A.   3 through 6?

8    Q.   Yep.

9    A.   They are all powders which came out of the ceramic

10   containers.  They have been marked which one they came from.

11   Q.   Okay.

12   A.   This is Exhibit 5.

13   Q.   Okay.  Thank you.

14   A.   And this would be Exhibit 6.

15   Q.   Okay.  Thank you.  If I could just have a second here.

16             Okay.  Can you show us what's marked as item 7.1

17   through 7.14?  Just go ahead and show the jury, if you would,

18   please.

19   A.   There are all of these bags with the different sized vials

20   and the liquid inside.  And that is what's in all of the

21   exhibits that you mentioned.

22   Q.   Okay.  What were those found in?

23   A.   Those were found in the safe in a duffel bag.

24   Q.   Okay.  Thanks.  And could you just describe those vials

25   that you just pulled out?

Bryan Harris - Direct

1   A.   They are the same size as the empty ones.  They are --

2   again, I don't know the exact capacity, but they are glass

3   vials.  These have the -- the tops on with the stopper.

4   Q.   Okay.  Thank you, Sergeant.  And if I could just have a

5   second to make sure I get this straight.

6           Now, I am going to go ahead and show you on the

7   screen what's marked as -- surfing through here -- Plaintiff's

8   Exhibit 47.  What is that?

9   A.   That's a photograph of some other items that were located

10  in the safe.

11  Q.   Okay.  Do you have that with you?

12  A.   I do.

13  Q.   Okay.  Where's it at?

14  A.   They are here.

15  Q.   They are in there?  Okay.  What did that contain?

16  A.   It contained a mylar bag.  Had a label on it that said

17  "Nolvadex," and inside the bag was some, again, white powder.

18  Q.   Okay.  Thanks.  And do you know what that's marked as,

19  which government's exhibit?

20  A.   It will be Exhibit 8.

21  Q.   Okay.  Thank you.  And Exhibit 8 contains that mylar bag

22  and the substance as well?

23  A.   Correct.

24  Q.   Okay.  Thank you very much.  And exhibit -- I am showing

25  you Exhibit 48.

Bryan Harris - Direct

1   A.   Okay.

2   Q.   Do you have that with you?

3   A.   Yeah.

4   Q.   Okay.  So, the picture -- what's the picture, first of

5   all?

6   A.   The picture is -- again, there were several mylar bags in

7   the safe that contained white -- or contained -- most of them

8   contained white powder.

9   Q.   Okay.  Thank you.  And I'm going to do the same with 49.

10  Show the jury that.

11  A.   Got to find the picture that was on there.  Do you want --

12  Q.   Sure.  That's great.  If you could show them the contents.

13  Okay.

14  A.   That's the bag that was depicted in the picture.

15  Q.   Okay.  And the bag has the actual picture, Exhibit 49,

16  attached to it; right?

17  A.   Correct.

18  Q.   So, the picture in 49 is actually what was and what is

19  shown in exhibit what again?

20  A.   This would be Exhibit 13, I believe.

21  Q.   Okay.  Thanks.  Looking at Exhibit 50.

22  A.   Same -- same situation.  This is Exhibit 10, a mylar bag

23  with the powder.  This powder was inside the bag.  Again, it

24  was removed so that it could be sent for testing.

25  Q.   Okay.  And 51?  And I am showing you 51 on the overhead as

Vol. 2 - 66

Bryan Harris - Direct

1  well, or the -- it's not overhead but the picture.

2  A.   This is marked as Exhibit 9.  The bag inside was labeled

3  with Tbol.

4              THE REPORTER:  I can't hear you.

5              THE WITNESS:  The bag inside was labeled with

6  T-B-O-L, Tbol.  This is Exhibit 9.

7  BY MR. WHEAT:

8  Q.   Okay.  Thank you.  And I'm going to do the same thing with

9  number's 52 and 53 and 54.

10  A.   I had a couple of them come off.  So, let me --

11             THE COURT:  When you say come off, some labels came

12  off?

13             MR. WHEAT:  No, the pictures that were paper clipped

14  to the bags.

15             THE COURT:  All right.

16             THE WITNESS:  This is Exhibit Number 12, and it's

17  picture 52.  This bag actually -- the contents liquified and

18  leaked, so it had to be repackaged.

19  BY MR. WHEAT:

20  Q.   Okay.  What exhibit was that again?

21  A.   12.

22  Q.   Okay.  Thank you.  And then which one are you looking at

23  now?  I am showing you Exhibit 53 on the screen.

24  A.   This is Exhibit 50 -- I'm sorry.  Exhibit 15.  And this is

25  what's depicted in that picture there.

Bryan Harris - Direct

1    Q.    Okay.  Thank you very much.  So 53 and 15 are the same?

2    A.    Correct.

3    Q.    Okay.  Thank you.  And Exhibit 54.

4    A.    This is Exhibit 14.  This is that small foil package and

5    the powder that was inside.

6    Q.    Okay.  Thank you very much.

7          (Pause in the proceedings.)

8          MR. WHEAT:  And Your Honor, for the record, I just

9    discussed with defense counsel.  The laboratory reports we've

10   agreed that they match these -- these items, these exhibits

11   that are marked.

12         So, for example, the exhibit marked 7.1 that we have

13   seen matches the 7.1 shown in the laboratory reports, which are

14   Exhibit 92, Plaintiff's Exhibit.  So, in other words --

15         THE COURT:  Is there a stipulation to that effect or

16   what -- I'm not sure I understand.

17         MR. RICHERT:  Well, that's a fact.  I can agree to

18   that.

19         THE COURT:  All right.  Go ahead, Mr. Wheat.

20         MR. WHEAT:  Thank you, Your Honor.

21   Q.    Then I am going to show you one more picture, Sergeant.

22   Do you recognize that?

23   A.    Yes.

24   Q.    What is that?

25   A.    That's the duffel bag that contained the vials that we

Bryan Harris - Direct

1   displayed earlier.

2   Q.   Okay.  If I could just have a second to make sure I got

3   everything there.

4        (Pause in the proceedings.)

5   BY MR. WHEAT:

6   Q.   Okay.  So, for example, Sergeant, have you seen this

7   before?

8   A.   This picture?

9   Q.   This.  Yeah.

10             THE COURT:  Again, counsel, exhibit number?

11             MR. WHEAT:  Oh.

12             THE COURT:  55?

13             MR. WHEAT:  Oh, yes.  So, yes.  Yeah.  It's

14   actually -- I am all over the place.  I apologize.

15             THE COURT:  Do you want the evidence presenter turned

16   on?

17             MR. WHEAT:  It's 92.  Yeah, actually, can we show the

18   evidence presenter?

19   Q.   And just to clarify, have you seen that report though?

20   A.   Yes, I have.

21   Q.   Okay.  So, lab item number two, do you see where it says

22   that on Exhibit 92?

23   A.   Yes.

24   Q.   That -- where it says 170.16 white powder oxandrolone.

25   So, lab item number two, is that consistent with physical item

Bryan Harris - Direct

1   two, Plaintiff's Exhibit 2, I guess, that you have held up?

2   A.   I would have to check the -- what we call the P number.

3   Q.   That's okay.  Do you mind doing that?

4   A.   Yes, that's the same.

5   Q.   Okay.  Thank you.  I just wanted to clarify that to the

6   jury.

7        Okay.  So, Sergeant, you found this stuff at the

8   house; correct?  And you can take a seat now.

9   A.   Yes, I did.

10  Q.   Based on your training and experience, what can you tell

11  the jury about this quantity of items?

12  A.   In my experience, in dealing with controlled substance

13  investigations, this amount of -- whether it be

14  methamphetamine, heroin, or steroids, generally indicates

15  somebody who is involved in distributing or selling the

16  substance.

17       The other thing is -- that lead me to that conclusion

18  are the empty vials, which typically would be called packaging.

19  They are a way to reduce the powder and other ingredients into

20  a form that can be used and sold, and they are easier to

21  transport and move around of course.

22       There is also the large syringes.  They indicate to

23  me that he was using or someone was using those syringes to

24  remove liquid and put it into another container.  Typically,

25  when you look for -- or when you are doing an investigation

Bryan Harris - Cross

1    that has to deal with the sale and distribution of a controlled

2    substances, the things that you really -- that really stand out

3    to you are not always the quantity, but the quantity, the types

4    of packaging.

5            The more, I guess, what you call clean packages or

6    packaging that's not been used usually indicates somebody who

7    is selling, because they have the packaging on hand so that

8    when they receive a shipment of whatever it is, they are able

9    to break it down and sell it.

10           So, the packaging, the quantity, the means to break

11   down the substances, whether it's cut them up into smaller

12   chunks or whatever you need to, but a way to be able to do

13   that.  And based on the things that we found in the safe and in

14   the room, it appeared to me that's what was happening.

15   Q.   Okay.  Thank you very much.  And how did the what you

16   described as recipes fit to that?

17   A.   We did research on what we found in the -- in the copy --

18   I'm sorry -- photocopied papers.  And based on what I was able

19   to learn from there, it appeared that they were recipes on how

20   to make certain dosages of anabolic steroids.

21           MR. WHEAT:  Thank you.  Nothing further.

22           THE COURT:  Cross.

23                    CROSS-EXAMINATION

24   BY MR. RICHERT:

25   Q.   Sergeant Harris, the first thing I want to ask you about

Bryan Harris - Cross

1    is how many steroid investigations you have been involved with?

2    A.   Approximately -- I guess it would be three, two or three.

3    Sorry.

4    Q.   Steroid investigations are not common to your department;

5    are they?

6    A.   No, I would say not.

7    Q.   And the discussion we just had about quantity, that's

8    typically true, is it not, when you are dealing with

9    methamphetamines?

10   A.   I'm sorry.  As far as the quantity located?

11   Q.   Well, you told us that one of the biggest factors for your

12   conclusion that there was distribution going on here was the

13   quantity of the steroids.

14   A.   In this case, yes.

15   Q.   Now, that's typically true of other illegal substances?

16   A.   It -- quantity is one of the things you look at, but the

17   quantity doesn't necessarily mean that there's not distribution

18   going on.  Because there are times when you find the packaging

19   materials, money, scales and all the other stuff, but you don't

20   find the quantity, but it's been sold.  So --

21   Q.   I think I understand that.  I'm going to ask again.

22   Quantity is an important factor when you are looking at

23   narcotic investigations?

24   A.   It can be, yes.

25   Q.   And here, that is the primary reason you think there was

Bryan Harris - Cross

1   distribution going on?

2   A.   It's one of the reasons, not necessarily the primary.

3   Q.   The first reason you named?

4   A.   It was one on the list, yes.

5   Q.   And you said that was an important consideration in your

6   opinion?

7   A.   In my opinion, the quantity here is -- is important, yes.

8   Q.   And what I'd like to do -- well, by the way, the -- this

9   is Exhibit 35, which depicts the room looking at the safe in

10  which all this material was located; correct?

11  A.   Correct.

12  Q.   The safe was open when you got there; was it not?

13  A.   The -- it was unlocked.

14  Q.   I'd like to go to -- to show you -- and you have got the

15  box.  I think it's number 25.

16  A.   Correct.

17  Q.   I am showing you Exhibit 60, which is a photograph

18  presumably of that box.

19  A.   I believe that's the shipping label on the box, yes.

20  Q.   That's the one you read to us.

21  A.   Yes.

22  Q.   It says -- does it say from where it came?

23  A.   No.

24  Q.   We don't know who sent this, and we don't know who it went

25  to?

1    A.    No.

2    Q.    I'm going to show to you -- I'm not as quick with the

3    computer, so I'm just using the photographs.  This is

4    Exhibit 47, which physically is -- I'm not sure which it is

5    physically.  47 is a photograph of a package you found in that

6    safe; is it not?

7    A.    Correct.

8    Q.    Does it look old or new to you?

9    A.    I don't have a way to determine that.

10   Q.    Well, what exhibit is it if you look at it?

11   A.    I -- I'm sorry.  I don't know right off the top of my

12   head.

13   Q.    All right.  I'm showing you Exhibit 50, which is another

14   pouch or package you found in the safe; is it not?

15   A.    Correct.

16   Q.    Does that look worn, old, or new?

17   A.    It does appear worn.  Well, it appears if something leaked

18   on it.

19   Q.    And it looks like it's been -- the edge has been rolled

20   up?

21          Showing you 51, that's another pouch; is it not,

22   found in the safe?

23   A.    Correct.

24   Q.    Does it look old or new?

25   A.    Again, it looks as if something's leaked on it to me.

Vol. 2 - 74

Bryan Harris - Cross

1    Q.   Well, you probably don't remember what exhibit this goes

2    to.

3    A.   I can find it if you want.

4    Q.   Yeah, we might.  Here's -- I'm showing you Exhibit 54.

5    Again, does that look like it's somewhat aged?

6    A.   It appears to me it's fairly new, actually.

7    Q.   Now, Exhibit 49 is a photograph of a pouch that says TE350

8    or something like that on it?

9    A.   Correct.

10   Q.   And you are -- are you aware that the materials that were

11   taken in the house were tested to see what they were?

12   A.   I am.

13   Q.   And this TE350 -- well, I'm now showing you Exhibit 51.

14   That, according to Exhibit 92, is Exhibit 9 that was sent to

15   the lab.  You don't know that; do you?

16   A.   I would -- without checking the numbers, I wouldn't know.

17   Q.   I will represent to you that it is, because that's what we

18   just established, that 52 -- 51 turns out to be Exhibit 9 that

19   was sent to the lab.

20   A.   Okay.

21   Q.   Which apparently contained something but we don't know

22   what.

23   A.   That's what the report indicates.

24   Q.   This is Exhibit 53, which according to what we understand,

25   is Exhibit 15 that went to the lab.  And you don't know that,

Bryan Harris - Cross

1    and I guess I have to ask you --

2    A.   I'll take --

3    Q.   -- to take my word for that.

4    A.   -- your word for it.

5    Q.   And this -- the lab said there might be something in there

6    but they don't know what it is.  Is that --

7    A.   I can't -- that's what it says in the report, so --

8    Q.   So, not all of the stuff that you showed us have been

9    identified as steroids?

10   A.   Correct.

11   Q.   When did you begin your work on this case?

12   A.   Without my report to refresh my memory, I don't remember

13   exactly when.  It was probably a few weeks before the search

14   warrant was served.

15   Q.   Do you know at the time or did you know at the time that

16   Mr. Newbold had been -- pled guilty to one count of

17   distribution of anabolic steroids?

18   A.   Yes.

19   Q.   Did that factor into your conclusion that he was doing it

20   again?

21   A.   I'm sure that played a part.

22   Q.   You don't have any evidence other than the quantities and

23   what you talked about that he was; do you?

24   A.   In this instance, we don't have anything like a controlled

25   purchase or anything like that, no.

Bryan Harris - Redirect

1   Q.   So, the conclusion you based -- part of the conclusion

2   that you drew for us is the quantities, the empty vials, and

3   part of the conclusion that you voiced to us is because he did

4   something before similarly?

5   A.   The conclusion that we drew, based on this particular

6   instance, was based mostly on -- or, I'm sorry.  It was based

7   on the evidence that was located during the search warrant.

8   Q.   But you told us just now that your conclusion was also

9   colored by the fact that you knew he had a prior conviction?

10  A.   I didn't say my conclusion was colored.  I said --

11  Q.   That was my word.

12  A.   So, yes.  I was aware of that prior conviction, because I

13  was involved in that case, so --

14           MR. RICHERT:  No, further questions.

15           THE COURT:  Mr. Wheat.

16           MR. WHEAT:  May I have just a second?

17      (Off-the-record discussion.)

18                    REDIRECT EXAMINATION

19  BY MR. WHEAT:

20  Q.   Detective, if you hadn't known about that prior conviction

21  addressed by Mr. Richert, would you have come to the same

22  conclusion about whether these indicate distribution?

23  A.   Yes, I would have.

24           MR. WHEAT:  Thank you.  Nothing further.

25           THE COURT:  Anything else?

Bryan Harris - Redirect

1              MR. RICHERT:  No.

2              THE COURT:  All right.  Officer, you may step down.

3     I assume he's released and won't be subject to recall?  Is that

4     correct, Mr. Wheat?

5              MR. WHEAT:  Yes, that is correct, Your Honor.

6              THE COURT:  And no objection?

7              MR. RICHERT:  No.

8              THE COURT:  All right.  Thank you, Officer Harris.

9              Call your next witness.

10             MR. WHEAT:  Lance Lewis from Idaho -- well, from the

11    state of Idaho.  Your Honor, can we have a brief sidebar?

12             THE COURT:  Yes.

13             MR. WHEAT:  Thank you.

14        (Sidebar.)

15             MR. WHEAT:  Your Honor, Mr. Lewis has been instructed

16    not to talk about his role.

17             THE COURT:  His role.

18             MR. WHEAT:  He's his supervisor.

19             MR. RICHERT:  From probation.

20             MR. WHEAT:  Just that he works for the state of Idaho

21    and that he did locate -- that he found a bottle, a clear

22    bottle in Travis's --

23             THE COURT:  Okay.  Well, you can just explain now, as

24    I said earlier, if it slips out, it slips out, but I don't want

25    him to volunteer it.  And as long as he's been so instructed,

1    that's fine.

2              Mr. Richert.

3              MR. RICHERT:  Well, it's going to come out, so --

4              THE COURT:  Well, I just --

5              MR. RICHERT:  I just, at this point, enter an

6    objection that he's called upon --

7              MR. WHEAT:  I guess the defense is --

8              THE COURT:  What are you calling him for?

9              MR. WHEAT:  There's inferences that these were old

10   vials, that they weren't any good anymore or any usable at all

11   based on questioning.  He's going to testify about a vile he

12   found in August, in the main house -- the other part of the

13   house that was indicated to be testosterone.

14             THE COURT:  Wait.  Wait.  Wait.  Say again?  He's

15   going to indicate what now?

16             MR. WHEAT:  That there was a vile that was indicated

17   to be testosterone that Mr. Lewis found during the probation

18   search.  But I guess the inference is that this was old stuff

19   that was unusable and from ancient history.

20             THE COURT:  So, this is August, two months before --

21             MR. WHEAT:  Correct.

22             THE COURT:  -- the arrest here.  And that he found --

23   well, what's to keep that in August from being old?  Does

24   not -- I don't know whether it makes the changes that dynamic.

25             MR. WHEAT:  Yeah, I guess it would be the place it

1    was found, which was -- I believe it was on a kitchen

2    windowsill.

3                THE COURT:  Was it tested?

4                MR. WHEAT:  Yeah, it was.  We will maintain that for

5    now, if that's all right.  We will hold that back if that's

6    okay.

7                THE COURT:  All right.

8                MR. WHEAT:  And then things have moved a little

9    quicker than I thought they would, Your Honor.  I'm sorry.  Not

10   all of our -- I am kind of lean on witnesses right now, so --

11               THE COURT:  Do you want to take a break and figure

12   out where we go from here?

13               MR. WHEAT:  I'm sorry to do that.

14               THE COURT:  No, no, no.  That's good news, because I

15   assume -- when do you think we will be done?

16               MR. WHEAT:  We should get in today.  I think the

17   government will rest today.  Depending on how things go, I

18   think, so, yeah.

19               MR. RICHERT:  Why don't you speed it up?

20               MR. WHEAT:  I'll try.

21               THE COURT:  Let's take a 10-minute break, and then

22   we'll take a lunch break around 12:30 or so.

23               MR. WHEAT:  I apologize.

24               THE COURT:  Oh, that's all right.  All right.

25          (End of sidebar.)

1            THE COURT:  Ladies and gentlemen, we are moving

2    rather quickly, and I think, just to assist counsel in getting

3    organized, we will take another 10-minute break at this point.

4            We'll -- when we -- and then we'll probably take a

5    lunch break around 12:00 to 12:30.  And as I indicated, we'll

6    have a meal brought in for you and hold that lunch break to no

7    more than an hour.

8            We are moving along.  I think there's reasonably --

9    well, there's at least some chance the case may be submitted to

10   you tomorrow morning rather than late tomorrow as we had

11   planned, so I think the case is moving quickly.  And just for

12   your planning purposes, even though we are moving along, you

13   are still to follow the Court's admonition.

14           Don't discuss the case among yourselves or with

15   anyone else, do not form or express any opinions about the case

16   until it is fully submitted to you, and continue following the

17   Court's admonition concerning jury conduct in all respects.

18           All right.  We'll be in recess.

19       (Recess 10:46 a.m.  Resumed 11:05 a.m.  Jury in.)

20           THE COURT:  Thank you.  Please be seated.  The jury

21   is present.

22           Mr. Wheat, you may call your next witness.

23           MR. WHEAT:  Thank you, Your Honor.  The United States

24   would call Ms. Raquel Serna.

25           THE COURT:  Miss Serna, would you please step before

Raquel Syrah Serna - Direct

1   the clerk and be sworn?

2            COURTROOM DEPUTY:  Please raise your right hand.  You

3   do solemnly swear the testimony you are about to give will be

4   the truth, the whole truth, and nothing but the truth, so help

5   you God?

6            THE WITNESS:  I do.

7            COURTROOM DEPUTY:  Please take a seat in the witness

8   stand.

9            Please state your complete name and spell your name

10  for the record.

11                     RAQUEL SYRAH SERNA,

12  having been duly sworn, was examined and testified as follows:

13           THE WITNESS:  Raquel Syrah Serna, R-A-Q-U-E-L.

14           THE COURT:  And how do you spell your last name?

15           THE WITNESS:  S-E-R-N-A.

16           THE COURT:  You may inquire of the witness.

17           MR. WHEAT:  Thank you.

18                      DIRECT EXAMINATION

19  BY MR. WHEAT:

20  Q.   Miss Serna, thank you for being here today.

21           Could you tell the jury a little bit about yourself?

22  Tell us where you're from, where you live now, city, and tell

23  us where you work.  A little bit about yourself.

24  A.   Okay.  I'm 20 years old.  I live in American Falls, Idaho.

25  And I currently work at Idaho Central Credit Union as a teller.

Raquel Syrah Serna - Direct

1    Q.    Thanks, Ms. Serna.  And I just want to ask you about

2    whether you are familiar with someone named Travis Newbold.

3    Are you familiar with someone named Travis --

4    A.    Yes.

5    Q.    -- Newbold?  How are you familiar with Mr. Newbold?

6    A.    I was acquainted with him about a year ago.

7    Q.    And do you recognize Mr. Newbold here in the court today?

8    A.    I do, yes.

9    Q.    Could you indicate where he's sitting?

10   A.    To the front of me in a sweater vest and glasses.

11         MR. WHEAT:  May the record indicate that she's

12   identified Mr. Newbold, Your Honor?

13         THE COURT:  The record will so reflect.

14   BY MR. WHEAT:

15   Q.    So, Ms. Serna, could you please tell the jury, when did

16   you meet Mr. Newbold?

17   A.    I met him the first week of September.

18   Q.    Okay.  And what was the nature of --

19         THE COURT:  Just a moment.  In what year?

20         THE WITNESS:  2017.

21         THE COURT:  All right.  Thank you.

22   BY MR. WHEAT:

23   Q.    Beginning of September 2017?

24   A.    Yes.

25   Q.    And what was the nature, if you could tell the jury, of

Raquel Syrah Serna - Direct

1   your relationship what with Mr. Newbold?

2   A.    Friends.   Just casual dating, I would say.

3   Q.    Okay.  And did that progress as time went on?

4   A.    It didn't get time to progress, no.

5   Q.    Okay.  Where were you living in the time of September and

6   October of 2017?

7   A.    In September I was living at my house.

8   Q.    Okay.

9   A.    That I am living at now.

10  Q.    And how about, did you live there during October as well?

11  A.    No.

12  Q.    Where did you live in October, Ms. Serna?

13  A.    I lived at Travis Newbold's house.

14  Q.    Do you know where that house is?  Could you tell the jury

15  where that house is?

16  A.    551 West Pine Street.

17  Q.    And which town is that in?

18  A.    Pocatello, Idaho.

19  Q.    Thank you.  How long did you live at Travis's residence?

20  A.    Less than two weeks.

21  Q.    Okay.  And did Travis live there at the time?

22  A.    Yes.

23  Q.    Who else lived there when you lived there?

24  A.    No one.

25  Q.    And what time frame was this?  Could you -- could you, I

Vol. 2 - 84

Raquel Syrah Serna - Direct

1  guess for my purposes, as much as anything, nail down, I guess,

2  the dates as best you know when you were there?

3  A.   I would say October 1st to the 15th.  Somewhere between

4  that time.

5  Q.   Okay.  Thank you.  I want to talk to you, Ms. Serna, about

6  how much time that you went with Mr. Newbold during that time.

7  Did you spend -- how much time did you spend with Mr. Newbold

8  when you lived there?

9  A.   So, I worked from 4:00 a.m. to 1:00 p.m. in the afternoon.

10  I would come home to Travis's house.  And then from 1:00 p.m.

11  to late at night we would spend time together.

12  Q.   Okay.

13  A.   That's usually how it was.

14  Q.   Okay.  And I don't want to -- I hope you don't mind me

15  asking this, but where did you, I guess, have your stuff in the

16  house or where did you stay in the house?

17  A.   Downstairs.

18  Q.   Downstairs?

19  A.   Yes.

20  Q.   Okay.  And at that time -- well, I'm going to switch gears

21  here a little bit and ask you, was there a -- I want to talk to

22  you about any packages you might have known associated with

23  Mr. Newbold.

24  A.   Okay.

25  Q.   Did you know about Mr. Newbold handling any parcels or

Raquel Syrah Serna - Direct

1    packages during that time period?

2    A.    There were two incidents.

3    Q.    Okay.  Could you tell us about the first incident?

4    A.    The first incident was, I believe, on a Thursday.  I

5    wasn't working.  We had gotten up.  It was early in the

6    morning, and we had went to the post office over in Old Town

7    around Center Street.  And he told me to go pick up a package

8    for him.  And I did.

9         And the first time I got rejected, because I didn't

10   have his license.  So, I went in the truck and gave him -- and

11   asked for his license and then went back and signed for it.

12   Q.    Okay.

13   A.    And that was the first incident.

14   Q.    And did he ask you to do that?

15   A.    Yes.

16   Q.    When approximately was that?

17   A.    That was sometime between those two weeks that I was

18   there.

19   Q.    Okay.  And did you talk to him about that package after

20   you picked it up for him?

21   A.    I didn't question much about the package.

22   Q.    Did he talk about it though?

23   A.    He did vaguely talk about it.

24   Q.    What did he say?

25   A.    He had mentioned that he was a muler for someone.  That he

1   gets packages out of state, he brings them in, and then sends

2   them out.

3   Q.   Okay.

4   A.   Is how I remember the conversation going.

5   Q.   Okay.  And did he indicate why he did that?  Did he tell

6   you why he did that?

7   A.   He said he got paid an odd amount of money, and he figured

8   he would do it just because it was just easy to do and easy

9   money.

10  Q.   Did you see anything happen to that package after you

11  picked it up from the post office for him?

12  A.   Yes, I remember that package got taped up a lot.  It was

13  on a scale, and I guess the more the package weighed the more

14  stamps you had to put on it.  So, that's what I remember of

15  that particular package.

16  Q.   Do you mind if I break that up a little bit with you?

17  A.   Yeah.

18  Q.   You said that package, you saw it on a scale?

19  A.   Yes.

20  Q.   Where was it seen on the scale?

21  A.   Like, in the house.

22  Q.   Okay.  Can you tell me which room?

23  A.   Yes, it was at the dining room table.

24  Q.   Okay.  Do you remember what the scale looked like?

25  A.   Yes.  It had like a silver plate on it, small.  I think it

1   was actually kind of fairly small, too.

2   Q.   Okay.  What kind of readout did it have on it?  I mean,

3   did it show numbers, or did it have an analogue or anything?

4   A.   So, I was sitting behind him.  I couldn't really see what

5   the front of it looks like.

6   Q.   Okay.  And you said you saw him putting stamps on it?

7   A.   Correct.

8   Q.   Do you know what happened to the package after that?

9   A.   I do not.  I didn't see what happened to that package.

10  Q.   Okay.  When you said odd amounts, did he indicate to you

11  any amounts that he would get paid for these packages?

12  A.   I remember somewhere between $25 and $50.

13  Q.   Okay.  So, you signed for that package at the post office.

14  You used his identification; correct?

15  A.   Correct.

16  Q.   And you picked it up for him.  Did you know what was in

17  that package?

18  A.   I did not, no.

19  Q.   Did you suspect what was in that package?

20  A.   At the time, I did not suspect anything.

21  Q.   Okay.  What about now?

22  A.   Now I have a --

23          MR. RICHERT:  Relevance.

24          THE COURT:  I'm sorry?

25          MR. RICHERT:  Relevance.

1          THE COURT:  Sustained.

2    BY MR. WHEAT:

3    Q.   Thank you.  Okay.  So, you mentioned that there was two

4    occasions.  Could you tell us about the second occasion?

5    A.   The second occasion I remember much more than the first

6    one.

7    Q.   Okay.  When was it?

8    A.   So, this was -- how do I -- I mean, it happened between

9    September and October.  That's all I can tell you.  I don't

10   remember if it was before or after.  I just remember me going

11   to his house, and he was sick that day.  And he had wanted me

12   to do him a favor.  If I could just send 'em the package that

13   was on, like, that was laying around somewhere.  And he asked

14   me to go if I could go to the post office and send it.

15          And I wasn't sure where the post office was, and he

16   had wanted me to send it to the one across the Ford dealership.

17   Q.   Okay.

18   A.   So, I went to that one.  Waited in line a long time.  And

19   when it came to my turn, I think I paid less than $10 for the

20   package.

21   Q.   Okay.  And you mailed it somewhere?

22   A.   What was that?

23   Q.   And you mailed it somewhere?

24   A.   Yes.

25   Q.   Okay.  And did this have stamps on it, or did you actually

Raquel Syrah Serna - Direct

1   send it from -- or did you pay for it -- you paid for it;

2   right?  It didn't have stamps?

3   A.   I don't remember stamps being on there, but I'm unsure

4   that of that.  It could have possibly had like one or two.

5   Q.   Okay.  But you had to pay some money to help send it?

6   A.   Yeah.

7   Q.   At least help.  Okay.  Did you know what was in that

8   package?

9   A.   I did not.

10  Q.   And did Mr. Newbold say anything about what was in that

11  package, or its destination, or anything?

12  A.   He didn't mention what was in the package.  He had just

13  told me that he was sending it out to, like, Seattle,

14  Washington, or Oregon, somewhere around that area, for his

15  daughter.

16  Q.   Okay.  Now, during the time that you lived there, did you

17  ever see any vials?

18  A.   There were two incidents that I remember where there were

19  vials.

20  Q.   Okay.  Two incidents.  Could you tell us about one of

21  them?

22  A.   The one that struck me the most was when I was sitting at

23  the dining room table, a friend of his had came over and sat

24  across from me.  And Travis was just in the kitchen.  And he

25  was just kind of talking.  I don't remember exactly what they

Raquel Syrah Serna - Direct

1    were talking about, but I remember Travis had pulled out a vile

2    from, like, the freezer and gave it to him.

3              And I remember there was a syringe, and someone

4    put -- the guy across from me put the syringe in the vile, or

5    Travis did it.  I'm not sure who did it, but I just remember

6    that particular incident.  And the man across from me had put

7    the syringe that had liquid in it into his stomach.  He had

8    mentioned that it had hurt when he did it a time before.

9    Q.   Okay.  Do you remember -- what do you remember about

10   this -- this person that you saw?

11   A.   I remember he came over once more.

12   Q.   Okay.  Do you know his name?

13   A.   I don't.  I just remember that he was, like, a plumber or

14   he did, like, construction work.  Something like that.

15   Q.   Do you remember what he looked like?

16   A.   If I were to see him, I would.  But he was just, like, a

17   5-8, average, worked out.  He was always in, like, work

18   clothes.

19   Q.   How about this vile?  What do you remember about this vile

20   when -- you said you saw it; correct?

21   A.   Yeah.

22   Q.   What did the vile look like?

23   A.   Clear glass, just really simple, nothing on it.  Just

24   small, clear glass.

25   Q.   What did the top of the vile look like?

1    A.   I think it had, like, a gray neutral color, if I remember.

2    Q.   And did you see the very top of the vile?

3    A.   No.

4    Q.   Okay.  Did you see what was inside the vile?

5    A.   I remember, like, a clear liquid.

6    Q.   Okay.  And that was a vile that you saw this individual

7    inject from?

8    A.   Correct.

9    Q.   Okay.  And did you say that that went from Travis's hands

10   to that individual's hands, that vile?

11   A.   Yes.

12   Q.   Okay.  You said there was a second occasion that you saw a

13   vile or that there was a vile that --

14   A.   So, the second occasion was I remember when I was staying

15   there, I had a bottle of vitamins, and I put it on top of -- on

16   top of the sink in, like, this little nook.  And I remember

17   seeing a small glass vile, the same one that Travis had given

18   to his friend.

19   Q.   The same one or looked --

20   A.   I'm not sure if it was, like, the exact same one, but it

21   was identical, yeah.

22   Q.   Could you tell us about that vile?

23   A.   It was just clear glass, same liquid.  I don't remember it

24   being full.  I remember it being, like, half empty.

25   Q.   What did that vile -- or what did the top of that vile

Raquel Syrah Serna - Direct

1    look like?

2    A.    I didn't analyze it that much.

3    Q.    Okay.  Had you seen a vile like that before?

4    A.    I have never seen a vile like that, but I have seen a

5    vile, like, with my grandpa, with, like, diabetes.  But that

6    had a yellow -- that was very distinctive.  But this one was

7    just small, clear, probably silver top.  Yeah.  Just super

8    simple.

9    Q.    Did you see the very top?

10   A.    The very, very top, like where the syringe would go in?

11   Q.    Is that what it was or is that --

12   A.    That is what I would think, but I'm not sure.  If that's

13   what you're asking, I didn't see that part.

14   Q.    Okay.

15   A.    But I just remember, like, when Travis was giving his

16   friend the little vile, that you could put a syringe in there.

17   Like you could put --

18   Q.    Okay.

19   A.    -- like, a needle on the top.  So, I would think that it

20   would be --

21   Q.    So, was it that kind of bottle?

22   A.    Yes.

23   Q.    Okay.

24   A.    Yes.

25   Q.    And can you tell the jury what your relationship with

Raquel Syrah Serna - Direct

1    Mr. Newbold has been since the time you moved out?

2    A.   We have spoken on and off when he's --

3    Q.   I'm sorry.  Just tell us where -- you know, if you've

4    spoken, but don't tell us any more details, just --

5    A.   Yes, we've spoken just friendship kind of, but I haven't

6    spoken to him in, like, three weeks maybe.

7    Q.   Okay.  Thanks.  So, when did you talk to investigators

8    about this?

9    A.   Two days ago, I think it was.

10   Q.   Okay.  So, why are you here today?

11   A.   I was subpoenaed.

12   Q.   Okay.  And any other reason?

13   A.   No.

14          MR. RICHERT:  Relevance, Your Honor.

15          THE COURT:  Sustained.

16   BY MR. WHEAT:

17   Q.   Okay.  One second.  Did you see -- did you see ever any

18   other -- you said you saw a syringe once.  Did you ever see any

19   other syringe in the house?  Any other syringes?

20   A.   Yes.  There was an incident in the morning where we had

21   gotten up and gone upstairs.  And Travis was kind of just going

22   around the house.  And he came out of a particular room and --

23   or he was talking to me and had a syringe in his arm and was

24   injecting himself with something.  And then -- and then I

25   remember we were just kind of talking about something, and I

Raquel Syrah Serna - Cross

1    never questioned what that was, because I never got to that at

2    the end of the conversation.

3    Q.   Do you remember what the syringe looked like?  What color?

4    A.   Clear.

5    Q.   Okay.

6    A.   There was nothing special about it.  But --

7    Q.   Okay.

8    A.   Just a clear tube, and that's all I can remember.

9    Q.   Do you remember if there was anything inside the syringe?

10   A.   I don't remember.  I just remember seeing Travis's hand,

11   like, covered it when he was putting it in his arm.

12   Q.   Okay.  Did he have big hands?

13   A.   He did, yes.

14            THE COURT:  Can you answer audibly?  I think you said

15   uh-huh.  Say yes or no if you would for the record.

16            THE WITNESS:  Okay.

17   BY MR. WHEAT:

18   Q.   So, was that a yes?

19   A.   Yes.

20   Q.   Okay.  One second, if I may.

21            I have -- I will -- I have nothing further on this

22   particular direct for Ms. Serna.  Thank you, Your Honor.

23            THE COURT:  All right.  Mr. Richert.

24

25

CROSS-EXAMINATION

BY MR. RICHERT:

Q.    Ms. Serna, you have indicated to us, at least for the two
weeks you were at Mr. Newbold's house, no one else lived there
besides Mr. Newbold?

A.    No one else lived there besides me and Mr. Newbold.

Q.    Was there a fellow named Michael?

A.    I don't remember a Michael, no, that lived there while I
was there.

Q.    Now, when you told us about this first package that you
went to the post office on Center Street, apparently Travis had
you go in, and you tried to get the package, and then you
couldn't; is that right?  So, you went back out and obtained
Travis's driver's license?

A.    From him, yes.

Q.    From him.  And then used the driver's license to
apparently sign for the package?

A.    Correct, with Travis's consent.

Q.    But there was no hiding who actually was going to get this
package, because you had to use Travis's ID to get it; correct?

A.    Yes.

Q.    And you didn't know what was in it?

A.    I had no idea.  I still don't know exactly what was in
that.

Q.    Do you know where it came from?

Vol. 2 - 96

Raquel Syrah Serna - Cross

1   A.   I remember Asian lettering on it.

2   Q.   And do you know, was it then sent off somewhere else?

3   A.   I don't recall that exactly, because I did not see it.

4   But I figured it was going to be sent off since it was getting

5   stamped.

6   Q.   Okay.  That's right.  You saw the scale that -- you don't

7   know this, but it's in evidence.  The scale was used to weigh

8   the package to put stamps on it?

9   A.   Correct.

10  Q.   In the second package, you mentioned to us that you went

11  to a -- to the post office across from the Ford dealership.  Do

12  you know what might have been in that?

13  A.   I have no idea, no.

14  Q.   But Travis apparently told you that he was sending it to

15  his daughter?

16  A.   Correct.

17  Q.   And I think you told us that he asked you to do that

18  because he was sick?

19  A.   Yes.

20  Q.   Now, the two vials that you told us about that you saw,

21  you indicated the first one you saw the vile came out of the

22  freezer?

23  A.   Or the fridge it might have been.

24  Q.   Or the fridge?

25  A.   But, yeah.

Raquel Syrah Serna - Cross

1    Q.    Do you know that insulin is typically refrigerated?

2    A.    It typically is, yes, but it's usually more

3    distinguishable than a clear glass.

4    Q.    Do you know that oftentimes insulin is injected through

5    the stomach?

6    A.    Yes.

7    Q.    Do you know if this vile contained insulin?

8    A.    No.

9    Q.    You don't know one way or the other?

10   A.    Well, my grandpa, he was a diabetic for about 15 years --

11   Q.    The question was, do you know what was in the vile?

12   A.    No.

13   Q.    Okay.  Did you know that Travis, at some point, had a

14   prescription to use testosterone?

15   A.    He had mentioned that he had a prescription for

16   testosterone, yeah.

17   Q.    Okay.  I should have stated that differently.  You don't

18   know that, but he apparently told you that?

19   A.    He had told me, yes.

20   Q.    Do you know whether or not the second vile was

21   testosterone?

22   A.    No.

23   Q.    Do you know at all what it would be?

24   A.    What was that?

25   Q.    Do you know what was in that?

Raquel Syrah Serna - Redirect

1    A.   No.

2    Q.   But then you saw him a third -- at one time actually

3    injecting himself in the arm?

4    A.   Correct.

5    Q.   Do you know if that was the testosterone?

6    A.   No.

7    Q.   You don't know?

8    A.   I don't know, no.

9              MR. RICHERT:  That's all the questions I have.

10             THE COURT:  Any redirect, Mr. Wheat?

11             MR. WHEAT:  Just briefly.

12                     REDIRECT EXAMINATION

13   BY MR. WHEAT:

14   Q.   That vile that you mentioned that came out of the fridge.

15   A.   Correct.

16   Q.   Did you think it was insulin?

17   A.   No.

18   Q.   Why didn't you think it was insulin?

19   A.   Because my grandpa had diabetes, and theirs is much

20   smaller.  Their insulin little vile is much smaller, and from

21   what I remember, it was yellow and has an actual description, a

22   label of what it would be.

23   Q.   Okay.

24   A.   And usually their syringes are much more distinguishable

25   that you get.

Raquel Syrah Serna - Redirect

1    Q.   Okay.

2    A.   This particular vile had no description, clear glass,

3    nothing.

4              MR. WHEAT:  Okay.  Thank you.  Nothing further.

5              THE COURT:  Anything else?

6              MR. RICHERT:  No.

7              THE COURT:  All right.  Ms. Serna, you may step down.

8    Thank you.

9              May the witness be released from any subpoena?

10             MR. WHEAT:  Yes, Ms. Serna can.  Thank you.

11             THE COURT:  Any objection?

12             MR. RICHERT:  No.

13             THE COURT:  All right.  You are free to go.  Thank

14   you, Ms. Serna.

15             Call your next witness.

16             MR. WHEAT:  Mr. James Wheeler, Your Honor.

17             Your Honor, I will just mention, we are going a lot

18   faster than I thought we were today.

19             THE COURT:  Well, I like to hear that.

20             MR. WHEAT:  I know, but it's kind of thrown off the

21   anticipated schedule, so I apologize.

22             THE COURT:  Well, that's fine.  We will just deal

23   with it as it comes.

24             Mr. Wheeler, would you come forward, sir.  Step

25   before Ms. Bracke.  She will place you under oath and then

James Charles Wheeler - Direct

1   direct you from there.

2          COURTROOM DEPUTY:  Thank you, Mr. Wheeler.

3          Please raise your right hand.  You do solemnly swear

4   the testimony you are about to give will be the truth, the

5   whole truth, and nothing but the truth, so help you God?

6          THE WITNESS:  Yes.

7          COURTROOM DEPUTY:  Please take a seat in the witness

8   stand.

9          MR. WHEAT:  Your Honor, I think we may have -- if I

10   could just have a second.

11          THE COURT:  Go ahead, Ms. Bracke.

12                    JAMES CHARLES WHEELER,

13   having been duly sworn, was examined and testified as follows:

14          COURTROOM DEPUTY:  Please state your complete name

15   and spell your name for the record.

16          THE WITNESS:  James Charles Wheeler.  J-A-M-E-S

17   C-H-A-R-L-E-S W-H-E-E-L-E-R.

18          THE COURT:  All right.  You may inquire of the

19   witness.

20                    DIRECT EXAMINATION

21   BY MR. WHEAT:

22   Q.   Good morning, Mr. Wheeler.

23   A.   Good morning.

24   Q.   Mr. Wheeler, will you please tell us a little bit about

25   yourself?  Where do you live?

Vol. 2 - 101

James Charles Wheeler - Direct

1  A.   I actually travel quite often.

2          THE COURT:  Could you speak up, sir, and get closer

3  to the microphone.

4          THE WITNESS:  My apologies.

5          THE COURT:  And it moves, so you can move it in front

6  of you so that it's -- yeah, there you go.  Go ahead.

7          THE WITNESS:  I'm a traveling artist.

8  BY MR. WHEAT:

9  Q.   What kind of artist?

10  A.   I do tattoos, sculptures, paintings.

11  Q.   Mr. Wheeler, do you know an individual named Travis

12  Newbold?

13  A.   I do.

14  Q.   Is he here in the courtroom today?

15  A.   I don't see him.

16  Q.   Okay.  You don't see Mr. Newbold here in the courtroom?

17  A.   Well, he definitely looks different.

18  Q.   Okay.  But do you see him?

19  A.   I see him now.

20  Q.   Okay.  Different than what?

21  A.   Well, last I seen him he was bald.

22  Q.   Okay.

23  A.   And he didn't have facial hair.

24  Q.   Okay.  Thanks.  So, do you recognize him today though?

25  A.   I do now.

James Charles Wheeler - Direct

1    Q.   Okay.  Where -- could you point him out for the record?

2    A.   He's in the center seat there.

3    Q.   Okay.  At which table?

4    A.   At that table there.

5    Q.   Okay.  So, Mr. Wheeler, it's -- I have trouble with this,

6    too, but you might want to speak up a little bit so we can pick

7    up.

8    A.   I'm a soft-spoken individual.

9    Q.   That's all right.  I do this for a living, and I am quiet,

10   so don't feel bat bad.

11             So, I'm going to ask you, how long have you known

12   Mr. Newbold?

13   A.   Probably since 2015.

14   Q.   Okay.  Did you ever live with Mr. Newbold?

15   A.   I would say that it was more of an on-and-off thing.

16   Q.   Okay.  What do you mean by on and off?

17   A.   Well, it started out that I would come and stay, hang out

18   at the house.

19   Q.   When was this that you started hanging out?

20   A.   I would say it was probably around May or June of 2015.

21   Q.   Okay.  And then --

22   A.   And then I left and went to New York.

23   Q.   Okay.

24   A.   I was gone for a while, and I didn't come back until -- I

25   have to think about that -- say, 2015, I think it -- I

James Charles Wheeler - Direct

1   didn't -- I have to think about the years, because it's 2018
2   now, and I was -- a lot goes on in my life.
3   Q.   Sure.
4   A.   I think 2015.  I should back that up.  I was actually -- I
5   still had a shop then, and it was 2000 -- in 2015, in the
6   summer, I believe, is when I started hanging out over there.
7   But it wasn't until 2016, I believe, when I first started -- I
8   want to say April when I first started hanging out at the house
9   when I actually moved over there, because he said, "You should
10  come down and hang out at the house.  You can move your stuff
11  in or whatever."  He had a roommate at the time, so I started
12  staying in the basement room.
13  Q.   Okay.
14  A.   And then he had a storage room upstairs that he cleaned
15  out a little bit.  Had a bed in there.  So, I stayed there for
16  a little while, and then I left.
17  Q.   Okay.
18  A.   And then I was gone for a year and a half almost before I
19  came back again.
20  Q.   Why do you call this room upstairs a storage room?
21  A.   Because that's what it was.
22  Q.   What kind of stuff did he store in there?
23  A.   Well, at first, he had a computer and a bunch of his ski
24  equipment and furniture.
25  Q.   Okay.  Which part of the house was it in?  It was

James Charles Wheeler - Direct

1    upstairs?

2    A.    Upstairs.  It was -- it would be the first great window

3    you came to when you came to the front of the house.  So, when

4    you entered into the house, you came into the living room, and

5    you would go into the hallway.  And his room was to the left

6    and then across from his room was that room.

7    Q.    Okay.  Where was his house by the way?  Do you remember

8    the address?

9    A.    551 West Pine Street.

10   Q.    Okay.  Now, did this room have a safe in it?

11   A.    It did.

12   Q.    Do you remember what the safe looked like?

13   A.    It's a tall green one that sat in the corner.

14   Q.    Okay.  Did you access this safe ever?

15   A.    Not ever.

16   Q.    Okay.  When you -- I want to talk to you specifically

17   about the months around September or October of 2017.  Can you

18   remember back then?

19   A.    Yeah, I was in New York.

20   Q.    You were in New York in October?

21   A.    Yes, sir.

22   Q.    Were you getting mail at the house though?

23   A.    I don't know.

24   Q.    Okay.

25   A.    I haven't actually been back to the house since.

James Charles Wheeler - Direct

1   Q.   But do you have things there?

2   A.   I kept a motorcycle on the outside of the premises, and I

3   had -- I had a bag of leather-working tools.

4   Q.   Okay.  That storage room, did you ever stay in that room

5   or sleep in it?

6   A.   Yeah, that was a place where I would stop and sleep from

7   time to time when I passed through town.

8   Q.   Okay.  And did you ever try to access that safe?

9   A.   No.

10  Q.   Okay.

11  A.   That's Travis's house.  That's his stuff.  I have no

12  reason to be looking or snooping around his house.

13  Q.   Okay.  So, did you have access to that room?

14  A.   That room is unlocked.  There is no lock on it.

15  Q.   Okay.

16  A.   It's just a storage room.

17  Q.   Okay.  Did it have any beds or desks or anything in it?

18  A.   It had a bed in there, and it had some -- two chests of

19  drawers.

20  Q.   Okay.  Did you ever keep any illegal items at the house?

21  A.   I don't have any illegal items at the house.

22  Q.   Did you ever keep any anabolic steroids at the house?

23  A.   Absolutely not.

24  Q.   Did you ever keep any anabolic steroids in that safe?

25  A.   No.

1    Q.   So, the contents of that safe, are they yours?

2    A.   No.

3    Q.   And even though you were getting mail there, did you live

4    there in -- I mean, when were you in New York?  When is the

5    last time around October --

6    A.   I just came back this last August.

7    Q.   Okay.  And so how many months before October 17 were you

8    in New York?

9    A.   In 2017, I left.  I came -- I was there from the end, or

10   mid to end of May till about June 8th -- or July 8th and that's

11   when I left.

12   Q.   Okay.

13   A.   At that time, I was working with Gypsy Tattoo in Pocatello

14   here on 518 East Center.

15   Q.   Okay.  You indicated that you stayed there off and on.

16   Did you ever see any anabolic steroids in the house?

17   A.   I can't say that I ever looked or read any labels of

18   anything like that in the house.

19   Q.   Okay.  But did you see something -- well, okay.  Fair

20   enough.

21        Did you see any use of those?

22   A.   I can't say as that I would say that I would actually seen

23   use of it.

24   Q.   What makes you say that?

25   A.   He works out a lot, and he's in and out of the house.

James Charles Wheeler - Cross

1  He's always in the kitchen making whatever his concoctions are,

2  and I don't really pay attention to that stuff.

3  Q.   What do you mean concoction?

4  A.   Shakes, drinks, things of that nature, juicer.

5  Q.   Okay.  And did you see any sales or anything of anabolic

6  steroids?

7  A.   No, that's none of my business nor would I pay attention

8  to it.

9           MR. WHEAT:  Okay.  Thank you.  Nothing further.

10          THE COURT:  Cross.

11                    CROSS-EXAMINATION

12  BY MR. RICHERT:

13  Q.   Mr. Wheeler, from your last response, you didn't see

14  people come in and out of the house?

15  A.   There was always people in and out of the house, but he

16  has lots of friends.

17  Q.   Okay.

18  A.   We had lots of roommates in and out.

19  Q.   Describe that for me then.  Apparently, there were a

20  number of folks besides you that would --

21  A.   He had roommates that lived downstairs in those rooms.

22  Q.   And this -- so we are kind of clear, this is a one-story

23  kind of a house with a basement?

24  A.   No -- it has a basement, yes.

25  Q.   And the bedroom that you sometimes stayed in was on the

James Charles Wheeler - Cross

1   main floor across from Travis's room?

2   A.   Yes, sir.

3   Q.   So, you call it a storage room, but it probably is a

4   bedroom?

5   A.   Well, it's a bedroom, but it's a place where he stored all

6   his stuff.

7   Q.   Now, you indicated to us that a number of folks came to

8   the house?

9   A.   Yes.

10  Q.   And is this also accurate that a number of folks --

11  A.   Well, he --

12  Q.   -- on occasion lived there?

13  A.   Yes.

14  Q.   Tell us what you saw, how that worked?

15  A.   Honestly, I am a tattoo artist.  I am in and out.  I got

16  my own life going on.  I came in and I used my room, or that

17  room particularly.  He always had guests, because he would have

18  people come over and watch movies.

19         He has a big, large living room with a projection

20  screen TV.  He has a Jacuzzi outside in the backyard.  He has

21  got a fire pit back there.  He had friends over.

22  Q.   So, it was kind of a --

23  A.   It was a nice --

24  Q.   -- social place.

25  A.   A social atmosphere, yes.

James Charles Wheeler - Cross

1    Q.   And you told us, although it's none of your business, you

2    didn't see any steroids being delivered to anybody?

3    A.   He had workout partners that came to the house, but I

4    don't -- I'm not a gym rat.  I tried my hand at working out,

5    but I am not that kind of guy.

6    Q.   But you, I think, told us you didn't see any distribution

7    of --

8    A.   I never did.

9    Q.   Do you still have belongings at the house?

10   A.   I should have a motorcycle and a toolbox outside the

11   house, and I should have a bag of leather there, because I --

12   Q.   Maybe clothing?

13   A.   -- do leather work.  Huh?

14   Q.   Maybe some clothing, too?

15   A.   There might be some clothing there.

16   Q.   When you were -- before staying at Travis's house, did you

17   have a place to stay?  Where did you stay?

18   A.   What do you mean before I did that?

19   Q.   Before.

20   A.   I was always on the road.

21   Q.   So, you didn't have --

22   A.   I always collected my mail at my father's house, which is

23   in Blackfoot, Idaho.

24   Q.   Okay.

25   A.   And I travel.  At that time, I was doing about

James Charles Wheeler - Cross

1   45,000 miles a year in the US.

2   Q.   So, you didn't -- did not have a place in Pocatello that

3   you could call --

4   A.   Well, because I --

5   Q.   -- where you lived?

6   A.   Because I stayed in my van, and I did work from state to

7   state.

8   Q.   But there was a period of time that you were in Pocatello

9   and spent at least some time at Travis's house?

10  A.   Yes.

11  Q.   Do you remember the name of the person who was in the

12  basement?

13  A.   Well, the first gal that was there, her name was Chelsea,

14  but I cannot think of her last name.

15  Q.   Anybody else?

16  A.   I know that she lives in Boise now.

17  Q.   Was there a guy named Michael?

18  A.   There was a guy named Michael that came and went.  I don't

19  know that he ever -- he might have slept a night or two, but I

20  was not around very often.

21  Q.   You don't recall, say, having a barbecue or barbecues with

22  Michael?

23  A.   We have had barbecues in the back.

24  Q.   Were you concerned that -- well, you obviously knew that

25  Travis had some dogs?

James Charles Wheeler - Cross

1    A.   Yeah, he had a lot of -- he had three Pomeranians.

2    Q.   And you weren't particularly fond of those dogs, because

3    they got into your stuff?

4    A.   Well, if I were gone, they liked to sit in that front

5    window, and he let them.  And if I had -- and I had some

6    sleeping bags on the top of that bed, and they would get hair

7    all over the place.

8    Q.   So, when you were gone, you would lock the door?

9    A.   There is no lock on that door.

10   Q.   Okay.  I was trying to get the time frame that you left to

11   go to New York.

12   A.   I know that other roommates had access to that room, so

13   the door didn't get shut very often.  My complaint was that my

14   stuff had a lot of hair on it.

15   Q.   And correct me if I misheard.  I understood that you left

16   for New York maybe July of 2017?

17   A.   The 8th of July, I believe.

18   Q.   8th of July?

19   A.   Yeah, of 2017, yes.

20   Q.   And you had been in and out of the house since April 2016?

21   A.   Yeah.  Well, yeah.  I left there.  I went -- I was in and

22   out from April, and then I left.  I left the area around June.

23   And, I mean, I -- I travel a lot.  So, when I leave Idaho, I

24   will go to Nebraska, then I will go Wisconsin, and then I will

25   go to New York.

James Charles Wheeler - Redirect

1          Sometimes I go from New York all the way to Florida

2    and work my way back up.  I use Facebook as my platform, social

3    media to gain customers.

4          MR. RICHERT:  Okay.  I don't think I have any further

5    questions.

6          THE COURT:  Redirect.

7                      REDIRECT EXAMINATION

8    BY MR. WHEAT:

9    Q.   Did you know of anybody else besides Travis to have access

10   to that safe, Mr. Wheeler?

11   A.   I don't know, because that safe was not my -- it's not

12   mine, and I don't -- it's not my -- I just have to say no.

13   Q.   Do you still have items at the house?

14   A.   I should have a bag of leather there.  I may have some

15   clothes there.  I should have a motorcycle outside, and I

16   should have a box of parts, tools and whatnot.  It's just a

17   toolbox with some motorcycle parts in it.

18   Q.   Any particular reason why you haven't retrieved those

19   items?

20   A.   Because his mother won't allow me to go over there.

21          MR. WHEAT:  I have nothing further.  Thank you.

22          THE COURT:  Anything else?

23          MR. RICHERT:  No.

24          THE COURT:  Mr. Wheeler, you may step down.  Thank

25   you.

1          Do you have other witnesses ready?

2          MR. WHEAT:  We may, Your Honor.  Can I -- I am so

3   sorry.

4          THE COURT:  That's all right.  If you want to just

5   check and see if they are available.

6          MR. WHEAT:  Well, maybe I can just talk with -- with

7   counsel, Your Honor --

8          THE COURT:  All right.

9          MR. WHEAT:  If that's all right briefly before we

10  make a quick decision.

11         THE COURT:  All right.

12     (Sidebar.)

13         MR. WHEAT:  I am just so sorry.

14         THE COURT:  Don't worry about it.

15         MR. WHEAT:  So, we have Mr. Lewis.  I wanted to talk

16  to him a little bit before.  We have a woman named Khem

17  Millward, and we may have -- I don't think so -- but an officer

18  to kind of square anything up.  But we're almost done.

19         THE COURT:  Are you putting in the --

20         MR. WHEAT:  We do have Mr. Robertson, too.

21         THE COURT:  -- the transcripts or the recording, the

22  cell phone data?

23         MR. WHEAT:  Oh, yes, we are.  We have that.

24         THE COURT:  When will that come in?

25         MR. WHEAT:  As soon as I get a chance to go to my

1    office and go get my notes, but --

2              THE COURT:  Okay.  Well, what do you want to do?  Do

3    you want to take a lunch break now?

4              MR. WHEAT:  I don't want to scoot --

5              THE COURT:  Our only problem is when was our meal

6    going to be delivered?

7              THE LAW CLERK:  12:15.

8              MR. WHEAT:  I am really sorry.

9              THE COURT:  Do you have anything you can put on now?

10   I mean, we can just take an hour and half lunch, if need be,

11   but I'd rather use the time if we can.

12             MR. WHEAT:  You know, we've got the probation

13   officer.  I just need to talk to him first, I guess.  I

14   anticipated that Mr. -- that Sergeant Harris was going to take

15   way longer this morning.

16             THE COURT:  Yeah.

17             MR. WHEAT:  And so -- and the way that things have

18   gone have just kind of changed it.

19             THE COURT:  Let's see.

20             MR. RICHERT:  Why don't I suggest we take a lunch

21   break, you can talk to Lewis, and then you will have all

22   afternoon to finish.

23             MR. WHEAT:  I think we are fairly close.

24             THE COURT:  You clearly will be done today then.

25             MR. WHEAT:  Yeah, I mean, Major Robertson is going to

1    take some time.

2              MR. RICHERT:  I have one witness who I told to come

3    tomorrow morning.

4              THE COURT:  You might try to reach them and see if

5    you can get them here.

6              MR. RICHERT:  All right.

7              THE COURT:  Let's do that.

8              MR. WHEAT:  And we are moving our witnesses up to

9    today, too, because we just --

10             THE COURT:  What you -- yeah, okay.  All right.  I

11   guess that's what we will do.

12             MR. WHEAT:  If there's some evidence we have,

13   depending how Steve's case goes, but I will just try to

14   determine.

15             THE COURT:  All right.  Well, certainly we need to

16   have our jury instruction conference tonight to be ready to go

17   tomorrow morning with instructions.

18             MR. WHEAT:  Sounds good.

19             THE LAW CLERK:  We can send them a draft today.

20             THE COURT:  Yeah.  I assume it's pretty much done.

21   Did you ask, counsel, whether there's any need to talk about

22   quantities?  I wouldn't think so.

23             MR. WHEAT:  I think we have an instruction in there

24   that says quantities are not at issue; right?

25             THE COURT:  Well, the problem is in other controlled

1    substances, we have to ask them -- have them make a

2    determination of quantities, because it affects not only the

3    guidelines but also mandatory minimums.  But I'm assuming

4    that's not an issue in this case.

5              MR. WHEAT:  No.

6              THE COURT:  So, we won't need to worry about that.

7    All right.

8              MR. WHEAT:  The only other thing -- well, there's a

9    couple of tweaks in the instructions, but I can tell you that

10   when the time is, so --

11             THE COURT:  All right.  Let's go ahead and do it.

12   All right.

13        (End of sidebar.)

14             THE COURT:  Ladies and gentlemen, we are moving much

15   more quickly than counsel anticipated.  I think the -- it is

16   very likely we will have the case submitted to you tomorrow

17   morning at some point.

18             What I'm going to do though, because we have

19   witnesses which we are trying to get lined -- or which the

20   government are trying to get lined up and likewise Mr. Richert,

21   we are going to take the recess now.  Unfortunately, your lunch

22   won't arrive for another 20 minutes or so.

23             But what we'll do is we will tentatively try to

24   reconvene about 1:00, but we will just see how that plays out.

25   If you need to run an errand and can do so within that time

1    frame, feel free to leave the courthouse.  Or if you just want

2    to stay and eat the meal that's going to be provided around

3    12:15, you can do that as well.

4            As we take this recess, I will again admonish you not

5    to discuss the case among yourselves, not to form or express

6    any opinions about the case, and to fully comply with and

7    follow the Court's admonition concerning jury conduct that we

8    read to you, I guess, yesterday before we started the trial.

9            All right.  We will be in recess until 1:00 or later

10   depending upon when we can get the witnesses lined up and be

11   ready to go.

12           All right.  We will be in recess.

13        (Recess 11:52 a.m.  Resumed 1:11 p.m.  Jury in.)

14           THE COURT:  Thank you.  Please be seated.  I will

15   note that the jury is present.

16           Mr. Wheat, you may call your next witness.

17           MR. WHEAT:  Yes, Your Honor.  We have Khem Millward.

18           THE COURT:  Miss Millward, would you come before the

19   clerk and be sworn?

20           COURTROOM DEPUTY:  Please raise your right hand.  You

21   do solemnly swear the testimony you are about to give will be

22   the truth, the whole truth, and nothing but the truth, so help

23   you God?

24           THE WITNESS:  I do.

25           COURTROOM DEPUTY:  Please take a seat in the witness

Khem Tachi Millward - Direct

1    stand.

2                         KHEM TACHI MILLWARD,

3    having been duly sworn, was examined and testified as follows:

4              COURTROOM DEPUTY:  State your full name and spell it

5    for the record.

6              THE WITNESS:  Khem Tachi Millward.  K-H-E-M.  Middle

7    name is Tachi, T-A-C-H-I.  Millward, M-I-L-L-W-A-R-D.

8              THE COURT:  All right.  Miss Millward, would you pull

9    the mike down and put it right in front of your mouth there.  I

10   think that may help us hear you a little bit better.

11             Mr. Wheat, you may inquire of the witness.

12             MR. WHEAT:  Thank you.

13                         DIRECT EXAMINATION

14   BY MR. WHEAT:

15   Q.   Miss Millward, good afternoon, and thank you for being

16   here.  Could you tell the jury where you live and what you do

17   these days?

18   A.   I live here in Pocatello, and I work for an ENT

19   specialist.  I'm a medical assistant.

20   Q.   Thank you.  Are you familiar with Travis Newbold?

21   A.   I am.

22   Q.   How are you familiar with him?

23   A.   He was a neighbor of mine for a couple years, and then we

24   became roommates.

25   Q.   Thank you.  Do you recognize him here in the courtroom

Khem Tachi Millward - Direct

1   today?

2   A.   Yep.  Yes, I do.

3   Q.   Thank you.  Could you point him out for the record?

4        MR. WHEAT:  Your Honor, could the record so reflect

5   she's pointing at counsel table?

6        THE COURT:  Yes, the record will so reflect.

7   BY MR. WHEAT:

8   Q.   When did you live with Mr. Newbold?

9   A.   2016.

10  Q.   Okay.  Did you live with him at all in 2017?

11  A.   No.

12  Q.   Did you live with him in October of 2017?

13  A.   No.

14  Q.   Did you ever see Mr. Newbold with a black duffel bag?

15  A.   Yes.

16  Q.   When?

17  A.   On several different occasions.

18  Q.   Did you get a good look at the black duffel back?

19  A.   It was black, and I know it had some vials in it.

20  Q.   What kind of vials?

21  A.   They weren't labeled but some were full.

22  Q.   How big were the vials?

23  A.   Like 2 -- like a 2 mls.

24  Q.   2 mls?

25  A.   Like -- they are glass.

Khem Tachi Millward - Direct

1  Q.   Okay.

2  A.   See-through, you know, puncture the top of them.

3          THE COURT:  Counsel, 2 mls, is that milliliter?

4          THE WITNESS:  Milliliters, yes.

5          THE COURT:  So, that's very small.

6          THE WITNESS:  It could be 10.  I'm sorry.

7          THE COURT:  But regardless, just ml, I am not sure

8  the jury would know what that is.

9          THE WITNESS:  Okay.

10         THE COURT:  So, I just want to make that clear for

11 the jury.

12         Go ahead, Mr. Wheat.

13 BY MR. WHEAT:

14 Q.   They were glass vials.  Were they filled with anything?

15 A.   Yes.

16 Q.   What were they filled with; do you know?

17 A.   I don't know.

18 Q.   Did you see it though?

19 A.   I did.

20 Q.   Did it have a color?

21 A.   Yes.

22 Q.   What was the color?

23 A.   Like a dark -- or a light yellow or a light brown.

24 Q.   So, just these vials, again, if I could get you to help me

25 out for the record.  About how tall in inches would they be?

1    A.    About 2.

2    Q.    About 2 inches tall?

3    A.    Two inches.

4    Q.    And about how -- like, if you looked at the bottom of it

5    upside down, about how far from edge to edge would the bottom

6    of it be?

7    A.    Inch.

8    Q.    Okay.

9    A.    And a half.

10   Q.    And what was the top of the vials like?

11   A.    They had rubber on the top.

12   Q.    Have you seen those kind of vials before?

13   A.    Like, at my work, yeah.

14   Q.    Okay.  What do you do with those vials?

15   A.    At work?  They are, like, full of medication that you give

16   for people with allergies and for inflammation.

17   Q.    Okay.  You mentioned that they were unlabeled.  Why did

18   you say that?

19   A.    Because there was -- there were no labels on them.  There

20   was not -- they were not prescribed.

21   Q.    Okay.  And how do you know that?

22   A.    Because they were clear.  They were just clear.  No

23   labels.  And I work around medicine, so --

24   Q.    How many vials did you see about?  Do you know?

25   A.    I couldn't give you a good number.  There was a lot.

Khem Tachi Millward - Cross

1    Q.    More than five?

2    A.    Yes.

3    Q.    More than 20?

4    A.    Probably around there.

5    Q.    Okay.  In a black duffel bag?

6    A.    Yes.

7          MR. WHEAT:  One second.

8          Thank you.  I have nothing further for Miss Millward.

9    Thank you.

10         THE COURT:  Mr. Richert.

11                    CROSS-EXAMINATION

12   BY MR. RICHERT:

13   Q.    Miss Millward, although you might not have lived in the

14   Newbold household in 2017, you still saw Mr. Newbold on

15   occasion?

16   A.    Yes.

17   Q.    Still somewhat romantically involved?

18   A.    Not by choice.  Not consensual.

19   Q.    I know you appear to be quite angry right now.  Would I

20   have that correct?

21   A.    I am not angry.

22   Q.    Okay.

23   A.    I have gotten over this.

24   Q.    So, the black duffel bag you saw where?

25   A.    Sometimes it was on the floor.  Sometimes it was in his

Khem Tachi Millward - Cross

1    truck.  Sometimes it was underneath his bed.

2    Q.   And was this in 2016 or some other time?

3    A.   Around 2016.

4    Q.   After 2016, were you around the house in order to see

5    whether or not the duffel bag was around?

6    A.   Yes, I had gone over there a couple times.

7    Q.   In the year 2000 -- last year?

8    A.   No.  Well, I'm sorry.  Let me take that back.  Maybe a

9    couple times.  There was a restraining order, and it was broke,

10   and he would not --

11            MR. WHEAT:  Objection, Your Honor.  Can we object to

12   this answer?  Relevance.

13            THE COURT:  All right.  Sustained.

14            MR. RICHERT:  I actually didn't ask a question about

15   that, but --

16            THE COURT:  Well, I don't know.  I understand, but I

17   am sustaining the objection to the response.  So, let's back up

18   and get another question.

19   BY MR. RICHERT:

20   Q.   You did not -- at no time, I guess -- well, maybe I will

21   ask it this way.

22            You have indicated to us you did not know what were

23   in the vials?

24   A.   No.

25   Q.   Did you know that Travis was a weightlifter?

Vol. 2 - 124

Khem Tachi Millward - Redirect

1   A.   He said he was.

2   Q.   Did you ever see him go to the gym?

3   A.   No.

4   Q.   Did he tell you that he used testosterone?

5   A.   Yes.

6        MR. RICHERT:  That's all the questions I have.

7        THE COURT:  Anything else, Mr. Wheat?

8        MR. WHEAT:  Just really briefly.

9                   REDIRECT EXAMINATION

10  BY MR. WHEAT:

11  Q.   Did he ever tell you where he got his testosterone?

12  A.   China from a lady named Bella.

13  Q.   And did he tell you how he communicated with anyone named

14  Bella?

15  A.   Facebook.  He set her account up.

16       MR. WHEAT:  Okay.  Thank you.  Nothing further.

17       THE COURT:  Anything else?

18       MR. RICHERT:  No.

19       THE COURT:  All right.  You may step down,

20  Miss Millward.  Thank you.

21            May the witness be released from any subpoena?

22       MR. WHEAT:  Yes, she may.

23       THE COURT:  Any objection?

24            All right.  You are free to go.  Thank you.

25            Call your next witness.

Vol. 2 - 125

Khem Tachi Millward - Redirect

1           MR. WHEAT:  Your Honor, can I -- I am so sorry to
2    keep calling a sidebar.  Can we talk to the Court real quick?
3           THE COURT:  Yes.
4        (Sidebar.)
5           MR. WHEAT:  I didn't know that answer was anywhere in
6    the world.  You know, is there any way for a curative
7    instruction by the Court, or do you think it didn't get far
8    enough and she didn't identify anything about, you know, a
9    restraining order or anything.
10          THE COURT:  Well, no.  It was not -- Mr. Richert
11   didn't object, so I -- and if he did, he is the one that should
12   be asking for it.  I think it's -- unless -- and I don't know
13   what I could say that wouldn't draw more attention to it.
14          MR. RICHERT:  I am not going to do anything about it.
15          THE COURT:  Okay.  All right.
16       (End of sidebar.)
17          THE COURT:  Call your next witness.
18          MR. WHEAT:  Okay.  We are going to call Marcel
19   Korvela from US Postal Services Investigations again.
20          THE COURT:  Mr. Korvela, I will remind you, you are
21   still under oath, if you will just retake the witness stand.
22                          MARCEL KORVELA,
23   having been previously sworn, was examined and testified as
24   follows:
25          THE COURT:  You may inquire.

Marcel Korvela - Direct

1          MR. WHEAT:  Thank you.

2                    FURTHER DIRECT EXAMINATION

3     BY MR. WHEAT:

4     Q.    Hi, Special Agent Korvela.  As I indicated, you have

5     testified already in this case; correct?

6     A.    Yes.

7     Q.    Have you done further investigation since that time?

8     A.    Yes, sir.

9     Q.    What have you done?

10    A.    I was given a tracking number to look to see if there's

11    any more information on a parcel delivery.

12    Q.    What was the tracking number you were given to look up?

13    A.    It was a tracking number pertaining to a package that was

14    delivered on October 12th, 2017.

15    Q.    Do you know what the tracking number was?

16    A.    I don't -- I don't have it memorized, no.

17          MR. WHEAT:  Okay.  Your Honor, can I mute the jury to

18    show Mr. Korvela a document?

19          THE COURT:  Yes.

20          MR. WHEAT:  Thank you.

21    Q.    Special Agent Korvela, I'm putting up on the overhead what

22    is marked there as Plaintiff's Exhibit 99.  Do you recognize

23    Plaintiff's Exhibit 99?

24    A.    Yes, sir.

25    Q.    What is Plaintiff's Exhibit 99?

Marcel Korvela - Direct

1    A.   It's a product and tracking reporting.  And basically,

2    that is an internal postal report of a parcel, and where it

3    originated, and its delivery status.

4    Q.   Okay.  What was the tracking number of that parcel?  Can

5    you -- can you tell that from this document?

6    A.   Yes.  It's EA181491353CN.

7    Q.   And you testified earlier about what the words -- what CN

8    at the end of -- or do you know -- I should say this in case I

9    am wrong here.

10            Do you know what CN means at the end of a tracking

11   number?

12   A.   CN is the two-letter country code for China.

13   Q.   Okay.  What does this -- and I would move to admit

14   Plaintiff's Exhibit 99.

15            THE COURT:  Any objection?

16            MR. RICHERT:  No.

17            THE COURT:  Exhibit 99 will be admitted and now

18   published to the jury if you wish.

19            MR. WHEAT:  Please.

20       (Exhibit 99 admitted.)

21   BY MR. WHEAT:

22   Q.   What does this show, Special Agent Korvela?

23   A.   If you can turn it to the -- that page that will show it

24   was delivered on -- oops.  The first page.  Sorry.  It shows

25   that the parcel was delivered in Pocatello, Idaho, on

Marcel Korvela - Direct

1    October 12th, 2017.

2    Q.    Where was it delivered to?

3    A.    Can you move the paper down a little bit?

4    Q.    Absolutely.  Sure.

5    A.    The parcel doesn't say where it was delivered, but if you

6    look at the signature portion of it, it will show an address.

7    Q.    Does it say the origin of where it was sent from?

8    A.    China.

9    Q.    Does it say a specific city in China?

10   A.    Shenzhen ENS is what's listed on the sheet of paper.

11   Q.    I'm going to refer you to the back page there.  Have you

12   seen that before?

13   A.    Yes, sir.

14   Q.    That's page -- well, it's the third page in the stapled

15   exhibit.  What is that?  It says "delivery section" there;

16   correct?

17   A.    Correct.

18   Q.    What does it say there below that?

19   A.    The address is 551 West Pine Street, and there is a

20   signature section, and then there's a printed section where

21   one -- a customer would print their name.

22   Q.    And what's the name printed there?

23   A.    Raquel Serna.

24   Q.    And when was it accepted?

25   A.    It was delivered on October 12th, 2017.

Marcel Korvela - Direct

1   Q.   Okay.  Does it say where it was delivered -- or I guess I
2   already asked you that.
3   A.   Yes, the address is 551 West Pine Street.
4   Q.   Okay.  So, would it have been delivered to that address?
5   A.   Not necessarily.  Somebody -- in this instance, somebody
6   could have went to the post office and picked it up there.
7   Q.   Okay.  But this document doesn't indicate that; right?
8   A.   No, sir.
9   Q.   And where did you find this document?
10  A.   I found it two days ago, and I also reprinted it out this
11  morning.
12  Q.   Okay.  And from what?
13  A.   From the postal tracking system.  It's an internal -- I
14  got it from the post office this morning on Clark Street.
15  Q.   Okay.
16  A.   And actually, could you scroll that front page down there.
17  Up the other way, please, so I can see the bottom.
18  Q.   No problem.
19  A.   Okay.  As you can see on that line, on the bottom left, it
20  says it's delivered, and it says "individual picked up at the
21  post office."  So in this case, the person picking the parcel
22  up would have picked it up at the post office, because there is
23  designations if it's, you know, delivered to the doorstep or
24  something to that nature.  So, I was -- it was picked up at the
25  post office.

Marcel Korvela - Cross

1   Q.   And was this kept in -- this was an internal post office
2   record you said?
3   A.   Yes, sir.
4   Q.   Did you find it where it was supposed to be?
5   A.   Yes.
6   Q.   Okay.  One second.  Okay.  And who does it say the
7   recipient's name is?
8   A.   In the bottom corner here, you will see it says T.
9   Newbold.
10  Q.   Okay.  So, what does that mean?
11  A.   That -- that was who the parcel was addressed to.
12  Q.   So, it was addressed to T. Newbold, but it was signed for
13  by someone else?
14  A.   Correct.
15  Q.   And who was that?
16  A.   Raquel Serna.
17          MR. WHEAT:  Okay.  Thank you.  Nothing further.
18          THE COURT:  Any cross?
19                  CROSS-EXAMINATION
20  BY MR. RICHERT:
21  Q.   Just for some clarification, the signature line or lines,
22  that's similar to that form PS 39 --
23  A.   3849, yes.
24  Q.   So, that would be someone had to bring that form down, it
25  looks like?

Marcel Korvela - Cross

1  A.   Yeah, that -- someone would bring that slip into the post

2  office, and that would be the slip that the clerk would use to

3  find the parcel.

4          MR. RICHERT:  Okay.  No further questions.

5          THE COURT:  Anything else, Mr. Wheat?

6          MR. WHEAT:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  If there's nothing else, you

8  may step down.

9          May the witness be excused and released from any

10 subpoena at this point?

11         MR. WHEAT:  Yes, Your Honor.  Thank you.

12         THE COURT:  All right.  Thank you, sir.  I assume,

13 Mr. Richert, there was no objection.

14         I don't know what that was.

15         THE REPORTER:  The witness's jacket on the mic.

16         MR. WHEAT:  It sounded like fanfare.

17         THE COURT:  Oh.  Get my WD-40 to work here.

18         Call your next witness.

19         MR. WHEAT:  Special Agent Andy Robertson.

20         THE COURT:  Agent Robertson, I remind you, you are

21 still under oath having previously been sworn.

22         THE WITNESS:  Yes, Your Honor.

23                    ANDREW ROBERTSON,

24 having been previously sworn, was examined and testified as

25 follows:

Andrew Robertson - Direct

1    THE COURT:  You may inquire.

2    MR. WHEAT:  Thank you, Your Honor.

3    FURTHER DIRECT EXAMINATION

4  BY MR. WHEAT:

5  Q.   Hi, Special Agent Robertson again.

6    Special Agent Robertson, in this investigation, you

7  indicated earlier that you searched a phone; correct?

8  A.   Yes, I did.

9  Q.   What kind of phone was that?

10  A.   Oh, let me clarify.  I didn't search the phone.  I

11  reviewed the data that was extracted from the phone.

12  Q.   Reviewed the data?  Okay.  And I guess this data that was

13  extracted from the phone, how did you know that it was

14  Travis's -- or, excuse me -- I am sorry -- Mr. Newbold's phone

15  that you reviewed the data from?

16  A.   I recovered the phone from Pocatello Police Department,

17  brought it to Special Agent -- brought it back to our office

18  after we got the search warrant, the federal search warrant for

19  its contents.  And those items were forwarded to the San Diego

20  lab where they were able to get into the phone, and then they

21  mailed it back to us when they were done.

22  Q.   Okay.  But how do you know that it was Mr. Newbold's

23  phone?  I guess you got it from Pocatello police, but --

24  A.   The telephone phone number in the phone.  Photos of

25  Mr. Newbold in the phone.  Text messages in the phone that said

Andrew Robertson - Direct

1    "Travis Newbold."  Has his ID, the email address that he
2    provided us when I interviewed him was in the phone as the user
3    ID.
4    Q.   So, there was a phone number that was on the front of the
5    house you said?
6    A.   Yes, on fence?
7    Q.   Okay.
8    A.   The Big T Construction is the telephone number of the
9    phone --
10   Q.   Okay.
11   A.   -- that I examined.
12   Q.   Okay.  And did you review certain conversations in the
13   phone relating to shipments from China?
14   A.   Yes, I did.
15   Q.   Could you tell the jury about those?
16   A.   Yes.  The conversations were in a WhatsApp application.
17   And it's a chatting application that you can use similar to
18   Facebook Messenger or -- and there was actually another one on
19   Skype that you can do audio-video calls and you can also just
20   exchange messages.
21            THE COURT:  What is the app again?
22            THE WITNESS:  It's called the WhatsApp, Your Honor.
23            THE COURT:  Like W-H-A-T-S?
24            THE WITNESS:  A-P-P, yes, Your Honor.
25            THE COURT:  Okay.  Thank you.

Andrew Robertson - Direct

1   BY MR. WHEAT:

2   Q.   Okay.  So, it was in WhatsApp.  Where did you leave off

3   there?

4   A.   I was about to say it's -- the WhatsApp application is

5   known for end-to-end encryption, so that the messages that are

6   sent back and forth, you can't -- they are less apt to be

7   compromised.

8   Q.   And are you indicating this based on training and

9   experience that you've indicated in this trial before?

10  A.   And because, yeah, I have a phone and it's pretty

11  ubiquitous now.

12  Q.   Okay.  Why is that significant?  Why do you talk about

13  end-to-end encryption?

14  A.   The messages are protected between the two parties.

15           THE COURT:  You used the word "ubiquitous."  That

16  means widespread?

17           THE WITNESS:  Yes, Your Honor.

18           THE COURT:  Go ahead.  Just so we are clear.

19           THE WITNESS:  It's common.

20  BY MR. WHEAT:

21  Q.   Okay.  The encryption is common?

22  A.   The apps -- messaging applications are common.

23  Q.   Okay.  But why did you bring up encryption?

24  A.   Because that particular messaging app is one that would

25  encrypt the messages on either end, so that just the users

Andrew Robertson - Direct

1   would be able to view them.

2   Q.   Okay.  Why is that significant?

3   A.   It protects the communication.

4   Q.   Okay.  From what?

5   A.   Someone else viewing it.

6   Q.   Okay.

7            THE COURT:  Is the jury -- it's off.

8   BY MR. WHEAT:

9   Q.   Okay.  Thank you.  Special Agent Robertson, I am showing

10  you what has been previously marked as Plaintiff's Exhibit 85.

11  You have that in a binder in front of you as well.  And I am

12  going to double check my notes to make sure that's the right

13  one.

14            Okay.  Do you recognize Plaintiff's Exhibit 85?

15  A.   Yes, I do.

16  Q.   What is Plaintiff's Exhibit 85?

17  A.   It's an extraction report from the cell phone data that I

18  examined for WhatsApp text messages between a user named Amy

19  and a user named Travis.  They are further identified by their

20  phone numbers.  The Travis user name belongs to the phone and

21  it's 12083170090@s.whatsapp.net and the Amy one is

22  8615107130501@s.whatsapp.net.

23  Q.   Does that phone number match the phone?

24  A.   Yes, the Travis one does.

25  Q.   Thank you.  Could you tell the jury a little bit about

Andrew Robertson - Direct

1    these chats?  What you discovered when you reviewed these?

2    A.    In reviewing the chats and reading through them, I

3    understood that -- that the two seemed to have known each other

4    prior to these chats.  It seemed like an ongoing conversation

5    back and forth over time.

6              They were -- there wasn't, "Hey, this is me," and

7    that kind of introduction.  It was like -- it was more of a

8    conversation that two people would have on and off.

9    Q.    Okay.  And what else did you notice?

10   A.    That Amy -- Amy is from China and is in China, and that

11   Amy -- well, the content of the text messages, there was a lot

12   of small talk and there's some images exchanged.

13             MR. WHEAT:  Okay.  I'm going to move -- Your Honor,

14   I'd move for the admission of Plaintiff's Exhibit 85.

15             THE COURT:  Any objection?

16             MR. RICHERT:  Nope.

17             THE COURT:  Exhibit 85 will be admitted and now

18   published to the jury.

19        (Exhibit 85 admitted.)

20             MR. WHEAT:  Again, apologies, because this is -- I

21   don't know if that's helpful.  Probably doesn't work; does it?

22   Oh, look at that.  Okay.  But it's still not that helpful.

23             THE COURT:  Counsel, I would suggest zooming in and

24   then sliding it up and down.  I think it's going to be much

25   easier for the jury to read.

Andrew Robertson - Direct

1          MR. WHEAT:  Will do, Your Honor.

2  Q.   Okay.  And you talked about these numbers; correct?  The

3  phone numbers and things like that?

4  A.   Yes, I did.

5  Q.   Is that what I'm showing on the screen right now?

6  A.   Yes.

7  Q.   Where it says "Amy and Travis"?

8  A.   Yes.

9  Q.   "Participants," and that's on page one.

10  A.   That's correct.

11  Q.   Okay.  Could you tell the jury a little bit more about

12  conversations that you found in there that drew your attention?

13  A.   On page 7, there's a message that was sent from Amy to

14  Travis, and it was a photo of a bag of white powder with a

15  placard in front of it.  It says "Alliance Raws.  Alliance Raw

16  Pharmacy Company Limited," and then

17  "alliancerawpharmacies@protonmail.com."  I know from a

18  conversation that I had with Special Agent Roedel that Proton

19  Mail is also an encrypted mail server.

20  Q.   Okay.

21  A.   Email service.

22  Q.   Is that picture blown up in this exhibit?

23  A.   That's the photograph of the text message.

24  Q.   Flipping the page over?

25  A.   And that's the photograph.

1   Q.   Okay.  Shown on the -- on the picture on the opposite side

2   of page 7 of Exhibit 85, there's a picture.  And what does that

3   picture have to describe it?

4   A.   It's a picture of -- it looks like a small dog, a statute,

5   and then a Ziploc or baggy of white powder with a placard for a

6   website or email -- or an email address -- I'm sorry -- and a

7   company name.

8   Q.   What is that company name?

9   A.   Alliance Raw Pharmacy Company Limited.

10  Q.   Special Agent, did you have more to indicate about that or

11  can I direct your attention somewhere else in this document?

12  A.   Oh, we can move forward.

13  Q.   Okay.  Could you turn to page 4?  Was there a conversation

14  on page 4 about -- about Alliance Raw Pharmacies?

15  A.   Yes.  Amy sends a message, and on -- back in May, saying

16  that she wants to build her business website and asks for

17  suggestion about the website name.

18  Q.   Okay.  What does she say specifically?

19  A.   "I want to build my business website.  Could you please

20  kindly offer me some suggestions about the website name?  I am

21  not sure which name is popular with you.  Because I know little

22  about US culture."

23  Q.   Okay.  And what -- what was said next?  And I guess what

24  dates were these taking place?  Does it indicate on there?

25  A.   March 22nd, 2017.

Andrew Robertson - Direct

1    Q.   Okay.  And then what was said next after "because I know a
2    little about US culture"?
3    A.   "What about Alliance Raw Pharmacy Company Limited?"
4    Q.   And who was that?
5    A.   Amy did.
6    Q.   And then what does it say after that?
7    A.   "That sounds good."
8    Q.   Who said that?
9    A.   Travis.
10   Q.   And then what does it say after that?
11   A.   "I will try to think of more for you."
12   Q.   Thank you.  Could you tell the jury about any more
13   conversations that you think were significant?
14   A.   So, after the picture of the bag of white powder was sent
15   on March 30th, on April 7th, Travis asked Amy when she thinks
16   she's coming to the United States.  She said --
17   Q.   April 7th?  Could you direct us to that page?
18   A.   Sorry.  Page 8.
19   Q.   Page 8.  Okay.
20   A.   Right around the middle, the third blue.
21   Q.   Okay.  Are you looking at it up there?
22   A.   Yes.
23   Q.   Okay.  And is it right here?
24   A.   It is.
25   Q.   Okay.  Sorry.

1    A.   That is where I was reading.

2    Q.   Okay.  There you go.  All right.  So, who says "When are

3    you coming to the states?"

4    A.   Travis.

5    Q.   And then what is said?  Is there a reply indicated there?

6    A.   There is.

7    Q.   What is it?

8    A.   "I am not sure now.  Will I be dangerous if I am still in

9    this business when I am stay in US?"

10   Q.   Who says that?

11   A.   Amy does.

12   Q.   Okay.  And then what's the next message?

13   A.   "You are American but I am Chinese."

14   Q.   And then what does it say next and who says it?

15   A.   Travis says, "Well, it is illegal in the states."

16   Q.   And then what does it say next?

17   A.   "I was just" -- Amy says, "I was just afraid the laws will

18   not allow me to do this."

19   Q.   Okay.  Is there more information?

20   A.   Travis suggested that she could conduct her business from

21   China while she's here in the United States.  And then Amy

22   sends him a graphic of a logo.

23   Q.   Okay.  That logo, is it blown up in this document?

24   A.   On -- on the next page, yes.

25   Q.   Okay.  Do you recognize that logo?

Andrew Robertson - Direct

1   A.   I do.

2   Q.   Is that the one from the chat?

3   A.   Yes, it is.

4   Q.   Okay.  And is there another logo in there?

5   A.   Yes, there is.

6   Q.   Okay.  Do you recognize that?  Oh, gosh.  I'm sorry.

7   There we go.

8   A.   Yes, I do.

9   Q.   Okay.  What is that?

10  A.   That's another logo.

11  Q.   Okay.

12  A.   Suggested logo.

13  Q.   Okay.  Any other conversations that you -- that drew your

14  interest?

15  A.   Travis replied to Amy with the one that he liked better.

16  Q.   Okay.  Out of the two logos?

17  A.   Yes.

18  Q.   Okay.  What else, Agent?

19  A.   Moving up to page 11.

20  Q.   Okay.

21  A.   The conversation starting on April 28th, 2017.  Right --

22  you can probably start right at the top of the page.

23  Q.   Okay.  Page 11?

24  A.   Page 11, yes, sir.

25  Q.   Okay.  Top of the page.  Is that okay?

Andrew Robertson - Direct

1    A.    That's the top.  Thank you.

2    Q.    Okay.

3    A.    At the top of the page, Amy's asking Travis "What about

4    your work?"  Travis says, "It's okay so far.  How is yours

5    doing?"  Travis replies.  Amy says, "Very good.  More and more

6    clients like my quality and safe delivery."  Travis replies,

7    "Awesome."  Amy asks Travis, "Did you sell all your last order

8    out?"

9    Q.    And what does Travis reply?

10   A.    "Most of it."

11   Q.    Where is that written here?  I moved it here.

12   A.    It's near the top.  Next one down.  There you go.

13   Q.    Okay.  And then what does it say next.

14   A.    "It sees that your clients are not too much."

15   Q.    And what is the next -- and who is that from?

16   A.    That's from Amy.

17   Q.    Okay.  What's said next?

18   A.    Travis replies, "Yes, not much."

19   Q.    Okay.

20   A.    And then Amy says, "Just sell it to the familiar guy for

21   safety?"  Travis says, "Yeah, definitely."

22   Q.    Thank you.  Could you indicate anything else on this

23   document?

24   A.    Yes, just a few more lines down on that page.

25   Q.    Okay.

Andrew Robertson - Direct

1    A.   Just slide it up.  Travis asks, on May 13th, 2017 -- he

2    says -- he says, "Hello."  Amy replies, "Hello, Travis."

3              "Hey, do you remember our last order?  It was Test E,

4    Test Cyp, and Deca?"

5    Q.   Who asked that?

6    A.   Travis did.

7    Q.   Have you seen those words before, Test E, Test Cyp and

8    Deca?

9    A.   I have.

10   Q.   What are they?

11   A.   Test E is testosterone enanthate.

12   Q.   Okay.

13   A.   Tes Cyp is testosterone cypionate, and Deca is nandrolone

14   decanoate.

15   Q.   And what does it say below that?

16   A.   Amy replies, "Yeah."  In one minute, Amy replies, "Yeah."

17   Q.   And Travis says what?

18   A.   Travis says, "Deca was 250 grams, right?"  And Amy says,

19   "Yeah."

20   Q.   These substances, are you familiar with them in this

21   investigation?

22   A.   I am.

23   Q.   How?

24   A.   They are -- there was testosterone enanthate -- I think I

25   am saying it right -- testosterone cypionate and nandrolone

Andrew Robertson - Direct

1    seized from Mr. Newbold's residence.

2    Q.   Thank you.  Anything else on this document?

3    A.   About right the next page on page 12.

4    Q.   Okay.

5    A.   The fourth line down from the top.

6    Q.   From the top.

7    A.   That's good.

8    Q.   All right.

9    A.   On May 17th, 2017, Amy sends a link "www.alianceraws.com."

10   Q.   Okay.  What else is in there, Special Agent Robertson?

11   A.   On page 14, Travis sends a photograph of himself to Amy.

12   Q.   Why is that relevant?

13   A.   The photograph of Travis --

14   Q.   Does it indicate anything about who used the phone, I

15   guess?

16   A.   Yes.

17   Q.   What does it indicate?

18   A.   It's a photograph that he sent of himself to someone.

19   Q.   Thank you.  And is that the photograph?

20   A.   It is.

21   Q.   Okay.  Special Agent, please continue about this document,

22   if you need to.

23   A.   If you start from the back and just go two pages to the

24   front.

25   Q.   Is that page 17?

Andrew Robertson - Direct

1    A.    Page 17, yes.

2    Q.    Okay.  And Special Agent Robertson, if you look up on the

3    overhead, there's some pictures.

4    A.    Yes.

5    Q.    Do you know what those pictures are?

6    A.    That's a picture that Travis sent to Amy's cooking fish, I

7    think, and then she replied with all these photographs that she

8    can, too -- also cooks fish.

9    Q.    And are these blown up versions of those?

10   A.    They are.

11   Q.    Okay.  Thank you.  Okay.  There's page 17.  And, okay.

12   What -- what did you want to direct the jury to on page 17?

13   A.    The forth line down on October 11th, 2017, Amy sends a

14   message that says, "The first package will arrive at your

15   place."

16   Q.    Okay.  Was there a response?

17   A.    "Okay."

18   Q.    Okay.  What was next?

19   A.    Excuse me.  "Tracking No. EA181491353CN" was sent by Amy.

20   Q.    Have you seen that tracking number before?

21   A.    I have.

22   Q.    On a document?

23   A.    Yes.

24   Q.    Which document?

25   A.    The document that Special Agent Korvela testified to

Vol. 2 - 146

Andrew Robertson - Direct

1   previously.

2   Q.   Okay.   Showing -- showing Special Agent Robertson

3   Plaintiff's Exhibit 99, is that the document you are talking

4   about?

5   A.   Yes, it is.

6   Q.   Okay.   What is that tracking number?

7   A.   It's "EA181491353CN."

8   Q.   So, what else happens in this exchange?

9   A.   Right after Amy sends a tracking number, she sends another

10  message that says, "Please send this package to the following

11  place by UPS when you receive it."  And the addressee for that

12  is "Rainero Durante, 3843 Union Road, Suite 15, Number 202, in

13  Cheektowaga, New York."  That Zip code is "14225."

14          And then Amy sends a message "I will pay you USD" --

15  USD is short for US dollars -- "50 and the shipping cost."

16  Travis replied "Okay.  Sounds good."  And then the next day, in

17  the morning --

18  Q.   Okay.

19  A.   -- Amy sends another message that says "Hello, Travis."

20  And then sends a message.

21          THE COURT:  Counsel, what do we have on the screen?

22          MR. WHEAT:  Oh, I'm sorry.  Thank you.  Page 18 is up

23  on the screen.

24          THE COURT:  All right.  Is that what you are reading

25  from?

Vol. 2 - 147

Andrew Robertson - Direct

1           THE WITNESS:  No, I am at the bottom of page 17, Your

2    Honor.

3    BY MR. WHEAT:

4    Q.    Oh, you are?

5    A.    Yeah, I'm sorry.

6    Q.    That's fine.

7    A.    I was looking down not at the screen.  I apologize.

8    Q.    There we go.

9    A.    She engages in conversation in the morning.  "Hello,

10   Travis.  Do you have time today?"  And that link was sent with

11   the same tracking numbering with the updated tracking

12   information.

13   Q.    Okay.

14   A.    And it says at the top of the tracking -- if you turn the

15   page, please.

16   Q.    Yeah.  Sure.

17   A.    Thank you.  And then slide that down.  If you will notice

18   at the top, when it comes into focus --

19           THE COURT:  I think it will -- give it a moment.  It

20   will focus by itself.  Now zoom in.

21   BY MR. WHEAT:

22   Q.    Okay.

23   A.    Perfect.  Thank you.  It notes that on -- on October 11th,

24   2017, at 10:52 in the morning, that a notice was left, but

25   there was no authorized recipient available.  "We attempted to

1    deliver your item at 10:52 a.m. on October 11, 2017, in

2    Pocatello Idaho, 83201.  And a notice was left because an

3    authorized recipient was not available."

4    Q.    What's the significance of this, Special Agent Robertson?

5    A.    Special Agent Korvela already testified that a slip was

6    brought to the post office to collect the package with this

7    tracking number.

8    Q.    And by whom?

9    A.    By Raquel Serna, and Ms. Serna also testified that she

10   picked up a package around that time.

11   Q.    Okay.  Anything else in the exhibit?  And I am referring

12   to Plaintiff's --

13   A.    The last line on page 18, Travis replied to that tracking

14   information.

15   Q.    Okay.

16   A.    "Yes, I have to go pick up the package today and resend

17   it."

18   Q.    Okay.  That's on October 12th?

19   A.    Yes, it is.

20   Q.    Were there any other messages on this phone that caught

21   your attention?

22   A.    Yes.  So, on October 13th, on Skype Messenger, the

23   following day Travis received a message from Live ID.  I

24   understand Microsoft owns Skype, so you get a Live ID that's

25   like a Microsoft handle, I guess.  I don't know the proper term

Andrew Robertson - Direct

1    for that.

2            It is "Live:  Alliance Raws."  And then "Alliance

3    Raws" for the name.  So that the -- I don't know.  For lack of

4    a better term, the email address would be live:alianceraws,

5    that part, and then the name would be "Alliance Raws," just

6    that it was Live, Special Agent Robertson.  And then it would

7    have just my name where my name would appear.

8    Q.   Okay.

9    A.   So, the Alliance Raws says, "Hello Travis."

10           THE COURT:  Just a moment.  Is this part of the same

11   exhibit?

12           MR. WHEAT:  This is a different exhibit.

13           THE COURT:  Yeah, we need to have that offered.

14   BY MR. WHEAT:

15   Q.   Okay.  Have you reviewed Plaintiff's Exhibit 86, Special

16   Agent Robertson?

17   A.   Yes, I have.

18   Q.   And have you just described Special Agent -- or

19   Plaintiff's Exhibit 86?

20   A.   Yes.

21   Q.   What is Plaintiff's Exhibit 86?

22   A.   It's an extraction report of Skype chats between user name

23   Alliance Raws and Travis Newbold.

24   Q.   From which one?

25   A.   From Travis Newbold's phone.

Andrew Robertson - Direct

1    Q.   And does Plaintiff's Exhibit 86 fairly and accurately

2    depict the conversation pulled from that phone?

3    A.   Yes, it does.

4              MR. WHEAT:  I would move to exhibit -- I would move

5    to admit Plaintiff's Exhibit 86.

6              THE COURT:  Any objection?

7              MR. RICHERT:  No.

8              THE COURT:  Exhibit 86 will be admitted.

9         (Exhibit 86 admitted.)

10             MR. WHEAT:  May I publish, Your Honor?

11             THE COURT:  You may.

12             MR. WHEAT:  Thank you.

13   Q.   Okay.  So, up on the screen is Plaintiff's Exhibit 86.

14   And you indicated participants earlier; correct?

15   A.   Yes.

16   Q.   And what does it say under "participants"?

17   A.   Alliance Raws.

18   Q.   And is that in the top upper left-hand corner?

19   A.   Yes, it is.

20   Q.   And what are these conversations again?

21   A.   They are messages between Travis Newbold and Alliance

22   Raws.

23   Q.   Okay.  And what about these stuck out to you?

24   A.   Well, they started the day after the WhatsApp chats with

25   Amy ended, so the following day.  They start, "Hello, Travis.

Andrew Robertson - Direct

1    This is Amy."  And they come from Alliance Raws.  Amy had sent

2    Alliance Raws' link to the website during the WhatsApp chats

3    and sent Travis those logos.

4    Q.   Okay.  And what else is said?

5    A.   They are just Travis says, "hello," and they talk about --

6    she talks about on the top of the next page, on the top of

7    page 2, that WhatsApp is available sometimes but not always.

8    Q.   Okay.

9    A.   So, that would be a possible reason for the switching

10   applications for the communications.

11   Q.   Okay.  Any other possible reasons that you know of.

12   A.   No, not off the top of my head.

13   Q.   Okay.  What else?

14   A.   Down toward the bottom of that page, halfway -- yes.

15   Q.   There?

16   A.   Yes.  It's right there on October 25th, 2017.  She sends a

17   message that says, "You will receive your package soon."

18   Q.   Okay.  Is there a response?

19   A.   She indicated after that that she had a friend who had

20   trouble, personal trouble.  And then Travis replied that that

21   was no good.

22   Q.   Okay.  And then what?

23   A.   Travis responded, "I have to go to the post office to get

24   package.  It's here."  And then she replied, "It does not

25   arrive at USA now."

Andrew Robertson - Direct

1    Q.   Okay.  Showing you page 3 of Exhibit 86, Plaintiff's
2    Exhibit 86.  Okay.
3    A.   Alliance Raws tells Travis "I will tell you when it
4    arrives at your place."  Travis says, "Okay.  Thank you."  And
5    then Alliance Raws, Amy, says, "It is 50g Test E.  I will send
6    you more when you get a good result."  And then Alliance Raws,
7    who has identified herself as Amy, says, "Is it possible for
8    you to send the package to Canada?"  And Travis replies, "Yes,
9    I can."  And Alliance Raws, Amy, says, "Okay."
10   Q.   Is that -- anything else about that document, Special
11   Agent Robertson?
12   A.   No, that's it for those chats.
13   Q.   Special Agent Robertson, are you familiar with the word
14   "muling"?
15   A.   Yes, I am.
16   Q.   How are you familiar with it?
17   A.   It's drug terminology, drug trafficking terminology for
18   somebody who is moving packages for somebody else.
19   Q.   Packages or --
20   A.   Any -- any illegal drugs.
21   Q.   Were there any other conversations that -- on this phone
22   that drew your attention?
23   A.   There were just two other WhatsApp chats.
24   Q.   Okay.  Special Agent Robertson, have you seen Plaintiff's
25   Exhibit 87?

Andrew Robertson - Direct

1    A.   Yes, I have.

2    Q.   Could you describe what Plaintiff's Exhibit 87 is?

3    A.   It's WhatsApp chats between Travis and a user named Belle,

4    B-E-L-L-E, Li, L-I.

5    Q.   And is that Belle, B-E-L-L-E; right?

6    A.   Yeah.

7    Q.   Do you know if that's how you pronounce it?

8    A.   I do not.

9    Q.   And who else?  Is it the same number as what you described

10   earlier, the same WhatsApp person?

11   A.   The WhatsApp's the same.  There were three -- there were

12   three WhatsApp conversations extracted from the phone and one

13   Skype chat.  There were no other conversations relevant to the

14   case that were extracted.

15   Q.   Okay.  Plaintiff's Exhibit 88, what is that?

16   A.   It's an additional WhatsApp chat.

17   Q.   Okay.  Who were the participants?

18   A.   Travis and the other participant is Love Ironman, Diana,

19   Zoe, Z-O-E.

20   Q.   And were these pulled from that phone that you seized?

21   A.   Yes.

22            MR. WHEAT:  Okay.  I would move to admit Plaintiff's

23   Exhibits 87 and 88.

24            THE COURT:  Any objection?

25            MR. RICHERT:  No.

Andrew Robertson - Direct

1          THE COURT:  87 and 88 will be admitted and now may be

2     published to the jury.

3          (Exhibits 87 and 88 admitted.)

4     BY MR. WHEAT:

5     Q.   Special Agent Robertson, what do you want to tell the jury

6     about Plaintiff's Exhibit 87?

7     A.   The Exhibit 87 is the conversation with Belle Li and

8     Travis.

9     Q.   Okay.

10         THE COURT:  Counsel, do you want to show to it the

11    jury?

12         MR. WHEAT:  Oh, yeah.  Great idea.  I guess it's

13    admitted now.

14    BY MR. WHEAT:

15    Q.   Okay.

16    A.   And you'll notice on the WhatsApp chats, that the mess

17    that -- the system message on the first line there on this

18    one --

19    Q.   Uh-huh.

20    A.   -- and it's on the second messages.  It's the second

21    message on the other two chats, but it says, "Messages to this

22    chat and calls are now secured with end-to-end encryption.  Tap

23    for more info."  That's what I had described before, the

24    encryption on the messaging.

25    Q.   What did you find significant about this particular

Andrew Robertson - Direct

1   report?

2   A.   Again, with the Amy chat, this chat was also similar in

3   that it seemed like they knew each other for a long time.  When

4   the conversation started, they said, "Oh, I haven't heard from

5   you for a long time," and then there's a lot of small talk back

6   and forth.

7            And then on April 4th, 2017, Belle Li sends a message

8   that says, "Do you need any HGH or steroids?  Raw powders

9   recently."  And Travis replies --

10  Q.   Which page is that on?

11  A.   I am on page 4, a little more than halfway down.  Right

12  there.

13  Q.   Okay.

14  A.   So, that's toward the bottom of the page, and then Travis

15  replies "Not quite yet."

16  Q.   Okay.  What else about that document?

17  A.   If you flip forward, it's page 7, the last line.  Similar

18  message from Belle Li, "Do you have any demands about the

19  steroids, raw, powders, or HGH recently?"

20  Q.   Okay.  There was a response?

21  A.   The response from Travis "Not -- not yet, but when I do,

22  you will be the first I contact."

23  Q.   Okay.  What else?

24  A.   On the top of page 9.

25  Q.   Okay.

1   A.   "I hope you can make an order soon."  And Travis replied,

2   "I saving money so I can."  And then at the very bottom of that

3   same page, "Hey, that package of HGH hasn't made it yet."

4   Q.   From who?

5   A.   From Travis.

6   Q.   And on what date?

7   A.   On October 4th, 2017.

8   Q.   Okay.

9   A.   So, one of the things I noticed with these chats are that

10  the messages were "Your package is going to arrive," or they

11  are out of blue.  And then this -- you know, the ordering

12  information, it's out of the blue.  It's not that -- it's not

13  contained in this chat.  However, he's placing these orders.

14  Q.   What else about that document?

15  A.   At the bottom of that page -- I'm sorry.  Can we turn to

16  page 10?

17  Q.   Okay.  At the bottom of page 10?

18  A.   At the top.

19  Q.   Oh.

20  A.   Most of page 10.  Okay.  Just a minute.  I want to go back

21  to the front for a minute.

22  Q.   Okay.

23  A.   Okay.  Sorry.  Thank you for your patience.  So, as I just

24  said, at the bottom of page 9, "Hey, that package" -- Travis

25  sends a message to Belle Li.  "Hey, that package of HGH hasn't

Andrew Robertson - Direct

1   made it yet."  She replies with three question marks.  "You

2   still didn't get the package?"

3   Q.   Okay.  Sorry.

4   A.   I'm sorry.  I'm at the top of page 10 again.

5   Q.   Okay.  Top of page 10.  Okay.

6   A.   We are there.  "No.  There have not received I," and then

7   "it," to correct it.

8   Q.   Okay.

9   A.   Belle Li says, "Can you contact your local post office.

10  Ask why they didn't receive -- why they didn't deliver the

11  parcel to you, because the parcel arrived at your local post

12  office for a long time."

13          And Travis replied, "I had you send it to E," another

14  state, "My client hasn't received it.  I told her to check post

15  office."

16  Q.   Okay.  What else?

17  A.   Belle Li says, "Okay.  Thanks.  Please ask your friend to

18  check with the local post office."  And then Travis replied, "I

19  already did."  And then she said it wasn't -- Travis said that

20  his client said that it was in transit.

21  Q.   Okay.  So, who was that package being sent to?  Does it

22  indicate?

23  A.   It does not.

24  Q.   What do you take from that exchange though?

25  A.   That Travis, at some point, had contact with whatever

Andrew Robertson - Direct

1    entity Belle Li is working for and then had them send a parcel

2    of HGH to the United States for someone else.

3    Q.   And what happened to that package of HGH?  Do you know?

4    A.   That package -- I don't know what happened to that package

5    of HGH.

6    Q.   Okay.  What else in that document?

7    A.   It continues down.  Where are we at?  And Travis -- just a

8    few lines below that, Travis ordered -- begins to order HGH on

9    October 16, 2017.  "Can you send me an HGH and two kit -- HCG

10   and two kits of HGH."

11   Q.   Okay.  And what else?

12   A.   And then Belle Li responds, "One blue tops HCG?  And two

13   kits of Jintropin.  Right?"  And Travis replies, at the top of

14   page 11, "Yes.  And, of course, the ones that got taken by

15   Customs."  And Belle Li says, "Okay."

16   Q.   Okay.  What else?

17   A.   And then Travis replied, "Is Customs getting tough these

18   days?"

19   Q.   Okay.  Go on.

20   A.   And then Belle Li says, "Hi.  Hi, Dear Travis.  Should I

21   ship all HR products together?  Or separate them into different

22   parcel?"  Travis replied, "One is good, probably."  And then

23   there's an order summary from Belle Li.  "Okay.  The shipping

24   cost for six kits will be" US dollars, "USD 50."

25             So the new order will be "USD 380 including the

Vol. 2 - 159

Andrew Robertson - Direct

1    shipping cost, five kits of Jintropin, 220, one kit of HCG,

2    120, shipping cost 50.  Total cost $390 including the shipping

3    cost."

4    Q.   Okay.  What else?

5    A.   "For payment, do you want to pay via Western Union or

6    MoneyGram?"  Travis replies, "Either way."  Belle Li says,

7    "Western Union is more convenient for us."  And then "WU" -- so

8    Belle Li sends a message.  WU is short for Western Union.

9    First name -- I can't pronounce that.  "X-I-A-O-W-E-I," for

10   first name, last name "Ma," M-A.  Address, "ADD:" address,

11   "China."

12   Q.   What does it say after that?

13   A.   "Please give me the payment information and shipping

14   address after transfer the funds, then I can arrange the parcel

15   ASAP."

16   Q.   Okay.  And what else?

17   A.   Travis replies, "Okay.  Awesome.  Thank you."  She says,

18   "You are welcome," and then begins to ask him, "Can you apply a

19   Facebook for me?"

20   Q.   Okay.  That package of HGH, what do you know about it?  Or

21   not package.  I'm sorry.  What was this conversation?  I said

22   package, but what was it, this thing that was just discussed?

23   A.   It -- it appears that Travis was trying to order H --

24   human growth hormone, HGC and HGH from Belle Li.

25   Q.   Okay.  Do you believe that took place?

1   A.   I believe it probably did.

2   Q.   Okay.

3   A.   No, I'm sorry.  No, he never -- we didn't finish the

4   chats.  He never paid.

5   Q.   Okay.  Okay.

6   A.   As we progress.

7   Q.   Okay.  Thank you.  Okay.  So, what else about that

8   document?

9   A.   Well, he's asking for stuff that he ordered previous.

10  Q.   Okay.

11  A.   A lot of times, I know from previous investigations that I

12  have had, people that order things from China that are illegal

13  drugs, that they just order over the Internet from any website

14  that you can go to.  They will often have a FAQ, a frequently

15  asked questions section, that says "If your stuff gets seized

16  by Customs, we'll do this for you, or we'll do that for you,"

17  and some may require you to send the seizure notice to them or

18  something like that.

19          MR. RICHERT:  Your Honor, I am going to object as to

20  relevance, because we don't know what this website may have

21  said.  And lack of foundation.

22          THE COURT:  Sustained.

23  BY MR. WHEAT:

24  Q.   Well, Special Agent Robertson, we can move on.  And can

25  you discuss anything else about this document that you wanted

Andrew Robertson - Direct

1    to provide the jury?

2    A.    In -- as it progresses, Belle Li provides her email

3    address as on --

4    Q.    Which page are you referring to?

5    A.    I am on page 12, halfway down.

6    Q.    Okay.  There we go.

7    A.    So, in furtherance of the attempt to set up the Facebook

8    account, she provides her email address as

9    salespowders@163.com.

10   Q.    Okay.  What else?

11   A.    At the bottom of that page, she asks Travis if he arranged

12   payment already.  He said -- and then so that she can -- she

13   says, "If so, can you give me the shipping address and payment

14   information?"

15   Q.    Okay.  What else?

16   A.    And she offers to arrange -- at the top of the next page,

17   to send the parcel before the weekend.  Travis says, "I haven't

18   yet.  Hopefully tomorrow.  Thank you."  On the -- that's on

19   October 20th, 2017.  On the 21st, she says, "Any news?"

20   Q.    Just a second, Special Agent Robertson.  I am a little bit

21   behind you.

22   A.    Yep.

23   Q.    Oh, there we go?

24   A.    You are right there.

25   Q.    Looking at page 13.

Andrew Robertson - Direct

1    A.   And then on October 21st, she asks him if there's any news

2    about the payment or address.  And Travis replies that he

3    forgot, and that he would send it on Monday.

4    Q.   What day was that conversation?

5    A.   That day -- that was on October 21st, 2017.

6    Q.   Okay.

7    A.   And then farther on down the page, Travis sends a message

8    and says, "It's under your email and my phone number

9    208-317-0090 Belle Li."  That's the same phone number that's on

10   the fence --

11   Q.   Okay.

12   A.   -- by his house at the time of the search warrant.

13   Q.   All right.

14   A.   And then at the bottom of the page, Travis sends a message

15   reducing his order.  He says, "Belle, can I just get two HCG

16   and what you need to resend.  I haven't got the money for the

17   rest."  That was on October 23rd, 2017.  Belle Li says, "It's

18   difficult," and she has to check with her boss.

19   Q.   Okay.  What else?

20   A.   On page 16, on the --

21   Q.   Did they talk anything further about that particular topic

22   by the way?

23   A.   About the Facebook?

24   Q.   No, about the HCG.  About the conversation you referenced

25   regarding the one at the bottom of page 13.

Andrew Robertson - Direct

1   A.   She said she would check with her boss, and now -- and she

2   would reply to him.  And he said, "Thank you."

3   Q.   Were there any replies that you are aware of in this

4   document?

5   A.   I would have to reread through here real quick.

6   Q.   Feel free to.

7   A.   Thank you.

8        I don't see anything referencing the HCG further.

9   Q.   Okay.  Thank you.  What else in this document did you want

10  to point out to the jury?

11  A.   On page 16.

12  Q.   Okay.

13  A.   About midway through, this is -- the context of this

14  conversation is Belle Li is still working with Travis in an

15  attempt to get a Facebook account set up.  And on October 23rd,

16  2017, she sends a message, "Can you verify it with your phone

17  number two?  Then the Facebook account will be safer, you from

18  USA."  And then she says, "Other Chinese phone number couldn't

19  work because we are from China."

20  Q.   Anything else?

21  A.   On the last page, Belle Li sends a message to Travis that

22  says, "It's too difficult to open a Facebook account in China."

23  Q.   Okay.  Thank you.  Anything else about this exhibit --

24  about this data from this WhatsApp conversation?

25  A.   No, not at this time.

Vol. 2 - 164

Andrew Robertson - Direct

1   Q.   Okay.  I'm going to direct your attention to page 88 -- or

2   page 88.  Excuse me -- Plaintiff's Exhibits 88.  Could you just

3   summarize, for the jury, what Plaintiff's Exhibit 88 is?

4   A.   This is the third extraction report of WhatsApp chat from

5   Travis Newbold's phone.

6   Q.   Okay.  What's significant about that?

7   A.   This is the one that's from Love Ironman, Diana Zoe.

8   This -- in this chat, it's basically they are soliciting Travis

9   to buy powder and high-quality peptides.

10  Q.   Okay.

11  A.   So, it starts with the end-to-end encryption again, and

12  "Long time no your news.  How are you?"  So, again, this is a

13  conversation that just started -- it seems as though two people

14  that knew each other.  And then "A good batch of powders

15  produced out recently.  Do you need some?  High-quality

16  peptides also in stock.  Today made some liquids.  Pictures

17  foe" -- F-O-E -- "your reference."  And this is all between

18  July 18th, 2017, and July 22nd, 2017.  And then they send three

19  photographs.

20  Q.   Showing the jury photographs or at least blown-up versions

21  of the photographs, which are a little pixilated.  Do you know

22  why they are pixilated, Special Agent Robertson?

23              THE COURT:  Counsel, you need to turn --

24  BY MR. WHEAT:

25  Q.   Yeah.  Landscape view.  There we go.  Okay.  They are tiny

Andrew Robertson - Cross

1    in the pictures; right?

2    A.   They are tiny.

3    Q.   Okay.

4    A.   And I can speculate, but I'm not certain.

5    Q.   All right.  Showing the second picture and the third

6    picture.

7    A.   Yes.

8    Q.   And what does it say on the last page there?  I am looking

9    at page 2.

10   A.   Yes.

11   Q.   I believe page 2.

12   A.   Yes, when -- Zoe says, "When you online, please give me

13   some feedback."  And then that was on the 22nd, and then again

14   on the 22nd, "Hey, man.  Don't you have purchase plan

15   recently?"  And Travis replies, "Soon I should.  I will get a

16   hold of you when ready."  And that was also on the same day,

17   July 22nd, 2017.

18           Zoe replied back, "Okay.  Waiting for your updates."

19   And then on October 9th, 2017, "Hey, bud, we back to work from

20   the holiday.  What can I do for you?"  And that's it.

21           MR. WHEAT:  Thank you.  I have nothing further for

22   Special Agent Robertson at this time.  Thank you.

23           THE COURT:  Cross, Mr. Richert.

24           MR. RICHERT:  Thank you.

25

Andrew Robertson - Cross

1                        CROSS-EXAMINATION

2    BY MR. RICHERT:

3    Q.   Agent Robertson, reviewing these extracted communications,

4    it sure seems like these women, if they are women, are trying

5    to solicit Travis to buy things; is that fair?

6    A.   On -- probably the one that I would feel the most about

7    that is the Zoe one, the last one I just discussed.

8    Q.   Clearly, the last one she -- if it's a she -- she contacts

9    Travis and says "Long time no hear from.  Do you want some

10   stuff?  Here's some pictures"?

11   A.   Yeah.  Yes.

12   Q.   And Belle does about the same thing?

13   A.   Well, Travis ordered from Belle.

14   Q.   Ordered but didn't pay.

15   A.   Well, he talked about in the chats that he had arranged to

16   have a package from her shipped to the United States from China

17   to someone else in the United States.

18   Q.   Well, I'll get to that in a minute if I don't forget.  But

19   you also -- well, I will go to Exhibit 86.  Excuse me.  85,

20   which is the Alliance Raws.

21   A.   Exhibit 85 is the conversation with Amy.

22   Q.   Is that Amy?  These are the WhatsApp.

23   A.   Yes.

24   Q.   So, on the WhatsApp, you have -- well, you have shown us

25   that Amy sent a package to Travis which was picked up by

Andrew Robertson - Cross

1    Miss Serna on 10/12 of last year; correct?

2    A.    Yes.

3    Q.    If we go to page 17 of Exhibit 85, do you have that?

4    A.    I am almost there.  The second to the last page.

5    Q.    That's my marking on the page, so --

6    A.    Yes.

7    Q.    It has nothing to do with your exhibit.  This is the

8    tracking number right here in the middle.  It's 181491353 of

9    the package picked up --

10   A.    Yes.

11   Q.    -- by Ms. Serna?

12   A.    Yes.

13   Q.    Do we know what was in it?

14   A.    No.

15   Q.    Is there any conversation at all about what might be in

16   it?

17   A.    No.

18   Q.    Is there any indication that Travis asked what might be in

19   it?

20   A.    No.

21   Q.    Now, there was -- I am trying to use the colored ones

22   here, and it might have been on the page.  Well, while I thumb

23   through trying to find what I am looking for, on October 25,

24   there was communication between this Amy at Alliance Raws and

25   Travis about picking up a package; is there not?

Andrew Robertson - Cross

1   A.    Yes, there is.

2   Q.    And she says to Travis that a package is on its way.

3   Something to that effect.  Do you know what page that is?

4   A.    It's on page 2 just under the attachment.

5   Q.    And this is of exhibit which?

6   A.    Of Exhibit 86.  We weren't able to extract -- the forensic

7   aid was not able to extract the attachment from what was likely

8   a --

9   Q.    Okay.

10  A.    It's a JPEG photograph.

11  Q.    Okay.  So, on 86, page two, Amy says, "You will receive

12  your package soon."  And this was on 10/25 --

13  A.    Yes.

14  Q.    -- of last year.  "Sorry for the delay.  That's good."

15  Travis says, "I have to go to post office to get package.  It's

16  here."  Right?

17  A.    Yeah.  Yes.

18  Q.    So, he's responding.  She says, "It's on its way.  Get

19  there soon."  He says, "No, it's here."  Right?

20  A.    Yes.

21  Q.    Amy says, "It does not arrive at USA now."  So, Amy is

22  saying, "It's not there yet."  And then she says, "I will tell

23  you when it arrives at your place."  Right?

24  A.    Yes.

25  Q.    This is the day that he's arrested for picking up a

Andrew Robertson - Cross

1    package; right?

2    A.    Yes.

3    Q.    And this is the label on the package that he was arrested

4    when he had it in possession; correct?

5    A.    Yes, it is.

6             THE COURT:   Counsel, exhibit number?

7    BY MR. RICHERT:

8    Q.    It's not on this one, so -- the Exhibit 30.

9             If we look at Exhibit 30, we see this package, the

10   identity of the company from which it supposedly derived is an

11   "Idea Fortune Company LTD," right there in the middle; correct?

12   A.    Yes.

13   Q.    Not Alliance Raws?

14   A.    No.  It says "Idea Fortune Company Limited."

15   Q.    Do we know from these chats whether this Amy at Alliance

16   Raws sent this package?

17   A.    We don't.  And I don't -- I can't testify to her clerical

18   skills with adding a correct tracking number in text message

19   either.

20   Q.    Well, she had the one correct tracking number?

21   A.    She did.

22   Q.    She -- in fact, did there not come a time when there was

23   the package she's referring to delivered to Pocatello?

24   A.    Yes, there was.

25   Q.    November 1?

Andrew Robertson - Cross

1    A.   Yes, that's correct.

2    Q.   So, the package this discussion talks about is on its way

3    was not the one he was arrested for?

4    A.   No, it wasn't.

5    Q.   And we don't know from whom this package that he was

6    arrested for came from?

7    A.   No, and I don't know if any of the chats were deleted in

8    between what was displayed in the extraction or if there were

9    any other messaging apps on his phone that was deleted.

10   Q.   Well, now you are suggesting he deleted things knowing

11   that someone was going to take his phone?

12   A.   No, not that someone was going to take his phone, to hide

13   illegal activity or criminal activity possibly.  People do

14   that.  People delete text messages all the time.

15   Q.   Sure.  But if you are doing -- deleting illegal things,

16   don't you think you should delete them all?

17   A.   I am not going to -- if it's ongoing, probably not.  You

18   need to keep what you need.

19   Q.   And we see that these conversations are relatively --

20   there's a lot of small talk in them?

21   A.   Yes, there is.

22   Q.   Travis going fishing, "Hi, Bud.  Love you."  All that kind

23   of stuff.

24   A.   Yes.

25   Q.   And you mentioned the phone.  For what time period did the

Andrew Robertson - Cross

1   extraction -- I don't know the age of the phone; do you?

2   A.   The age of the phone?  No, I don't.  It appeared that the

3   phone started in or became activated in October, the beginning

4   of October, I think.

5   Q.   Of which year?

6   A.   Of 2017.

7   Q.   Well, aren't there chats here --

8   A.   If you --

9   Q.   -- April and March?

10  A.   If you log into your account, it will recover -- even if

11  you delete WhatsApp, it will recover messages.

12  Q.   Don't we have messages here in March of 2017?

13  A.   As I just said, if you delete an app, and you reinstall

14  it, it can restore all of your messages.  It depends on the

15  setting that you have in the app.

16  Q.   Well, you have got me.  I am confused.

17  A.   Okay.

18  Q.   We don't know any apps were deleted; do we?

19  A.   No.  If he switched telephones, if he switched cellular

20  phones and reinstalled the application on his new phone or

21  brought an image with him to his new phone, some of those

22  messages may be restored.

23  Q.   So, the phone may be relatively new, but the information

24  from the phone which would be have transferred from a prior

25  phone will be on the new phone?

Andrew Robertson - Cross

1    A.    Yes.

2    Q.    So, these conversations at least began in March with Amy.

3    A.    You are referring to the WhatsApp chat and not the Skype

4    chats now?

5    Q.    I am at the WhatsApp, Exhibit 85.

6    A.    Exhibit 85, yes.  The extracted data is reflected here,

7    the data that was on the phone.

8    Q.    Other than from the information you have extracted from

9    the phone, is it correct -- is this a correct statement that

10   Amy sent two packages to Travis, one on -- that was picked up

11   on October 12th and one you wound up with on November 1?

12   A.    That's correct.

13   Q.    We don't have -- and they were, what?  25, 250 milligrams

14   of something?

15   A.    Which?  The package that we seized?  The one on November

16   1st?

17   Q.    No, that was -- the first.

18   A.    The first package?

19   Q.    Yes.

20   A.    The first package was over -- just over 1,000 grams of

21   oxymetholone, and 1500 -- I'm sorry -- 518 grams of

22   methandienone.

23   Q.    That's the package reflected that you seized from the post

24   office; right?

25   A.    That Customs and Border Protection seized that --

Andrew Robertson - Cross

1  Q.   But we don't know at all if that came from this Amy

2  person.

3  A.   No.

4  Q.   We do know that Ms. Serna picked up a package that this

5  Amy says, "Here's the tracking number," on October 12th of last

6  year?

7  A.   Yes.

8  Q.   It was not nearly the size of this one; right?  It was a

9  smaller quantity?

10  A.   It was.  Yes.

11  Q.   As was the one you wound up with or your agency --

12  A.   I'm sorry.  I'm confused about the last question.  You

13  asked me -- I thought you were referring to the November 1st

14  one.

15  Q.   That's my second question.

16  A.   Yeah, that is your second question.  I am confused about

17  the package you are referring to in the question you asked me.

18  Q.   The package that Miss Serna picked up --

19  A.   Uh-huh.

20  Q.   -- had less quality of whatever was in it than the one

21  that was seized?

22  A.   I don't know the answer to that.

23  Q.   You do know the answer about the one on November 1?

24  A.   Yes, sir.

25  Q.   You have it?

Andrew Robertson - Cross

1   A.   It's --

2   Q.   Well, you seized it.

3            MR. WHEAT:  Can I have just a second?

4        (Off-the-record discussion.)

5   BY MR. RICHERT:

6   Q.   Do you know the weight of the material in that package on

7   November 1?

8   A.   I know the weight and the material in the package.

9   Q.   And it was 50 grams?

10  A.   It was 53 grams, I believe.

11  Q.   Of testosterone?

12  A.   Testosterone enanthate, powder.

13  Q.   Pardon?

14  A.   Powder.

15  Q.   You are aware, because you started to tell us, that there

16  are a number of websites when you -- you can get materials,

17  powders, liquids, for physical reasons, for testosterone, HGC,

18  human growth hormones.  There are a number of websites that you

19  can buy from?

20  A.   Illegal drugs from out of the country, yes, there are.

21  Q.   Well, Schedule III drugs?

22  A.   And Schedule I.

23  Q.   Pardon?

24  A.   All schedules, yes.

25  Q.   Yeah.  But these are Schedule III drugs?

Vol. 2 - 175

Andrew Robertson - Redirect

1    A.   Yes, that's correct.

2    Q.   And the process, from your review, is that you simply

3    order to get those drugs or substances?

4    A.   Yes, I have had other investigations with drugs being

5    shipped from China.

6    Q.   And if we look at, like, this person Belle Li or Diana, it

7    appears that once an order is made, now you are hooked, meaning

8    they -- they solicit you.  "How you doing?  I haven't talked to

9    you for a while."  That seems to be the pattern; correct?

10   A.   It's the same as any other solicitation that anybody else

11   here would get.  You get -- I got three phone calls yesterday,

12   while I was sitting over there, from numbers that I didn't know

13   that were -- this is just a text solicitation.

14            MR. RICHERT:  That's all the questions I have right

15   now.

16            THE COURT:  Mr. Wheat.

17                     REDIRECT EXAMINATION

18   BY MR. WHEAT:

19   Q.   Detective Robertson or Special Agent Robertson -- excuse

20   me -- you indicated that you had other investigations with

21   controlled substances being imported from China?

22   A.   Yes, I have.

23   Q.   In those other investigations, was it always traceable who

24   sent them and when?

25   A.   No.  In the last case that I had in the District of Idaho

Andrew Robertson - Redirect

1   that involved importation, there were multiple email addresses

2   used.  There were -- the person that was ordering the

3   substances used another person's PayPal account, used another

4   person's mailing address.  The website that they were

5   purchasing from, they gave instructions on how to circumvent

6   Customs, how to pay -- directions on how to pay.

7   Q.   Okay.  Thanks.

8   A.   Things of that nature.

9   Q.   Oh, sorry.

10  A.   I'm sorry.  Things of that nature.

11  Q.   Okay.  Thanks.  So, this second package, I am going to

12  direct you to -- this -- one of these other packages -- let me

13  grab what I want to look at here.

14       We talked earlier about a package that was picked up

15  by Ms. Serna; right?

16  A.   Yes.

17  Q.   On page 17 of Amy's --

18  A.   Exhibit 85.

19  Q.   Yeah -- WhatsApp chat.

20  A.   Yes.

21  Q.   I am going to show you this version.  A little more

22  complex than it looks like, I guess.

23            THE COURT:  Counsel, that's Exhibit 85.

24            MR. WHEAT:  Exhibit 85, Your Honor.  Thank you.

25  Q.   There's that tracking number; correct?

Vol. 2 - 177

Andrew Robertson - Redirect

1   A.   Yes.

2   Q.   Okay.  And did it say, in this information -- I'm going to

3   show you page 18 of Exhibit 85 -- where that particular package

4   came from?

5            THE COURT:  Counsel, can you slide it down so the

6   jury can see it, please?

7   BY MR. WHEAT:

8   Q.   Oh, yeah.  Absolutely.  Sometimes I think what I'm looking

9   at is what everybody else is looking at.

10  A.   Towards the bottom third, it says "China acceptance."

11  Q.   Okay.  Does it say a city?

12  A.   Shenzhen.

13  Q.   Have you seen that city name before on a page?

14  A.   I have.

15  Q.   Which package?

16  A.   The package that was delivered to Travis on October 25th,

17  2017.

18  Q.   Okay.  Thank you.  Now, the other package that we

19  discussed, did Mr. Newbold acknowledge that that was a

20  controlled substance?  Well, I mean that it was -- the identity

21  of that package in these chats?  Or did -- was he told in these

22  chats?

23  A.   Yes, he was.

24  Q.   What was he told?

25  A.   He was told, on October 25th, 2017, that the package

Andrew Robertson - Redirect

1   contained 50 grams of Test E, testosterone enanthate.

2   Q.   Thank you.  So, based on your review of these chats and

3   the remainder of the evidence in this case, as the

4   investigator, do these chats indicate that there was an

5   agreement to import controlled substances into the United

6   States?

7   A.   Inarguably, by the last three messages on the Skype chat,

8   to also export.

9   Q.   Okay.  Does that match up with the remainder of the

10  evidence in this case?

11  A.   Yes, it does.

12  Q.   And does it indicate that Mr. Newbold joined in that

13  agreement?

14  A.   Yes.

15  Q.   And that he knew it was illegal?

16  A.   Yes.

17  Q.   And that there were other orders from Amy by Mr. Newbold?

18  A.   Yes.

19  Q.   And at least one of them was testosterone enanthate?

20  A.   Enanthate, yes.

21  Q.   And do these exchanges indicate drug distribution by

22  Mr. Newbold?

23  A.   Yes, they do.

24  Q.   Okay.  How so?

25  A.   He's receiving controlled substance in the mail and then

Andrew Robertson - RX

1    reshipping it to someone else.

2    Q.   Okay.  And do they discuss whether he sells to people?

3    A.   Yes.

4              MR. WHEAT:  And thank you very much.  Nothing

5    further.

6              THE COURT:  Mr. Richert, anything else?

7              MR. RICHERT:  Yes.

8                         RECROSS-EXAMINATION

9    BY MR. RICHERT:

10   Q.   Agent Robertson, didn't we just talk about the fact that

11   these are solicitors, people soliciting business?

12   A.   Yes, we did.

13   Q.   And you agreed that's probably what it is?

14   A.   I agreed that they are solicitors.

15   Q.   And you just told Mr. Wheat that Mr. Newbold is

16   distributing controlled substances.  We don't know what was in

17   any of those packages except the one you seized.  I guess two

18   that you have.

19   A.   Yes, two.

20   Q.   Beyond that, we don't know what was in any of the

21   packages?

22   A.   The text messages with -- with Belle Li, the distribution

23   of HC --

24   Q.   Let me be real clear.

25   A.   Okay.

Andrew Robertson - RX

1   Q.   I apologize.  I was a little broad.  The quantity that

2   Travis was trying to get from Diana --

3   A.   Zoe?

4   Q.   Zoe -- was a small quantity.  360 bucks I think was the

5   price.

6   A.   You are talking about Belle Li?  There was no -- the Zoe

7   one, there was no talk of -- they were offering.

8   Q.   Okay.  So, we are talking about --

9   A.   So you are referring to Exhibit 87 with Belle Li?

10  Q.   Yes.

11  A.   Yes.

12  Q.   And the quantity of testosterone that was delivered on

13  November 1 from Amy was 50 grams?

14  A.   Of the Schedule III controlled substance imported in the

15  United States.  I'm sorry.  I misspoke.  It was 50 grams of a

16  controlled substance.

17  Q.   That was not distributed, or we don't know if it was going

18  to be distributed?

19  A.   He was arrested before the package was delivered.

20  Q.   And we don't know what was in the package Ms. Serna picked

21  up?

22  A.   No.

23  Q.   We don't know -- well, the only information Miss Serna

24  knew that she was sending it off to Travis's daughter?

25  A.   Yes.  We --

Andrew Robertson - RX

1   Q.   That's what she said.

2   A.   It is, and we know that -- we also know that Amy, the

3   person that he was talking to at that time, texting with, had a

4   company that purports to sell anabolic steroids.

5   Q.   And other things.

6   A.   Other things?

7   Q.   Does this Alliance Raws sell other things?

8   A.   Not that I am aware of.

9   Q.   It says a pharmaceutical -- Alliance Raws Pharmaceuticals.

10       (Off-the-record discussion.)

11            MR. RICHERT:  I will withdraw the question.

12   Q.   The charge here in Count Two is what?

13   A.   Is it conspiracy?  Is Count Two conspiracy?

14   Q.   That's Count One.

15   A.   Importation.

16   Q.   The importation.  And Count Three is distribution.

17   A.   Yes.

18   Q.   Do we know who this Amy is?

19   A.   No.

20   Q.   Do we know who this Diana is?

21   A.   No.

22   Q.   Or Belle Li?

23   A.   No.

24   Q.   Do we know if they even are associated individuals or

25   associated with companies?

Andrew Robertson - RX

1    A.    No, we don't.

2    Q.    We don't know anything?

3    A.    We know that Amy, the person who purported to be Amy, is

4    associated with Alliance Raws.

5    Q.    Because she set that up herself apparently.

6    A.    Based on the text message in the WhatsApp chats that she

7    had with Travis.

8              MR. RICHERT:  That's all the questions I have.

9              THE COURT:  Anything else, Mr. Wheat?

10             MR. WHEAT:  No, thank you, Your Honor.

11             THE COURT:  All right.  You may step down, Special

12   Agent Robertson.

13             THE WITNESS:  Thank you.

14             THE COURT:  I think we are ready for the afternoon

15   break.  Let's take a short break.

16             MR. WHEAT:  Can I ask just a privilege of the Court

17   real quick?

18             THE COURT:  Yes.

19             MR. WHEAT:  And if I can explain to counsel real

20   quick what I did.

21        (Off-the-record discussion.)

22             MR. WHEAT:  So, Your Honor, just for the Court's

23   information, and before I forget, I'd like to introduce another

24   exhibit, which would be Plaintiff's Exhibit 100.

25             And we have stipulated to this.  And what it is, is a

1    comparison for the jury's help.  It's a summary of the photos,

2    and the exhibit numbers, and the evidence numbers of the

3    physical evidence, and then the descriptions, so that when they

4    handle the evidence, they have something helpful for them.

5                    THE COURT:  Any objection?

6                    MR. RICHERT:  No.

7                    THE COURT:  All right.  Exhibit 100 will be admitted.

8            (Exhibit 100 admitted.)

9                    MR. WHEAT:  Okay.  Thank you, Your Honor.  That's

10   all.

11                   THE COURT:  All right.  Let's take a recess.

12                   Ladies and gentlemen, we will be in recess for 15

13   minutes.  I will again admonish you to follow the Court's

14   admonition concerning jury conduct.  We will be in recess.

15           (Recess 2:49 p.m.  Resumed 3:18 p.m.  Jury in.)

16                   THE COURT:  Thank you.  Please be seated.  Note that

17   the jury is present.

18                   Mr. Wheat.

19                   MR. WHEAT:  Thank you, Your Honor.  One last time we

20   briefly ask to call Special Agent Robertson.

21                   THE COURT:  All right.  Agent Robertson, I will just

22   remind you, you are still under oath.

23                          FURTHER REDIRECT EXAMINATION

24   BY MR. WHEAT:

25   Q.   Special Agent Robertson, I am showing you what's been

Andrew Robertson - Redirect

1    marked as -- what's been previously admitted as Plaintiff's

2    Exhibit 64.  Do you recognize that?

3    A.    Yes.

4    Q.    What is that?

5    A.    That's a photograph that -- taken by the Pocatello Police

6    Department of a cooler that was located in the bedroom by the

7    safe or the same bedroom/storage room as the safe.

8    Q.    Okay.  Are you familiar with the substances -- and I am

9    showing you other exhibits here for the jury's purposes.  I am

10   showing you 65, Plaintiff's Exhibit 65, Plaintiff's Exhibit 66,

11   Plaintiff's Exhibit 67, Plaintiff's Exhibit 68, Plaintiff's

12   Exhibit 69, and Plaintiff's Exhibit 70, 71.  Do you recognize

13   those?

14   A.    I do.

15   Q.    Okay.  I am also showing you -- I am going to show you --

16   and I will provide the context here -- what's been previously

17   marked as Plaintiff's Exhibit 98.  Do you recognize --

18            THE COURT:  Counsel, wait a minute.  I don't have

19   that as having been offered or admitted.  But Ms. Bracke?

20            MR. WHEAT:  Oh, I'm sorry.  I apologize.

21            COURTROOM DEPUTY:  It's not admitted.

22   BY MR. WHEAT:

23   Q.    I apologize.  Do you recognize Plaintiff's Exhibit 98?

24   A.    Yes.

25   Q.    What is it?

Andrew Robertson - Redirect

1   A.   It's photocopies of notebooks and things that were taken

2   from Travis Newbold's -- the safe, the green safe in that room.

3   Q.   Okay.  So, in other words, is that a photo of the notebook

4   and items seized together in a blue folder?

5   A.   Yes.

6   Q.   Okay.  And would that be the same as in Plaintiff's

7   Exhibit 96?

8   A.   Yes.

9   Q.   Okay.  So, these are photocopies of that?

10  A.   Yes, that's correct.

11  Q.   Okay.  Could you tell us about -- I have just showed you

12  Plaintiff's Exhibit 71 -- or 64 through 71 -- how those relate

13  to Plaintiff's Exhibit 98?

14  A.   If you turn deeper into this document, there's website

15  instructions printed out.  And one says page 7 of 11.

16          THE COURT:  Counsel, let's -- okay.  What are we

17  looking at now?  I just want to make sure we are showing to the

18  jury what's been admitted.

19          MR. WHEAT:  And I would move for this document's

20  admission, too, Your Honor.

21          THE COURT:  98?

22          MR. WHEAT:  Yes, please.

23          THE COURT:  Any objection?

24          MR. RICHERT:  No.

25          THE COURT:  All right.  Exhibit 98 will be admitted

Andrew Robertson - Redirect

1    and now may be published to the jury.

2         (Exhibit 98 admitted.)

3    BY MR. WHEAT:

4    Q.   Okay.  There is page 7 of 11 of the packet of copies that

5    are now Plaintiff's Exhibit 98.

6    A.   I'm sorry.  Could we turn to page 2 of 11 or 1 of 11 first

7    and then flip back?

8    Q.   Yep.  That's fine.  Okay.

9    A.   That's actually the first page of it.  Oh, that's the

10   second page.  That's fine.

11        THE COURT:  Counsel, when you move around real

12   quickly, the jury doesn't get a chance to really see it.  So,

13   it might be good, if you are putting something there, to leave

14   it long enough for them to digest what it is.

15        MR. RICHERT:  And I don't seem to be able to find the

16   pages being referred to.

17        THE COURT:  This is page 2 of 11?

18        MR. WHEAT:  I thought I had given you a different

19   copy.

20        MR. RICHERT:  Okay.  I have got it.

21   BY MR. WHEAT:

22   Q.   Okay.  You wanted to see 2 of 11 or 1 of 11.  Sorry.

23   A.   2 of 11 is great.

24   Q.   Okay.  There you go.

25   A.   This is a -- again, recovered from the safe in the packet

Vol. 2 - 187

Andrew Robertson - Redirect

1  of documents there.  And it says "Instructions for making

2  injectables from powder, anabolic steroids," and the page is

3  actually dated from 2006, but it lists recipes for how to make

4  steroids from powders into liquid form.

5              THE COURT:  Into what?

6              THE WITNESS:  Liquid form, Your Honor, or injectable.

7  BY MR. WHEAT:

8  Q.   And how does that relate to the other items, the bottles

9  in that ice chest, and I am speaking of, when I say that, the

10  bottles showed in -- the bottles showed in 64 through 71?

11  A.   So again, if you move forward to page 7 of 11 --

12  Q.   Or at least a portion of those.  Not all of it.

13  A.   Yes.

14             THE COURT:  And you might zoom in just a little,

15  counsel.  All right.  No, so the jury can read it.

16  BY MR. WHEAT:

17  Q.   Okay.

18  A.   Scott Hellstrom, I believe, testified to the contents of

19  the lab report for the substances seized.  And there was

20  testosterone propionate seized from Mr. Newbold's house.  And

21  here it appears to be a recipe for how to make testosterone

22  propionate from within this instructions of making powders into

23  injectables.

24             And two of the liquid ingredients, benzyl alcohol and

25  benzyl benzoate were contained in that safe.  Not safe.  I'm

Andrew Robertson - Redirect

1   sorry.  Within the cooler that was in that room.

2           MR. WHEAT:  Okay.  Thank you.  Nothing further.

3           THE COURT:  Cross?

4           MR. RICHERT:  None.

5           THE COURT:  All right.  You may step down, Agent

6   Robertson.

7           MR. WHEAT:  Just briefly, Your Honor.  We have

8   also -- and we also have a stipulation.  One second.

9           THE COURT:  Do you want to read that to the jury?

10          MR. WHEAT:  So, one second.  If I can just have a

11  second.

12          Nothing further.  Thank you.

13          THE COURT:  The defense -- or the government rests?

14          MR. WHEAT:  The government rests, Your Honor.

15          THE COURT:  Ladies and gentlemen, there's a matter

16  I'll need to take up outside your presence, so I'm going to

17  have Mr. Metcalf escort you out to the jury room.

18          Again, I will admonish you not to discuss the case

19  among yourselves, not to form or express any opinions about the

20  case.  Just follow the Court's admonition at this point until

21  you are advised by the Court to do otherwise.

22          Mr. Metcalf, if you will escort the jury out.

23      (Jury out.)

24          THE COURT:  Please be seated.

25          Mr. Richert.

1            MR. RICHERT:  Your Honor, we move, pursuant to Rule

2    29, for a dismissal of the case on the grounds that there was

3    insufficient evidence upon which a reasonable jury could find

4    Mr. Newbold guilty of any count.

5            As to Count One, the importation of controlled

6    substance, what Mr. Newbold was doing was simply buying

7    substances from a website.

8            Count Two, importation of a controlled substance, we

9    simply feel there's not sufficient evidence for the jury to

10   find him guilty of that.

11           Count Three, possession with intent to distribute a

12   controlled substance, although we have testimony that the

13   amount of the substance suggests an attempted to -- intended to

14   distribute, there is no evidence that he really did.

15           THE COURT:  Mr. Wheat.

16           MR. WHEAT:  Your Honor, the government would contest

17   that motion and indicate to the Court that there is plenty of

18   evidence for a reasonable jury to find, beyond a reasonable

19   doubt, that Mr. Newbold is guilty of these three offenses.

20           As to Count One, conspiracy to import anabolic

21   steroids into the United States or controlled substances, there

22   has been ample evidence suggesting that Mr. Newbold had an

23   agreement, with someone in China, who was importing.  And in

24   the statute, by the way, and in a jury instruction we will

25   request, and either way, is to either import, which means to

1    import, to bring in something into the United States from

2    outside the United States, or to introduce into the United

3    States a controlled substance.

4            We have an agreement where Mr. Newbold was

5    introducing a controlled substance into the United States and

6    working with someone else to do so and to facilitate

7    distribution.

8            In other words, that there was an agreement that

9    Mr. Newbold joined in that agreement knowing its scope and

10   agreeing to further it.

11           As to Count Two, the importation, we have that

12   Mr. Newbold picked up a package of over 3 pounds of anabolic

13   steroids.  They were sent from China.  We have other packages

14   from China and a whole host of the other steroids in

15   Mr. Newbold's home that corroborate that finding and would

16   suggest that there's ample reasons for a reasonable jury to

17   find that.

18           And as for the possession with intent to distribute,

19   we'd submit that there's ample evidence there to.  The amounts,

20   the eyewitness testimony of Mr. Newbold giving someone

21   something that looked like a vile.  Some vials in this case

22   tested positive as controlled substances, anabolic steroids,

23   and we'd oppose the motion.  Thank you.

24           THE COURT:  All right.

25           MR. WHEAT:  And Your Honor -- I'm sorry.

1          THE COURT:  Yes.

2          MR. WHEAT:  I can indicate more evidence.  If the

3   Court's having a hard time, there's more evidence that the

4   government would argue in closing, but those are just a few of

5   the government's reasons.

6          THE COURT:  All right.  I am going to deny the Rule

7   29 motions.  The one that gives me slight pause, until I

8   reflect on it a moment, is Count One, the conspiracy.

9          I had a trial here some years ago in which the

10  government, for whatever reason, agreed not to pursue a

11  distribution count but rather pursued only a conspiracy count.

12         The defendant was convicted, and that conviction was

13  reversed by the Ninth Circuit on the theory that there was

14  ample evidence of actual possession with intent to distribute,

15  but the evidence of the conspiracy was basically just a

16  buyer/seller relationship.  Nothing more.  And the circuit said

17  that is not a conspiracy.  That is just a buyer/seller

18  relationship, and there is no indication of a conspiracy to

19  distribute a controlled substance.

20         At first, I thought you could make that argument, but

21  here there's the additional -- the text messaging that went

22  back and forth and the clear indication that the items were

23  being distributed.  And actually, Mr. Newbold, I think, was

24  being perhaps paid just to act as a conduit for the reshipment

25  of these products, and I think that would constitute a

1    conspiracy.

2                You know, I suppose, when I dig down and subject, you

3    know, the trial transcript to some flyspecking, I may conclude

4    otherwise.  But at this point, it seems to me that there is

5    evidence of an actual conspiracy, not just a buyer/seller

6    relationship.  And it's probably premised, as much as anything

7    else, on those communications in which there's at least a clear

8    suggestion, clearly sufficient evidence from which the jury can

9    conclude that there was a conspiracy in which Mr. Newbold

10   agreed to receive and then redistribute, if only by remailing

11   it to other people in the United States, the illegal substances

12   that he was receiving from China.

13               With regard to importation of a controlled substance,

14   clearly, he received the package.  Whether he ordered it or

15   whether it was sent in some kind of a promotion, it doesn't

16   really matter.  He clearly imported it.

17               Again, the chat messages indicate that he was

18   expecting the package.  There was some surprise or disconnect

19   between whether the package had actually arrived or not,

20   because the person in China appeared to think that at least

21   their -- I assume they were going on some tracking service with

22   the postal service, and it indicated that it had not arrived

23   yet even though Mr. Newbold had already received a notice that

24   it had.

25               And I expect that has to do with the fact that it was

1    seized and maybe the regular tracking system wasn't used.  It

2    doesn't matter.  It's clearly sufficient evidence, I think, to

3    satisfy the elements of Count Two.

4              And then finally, Count Three, possession with intent

5    to distribute, I think the evidence of Mr. Newbold taking a

6    vile out of his fridge, giving it to another individual, or

7    putting it into a syringe himself, and then the individual

8    injecting it into his stomach, I think that's sufficient

9    evidence from which the jury could infer that that was, in

10   fact, possession with intent to distribute.

11             And then again, the evidence I also referred to in

12   terms of receiving and then acting as a point of, I guess,

13   transshipment of the steroids to someone else the United

14   States, that also would constitute possession with intent to

15   distribute.

16             So, for those reasons, I will deny the Rule 29

17   motion.  Noting, of course, Mr. Newbold, this is the one time

18   when the government does get the benefit of all the doubts.  We

19   construe the evidence in a light most favorable to the

20   government in considering a Rule 29 motion.  And having done so

21   in this case, I think there's clearly evidence for this issue

22   to be submitted to the jury.

23             So, with that, Mr. Richert, do you have a witness who

24   could be here or are we going --

25             MR. RICHERT:  I think we do have a witness here.

Vol. 2 - 194

Andrew Robertson - Redirect

1          THE COURT:  All right.  Do you want to -- how long?

2    Can we be done by 4:00?

3          MR. RICHERT:  I would think so.

4          THE COURT:  All right.  Let's bring the jury back in.

5          And Ms. Bracke, was there -- no.  Let's bring the

6    jury back in.

7        (Jury in.)

8          THE COURT:  Please be seated.  I will note that the

9    jury has been brought back into the courtroom.

10          Mr. Richert, could you announce the name of your

11    witness?

12          MR. RICHERT:  Michael Montano.

13          THE COURT:  Sir, would you step before the clerk and

14    be sworn.

15          COURTROOM DEPUTY:  Please raise your right hand.  You

16    do solemnly swear the testimony you are about to give will be

17    the truth, the whole truth, and nothing but the truth, so help

18    you God?

19          THE WITNESS:  I do.

20          COURTROOM DEPUTY:  Please take a seat in the witness

21    stand.

22                    MICHAEL JOSEPH MONTEJANO,

23    having been duly sworn, was examined and testified as follows:

24          COURTROOM DEPUTY:  Please state your complete name

25    and spell your name for the record.

Michael Joseph Montejano - Direct

1          THE WITNESS:  Michael Joseph Montejano.  And you just
2    want my last name spelled?
3          THE COURT:  Yes, that should -- unless your first
4    name is spelled something different than the normal spelling,
5    but if it's not, just spell the last name.
6          THE WITNESS:  M-O-N-T-E-J-A-N-O.
7          THE COURT:  Okay.  Is it pronounced Montejano?
8          THE WITNESS:  Montejano.
9          THE COURT:  Okay.  You may inquire of the witness.
10                    DIRECT EXAMINATION
11   BY MR. RICHERT:
12   Q.   I mispronounced your name, so I apologize.
13   A.   Excuse me.
14   Q.   I mispronounced your name, so I apologize.
15          Mr. Montejano, do you reside in -- where do you
16   reside?
17   A.   I am now at 2749 Jerome Street, Pocatello, Idaho.
18   Q.   I didn't ask for the exact address.  You reside in -- you
19   still reside in Pocatello?
20   A.   Yes.
21   Q.   And the years 2016 and '17, did you also reside in
22   Pocatello?
23   A.   Yes.
24   Q.   And at some point, did you reside at -- with Mr. Newbold?
25   A.   Yes, I did.

Michael Joseph Montejano - Direct

1   Q.   Can you tell us about when that would be?

2   A.   It was --

3           THE COURT:  Can you bring the microphone a little

4   closer or maybe slide -- you can move it on its base or point

5   it closer to your mouth, so we can hear you.  There you go.

6   Thank you.

7           THE WITNESS:  It was the end of December 2016 till

8   midsummer of '17.

9   BY MR. RICHERT:

10  Q.   Were you also residing there at the time in October 2017

11  when Mr. Newbold was arrested?

12  A.   I -- yeah, I was.  I had came back from California.

13  Q.   Okay.  So, in mid-2017, you -- did you leave Pocatello for

14  a period of time?

15  A.   I did.

16  Q.   And did you -- when did you return approximately?

17  A.   End of November.  I was here for Thanksgiving.

18  Q.   But you were also here in October of 2017?

19  A.   Yes.  Oh, October.  I was thinking.  Yeah.  Yeah.  Yes, I

20  was.

21  Q.   I don't want to put words in your mouth.

22  A.   No, you are not.  No, I was here for Halloween, too.

23  Q.   Okay.  And when you returned from California, did you then

24  reside again in the Newbold house?

25  A.   I did.  You know, I was -- I was there.  I was kind of in

Michael Joseph Montejano - Direct

1   between places.

2   Q.   Okay.  Were other people, while you were living there,

3   also living there besides Mr. Newbold?

4   A.   Yes.

5   Q.   Do you remember any names?

6   A.   Ox.  I don't remember his last name.  Big guy, Ox.

7   Q.   Ox Wheeler?

8   A.   Yes.

9   Q.   Was he living there when you were?

10  A.   Yes.

11  Q.   Do you know about the time frame that he was there?

12  A.   I don't.  He was there before me and after I was gone.

13  Q.   Because he was still there after you left?

14  A.   Yes.

15  Q.   Were there other people that you can remember living

16  there?

17  A.   There was a kid that lived downstairs before I went, and

18  he -- he moved out while I was there.  His name was Ricky.  I

19  don't -- he was from Washington.  He was working -- he was here

20  for work.

21  Q.   And did you pay rent for living there?

22  A.   I still owe rent.  I didn't -- I never paid him, because I

23  was -- I was waiting for my tax check to come actually.

24  Q.   So, you were to pay rent?

25  A.   Yeah, and then I -- I just -- I went to work for him.

1   Helped him with a few jobs.

2   Q.   Okay.  So, you worked off maybe the rent?

3   A.   Yes.

4   Q.   Rather than pay him in cash?

5   A.   Yes.

6   Q.   Would that be fair?

7   A.   Yes.

8   Q.   Was there a woman by the name of Khem Millward that

9   habituated that place?

10  A.   Yes.

11  Q.   Tell me your observations of whether or not she was in and

12  out or was she staying there?

13  A.   She stayed there sometimes.  I think she had her own

14  place --

15  Q.   Okay.  And she testified --

16  A.   -- as a matter of fact.

17  Q.   Go ahead.

18  A.   I think she was living at her parent's house.  And while I

19  was there, she moved into her own place, but she was always

20  there.

21  Q.   And what -- that period of time would have been what when

22  she was there?

23  A.   All summer.

24  Q.   Okay.  And was there a time that there became a dispute

25  between her and Mr. Newbold, if you know?

1    A.   Yeah, they got into a domestic deal.  I wasn't there when

2    it happened.  I was there before and after it.

3    Q.   After that domestic deal, did she still come to the house?

4    A.   She did.  She wasn't supposed to but she did.

5    Q.   As far as you know, she wasn't supposed to be there but

6    she did?

7    A.   Yes.

8    Q.   Because you saw that?

9    A.   Yes.

10   Q.   Did you see a woman by the name of Serna at the house?

11   A.   Yes.

12   Q.   About what time frame was that?

13   A.   It was wintertime.  There was snow on the ground.

14           MR. RICHERT:  Okay.  I have no further questions.

15           THE WITNESS:  Sorry?

16           THE COURT:  That's all right.

17           Mr. Wheat.

18           MR. WHEAT:  Thank you.

19           THE COURT:  Cross.

20                   CROSS-EXAMINATION

21   BY MR. WHEAT:

22   Q.   All right.  Mr. Montejano, Bryan Wheat for -- I am the

23   Special Assistant United States Attorney.

24           You weren't living with Mr. Newbold at the time in

25   October of 2017 then?

Michael Joseph Montejano - Cross

1   A.   I had come back in October.

2   Q.   You had come back in October?

3   A.   Yes, and he let me stay there as long as I needed to.  I

4   was trying to find my own place.  It was a difficult time for

5   me, so --

6   Q.   So, your testimony today is that you lived there in

7   October of 2017?

8   A.   Yes.

9   Q.   What part of October 2017?  Was it late 2017 October?

10  A.   Probably mid to late.  In and out.  I mean, I stayed there

11  a few nights.

12  Q.   Which room did you reside in?

13  A.   Downstairs basement.

14  Q.   Which room did --

15  A.   Either that or on the couch.

16  Q.   Which room did Mr. Newbold reside in?

17  A.   Upstairs right to the bathroom.

18  Q.   Was there a safe in the home?

19  A.   I don't know.

20  Q.   Were there anabolic steroids in the home?

21  A.   Not that I know of.

22  Q.   Were there vials in the home?

23  A.   Not that I knew of.

24  Q.   Did you receive mail at the home?  You didn't receive mail

25  at the home; did you?

Michael Joseph Montejano - Cross

1   A.   No.

2   Q.   And you stayed there sporadically; didn't you?

3   A.   Yes.

4   Q.   And you had another place to stay?

5   A.   No.

6   Q.   You don't know when Khem was there, the dates; do you?

7   A.   Not exact dates, no.

8   Q.   And you don't know when Ms. Serna was there; did you?  Do

9   you?

10  A.   No.

11  Q.   You do know when Mr. Newbold stopped living there though;

12  correct?

13  A.   When he what?

14  Q.   When he stopped living there?

15  A.   Not sure of the date.

16  Q.   Okay.  But that was -- but around October, were you living

17  there with him?

18  A.   Right.  Right.

19  Q.   Or without him?

20  A.   Without him.

21  Q.   You were living there without him?

22  A.   Yes.

23  Q.   Okay.

24  A.   I had to -- I had some stuff.  I had to get it.  My bike

25  was still there.

Michael Joseph Montejano - Redirect

1   Q.   Okay.  So, Mr. Newbold didn't live there at the time?

2   A.   No.

3   Q.   Okay.  Was there snow on the ground at that time?

4   A.   No.

5   Q.   Okay.  Was it fall?

6   A.   Possibly.  I --

7   Q.   You don't remember whether it was fall?

8   A.   Not when he wasn't there.  There was no snow on the

9   ground.

10  Q.   Okay.

11  A.   I don't believe.

12  Q.   Did you live there when Raquel lived there?

13  A.   No.

14  Q.   Did you ever have access to any safes in the home?

15  A.   I don't know that there was safes in the home.  I don't

16  know.

17  Q.   Did you ever have any access to any storage rooms in the

18  home?

19  A.   There was a storage room downstairs.

20          MR. WHEAT:  Thank you.  Nothing further.

21          THE COURT:  Anything else, Mr. Richert?

22          MR. RICHERT:  Yeah, there was a question I forgot to

23  ask.  May I?

24          THE COURT:  You may.

25

Michael Joseph Montejano - Redirect

1                          REDIRECT EXAMINATION

2   BY MR. RICHERT:

3   Q.   Which room did Mr. Wheeler, Ox reside in?

4   A.   Upstairs to the -- if you are facing the bathroom, left is

5   his room and right was Mr. Newbold's.

6   Q.   And Ox was kind of itinerant, there sometimes and there

7   not, gone sometimes?

8   A.   Yes.

9   Q.   Would he shut his door when he was not there?

10  A.   Yes.

11  Q.   Would he lock it?

12  A.   He did.

13          MR. RICHERT:  That's the questions I forgot.

14          THE COURT:  Anything else?

15          MR. WHEAT:  Nothing further.  Thank you.

16          THE COURT:  You may step down.  Thank you,

17  Mr. Montejano.

18          THE WITNESS:  You are welcome.

19          THE COURT:  May the witness be excused and released

20  from any subpoena?

21          MR. RICHERT:  Please.

22          THE COURT:  Mr. Wheat, I assume there is no

23  objection.  You won't need to recall him or call him?

24          MR. WHEAT:  Yeah.  Correct, Your Honor.

25          THE COURT:  Mr. Richert?

1          MR. RICHERT:  May we have a moment?

2          THE COURT:  You may.  Do you want to take a break?

3          MR. RICHERT:  Take a break.

4          THE COURT:  All right.  Ladies and gentlemen, we are

5     going to take a short recess at this time.

6          Well, it will be 10 minutes at least.  Might be 15.

7     I will again admonish you to follow the Court's admonition

8     concerning juror conduct.  We will be in recess for 10 minutes.

9          (Recess 3:47 p.m.  Resumed 4:11 p.m.  Jury in.)

10          THE COURT:  Thank you.  Please be seated.  I will

11     note the jury's presence.

12          Mr. Richert.

13          MR. RICHERT:  Your Honor, Mr. Newbold rests.

14          THE COURT:  All right.  Thank you, Mr. Richert.

15          Mr. Wheat, any rebuttal testimony?

16          MR. WHEAT:  No, Your Honor.  Thank you.

17          THE COURT:  All right.  Ladies and gentlemen, the

18     evidence now has been fully submitted to you.  However, given

19     the hour, we really won't have time for the Court to instruct

20     you and to have the arguments of counsel, so I think a better

21     choice is just to recess for the day, and we will reconvene.

22          I think I indicated to you that I have a scheduling

23     problem.  I have to be on a conference call between 10:00 and

24     11:00.  I can't change it, because it involves people all over

25     the country, and I can't get out of it for the same reason.

1          So, for that reason, I think if we start at 9:00,

2   what will happen is I will give you my instructions, which will

3   take perhaps 40 minutes.  We will then take a recess while I am

4   on my conference call.  We will come back at 11:00, and then we

5   will hear the closing arguments of counsel, which will take

6   collectively I think not more than an hour.

7          And then at that point, I will give you a few final

8   instructions, and then you will begin your deliberations.  We

9   will have a meal brought in for you, so it should be ready as

10  soon as you are beginning your deliberations.  You will have a

11  meal there, so you can go directly into deliberations.

12         However, the concern I have is that you may think,

13  "Well, I've heard all the evidence now.  I can start forming an

14  opinion or I can talk to people.  I can talk to other jurors

15  about the case."  And the answer is, no, you can't.  You are

16  under a strict admonition of the Court to continue doing just

17  what I've told you, you must, which is not to discuss the case

18  with anyone else.  Don't discuss it with other jurors.  Don't

19  form or express any opinions about the case.

20         You have not had the benefit of my final

21  instructions, which are critical, because the evidence doesn't

22  mean anything unless you have kind of a structure to put it

23  into, which will be what the Court's instructions will be.  It

24  will advise you as to what the elements are and the burden upon

25  the government and will put everything into a context that will

 1    make a verdict possible.  Until you have that, a verdict is not

 2    possible.  So, I will ask you to again -- or direct that you

 3    continue following the Court's admonition.

 4          Juror Number 6, we talked with you about the -- we

 5    will still ask you to come in the morning, but barring some

 6    tragedy tonight or someone becoming ill, I think you can fairly

 7    safely assume that by 10:00, we'll excuse you, and you will be

 8    allowed to keep that rather important date that I think you had

 9    scheduled with your spouse.

10          So, at this point, counsel, is there anything else we

11    need to take up in front of the jury?

12          MR. WHEAT:  Not from the United States.  Thank you.

13          MR. RICHERT:  No.

14          THE COURT:  All right.  Counsel, again, if you

15    perhaps could review the proposed instructions, being ready to

16    discuss them in perhaps half an hour, we will try to get that

17    wrapped up tonight so we are ready to go by 9:00 in the

18    morning.

19          Ladies and gentlemen, have a pleasant evening, and we

20    will be in recess until 9:00 tomorrow morning.

21          (Recess 4:14 p.m.)

22

23

24

25

INDEX OF EXAMINATIONS

For the Plaintiff:

| Witness Name | Direct | Cross | RD | RX | Further D |
|---|---|---|---|---|---|
| Clara Sutherland | 4 | | | | |
| Nicholas Cloise Edwards | 12 | 19 | 23 | 26 | 28 |
| Bradley J. Roedel | 33 | 40 | | | |
| Bryan Harris | 45 | 71 | 77 | | |
| Raquel Syrah Serna | 82 | 95 | 99 | | |
| James Charles Wheeler | 101 | 108 | 113 | | |
| Khem Tachi Millward | 119 | 123 | 125 | | |
| Marcel Korvela | 127 | 131 | | | |
| Andrew Robertson | 133 | 166 | 176 | 180 | 184 |

For the Defendant:

| Witness Name | Direct | Cross | RD | RX | Further D |
|---|---|---|---|---|---|
| Michael Joseph Montejano | 196 | 200 | 203 | | |

PLAINTIFF'S EXHIBIT INDEX

| Exhibit No. | Marked | Admitted |
|---|---|---|
| 18 through 25 | | 50 |
| 26 | | 39 |
| 32 through 55, 57 through 60 and 63 through 71 | | 48 |
| 61, 62, 72, and 73 | | 35 |
| 85 | | 137 |
| 86 | | 151 |
| 87 and 88 | | 155 |
| 94 | | 38 |
| 95 | | 31 |
| 96 | | 61 |
| 97 | | 64 |
| 98 | | 187 |
| 99 | | 128 |
| 100 | | 184 |

1                              --oOo--

2                    COURT REPORTER'S CERTIFICATE

3

4        I, KATHERINE EISMANN, Official Court Reporter, certify

5    that the foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.

7

8    Date:  February 18, 2019.

9                              /s/ *Katherine Eismann*

10                            Katherine Eismann, CRR, RDR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25