**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 4:17-cr-00328-BLW |
| Plaintiff, | ) | **JURY TRIAL DAY 1** |
| vs. | ) | |
| TRAVIS M. NEWBOLD, | ) | |
| Defendant. | ) | |

**TRANSCRIPT OF PROCEEDINGS - VOLUME 1**
**BEFORE THE HONORABLE B. LYNN WINMILL**
**WEDNESDAY, OCTOBER 17, 2018, 8:30 A.M.**
**POCATELLO, IDAHO**

**FOR THE UNITED STATES OF AMERICA**
Bryan Wheat
US ATTORNEY'S OFFICE
801 E. Sherman, #192
Pocatello, ID 83201

**FOR DEFENDANT**
Steven V. Richert
FEDERAL DEFENDER SERVICES OF IDAHO, INC.
757 N. 7th Avenue
Pocatello, ID 83201

Proceedings recorded by mechanical stenography, transcript produced by computer.

---

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO 83724

I N D E X

OCTOBER 17, 2018 - VOLUME 1

| Date | Proceeding | Page |
|---|---|---|
| 10/17/18 | Jury Trial Day 1 | 1 |
| | Jury instruction by the Court .................... | 11 |
| | Opening statement by Mr. Wheat .................. | 24 |
| | Opening statement by Mr. Richert ................ | 31 |

**U N I T E D  S T A T E S  W I T N E S S E S**

**PAGE**

**JONATHAN CARVER DUMKE**
Direct Examination By Mr. Wheat........................86
Cross-Examination By Mr. Richert.......................98
Redirect Examination By Mr. Wheat......................100
Recross-Examination By Mr. Richert.....................102

**SCOTT HELLSTROM**
Direct Examination By Mr. Wheat........................104
Cross-Examination By Mr. Richert.......................136
Redirect Examination By Mr. Wheat......................143

**MARCEL ANDREAS KORVELA**
Direct Examination By Mr. Wheat........................145
Cross-Examination By Mr. Richert.......................153

**ANDREW ROBERTSON**
Direct Examination By Mr. Wheat........................34
Cross-Examination By Mr. Richert.......................55
Redirect Examination By Mr. Wheat......................65
Recross-Examination By Mr. Richert.....................66

**MATTHEW WONG**
Direct Examination By Mr. Wheat........................67
Cross-Examination By Mr. Richert.......................80
Redirect Examination By Mr. Wheat......................84

# UNITED STATES EXHIBITS

| ADMITTED | | PAGE |
|---|---|---|
| **1** | Bag of oxymetholone powder | 135 |
| **2** | Bag of white powder | 135 |
| **3** | Bag of testosterone powder | 135 |
| **4** | Bag of testosterone powder | 135 |
| **5** | Bag of nandrolone decanoate powder | 135 |
| **6** | Bag of yellow powder | 135 |
| **7.1** | vial of oily liquid testosterone propionate | 135 |
| **7.2** | Vials with trenbolone enanthate | 135 |
| **7.3** | Vials of testosterone cypionate | 135 |
| **7.4** | 2 sealed vials with methasterone | 135 |
| **7.5** | 8 vials, trenbolone enanthate | 135 |
| **7.6** | 6 vials, methasterone | 135 |
| **7.7** | 42 vials, boldenone undecylenate | 135 |
| **7.8** | 17 vials, no controlled substance detected | 135 |
| **7.9** | 20 vials, nandrolone decanoate | 135 |
| **7.10** | 5 vials, testosterone and clostebol | 135 |
| **7.11** | Vial, no controlled substance detected | 135 |
| **7.12** | 11 vials, oxandrolone | 135 |
| **7.13** | 3 vials, testosterone cypionate | 135 |
| **7.14** | Sealed ziploc with oily liquid methandienone | 135 |
| **8** | Bag of white powder, no controlled substance detected | 135 |
| **9** | Bag of tan powder | 135 |
| **10** | Paper bag with 140.79 grams of a white powder that contains methandienone | 136 |
| **11** | White powder, methasterone | 135 |
| **12** | Ziplock baggy with boldenone undecylenate | 135 |
| **13** | Bag of white powder, testosterone enanthate | 135 |
| **14** | Bag of white powder, testosterone propionate | 135 |
| **15** | Bag of powder, unconfirmed controlled substance | 135 |
| **27** | Package received and paperwork | 45 |
| **28** | Methandienone powder from package | 50 |
| **29** | Oxymetholone powder from package | 50 |
| **30** | Packing slips from package | 46 |
| **31** | Delivery slips from package | 40 |
| **80** | Photo of package and contents | 52 |
| **81** | Photo of bag on scale .796g | 54 |
| **82** | Photo of bag on scale .518g | 54 |
| **83** | Photo of bag on scale .205g | 54 |
| **89** | CBP log | 74 |
| **90** | Photo of tape from package | 76 |
| **92** | Report of Scott Hellstrom | 110 |
| **93** | Report of Jonathan Dumke | 89 |

P R O C E E D I N G S

October 17, 2018

(Jury voir dire; jury impaneled/sworn.)

(Jury present.)

THE COURT: Please be seated.

Ladies and gentlemen, we will now take a recess until roughly 1:00. We will have a meal -- a meal will be brought in in the next five minutes or so.

Is that right, Mr. Metcalf?

LAW CLERK: Yes.

THE COURT: Okay. Well, Counsel, why don't we have you come back at 1:00 and have the jury come back at 10 after 1:00. And there are two pending motions that I need to hear brief argument on. So if you'd come back at 1:00, we'll take that up, and then have the jury come back in one hour, which would be at 1:10.

Those of you who have been excused, I want to express my appreciation for your being here. We could not have picked a jury without your presence, including Juror 41, who was not actually picked. But, obviously, your presence was critical to our process.

For those of you who were picked, when you return, I'll give you an admonition about your conduct and my preliminary instructions. But in the meantime, just simply don't discuss the case among yourselves or with anyone else. Don't form or

express any opinions about the case. Don't talk about jury selection. Frankly, don't talk about anything that has anything to do with the case, no matter how remote. Just put it out of your mind. You can talk about anything else you want to but not about the case or anyone that you interacted with here in the courtroom.

Counsel, I think that will work. Can you be back at 1:00, and we'll take up the two pending motions in limine?

MR. WHEAT: That would be fine. Is there any chance --

THE COURT: I'm sorry. I can't hear you.

MR. WHEAT: Oh, I'm sorry, Your Honor. Is there any chance we could do it before lunch so that I know how to plan the rest of the day?

THE COURT: We can take it up right now, I suppose, and then we will start at 10 after.

Mr. Metcalf, why don't you just escort the jury out, and I'll stay with counsel.

Ladies and gentlemen, the rest of you will be excused and can leave as well.

(Jury absent.)

THE COURT: Let me just indicate my preliminary thoughts. I have some notes here that I took, if I can find them.

I indicated yesterday, when we met informally, that I was

inclined to deny the defendant's motion in limine to exclude Mr. Newbold's prior conviction of a single -- for delivery of a controlled substance, anabolic steroids, in March of 2015.

Federal Rule of Evidence 404(b) allows evidence of other crimes or wrongs for the purpose of proving intent or knowledge or the absence of mistake or the lack of accident.

In this case, the charges are conspiracy to import anabolic steroids, importation of anabolic steroids, and possession of steroids with intent to distribute.

The offense requires knowledge. In other words, that the defendant knowingly brought steroids into the U.S. and knew that the substance was an anabolic steroid. It also requires that he acted with intent, that is, with the intent to help a conspiracy to accomplish its purpose and the intent to possess steroids for distribution.

A prior conviction just over three years earlier for delivery of steroids, I think, is directly relevant to knowledge and intent; it also goes to prove an absence of mistake and lack of an accident. The conviction is only three years old and, therefore, is not too remote in time.

And I would also find that its probative value substantially outweighs any prejudicial impact. So that conviction, the government will be free to do that.

Now, with regard to the fact Mr. Newbold was on probation, I don't see why that adds anything. It may be unavoidable

because there may be witnesses testifying about things that were learned -- for example, probation officers and whatnot. That may be completely unavoidable. I don't think it substantially adds to any prejudice, but I also don't think it adds a lot to -- it's just not very probative.

So I'm going to direct counsel to not needlessly get into that. It may be unavoidable. I just don't know how the evidence will come out. But if you feel the need to get into it, we will need to discuss that at sidebar before you mention the fact that Mr. Newbold was on probation.

The government has filed a motion in limine seeking to be permitted to admit evidence of screen shots of a web page taken recently. I have got to say: I have got some, I guess, real problems with that. I will certainly hear any argument you may have.

I think the conduct by coconspirators immediately after a defendant is arrested, there is a lot of case law saying that that's entirely appropriate because it's just evidence of a continuation of a conspiracy from which the defendant has been removed involuntarily but has not made a decision to withdraw from the conspiracy.

But this is a case where, as I understand it, Mr. Newbold was arrested 10 months ago or even more. And so that screen shot's taken 10 months after the defendant's arrest of a website showing that they are offering the very substances -- that is,

steroids -- that are involved in this case might show what the government wants to present it for. But I'm concerned that, with the passage of time, we don't have any way of knowing who is still involved in that website, whether the somewhat-anonymous Amy is still involved or not. It's difficult to know whether that website is still owned or controlled by Amy or any other individual. And for a variety of reasons, I'm struggling with that.

So I'll hear some brief argument on that, but I'm just giving you my heads-up that I think it's just too remote in time to satisfy the requirements of Rule 901. It also constitutes possible hearsay. So I think, for both reasons, I would have some real concern about admitting that evidence.

So let me hear very briefly from you, Mr. Wheat.

MR. WHEAT: Your Honor, I'm not going to step too hard on that one. And I can certainly see the court's concern with the website.

THE COURT: Let me say also: The fact that, you know, the discussion about the website contemporaneous, that I don't have a problem with. You know, there was apparently some conversations or text messages on Mr. Newbold's phone that indicates some link to a website. And if you had, using one of the services that kind of freezes and locks in past websites -- if you had that information that was contemporaneous with when those conversations were going on, I think probably you would

get that in, but not things that happened 10 months later.

So I want to be clear: Even if I rule against you, I'm not going to preclude you from talking about a website as long as it's contemporaneous and there's no effort to put into evidence what the website showed 10 months later.

Go ahead.

MR. WHEAT: Sure, Your Honor.

The government's two bases for that were, first of all, this is indicative of a conspiracy; though Mr. Newbold made an agreement with someone who purported to be called "Amy," what we would argue, and that Amy was associated, even asked about names and asked for direction on logos of that website.

And that that website today -- and the court correctly acknowledges that we don't know what it said 10 months ago. We just can speculate because, you know, when you go back in that website freezer, you know, find what was there, we just don't know. So we acknowledge that.

We know what it says today because it's a live website. Anyone, to our knowledge, unless something has changed in the last several hours, could go to that website and find the information that the government has presented from it.

I think the value of that, Your Honor, would -- and agreeing that there is some pretty removed time compared to the other coconspirator's statements that happened. And the case law is fairly old, but I think there is kind of an important

principle that I will just make a record of; and that's that I think it has some strong value to prove the existence of the conspiracy. It does corroborate a lot of -- well, the pieces that kind of come together as the case goes on.

But that would just be the record the government would have. Thank you.

THE COURT: Okay. Mr. Richert.

MR. RICHERT: The court has already basically summarized what I was going to say. We don't know this Amy and what relationship she currently has with the website at all.

The time frame, we don't know, as Mr. Wheat says, what the website did or didn't look like in October of last year. Just allowing it in to effectively testify for what the government wants, I think is prejudicial and just too remote to allow it to happen.

THE COURT: Okay. Well, that will be my ruling. Now, if you -- and I think one service at least is called "Wayback," I think, that actually goes back and is -- I can't imagine the data storage would be involved in trying to capture what every website has ever shown and freezes that in a time certain.

If you had evidence of that sort and could lay a foundation, I would have to take a hard look at it. It would be a very different calculation. But we don't have that, and I realize that the government didn't even know about that connection until a few months ago.

But under the circumstances, at this point, I'll have to exclude any attempted use of the screen shots of the website taken more recently and I think as much as 10 months after Mr. Newbold was taken into custody.

So that will be my ruling, and we will see where it plays out from there.

All right. We will see you back here at roughly 10 after the hour. We will be in recess.

(Recess at 12:22 p.m. until 1:15 p.m.)

(Jury present.)

THE COURT: For the record, I'll note that all jurors are present. We're ready to proceed.

Ladies and gentlemen, I'll begin this afternoon by reading my instructions to you. Mr. Metcalf will hand you out a copy of the instructions so that you can read along with me.

All right. Ladies and gentlemen, you now are the jury in this case, and I want to take a few minutes to tell you something about your duties as jurors and to give you some preliminary instructions. At the end of the trial, I will give you more detailed written instructions that will control your deliberations.

And I might note that these instructions are preliminary in nature. They are really offered to you to give you a roadmap as to what the case -- or how the case will proceed. Because things may occur during the course of the trial that require

that I change or add to my instructions, at the end of the trial, we'll take away these instructions to avoid any confusion, and then give you my final instructions which will control your deliberations.

When you deliberate, it will be your duty to weigh and to evaluate all of the evidence received in the case and, in that process, to decide the facts. To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not.

You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.

Please do not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be. That is entirely up to you.

As I explained earlier, this is a criminal case brought by the United States Government. The government charges the defendant, Travis M. Newbold, with one count of conspiracy to import a controlled substance, one count of importation of a controlled substance, and one count of possession with intent to distribute a controlled substance.

In each of these three counts, the alleged controlled substance as issue is anabolic steroids.

The charges against the defendant are contained in an indictment. The indictment simply describes the charges the

government brings against Mr. Newbold. The indictment is not evidence and does not prove anything. Mr. Newbold has pled not guilty to the charges and is presumed innocent unless and until the government proves him guilty beyond a reasonable doubt.

In addition, Mr. Newbold has the right to remain silent and never has to prove innocence or to present any evidence. The government has the burden of proving every element of a particular charge beyond a reasonable doubt.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes which the government must prove to make its case.

In order for Mr. Newbold to be found guilty of conspiracy to import a controlled substance, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning in or about March 2017 through in or about October 2017, there was an agreement between two or more persons to import anabolic steroids into the United States; and, second, Mr. Newbold joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

In order for Mr. Newbold to be found guilty of importation of a controlled substance, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly brought anabolic steroids into the United States from a place outside the United States; and, second, the defendant knew the substance he was bringing

into the United States was anabolic steroids or some other prohibited drug.

In order for Mr. Newbold to be found guilty of possession with intent to distribute a controlled substance, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly possessed anabolic steroids; and, second, the defendant possessed them with the intent to distribute them to another person.

This description of the elements of each of the three counts is preliminary only and is designed to help you follow the evidence during the trial. At the end of the trial, the court will give you final instructions in more detail; and it is those final instructions, rather than these preliminary instructions, that will guide your deliberations.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If, after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant

not guilty.

On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The law does not compel a defendant --

LAW CLERK: You just left out the "not" --

THE COURT: Oh, thank you, Mr. Metcalf. I jumped a line. Let me restate that last point.

On the other hand, if, after a careful and partial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty --

LAW CLERK: It was the sentence before.

THE COURT: Let me just check. Well, I'm not sure. The transcript seems to indicate I said it correctly, but let me -- I'm going to restate that last paragraph in its entirety to make sure I have stated it correctly. I do not want to mislead the jury in any way.

If, after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a

reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The law does not compel a defendant in a criminal case to testify. The decision whether to testify is left to the defendant acting with the advice and assistance of the defendant's lawyer.

No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant does not testify. Nor should this fact be discussed by you or enter into your deliberations in any way.

On the other hand, if a defendant does testify, you should consider the testimony of the defendant just as you would the testimony of any other witness.

The evidence you are to consider in deciding what the facts are consists of: first, the sworn testimony of any witness; second, the exhibits which are received into evidence; and, third, any facts to which the parties agree.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: first, statements and arguments of the attorneys; second, questions and objections of the attorneys; third, testimony that I instruct you to disregard; and, fourth, anything you may have seen or heard when the court is not in session even if what you see or hear was done or said by one of the parties or by one of the witnesses.

Some evidence may be admitted for a limited purpose only. If so, I will so instruct you and indicate the purpose for which the evidence may be considered. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which one can find another fact.

Let me just digress for a moment and give you a hypothetical that I think points out the difference between the two.

If one were to wake up in the morning, look out, and see drops of precipitation falling from the sky, you could later testify that it was raining at that moment in time based upon what you actually observed. On the other hand, if, when you woke up, it was not actively raining, but you noted there were puddles on the street, the grass was wet, and there had not been so the previous evening -- perhaps the sky was gray and overcast when you went to bed; perhaps the weather forecast called for rain during the evening -- from that, you could testify as a matter of circumstantial evidence that it had rained during the preceding evening; not because you observed it, but because you observed other facts from which one could infer that it had

rained the preceding evening.

Now, as the instruction continues:

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. Indeed, the law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit in evidence, and the lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received. However, if I sustain the objection, the question cannot be answered or the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess or speculate as to what the answer would have been. Likewise, whenever I sustain an objection to an exhibit, you must ignore the exhibit and not speculate as to what it might have shown.

Sometimes I may order that the evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may ask yourself the following questions:

First, what opportunity and ability did the witness have to see or hear or know the things testified to?

Second, how good was the witness's memory about the events testified to?

Third, what was the witness's manner or demeanor while testifying?

Fourth, does the witness have some interest in the outcome of the case?

Fifth, does the witness have a bias or some prejudice for or against any of the parties?

Sixth, was the witness's testimony contradicted by other evidence that you found believable?

Seventh, how reasonable was the witness's testimony in light of all the evidence?

And, finally, are there other facts, mostly from your common sense, which suggest to you that the witness is or is not telling the truth?

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about

it.

I will now say just a few words about your conduct as jurors. This is the admonition about juror conduct that I referred to earlier. So listen carefully to this. I won't repeat it on every recess, but I'll simply remind you of this admonition and of your obligation to continue following this instruction.

You must keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case. Therefore, it is very important that you not form or express any opinions about this case until it is submitted to you.

You must decide this case based only on the evidence received in the case and on my instructions as to the law that applies. Therefore, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

It is critical that you not communicate with anyone in any way and that you not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This includes discussing the case in person, in writing, by phone, or by any electronic means, including email, text messaging, Internet chat room, blogs, websites, Facebook, Twitter, Snapchat, or any other form of social media.

This applies to communicating with your fellow jurors until

I give you the case for deliberation; and it applies to communicating with everyone else, including your family members, your employer, the media or press, and the people involved in the trial.

Although you may notify your family and your employer that you have been seated as a juror in the case. But if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report that contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation or in any other way try to learn about the case on your own.

I would also add if there is any location mentioned or website mentioned, you are not to go to any such location, nor are you to visit any website that may be mentioned during the course of the trial.

During the trial, you should also avoid contact with the attorneys, the parties, and the witnesses. Therefore, you should avoid loitering around the courthouse and parking lot

during the trial.

At the beginning of the day, proceed directly from your vehicle to the jury assembly room or other place designated by -- it says Mr. Severson; it's actually Mr. Metcalf. Likewise, when you leave the courthouse at the end of the day, proceed directly to your car.

If you happen to encounter an attorney, party, or a witness, do not say anything to them, and do not even acknowledge their existence. The court will also direct the attorneys, parties, and witnesses to do the same if they happen to encounter any juror outside of the courtroom during the course of the trial.

I will remind you of these admonitions from time to time. I do that not to insult you or because I don't think you are paying attention, but because experience has shown that this is one of the hardest instructions for jurors to follow. I know of no other situation in our culture where we ask strangers to sit together, watching and listening to something, then go into a little room and not talk about the only thing they have in common: what they just watched together.

There are, however, at least two reasons for this rule. The first is to help you keep an open mind. When you talk about things, you start to make decisions about them. And it is extremely important that you not make any decisions about this case until you have heard all the evidence and all the rules for

making your decisions. And you won't have that until the very end of the trial.

The second reason for the rule is that when the jury begins its deliberations at the end of the trial, it must be a deliberative process in which all jurors are involved. If you have conversations in groups of two or three during the trial, you won't remember to repeat all of your thoughts and observations for the rest of your fellow jurors when you begin your deliberations.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

At the end of the trial, you will have to make your decision based on what you recall of the evidence. You will not have a written transcript of the trial. I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note-taking distract from you being attentive. When you leave court for recesses, your notes should

be left in the jury room. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The next phase of the trial will now begin. First, each side may make an opening statement. An opening statement is not evidence; it is simply an outline to help you understand what that party expects the evidence will show. A party is not required to make an opening statement.

The government will then present evidence, and counsel for Mr. Newbold may cross-examine. And then if Mr. Newbold chooses to offer evidence, counsel for the government may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments. After that, you will go to the jury room to deliberate on your verdict.

Mr. Wheat, you may make your opening statement to the jury.

MR. WHEAT: Ladies and gentlemen of the jury, you and I are here because the defendant, Mr. Newbold, went to the post office and picked up a package from China full of anabolic steroids.

When he picked up that package full of anabolic steroids, at his house he had a whole bunch more anabolic steroids and a whole bunch more of paraphernalia and anabolic steroid

equipment.

When he picked up those steroids and had those steroids at his house, on his phone he had a whole bunch of communications where he had agreed to help import steroids into the United States.

Ladies and gentlemen, in that package, there were over 3 pounds of anabolic steroids, there were over 3 more pounds at his house. On his phone, it was learned that Mr. Newbold was working with someone named Amy from China to import or introduce anabolic steroids into the United States in package form.

And at his house, there were powdered steroids, liquid steroids, vials of steroids, empty vials, empty capsules, and other items.

My name is Brian Wheat. I represent the United States. I'm here to prove to you beyond a reasonable doubt the three counts that you have heard already.

Count 1 is that Mr. Newbold imported anabolic steroids into the United States. Count 2 is that Mr. Newbold -- well, excuse me. Count 1 is that Mr. Newbold had an agreement or made a conspiracy to import anabolic steroids into the United States. Count 2 is that he imported anabolic steroids into the United States. And Count 3 is that he possessed anabolic steroids with the intent to distribute them to other people.

And in order to do that, I have to prove certain elements of those.

For Count 1, I need to prove that there was an agreement between Mr. Newbold -- well, between two or more people to import steroids into the United States and that Mr. Newbold joined in that agreement knowing the purpose of that agreement and intending to help accomplish it.

Count 2 requires me to prove that Mr. Newbold knowingly brought steroids into the United States and knew that that was -- that it was some kind of anabolic steroids or a controlled substance.

And Count 3 is that Mr. Newbold possessed more anabolic steroids with the intent to distribute them to at least another person.

And we're going to prove that through physical evidence that you will get to handle and see. And we're going to prove that through photographs of the scene and of the things that were found and where the searches took place. And we're going to prove that through witnesses who saw and heard and were there for events that -- these events that I have talked to you about already. And we're going to prove that even through the defendant's own words.

And that evidence is going to combine to tell a story. And that story is going to be this:

That on October 5, 2017, Customs and Border Patrol Officer Matthew Wong was working in San Francisco at the San Francisco Air Mail Center. He was running the X-ray that day. And his

job was for packages to come through the X-ray, him to take a look at them and to determine whether they were suspicious.

He found one such package that he determined to be suspicious. It was a package that was from China, had a specific tracking number, and was addressed to Travis at 551 West Pine in Pocatello, Idaho.

That package was set aside. That package was found to contain over 3 pounds of powder that were determined -- that was determined, through laboratory analysis, to be anabolic steroids: oxymetholone and methandienone. We're going to have experts here to help make sense of some of those technical chemistry words for you.

But that package was picked up by Mr. Newbold during a controlled delivery that was coordinated through law enforcement.

That package was sent to Special Agent Andy Robertson. Andy Robertson -- Special Agent Robertson, excuse me -- coordinated that controlled delivery where Mr. Newbold was given notice of the package from China and invited to come and pick up that package at the post office, which he did.

He came to the post office on October 25th, 2017, turned in that delivery slip, accepted that package, and was arrested on his way out of the post office.

Shortly thereafter and on that same day, detectives and agents from the Department of Homeland Security, Pocatello

Police, they served a search warrant on the defendant's home. When they served that search warrant at 551 West Pine Street, where the package was addressed to, they found more powdered anabolic steroids as confirmed by a laboratory.

And we'll have the person who tested those to determine that they were anabolic steroids. There were powdered anabolic steroids. There were liquid vials, the kind of liquid vials that are glass and have rubber stoppers designed for needles to be put into them and drawn out. There were a whole lot of those. There were empty ones; there were full ones. There were empty pill capsules, a whole bunch more rubber stoppers, and a whole bunch more paraphernalia at that house in a safe that also contained Mr. Newbold's identification documents and even a prescription bottle for Mr. Newbold at Mr. Newbold's house.

And in addition to that, they also found instructions for mixing anabolic steroids in the very same place with the rest of the anabolic steroids.

Some time later, agents did a search warrant on a phone belonging to Mr. Newbold. And on that phone, they found conversations between Mr. Newbold and someone called "Amy." And Amy indicates -- and between those conversations, we learn that Amy was from China, that Amy had a business or at least was associated with a business that she called "Alliance Raws Pharmacy," and that Mr. Newbold made agreements with Amy to help import or introduce anabolic steroids into the United States

from China.

Ladies and gentlemen, there is a whole lot of evidence in this case that you're going to hear, and there is quite a few witnesses, and this is going to move kind of quick. But with those witnesses, with that evidence that you can touch, see, and handle for yourselves to take a look at, and with the firsthand accounts of people who saw these things, you're going to be able to put the puzzle together, and we will indicate to you each of those elements beyond a reasonable doubt.

Now, some of the evidence may not come in the most intuitive form. For example, you may hear from our lab officers, our chemists, who will confirm the identity of substances. They may be today and that might be a little early as to when you're going to hear about the rest of the story. And that will be done to accommodate schedules and things like that.

But as you listen to the evidence and as you listen to each person's account, you're going to find from these witnesses, from the law enforcement officers, from even the woman who delivered the package to Mr. Newbold, and from people who even lived at Mr. Newbold's house and knew who was there and who had control of that safe, that the defendant, Travis Newbold, he agreed with other people to import anabolic steroids into the United States; and that he did, in fact, import anabolic steroids into the United States; and that he possessed anabolic

steroids with the intent to distribute them to another person.

And at the end of the evidence, we're going to ask you to find him guilty on those three counts.

Thank you.

THE COURT: Thank you, Mr. Wheat.

Mr. Richert.

MR. RICHERT: Thank you, Your Honor.

Travis Newbold lives in Pocatello; self-employed construction contractor. When he is not working, he liked to work out. And you will hear that on occasion, when he did his workouts, part of his program also included the use of anabolic steroids. Whether that's good or bad, that's what he did, as some of our athletes have done. As one of our potential jurors indicated, he sees people doing the same thing where he works out.

As Mr. Wheat alluded to, this case arises from a package that was sent from China. And customs people, who apparently look at all the packages that come in from some other country, looked at this package with an X-ray and decided there was something fishy about it and then had it tested, and it turned out to contain some steroids.

Once it was determined to have steroids in it, it was sent to law enforcement agencies here in Idaho, where law enforcement agencies decided to do a sting on Mr. Newbold. As Mr. Wheat indicated, law enforcement agencies caused the post office

people to put a notice on his door: Come get this package. That was October 24th.

Then on October 25, post office people do the same thing again, put another post on the door, say: Come get this package at the Pocatello post office on Center Street.

Except for the seconds that Mr. Newbold grabbed that package before he was arrested, there will be no evidence whatsoever that he had anything to do with that package. There will be no evidence whatsoever that he ordered it. There will be no evidence whatsoever that he paid for it or had the ability to pay for it. There will be no evidence that he knew what was in the package.

He was -- held onto that package for, I'm guessing, 6 or 7 seconds, just long enough to turn from the counter and head for the door, when he was arrested. He didn't open it; we know that.

At his house -- by the way, the search warrant was issued by a local judge a couple days before the 25th to search Mr. Newbold's house. And once he was arrested, law enforcement agencies did exactly that; they went to his house and searched it and did find some anabolic steroids.

However -- and I have to confess, this is the first time I have ever been involved in a case with anabolic steroids. As Judge Winmill indicated, we see methamphetamine, cocaine, heroin, other illegal substances, but not anabolic steroids.

So what law enforcement agencies usually look for when they try to prove a case of possession of a controlled substance with the intent to distribute, they look for ledgers where someone is selling, keeping track of where the product went and who paid. There will be no evidence that there were any ledgers.

Oftentimes there will be evidence of a distribution. We can see someone take the drugs and give it to someone else, usually an undercover person. There will be no evidence of that.

There will be no evidence or records that Mr. Newbold paid for anything. There was some cash found at his house. I think it was about 6- or $700, which just about matches his rent. There was no substantial money there. No records of payments, no records of clients.

This actually is -- as the judge said, there is two kinds of proof; one is direct proof, and the other is circumstantial proof. This is a classic case of circumstantial evidence. It's all built upon: Well, you use this kind of stuff; the package came addressed to your house; therefore, you're guilty.

I ask you to listen to all the evidence because the important evidence which I have just pointed out isn't there. And as the judge mentioned with the description of the rainfall, how circumstantial evidence can build to a conclusion, here, the Constitution requires that any conclusion you reach based upon the circumstantial evidence is beyond a reasonable doubt.

And when we're finished, I'm going to ask you -- I'm going to suggest to you that there is no beyond a reasonable doubt here; it's circumstances that don't lead to guilt.

You might not like the fact that he did steroids, but he didn't possess any to distribute. He has no contact with that package except for just seconds. There was no evidence otherwise.

Mr. Newbold -- well, I guess the Constitution requires that we all give Mr. Newbold the shot of freedom if there is not enough to convict him, and I don't think there is.

THE COURT: Thank you, Mr. Richert.

Mr. Wheat, you may call your first witness.

MR. WHEAT: Thank you, Your Honor.

The government would call Special Agent Andy Robertson from Homeland Security.

THE COURT: Agent Robertson, please step before the clerk and be sworn.

Mr. Wheat, would you make sure the microphones are tipped. You're a little soft-spoken, and I want to make sure we can hear you. There are two mics; if you could tip them both towards you, I would appreciate that.

I apologize, Ms. Bracke. Go ahead.

ANDREW ROBERTSON, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Please take a seat in the witness stand.

MR. WHEAT: Your Honor, I do have some materials for

the court that were still being made by the time I came up here. Would it be okay if I distributed those to counsel, Your Honor?

THE COURT: Yes. That's fine.

THE CLERK: Please state your complete name, and spell your name for the record.

THE WITNESS: Andrew Robertson, R-O-B-E-R-T-S-O-N.

MR. WHEAT: Your Honor, if you will excuse me just a second so we can get these in order here, that would be great.

DIRECT EXAMINATION

BY MR. WHEAT:

Q. Good afternoon, Special Agent Robertson.

Could you please tell the jury what you do for a living. We know your name now.

A. I'm a criminal investigator for the Department of Homeland Security. I work for Homeland Security Investigations.

Q. How long have you worked for the Department of Homeland Security?

THE COURT: Could you make sure the microphone is close to you as well.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

THE WITNESS: I worked -- started with the United States Customs Service in -- at the end of 2001; I started as a special agent in 2002.

Q. BY MR. WHEAT: And during your work experience and

training, what has been your focus, I guess, as a special agent for the Department of Homeland Security?

A. I have done a lot of different cases: child exploitation investigations, drug investigations, drug smuggling investigations, some financial investigations, immigration law, intellectual property rights.

Q. Could you tell the jury about your training and experience related to drug investigations.

A. We have an academy that we go to for 10 weeks for all criminal investigators that work for agencies. There is a follow-on academy that's an additional eight weeks, and we talk about drugs and drug smuggling.

Then I'm also a special agent for the Air Force as a reservist, so I went to their academy for another eight weeks. It's the same place in Georgia.

Q. Thank you, Special Agent Robertson.

Are you familiar with an investigation involving Travis Newbold?

A. Yes.

Q. How are you familiar with that investigation, Agent Robertson?

A. I received some information from one of my coworkers. I received an email he forwarded to me on October 10, 2017, from Customs and Border Protection in San Francisco regarding a package that they had examined and determined that they had

presumptive positive tests for anabolic steroids.

Q. When you received this notification about the package, what did you do with that information?

A. I verified -- I contacted the U.S. Attorney's Office to see if they would be interested in prosecuting the case. And when they said that they would, I reached back out to San Francisco and said we would accept that package and asked them to ship it to me.

Q. And then what happened?

A. We received the package. I placed it in temporary evidence at Idaho State Police Investigations, and then prepared to do the controlled delivery. So a lot of moving parts.

Q. How did you receive the package?

A. Through the mail.

Q. And what did the package look like when you received it?

A. It was a regular shipping box that original box was shipped in. And they do that so that we can, as part of the controlled delivery, work with the postal service and put that original package that was destined to the address back in the mail system.

Q. Okay. So when you got the package, it was inside of another package --

A. Yes.

Q. -- shipped to you?

A. Yes.

Q. And you mentioned that when you received that package -- did I hear you correctly that you said you set up a request for what you called a "controlled buy"?
A. A "controlled delivery," yes.
Q. Thank you. A controlled delivery.

Will you please explain to the jury what a controlled delivery is.
A. Yes. When international mail parcels come in, as an example, we will -- as I explained, attempt to deliver that package as it was intended through the mail, but maintaining control of it by law enforcement, so that it goes to the intended recipient.

So part of that process is doing a background investigation and working in conjunction with the United States Postal Inspection Service that are special agents for the United States Postal Service.
Q. Which agencies did you work in conjunction with to set this up?
A. The U.S. Postal Inspection Service and the Pocatello Police Department.
Q. And did the controlled delivery take place?
A. It did.
Q. What date did it take place?
A. October 25, 2017.
Q. Could you tell the jury about the controlled delivery. How

was this package -- how was -- was -- well, let me ask you this: Was Mr. Newbold informed of a parcel?

A. Yes.

Q. How was he informed of the package?

A. A postal slip was presented at his residence the afternoon before the 25th, late in the day, and then another one on the morning of the 25th.

Q. When you say "postal slip," could you tell the jury what you mean by that.

A. A delivery slip that you get from the post office that says you have a package to pick up.

Q. If I could just have a second.

What did that postal slip look like?

A. It was orange. They were orange.

Q. What did it inform? What did it -- what did it inform Mr. Newbold of?

A. That he had a package at the post office that was addressed to him at his address, 551 West Pine Street.

Q. Okay. And how did you arrange for that to be -- to get to Mr. Newbold?

A. I worked with the postal inspectors, and I believe they had a carrier deliver those.

MR. WHEAT: Okay. Your Honor, may I approach?

THE COURT: Yes. Well, to the witness or --

MR. WHEAT: Yeah.

THE COURT: Mr. Metcalf will hand that to him, if that's what you want.

MR. WHEAT: Okay. Thank you.

Q. BY MR. WHEAT: Special Agent Robertson, I have just handed you what's marked as Government's Exhibit 31.

Do you recognize Government's Exhibit 31?

A. I do.

Q. How do you recognize Government's Exhibit 31?

A. They are the slips that were provided -- presented to the address at 551 West Pine Street.

Q. How do you recognize them as those slips that presented -- were presented at 551 West Pine?

A. They have the tracking number, the parcel that I received for the controlled delivery on them there. The address -- they are addressed, written out the same, and the dates match. And on the back of the one of the 25th, it's signed for.

Q. Do they fairly and accurately depict the -- what did you call them? "Delivery slips"?

A. Yes.

Q. That were given to Mr. Newbold's address?

A. Yes.

MR. WHEAT: Move to admit Government's Exhibit 31.

THE COURT: Any objection?

MR. RICHERT: No.

THE COURT: Exhibit 31 will be admitted and may be

published to the jury.

(Government's Exhibit 31 admitted.)

THE COURT: I don't know how you want -- do you want to put that on the evidence presenter or --

MR. WHEAT: If that would be all right, please, Your Honor.

THE COURT: Ladies and gentlemen, normally we have a screen from which you can watch. But our projector is out, so we brought in a monitor. I'm going to turn that on so that you can see. Hopefully, that's visible.

You may want to zoom in, realizing that for some of the jurors, it --

Can the jury see that? All right.

Q. BY MR. WHEAT: Special Agent Robertson, I have just put one of the slips from Government's Exhibit 31 up on the overhead display.

Is there a place on there where it says "sender's name"?

A. "Customer name and address, Travis."

Q. Okay. And what is the address that it indicates?

A. 551 West Pine.

Q. And where are you looking on that?

A. I'm looking at the bottom right-hand corner.

Q. The bottom left-hand corner? Okay.

In the top right-hand corner, what does that say?

A. "Sender's name."

Q. Okay. What does it have written there?
A. "China."
Q. And what was the date?
A. October 24th.
Q. Okay. You indicated there was a tracking number; correct?
A. Yes.
Q. And what was that tracking -- what is that tracking number?
A. It's EA181491234CN.
Q. And does that match a tracking number that was on the package that you received?
A. Yes.
Q. Okay. Turn that over to the other side. For the jury's purpose, I'm putting up on the display another slip here.
THE COURT: And that's part of the same exhibit.
MR. WHEAT: Part of the same exhibit, Your Honor. I think that's in focus now.
Q. BY MR. WHEAT: What is that, Special Agent Robertson?
A. It's the same form.
Q. Okay.
A. The delivery slip.
Q. And I flipped it over to the back.
What do you see on the back?
A. A signature.
Q. Okay. What is that signature?
A. It looks like it says "Travis." And to me, after that, it

doesn't seem too readable. "T. Newbold."

Q. And does it have a delivery address written there?

A. 551 West Pine.

Q. Thank you, Special Agent Robertson.

Okay. So this controlled delivery, could you tell the grand jury -- I'm so sorry -- the jury how that happened and what you did.

A. We brought the evidence from our office down to the post office. And an agent from my office stayed with two of the postal inspectors in the back of the post office in Pocatello and waited for Mr. Newbold to arrive to pick it up or someone to arrive to pick it up.

Q. Okay. And did that happen?

A. Yes.

Q. Okay. When did he arrive to pick it up?

A. Midmorning, 10:20.

Q. Okay. Which post office was it?

A. The post office on -- sorry; I'm referring to my report -- Clark Street.

Q. And Clark Street where?

A. Pocatello, Idaho.

Q. Okay. I want to talk to you a little bit, Special Agent Robertson, about that package.

What did the package look like?

A. It was just a tan package, wrapped in the cheap tape that

you get from things that you order from China.

Q. Did the package have a tracking number affixed to it?

A. Yes, it did.

Q. Did the package -- and would you recognize that package today?

A. Yes.

MR. WHEAT: Okay. Your Honor, may I approach?

THE COURT: Yes. Mr. Metcalf can --

MR. WHEAT: I'll get the mechanics down here.

THE COURT: What is that marked as?

MR. WHEAT: 27.

Q. BY MR. WHEAT: Special Agent Robertson, I have just handed you -- or what's been handed to you is what's marked as Government's Exhibit 27.

Do you recognize Government's Exhibit 27?

A. I do.

Q. What is Government's Exhibit 27?

A. This is the package that was sent to me with the anabolic steroids that were destined to 551 West Pine in Pocatello.

Q. How do you recognize it as such?

A. I recognize it by the tracking numbers and remembering what the box looked like.

Q. Okay. Did you handle that box before?

A. Yes.

Q. Okay. Does that box have some things affixed to it or some

writing on it?

A. It does. It has two tracking numbers, stickers, one on the bottom and then another one on the top. And then this -- we didn't believe that this was related because it's dated long before the -- and there is a line across it. There was a packing slip inside here.

THE COURT: Agent Robertson, would you keep your voice up and maybe stay as close to the mic as you can.

THE WITNESS: There was a packing slip inside here that had the address and return address and stated what the contents were.

Q. BY MR. WHEAT: Okay. Does that box have -- that you're handling that's marked as Government's Exhibit 27, does it have anything inside it?

A. Yes.

Q. What does it have inside of it?

A. It has two mylar bags and a -- just a like a packing list.

Q. Okay. Well, does it fairly and accurately depict the package that you received and coordinated controlled delivery of?

A. Yes.

THE COURT: Counsel, the exhibit has not yet been admitted, so we shouldn't be publishing it to the jury yet. Are you offering Exhibit 27?

MR. WHEAT: Yeah. I would move for its admission.

THE COURT: Any objection?

MR. RICHERT: No.

THE COURT: Exhibit 27 may be admitted.

(Government's Exhibit 27 admitted.)

THE COURT: What we may do is just have the exhibits left with the witness up on the stand down on the floor. And then he can look at them there, and then -- maybe on the break or something -- and then upon my direction, he can then hold them up for the jury to see them and, if need be, give them back to you, Mr. Wheat, so you can show them to the jury on the evidence presenter.

Go ahead and proceed.

MR. WHEAT: Thank you, Your Honor.

Q. BY MR. WHEAT: So you indicated that that package had some bags inside of it.

A. Yes.

Q. Okay. How would you describe those bags?

A. Silver mylar bags.

Q. Okay. Thank you.

Okay. And that package, you mentioned that it had a packing slip. I would like to talk to you a little bit about what you called the packing slip.

What do you mean by "packing slip"?

A. The slip that has all the information: who it's to, who it's from, what's inside. And that would be used for the mail

facility to tell who it came from and where to send it.

Q. I'm going to hand you in a second or have handed to you what's marked as Plaintiff's Exhibit 30.

Special Agent Robertson, if you could examine what's been marked as Government's Exhibit 30. Do you recognize that?

A. I do.

Q. What is that?

A. It's a packing slip that was inside the plastic on the side of the box.

Q. How do you recognize it?

A. By the addressee information and the tracking number.

Q. And does that match the tracking number on the package itself?

A. Yes.

Q. And does that fairly and accurately depict the packing slip that was in -- that was with the package that we just had?

A. Yes.

MR. WHEAT: Okay. I'd move to admit that, Your Honor, Exhibit 30.

THE COURT: Any objection?

MR. RICHERT: No.

THE COURT: Exhibit 30 will be admitted and published to the jury at counsel's option.

(Government's Exhibit 30 admitted.)

Q. BY MR. WHEAT: Does that packing slip --

If I could please publish it, I would appreciate it. Thank you. Sorry for all the miles you are putting in.

Now, does that packing slip indicate a sender?

A. Yes.

Q. Okay. What's -- where does it indicate the sender? I am putting this up on the display.

A. Top left corner, it says "From Mr. Yang."

Q. Okay. And does it say a city of origin?

A. Shenzhen.

Q. And a country of origin?

A. China.

Q. And does it talk about who it's addressed to?

A. It's addressed to Travis.

Q. And does it give an address?

A. 551 West Pine, Pocatello, Idaho, 83201, USA.

Q. Now, when you received this package, did it have anything in it?

A. Yes.

Q. What did it have in it?

A. It had bags containing oxymetholone and a bag of methandienone.

Q. When you say "bags," could you please describe the bags.

A. They are clear plastic bags.

Q. Okay. And what kind of -- clear plastic bags. And could you show the jury about how big these bags were.

A. They were probably this big (indicating) and maybe that thick.

Q. Approximately how many bags were there?

A. There were three bags.

Q. Three bags inside this package?

A. Yes.

Q. Okay. Would you recognize the bags if you saw them again?

A. Yes.

Q. How would you recognize them?

A. I would recognize them because I put them in evidence bags, with a coworker.

MR. WHEAT: Your Honor, I have some physical exhibits to present to Special Agent Robertson.

THE COURT: Mr. Metcalf, can help you out with that.

MR. WHEAT: Thank you.

Q. BY MR. WHEAT: Okay. You have been just handed, Special Agent Robertson, what's marked as Government's Exhibits 28 and 29.

Do you recognize Government's Exhibits 28 and 29?

A. Yes.

Q. How do you recognize Government's Exhibit 28?

A. Government's Exhibit 28 is the methandienone that was shipped in the package of the box that we discussed earlier.

Q. Okay. How do you recognize it as that?

A. When that -- when the box came, we opened it up and then

resealed it. And we looked at the markings of the bags, and they were the same as the markings that were placed on it by CBP.

Q. And do you recognize it from having viewed it before?

A. Yes.

Q. How do you recognize having viewed it before?

A. Well, this one, my handwriting is on the evidence bag that's inside of this evidence bag. It's been rebagged a couple times since we sent it to the DEA lab.

Q. Okay. And how about Government's Exhibit 29? Can you tell the jury about how you recognize that.

THE COURT: Try to hold it down where the jury cannot see it yet.

THE WITNESS: Oh. Yes, Your Honor.

This bag is sealed in the evidence bag that I witnessed Special Agent Roedel process. When I processed the methandienone, we bagged them at the same time.

Q. BY MR. WHEAT: Where did these two bags come from again?

A. They came from the box that we -- I had previously identified.

Q. And do those -- do those bags fairly and accurately depict the bags that were removed from the package?

A. I believe -- I believe the DEA lab might have commingled this into one. The oxymetholone was in two bags when we received it. And I can't tell if they -- I don't think they put

it into two bags again after they processed it and sent it back.

Q. Okay. All right.

MR. WHEAT: I'd move to admit those exhibits.

THE COURT: Any objection to Exhibits 28 and 29?

MR. RICHERT: No.

THE COURT: 28 and 29 will be admitted and now may be published to the jury.

(Government's Exhibits 28 and 29 admitted.)

MR. WHEAT: Thank you.

Q. BY MR. WHEAT: So after you received this package with these labels with these contents, what did you do with the package and the contents?

A. After we received it, I picked it up from the post office in Idaho Falls, and then the special agent placed it into evidence at Idaho State Police Investigations. And then I began to plan a controlled delivery.

Q. After the controlled delivery, after you had the package, what did you do next? Did you take any steps to confirm the identity of substances?

A. Yes. We -- the package remained in our custody after the controlled delivery. We shipped it to the DEA lab in California so that they could do a drug test, a chemical test on it.

Q. Okay. What else did you do during this investigation?

A. We interviewed Mr. Newbold subsequent to his arrest.

Q. And did you also coordinate a search warrant?

A. Yes.

Q. Where was the search warrant for?

A. The search warrant -- again, the State had an anticipatory warrant for Mr. Newbold's residence. So when the package was picked up, we would then be able to execute the search warrant.

Q. And what date did that take place?

A. The same day, on October 25, 2017.

Q. Okay. Did you take any other investigatory steps afterward? I want to talk to you about whether you looked at communications.

Did you look at any communications?

A. We got a search warrant for the phone that he had with him when he was arrested.

Q. Okay. And what did you do with that search warrant?

A. We sent the phone to get analyzed at another one of our offices.

Q. What do you mean by "analyzed"?

A. We sent it to a forensic specialist who could extract the data from the cell phone --

Q. Okay.

A. -- forensically.

Q. Special Agent Robertson, do you have a binder in front of you there?

A. A binder?

Q. Yeah. Excuse me.

A. Yes, I have a binder.
Q. I'm going to direct your attention in that binder to Plaintiff's Exhibit 80.
Do you recognize Plaintiff's Exhibit 80?
A. I do.
Q. What is Plaintiff's Exhibit 80?
A. That's a photo of the bags that were taken out of the box at the time we received it.
Q. Which box?
A. The box that I described earlier.
Q. Okay. And when you say the box that you described earlier, is that the package that we received in evidence?
A. Yes.
Q. Okay. Does that fairly and accurately depict the box, the package, and its contents?
A. Yes.
MR. WHEAT: I would move to admit Plaintiff's Exhibit 80.
THE COURT: Any objection?
MR. RICHERT: No.
THE COURT: Exhibit 80 will be admitted and may be published to the jury.
(Government's Exhibit 80 admitted.)
Q. BY MR. WHEAT: Special Agent Robertson, I'm going to direct your attention also to Plaintiff's Exhibits 81, 82, and 83.

THE COURT: Mr. Wheat, I can turn off the jury projector so you can show them to him on -- are those photos as well?

MR. WHEAT: They are. And he is looking at them in his binder as well.

THE COURT: I have turned off the jury projector, monitor so that you can -- the witness can look at them on the screen at this point as well.

MR. WHEAT: Okay. Thank you.

Q. BY MR. WHEAT: Special Agent Robertson, have you reviewed the pictures marked as -- what's marked as 81, 82, and 83?

A. Yes.

Q. Okay. What are the pictures marked in photographs 81, 82, and 83?

A. They are photographs of the bags that Customs and Border Protection took the photographs, and they emailed them to me before they sent the package.

Q. And what are they sitting on?

A. They are sifting on a scale.

Q. Does that fairly and accurately depict the bags that were inside the package?

A. Yes.

MR. WHEAT: I would move to admit Government's Exhibits 81, 82, and 83.

THE COURT: Any objection?

MR. RICHERT: None.

THE COURT: 81, 82, and 83 are admitted and may be published to the jury.

(Government's Exhibits 81, 82, and 83 admitted.)

THE COURT: Do you want me to turn on the jury --

MR. WHEAT: Your Honor, that would be fine. I'm going to end up getting a slightly better version of this for the jury when they deliberate. For now, I'll just briefly publish, if that's all right with Your Honor.

THE COURT: Yeah. The projector is on.

Q. BY MR. WHEAT: Special Agent Robertson, did those -- do those scales have weights displayed on those?

A. Yes, they do.

Q. What are the weights displayed?

A. On 81 --

Q. Can you see them well enough to tell?

A. I can. This .796 kilograms.

THE COURT: If you put them on the screen, the jury might be able to see that as well and perhaps zoom in.

MR. WHEAT: Okay.

THE COURT: Or not.

MR. WHEAT: It's tough. I apologize. I will have to get a better picture for the jury.

Q. BY MR. WHEAT: Can you tell what's displayed on 82?

A. 82 is .518 kilograms.

Q. .518?
A. Yes.
Q. And on 83?
A. .205 kilograms.
Q. What was that again?
A. .205 kilograms.

MR. WHEAT: .205. Thank you, Special Agent Robertson.

The government has -- well, the government intends to call Special Agent Robertson later but nothing further at this time for Special Agent Robertson.

THE COURT: Cross-examination, Mr. Richert, or you can reserve and handle all the cross when he is recalled.

MR. RICHERT: I'll start now.

CROSS-EXAMINATION

BY MR. RICHERT:

Q. Agent Robertson, let's first talk about the post office here in Pocatello. Apparently, sometime around 9:00 in the morning, the delivery slip was posted on Mr. Newbold's house somehow?
A. Yes.
Q. And we know it was about 9:00 because that's what the slip shows.

So can we believe that to be about --
A. Yes.
Q. -- when it got there?

A. Yes.
Q. Okay. And then Mr. Newbold apparently got to the post office around 10:30, 10:20, somewhere in there?
A. Yes.
Q. So during that time frame, apparently there were a number of law enforcement officers at the post office.
A. In that area, yes.
Q. Which included you?
A. Yes.
Q. How many people -- how many law enforcement personnel were there?
A. More than 10. I don't have an exact number.
Q. There were some with the package in the back?
A. Yes.
Q. There were some outside the building?
A. Yes.
Q. And where were you located?
A. I was across the street.
Q. So you weren't even in the post office at the time?
A. No.
Q. Did you see Mr. Newbold come into the post office?
A. I saw him walk into the post office.
Q. Now, could you have recognized him?
A. I think I just saw the back of his head.
Q. Had you met him before, seen a photograph?

A. Photograph, yes.

Q. Now, when he walked in, did you follow him in?

A. I did not.

Q. Did you go in? Were you the one who assisted in his arrest?

A. No.

Q. Probably you're the wrong guy to ask these questions, but I'll try.

When you go into that post office, there is a long counter behind which are the postal service employees; correct?

A. Yes.

Q. You had been in there, so now you have seen it?

A. Yes.

Q. And I assume before you went across the street, you were in the post office?

A. The back, not the front, yes.

Q. And this package was in the back?

A. Yes.

Q. Until Mr. Newbold got there?

A. That's my understanding. I wasn't there.

Q. And correct me if your understanding would be this: Mr. Newbold would come to the counter with the postage notice?

A. Yes.

Q. And then he was directed to identify himself; correct?

A. Yes.

Q. If you know.
A. Yes.
Q. And then he was directed to sign, and we see he did?
A. Yes.
Q. When he did all that, the package was not in his view; correct?
A. I don't know the answer to that.
Q. Do you know where the package was at that time?
A. It -- it was in law enforcement control. It -- it may have been in the back.
Q. That's where you last saw it?
A. Yes.
Q. And that's where the law enforcement who had the custody of it were located?
A. Yes.
Q. Can we assume it was in the back when Mr. Newbold signed for it?

MR. WHEAT: Objection. Speculation.

THE COURT: Sustained.

Q. BY MR. RICHERT: So, if you know -- I guess you told me you don't know.

You don't know if he saw the package at all before he signed for it?
A. I wasn't there, so I'm not comfortable saying that.
Q. But the setup of the building and the counter, would that

suggest -- well, do you know if the package was out on the counter when he came?

A. I do not know.

Q. So once he signs for it, what was your anticipation would then happen?

A. He would attempt to leave the post office with the box.

Q. Wouldn't someone have to hand him the box?

A. Yes.

Q. And we can assume that happened?

A. Yes.

Q. And then before he left the building, he was stopped by law enforcement?

A. In the outer vestibule, yes.

Q. So he didn't quite get to the door, the outside door?

A. No, he didn't.

Q. And how many feet would that be, if you can recall, from the counter to where he was stopped?

A. I don't know how far along the counter he went to pick it up because I wasn't inside.

Q. During the course of your investigation -- by the way, you're the agent in charge of the investigation?

A. I'm the case agent, yes.

Q. The case agent would be the one -- you direct the investigation and kind of control what goes on?

A. Yes.

Q. During the course of the investigation that you directed -- well, I should stop here.

When he was -- when Mr. Newbold was arrested, he had a cell phone with him?

A. Yes.

Q. One or more, I think.

A. I believe there was one in his truck as well as the one he had on his person.

Q. And did you or law enforcement seize that cell phone?

A. Pocatello Police Department seized the evidence.

Q. So it was taken from him?

A. Yes.

Q. And remained as part of the evidence in this case for a period of months?

A. What phone are you talking about?

Q. Well, it's going to be the phone you did the extraction.

A. Oh, yes.

Q. And that phone was in police custody for a period of months?

A. Yes.

Q. And then in July of this year, was a search warrant obtained to search it?

A. Yes.

Q. Can you explain the reason for the delay? You don't have to.

A. It's a technology issue --

Q. You don't have to answer.

A. -- not a practical issue.

Q. So when the phone was ultimately -- a search warrant was issued to allow law enforcement to do what's called a forensic extraction?

A. Yes.

Q. And that was done sometime in July, maybe August --

A. Yes.

Q. -- of this year?

A. Yes.

Q. The extraction does what, generally, to your knowledge?

A. Creates a forensic image of -- in layman's terms, how I understand it, it creates a forensic image, a duplicate of the phone, but it's Windows-based, and you can look at the contents of the entire device.

Q. You can see what went on?

A. Yes.

Q. And did you have an opportunity to review that forensic analysis extraction?

A. 90 percent of it, yes.

Q. And did you see in there any indication that Mr. Newbold may have ordered this package?

A. No. By the tracking number? No.

Q. Did you see any indication that he had paid for this

package?

A. No.

Q. Did you see -- well, and you're probably the wrong guy to ask this.

You were not at the search of his house, were you?

A. I was not.

Q. But since you're the case agent, you would be aware of what evidentiary indications may have been seized from his house?

A. Yes.

Q. Did you see any indication of ledgers seized from his house?

A. No.

Q. Did you see any indications of large amounts of cash seized from his house?

A. No.

Q. Did you see any indication that there were money orders to China that may have been used to pay for this package in the house?

A. No.

Q. Did you see any receipts for Western Union or whatever else that may have been used to pay for this package?

A. No.

Q. And a search was done on the same day -- put it this way: The search was done immediately after his arrest; correct?

A. Yes.

Q. And who did the search? Which law enforcement agency?
A. Agents from my office were there and the Pocatello Police Department.
Q. You interviewed Mr. Newbold shortly after his arrest. Is that what we understand?
A. Yes.
Q. And that was done at the Pocatello Police Department?
A. Yes.
Q. And part of that interview included what that package was all about, did it not? Well, he was being interviewed because he just picked up a package that you caused him to go pick up; correct?
A. Yes.
Q. So can we assume, then, that the interview entailed something about that?
A. We asked him about the package.
Q. And he said he didn't know where it came from.
MR. WHEAT: Objection. Hearsay.
THE COURT: Sustained.
Q. BY MR. RICHERT: Did he look surprised?
MR. WHEAT: Objection. Foundation.
MR. RICHERT: Well, I'll finish the question.
THE COURT: Well --
MR. RICHERT: I'll restate it.
THE COURT: Counsel, I don't know how the witness can

                                                                      answer. I mean, you've got to be more specific. What do you mean by "surprised"? Raised his eyebrows? I mean -- the objection is sustained.

Q. BY MR. RICHERT: Did you tell Mr. Newbold what was in the box?

A. Detective Edwards did, yes.

Q. And he was with you during the interview?

A. Yes.

Q. Did Mr. Newbold make any sort of indication in reaction to that?

MR. WHEAT: Objection. Hearsay.

THE COURT: Sustained.

MR. RICHERT: I'm not asking what he said.

THE COURT: Well, you can ask him how he reacted.

Q. BY MR. RICHERT: How did he react?

A. He --

MR. WHEAT: Objection. Calls for foundation.

THE COURT: All right. We need to establish the witness was present. I'm not absolutely sure he was there. But let's -- if he was there, I'll allow it.

Q. BY MR. RICHERT: You were there?

A. Yes, I was there.

THE COURT: Okay. The objection is overruled. Go ahead.

Q. BY MR. RICHERT: How did he react when you described what

was in the box?

THE COURT: And you can describe not what he said but any physical reaction, if any.

THE WITNESS: I can't recall off the top of my head what his physical reaction was.

MR. RICHERT: For now, that's all the questions that I have.

THE COURT: Any redirect?

MR. WHEAT: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. WHEAT:

Q. Special Agent Robertson, we'll get into this later, but there was questions about, discussions about ledgers, large amounts of cash or money orders.

Were there conversations in there about whether Mr. Newbold was selling products -- in the phone? Excuse me.

A. Yes.

Q. And what were those conversations? Can you just describe those?

A. I'm sorry. I didn't hear.

Q. Could you summarize those --

MR. RICHERT: Your Honor, this is beyond the scope of direct or cross-examination.

THE COURT: Well, given the opening statements, I'm going to overrule the objection.

You may answer.

THE WITNESS: During the chats from the phone, from the search warrant, indicated that he was -- had distributed to at least one person.

MR. WHEAT: Thank you. Nothing further.

THE COURT: Anything else, Mr. Richert, at this time?

RECROSS-EXAMINATION

BY MR. RICHERT:

Q. Did the extraction indicate who this person might have been?

A. I would have to look at the chats. No. No, it did not.

MR. RICHERT: That's all I have.

THE COURT: All right. You may step down subject to recall.

And, Counsel, I'm assuming counsel wish to have witnesses excluded --

MR. WHEAT: That's correct.

THE COURT: -- except for, obviously, the defendant and the one case agent for the government. So you can remain in the courtroom as the case agent.

We're going to go until about 3:00, so about 20 more minutes.

MR. WHEAT: The government would call Special Agent -- excuse me -- Officer Wong from Customs and Border Patrol. Can we retrieve him, Your Honor?

THE COURT: Yes. Officer Wong, did you say?

MR. WHEAT: Yes.

THE COURT: Officer Wong, would you please step before the clerk and be sworn, and then Ms. Bracke will place you under oath and direct from you there.

MATTHEW WONG, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Please take a seat in the witness stand.

Please state your complete name, and spell your name for the record.

THE WITNESS: Matthew Wong. M-A-T-T-H-E-W, W-O-N-G.

THE COURT: You may inquire.

MR. WHEAT: Thank you, Your Honor.

And I actually have the right binder, if I can present that to Officer Wong.

THE COURT: Again, if we're looking at exhibits, if you want to use the evidence presenter, I can turn off the jury projector until it's admitted as well.

MR. WHEAT: Okay. That would be great. Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WHEAT:

Q. Officer Wong, could you tell the jury -- we have heard your name. Tell us what you do for a living.

A. I work for Customs and Border Protection in the Port of San Francisco in the international mail division.

Q. Okay. In San Francisco, you said?
A. That's correct.
Q. And what do you do in that role?
A. I inspect incoming foreign mail.
Q. What kind of incoming foreign mail?
A. Packages, letters, all sorts.
Q. How long have you worked for Customs and Border Protection in that role?
A. In that division, I was there for three years.
Q. And do you have certain training that goes with your job? What are you -- or what do you do at your job? What do you look for, I guess, when you inspect?
A. I have X-ray training, and we run packages through the X-ray. So I have -- so we look for anomalies in mail.
Q. Okay. What do you mean by "anomalies"?
A. Stuff that's unusual. Because normal stuff would be, like, clothing or cookies and cakes and stuff like that, electronics.
Q. Okay. And were you working at that job on October 5, 2017?
A. I was.
Q. What were you doing in that job on October 5 of 2017?
A. I don't recall what I was doing exactly that day, but I could have been running X-ray. I could have been targeting.
Q. Okay. Do you -- have you examined -- do you know what you were doing October 5, 2017?
A. Not precisely, but I -- you know, I would have to look at

my logs and stuff like that.

Q. Okay. Have you had a chance to examine those logs?

A. I did.

Q. Okay.

A. And I was working X-ray that day.

Q. Okay. And what does working the X-ray entail?

A. The postal employees, they load one side of the conveyor belt. The packages roll through X-ray. If I see anything unusual, I'll pull it aside and open it, inspect the contents. If it's normal stuff, I will just put it back in the mail stream. If it's abnormal or an anomaly, I'll refer it for further inspection.

Q. Okay. And how many packages do you inspect on a daily basis if you're running the X-ray, for example?

A. I couldn't say exactly. I don't know.

Q. Well, roughly, is it more than 100?

A. I would probably say it's in the thousands.

Q. Is it? Okay.

And when you inspect these packages, you say there is an X-ray?

A. Yes.

Q. How well does it see through packages?

A. Pretty well.

Q. Okay. Well, on that date when you were working the X-ray and you were inspecting packages, did you come across a package

that was addressed to an address in Idaho?

A. Possibly.

Q. When you say "possibly," what do you mean?

A. At some point, all packages start to look the same. I can't exactly remember if it came from Idaho. If I had the package, I could see.

Q. Okay. I'm going to present to you, Officer -- make sure I get it right -- Government's Exhibit 27. It should be just sitting right next to you there.

Do you recognize Government's Exhibit 27 if you take a look at it?

A. Yes. My initials and date are on the inside of the box.

Q. And what do you take by that?

A. As part of our procedure when we refer things to be examined, we initial and date the inside of the box.

Q. Okay. And what do you mean by when you ask for things to be examined?

A. When this case -- is there a label? Was there a shipping label here or --

MR. WHEAT: Can I go ahead and present Exhibit 30?

THE WITNESS: Thank you.

So in this case, this is a package that was said to declare beauty products. And when it passed through the X-ray, I picked it up; I checked the declaration. And it didn't appear to be beauty products, so I opened it, and I examined the contents.

Q. Okay. You opened it up and examined the contents.

What were the contents?

A. A couple bags of unknown powder.

Q. Why didn't you think it was beauty products?

A. Generally beauty products are commercially packaged, like in plastics and everything.

Q. And what was different about this particular package?

A. There was unmarked plastic bags inside of foil pouches.

Q. Okay. And based on your training as an inspector, what did this -- what were you trained to do in this situation?

A. Unless I can consciously determine the fact that it's harmless in all ways or not a controlled substance, then I would push it up to have it further examined either by testing or other means.

Q. Okay. So what did you do with this particular package?

A. I pushed it up to get further inspected. So I logged it into a logbook, and I put it in a secure area.

Q. Okay. Thank you.

And what happened from there?

A. It was tested by a different officer, and those results were sent to a laboratory, and they replied.

Q. Okay. Thank you.

I am very sorry. Just give me a second. I have enough papers here, it takes me a second to find them when I set them down.

I'm going to go ahead and show you -- and you can turn in that binder in front of you, Officer Wong, if you want to -- I would recommend it, actually -- Plaintiff's Exhibit 89.

A. Okay.

MR. WHEAT: And it's off for the jury, right, Your Honor?

THE COURT: You want it off?

MR. WHEAT: Yeah.

THE COURT: It is off.

MR. WHEAT: Okay. Thanks.

Q. BY MR. WHEAT: Do you recognize Plaintiff's Exhibit 89?

A. Yeah. It looks like part of the -- redacted part of our logbook for October 5, 2017.

Q. Could you tell the jury what that logbook is.

A. When we refer stuff to be tested or for further analysis, we seal the box up with our tape, log it into a logbook, and put it in a secure area while it's waiting to be tested.

Q. What kind of tape do you mean?

A. It's a green Customs tape. We initial the tape and date the tape as well.

Q. And I'm going to ask you to look at that log, and I'm going to ask you: Do you recognize any of those tracking numbers written on that log?

A. If I had to look, I would say I don't know. But since I have this tracking label in front of me, yes. It's part of the

list here of the seven, I think -- yes, seven.

Q. Okay. Which one is that? Could you read that tracking number?

A. It's Echo Alpha 181491234 Charlie November.

Q. Okay. And so did you write this?

A. Yes, that's in my writing.

Q. Okay. And where was it kept?

A. In a secure cage.

Q. Okay. And did you go back and find this document?

A. The logbook? The logbook is actually next to the cage.

Q. What's that?

A. I'm sorry. I don't understand the question.

Q. I'm sorry. What's this written on?

A. It's in a logbook that's next to the cage.

Q. Okay. Did you go back and look at the logbook later?

A. After I logged it in?

Q. Yeah.

A. No.

Q. But how did we get this document, then?

A. Okay. Well, because you asked me if I could find out if it was logged properly, yeah.

Q. And did you determine that?

A. Yes.

Q. So where was this page that's redacted found?

A. Inside the logbook that's next to the secure cage.

Q. And was that where it was supposed to be?
A. Yes.
MR. WHEAT: Okay. I would move to admit Government's Exhibit 89, Your Honor.
THE COURT: Any objection?
MR. RICHERT: No.
THE COURT: 89 will be admitted and published to the jury.
(Government's Exhibit 89 admitted.)
Q. BY MR. WHEAT: Okay. Could you just count down on the lines. Which tracking number are we looking at?
A. No. 2.
Q. How many from the top? Oh, No. 2?
A. Yes.
Q. EA181491234CN?
A. Right.
Q. Okay. There is two letters at the end of that tracking number. Can you see those?
A. Yes.
Q. Are you familiar with what they mean?
A. Yeah. I have some knowledge of the tracking number. It's usually two letters in the front with nine digits in the middle and two at the end.
Q. What are the two at the end?
A. That's a country code from where the package originated

from.

Q. Are you familiar with "CN"?

A. Yeah. That should be the one for China.

Q. By "should be the one," what do you mean?

A. Well, it is.

MR. WHEAT: Okay. If we could mute the jury real quick, Your Honor.

THE COURT: I'm sorry. Yes. I apologize. Okay.

Q. BY MR. WHEAT: I'll show you what's been marked as Government's Exhibit 90.

Do you recognize Government's Exhibit 90? I can zoom in wherever you need me to. Also, it's in your book, Officer.

A. 90. Yes, I recognize it.

Q. Okay. What is Government's Exhibit 90?

A. It's the tape that I used to seal the box before I referred it. I dated it and initialed it and put a brief description of what I found inside and the weights of the items I found inside.

Q. Okay. And what were those weights of the items that you found inside?

A. I numbered them 1, 2, and 3. One was 518 grams, was 796 grams, and one was 205 grams.

Q. Okay. And how do you recognize this as that tape that you put on that package?

A. This tape is affixed to the seizure folder that's created as a hard copy of the seizure. And these numbers did match up

to the report on the top of the folder there.

Q. Okay. Thank you.

Where was that folder kept?

A. It's kept on site in our office.

Q. Okay. So you kept the tape, you recognize the package, you have your initials on the package and the tape.

MR. WHEAT: I guess, first of all, I would move for the admission of Government's Exhibit 90.

THE COURT: Any objection?

MR. RICHERT: No.

THE COURT: Exhibit 90 will be admitted and published to the jury.

(Government's Exhibit 90 admitted.)

Q. BY MR. WHEAT: Now, is there a record kept in your agency of what happened to the package from there?

A. There should be. It would be added to this folder here.

Q. I'm going to show you what's marked in your binder as Government's Exhibit 91.

THE COURT: Do you wish to turn the jury projector off, the monitor?

MR. WHEAT: That's okay.

Q. BY MR. WHEAT: Do you recognize Government's Exhibit 91?

A. Yes. This is an electronic -- sorry. It's a hard copy created from an electronic seizure.

Q. Okay. And where was this generated?

A. This is generated once the contents of the item -- I'm sorry -- the contents of the box were seized.

Q. Okay.

A. This looks to be the same -- it says the seizure is generated from -- yeah. The numbers match up, so this is the seizure that was generated from this particular item.

Q. Okay. And where was this document kept?

A. The electronic version, in our system, and a hard copy printed inside this folder.

Q. Okay. I guess I should say: How do you recognize this document? And is it associated with the package that you have just testified about?

A. Because on the prior exhibit you have here, the folder numbers correspond with the incident number and the FBI case number on this file.

Q. Okay. And does it indicate a tracking number?

A. Yes. That would be page 3 in the narrative section or the remarks section.

Q. Okay. And what is that tracking number? Is it consistent -- I guess I'll just shortchange it: Is it consistent with the tracking number on the package you have just testified about?

A. Yes, it is.

Q. Okay. And does it indicate contents of that package?

A. Yes, it does.

MR. WHEAT: Well, Your Honor, first I would move to admit this document, Government's Exhibit 91.

THE COURT: Any objection?

MR. RICHERT: Yes. It's a generated report by a number of different folks. It's hearsay, and it's a law enforcement record.

MR. WHEAT: Can I have just a second, Your Honor?

THE COURT: Yes.

MR. WHEAT: Withdrawn, Your Honor. Excuse me.

Q. BY MR. WHEAT: Well, could you inform the jury what happened to this package after it left your hands, after you had it on the conveyor belt and you said you locked it up in the -- what was that thing called?

A. We just call it the "cage."

Q. Cage. Okay.

What happened to this package afterward?

A. Okay. Generally what happens is that once one of us is assigned to field test it, we field test it on infrared spectrometer. I'm not certified on that particular one that was used, according to this narrative here. But once the substance is analyzed, the results are emailed to a lab, and then they go over the results.

Q. Okay. What's done with the package after that, the typical procedure?

A. Usually, if it comes back as a positive for a controlled

substance, then we would seize it, and then we would reach out to the final destination. Their responsibility of where the package would be to HSI to see if they are interested in taking control of the package.

Q. Okay. Now, the other thing I wanted to talk about is -- you look at a lot of packages. You said thousands per day; right?

A. Correct.

Q. But are you adequately able to determine what you saw that day based on what you have seen and examined here before the jury?

A. I'm sorry. One more time.

Q. Are you able to put back together that you analyzed this package?

A. Given the records, yeah.

Q. Okay. Thank you.

And do you keep those records routinely as part of your job?

A. Yes.

Q. Okay. And do you know Travis Newbold?

A. No.

Q. Had you ever heard his name before this date when you examined this package?

A. No.

Q. Okay. Do you know him personally at all or recognize him?

A. No.

MR. WHEAT: And I have nothing further, thank you.

THE COURT: Cross-examination, Mr. Richert.

MR. RICHERT: Thank you.

CROSS-EXAMINATION

BY MR. RICHERT:

Q. Mr. Wong, I was a little unclear as to exactly how this process went, so I'm going to kind of quiz you about that.

You're using some kind of an X-ray machine that -- is it on a conveyor belt, or how does that work?

A. Yeah; it's conveyor-driven.

Q. So someone loads the conveyor, and the packages come up to you; you look through the X-ray and make a determination if there is an anomaly, something wrong with it?

A. That's correct.

Q. When the packages go through the X-ray machine, are there any photographs taken so we can actually see what you saw?

A. I'm sorry. One more time?

Q. When you see something wrong with a package looking through the X-ray machine, is there a mechanism that you can click and make a photograph of that?

A. There might be a function in X-ray for that, but we don't routinely do that.

Q. So, apparently, you don't even know if there is such a function on your machine?

A. I guess you could say, sure.
Q. In any event, you don't have an actual photograph of the -- of what you saw through the X-ray machine?
A. That's correct.
Q. Now, I'm a little curious. Once you saw something that you thought was suspicious, then you take it out of the machine and off the conveyor belt and place it somewhere?
A. Yes, with me, yeah.
Q. Does the conveyor belt continue to go or do you --
A. It continues to go.
Q. So are there now some packages going through that you're not looking at?
A. Well, yes, I'm looking at them. But actually I'm looking at them, yes, but they are continuing going.
Q. So you are still at your work station, but you put the box somewhere?
A. Right next to me, yes. Next to me.
Q. Is there a table or something you can place them on?
A. Yes, table.
Q. And then at some point, you move it to a cage?
A. No.
Q. A cage area?
A. No. I opened it first. Because if it's good or if I find nothing wrong with the package, then I add it back to the mail stream. So I opened it there while I'm working on the X-ray.

Q. Okay. And then you saw what appeared to be powder?

A. Correct.

Q. Then did you move the package somewhere?

A. No. Then I seal it up with the green tape.

Q. With the green tape?

A. Yeah.

Q. So Exhibit 90, that's the green tape you would have sealed it back up with?

A. Correct.

Q. It has weights written on there.

Did you weigh the packages?

A. Yes. Before we secure it in the cage, we weigh the packages, the contents.

Q. So you actually did the weights?

A. Correct.

Q. Now, you indicated this green tape was now on a -- some kind of a folder.

What was that folder?

A. It's the hard copy of the electronic seizure that's in our records.

Q. Seizure folder --

A. Yes.

Q. -- I think is the term.

So this -- did you generate that seizure folder or did someone else?

A. Someone else did.
Q. The same day? October 5?
A. No.
Q. I'm now going to show you Exhibit 89, which you have indicated that's the log or portion of the log that you did on October 5 last year. So -- that's correct?
A. Correct.
Q. Okay. And it looks to me like all of them have a "CN," which indicates that all of these packages that you logged in came from China.
A. Correct.
Q. Is that common?
A. I don't think I follow your question. Is it common?
Q. Well, we know that, at least from this exhibit, every one, every package you flagged came from China.
A. On that particular day, yes.
Q. And we don't know, because it's been redacted, what may have been other packages from their origins?
A. One more time, sorry.
Q. I'm sorry. That was kind of a lousy question.
Because we have got the exhibit of the logbook blacked out except the portion with these six or seven entries, do you know how many other packages may have been from China this day?
A. No.
Q. When you take -- when you opened the package and then

resealed it, how did the package get into this cage, this secure area?

A. I log it in, and I put it in the cage.

Q. And where is that located?

A. It's on site.

Q. Pardon me?

A. It's on site.

Q. On the side of you?

A. On site.

Q. Somewhere in the building?

A. Yes.

Q. So you have to walk somewhere to do that?

A. Yes.

Q. Did you do any testing to determine what the powder was?

A. I did not.

Q. Do you have -- well, I shouldn't ask.

MR. RICHERT: That's all the questions I have.

THE COURT: All right. Do you have any further questions at this time? We are right where we take the break. But if you have one or two questions, let's wrap up with this witness.

REDIRECT EXAMINATION

BY MR. WHEAT:

Q. Did this package come from China?

A. Yes.

Q. And I guess, where are you in relation to when it arrives from China when you do your job?

Well, how did it get here from China, I guess?

A. It's flown in by airplane.

Q. Okay. And where does it go from airplane?

A. It gets driven across the tarmac to us.

MR. WHEAT: Okay. Thank you. Nothing further.

THE COURT: Anything else, Mr. Richert?

MR. RICHERT: No.

THE COURT: All right. You may step down.

I assume the witness can be excused and is going to be recalled.

MR. WHEAT: Yes, Your Honor.

THE COURT: All right. Thank you very much for being here.

Ladies and gentlemen, we will take a 15-minute recess. I'll again admonish you to follow the court's extended directions concerning juror conduct. I won't repeat them now, but you're subject to that same admonition until the end of the trial.

We'll be in recess for 15 minutes.

(Recess at 3:03 p.m. until 3:21 p.m.)

(Jury present.)

THE COURT: For the record, I'll note that the jury is present.

Mr. Wheat, you may call your next witness.

MR. WHEAT: Your Honor, the government would call Jonathan Dumke from the DEA -- yeah, from the DEA.

THE COURT: All right.

MR. WHEAT: He is just in the witness room right outside.

THE COURT: Officer Dumke, would you step before the clerk and be sworn.

JONATHAN CARVER DUMKE, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Please take a seat in the witness stand.

Please state your complete name, and spell your name for the record.

THE WITNESS: Jonathan Carver Dumke. J-O-N-A-T-H-A-N, Carver, C-A-R-V-E-R, and then Dumke, D-U-M-K-E.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. WHEAT:

Q. Mr. Dumke, could you tell the jury what you do for a living.

A. I'm a forensic chemist for the Drug Enforcement Administration.

Q. What does a forensic chemist for the Drug Enforcement Administration do?

A. We testify here in court. We analyze controlled substances for the presence or nonpresence of any material that is

acquired. We respond to law enforcement activities if needed. And that's it.

Q. And where is your office at?

A. In Pleasanton, California.

Q. Is there a laboratory attached to your office?

A. Yes.

Q. Okay. And do you test controlled substances?

A. Yes, sir.

Q. What is your training and experience to become a forensic chemist for the Drug Enforcement Administration?

A. I received a bachelor in science in chemistry from Hillsdale College, and then I received a Ph.D. in chemistry from Louisiana State University. And then after that, I took a four-month course in Quantico, Virginia, for the DEA basic forensic chemistry course.

Q. Do you have training and experience with the identification of anabolic steroids?

A. Yes, sir.

Q. Where does that training come from?

A. The training comes from Quantico and on the field.

Q. And I'm going to ask you, Mr. Dumke, if you would, please, to look in the binder in front of you at a Plaintiff's Exhibit 93.

THE COURT: 93?

MR. WHEAT: Yes, Your Honor.

Q. BY MR. WHEAT: Are you looking at Plaintiff's Exhibit 93?
A. Yes, sir.
Q. Do you recognize Plaintiff's Exhibit 93?
A. Yes, sir.
Q. What is Plaintiff's Exhibit 93?
A. These are my lab reports.
Q. Lab reports for what?
A. For the substances that were submitted to the laboratory.
Q. Okay. And how do you recognize those as your lab reports?
A. It has my name at the very bottom, where it says "Analyzed by."
Q. And how do you know that it was you that put these together?
A. I generate the report as soon as I'm finished with analyzing it.
Q. Does this fairly and accurately represent reports of laboratory activities that you did?
A. Yes, sir.
Q. On what date?
A. I completed the report on March 19, 2018.
Q. What did you find in those when you did those reports?
A. On Exhibit 2, it was methandienone; and on Exhibit 1, it was oxymetholone.
MR. WHEAT: I would move to admit Plaintiff's Exhibit 93.

THE COURT: Any objection?

MR. RICHERT: No.

THE COURT: 93 will be admitted. Do you wish to publish it to the jury?

MR. WHEAT: May I please, Your Honor.

(Government's Exhibit 93 admitted.)

Q. BY MR. WHEAT: I'm putting on the overhead, Mr. Dumke, part of Plaintiff's Exhibit 93.

Do you recognize that?

A. Yes, sir.

Q. What is that?

A. That is my lab report.

Q. Can you tell the jury about some of the parts of this lab report. I'm pointing at something that says "HSI Idaho Falls" in the upper left-hand corner.

What does that mean?

A. That is the -- where the submitting agency of where the material came from.

Q. And there is something that says "Case number" across there to the right.

What is that?

A. That is the agency's number.

Q. And what is L-I-M-S number just below that?

A. LIMS stands for Laboratory Information Management System. That's how we record our data electronically, and it's --

THE COURT: Mr. Wheat, could you zoom in so the jury can see it more clearly.

MR. WHEAT: Oh, yeah, I can.

THE COURT: I think it's helpful. There, thank you.

THE WITNESS: And it's just a constant counter number that we get every time new evidence comes in that the last five-digit number constantly increases, the first being the fiscal year; the second portion is our laboratory. We are the 7th laboratory in the DEA system. And then the last five digits is the increasing number.

Q. BY MR. WHEAT: Now, does it reference an exhibit in there?

A. Yes, sir.

Q. Which exhibit?

A. This is Exhibit 1.

Q. And what was Exhibit 1 found to be?

A. Oxymetholone.

Q. And could you tell the jury how you came to that conclusion.

A. So as soon as I am assigned by my supervisor the exhibit, I get a response on my LIMS system. And I go to the vault, I pick it up. There is an electronic transfer from the evidence custodian to my possession.

I take it -- I took it back to my bench, and then I took a gross weight of the entire packaging itself without doing anything else first.

Q. In this case, what did the entire packaging weigh?

A. The entire packaging weighed 1040 grams.

Q. And where are you looking at to get that number?

THE COURT: You can use your finger as a pen, I think, on that and just circle it or at least -- well, maybe you can. I don't know. Our system has not been --

Q. BY MR. WHEAT: I am pointing toward the center of the page. It says "Date accepted by the laboratory." Oh, I'm sorry. It says "Gross weight."

What does that say?

A. That says "Gross weight."

Q. Okay. And what do you mean by "gross weight"?

A. It is the weight of all of the packaging that the submitting agency put it in. For instance, this entire bag.

Q. Okay. So the package -- would it be fair to say that was the package weight?

A. Yes, sir.

THE COURT: Just a moment. What you just held up, what is the exhibit number on that?

THE WITNESS: I'm sorry. This is Exhibit 29.

Q. BY MR. WHEAT: Okay. What's in Exhibit 29? Do you recognize Exhibit 29, I should say?

A. Yes, sir.

Q. What is Exhibit 29?

A. Exhibit 29 is the complete packaging plus the material that

was submitted to me.

Q. And how do you recognize that it was submitted to you?

A. There are my name, multiple places from when I opened it, when I resealed it, and then -- I can't see because of how the packaging is, but my initials and date is on everything that I have touched.

Q. Okay. Does that fairly and accurately represent the substance that you tested to get this report?

A. Yes, sir.

Q. And what was that substance again?

A. Oxymetholone.

Q. Okay. And I accidentally interrupted you when you were going through your methodology of what you do when you test drugs. Could you pick up where you left off.

I think where you were -- correct me if I'm wrong -- was you were talking about when you pick up the package and bring it into your laboratory.

A. Yes.

So I take the gross weight. In this case, it was 1040 grams. And then I open up the packaging, the larger packaging, take out the material or the contents of the package. In this case, it was Ziploc bags.

I take the material, whether it be powder, liquid, gummy materials -- in this case, it was powder -- I put those into brand-new bags where I did a weigh-by difference. I weighed the

bags, the new bags, empty, put the material in; then I weighed again so I could do a subtraction of what the weight of the actual material is. And that's called the net weight.

Q. And what was the actual material in this? What was it in total, I should just say.

A. The net weight of the material is 989.7 grams.

Q. Okay. And where is that written on here?

A. It is right next to the "Substance identified: oxymetholone," to the right.

Q. Okay. Is that where it says "Net weight"?

A. Yes, sir.

Q. Okay. So what does net weight mean again as opposed to gross weight?

A. Net weight is the weight of the material itself. So whether it's a powder, liquid. In this case, it's a powder.

Q. Okay. So what do you do after you get the net weight and the gross weight?

A. So in this case, there were two units. So each unit got their own respective new bags.

Q. Could you tell us what you mean by "unit" in this case.

A. Okay. Sorry. So when I opened up the packaging, there were two separate Ziploc bags. So when I did the net weight, I got two brand-new Ziploc bags, weighed those empty, put the material in those new bags and then weighed them again. And that's how I got my net weight from the total of two units.

Then for testing them, I took two separate portions of the material from each bag and tested one by using gas chromatography-mass spectrometry, or GC-MS, and the other one was infrared spectroscopy. So each unit got its own independent test. And they both came up as oxymetholone.

Once I received the -- how they coincided with each other, I made a composite. And in this case, I took at least 7-1/2 grams of material -- so 15 grams total, combining both units -- ground them up using a mortar and pestle, and passed them through a mesh sieve, and then tested it one more time just to make sure that there was nothing else being missed. And the stuff still coincides as oxymetholone.

In this case, I used gas chromatography, flame-ionization detection, or just "GC."

Q. Do you have a quick overview for the jury of what that means, gas chromatography and infrared spectrometry?

A. Spectroscopy.

So gas chromatography, you think about a water slide. You and your friends are all holding hands. You go down the slide. But, eventually, you guys are going to start to separate, either by the friction of the tube or the strength that you are holding on to each other; and by the time you exit the slide, you guys have all separated, based on different strengths.

In this case, you want to get more technical. Strengths on the affinity-to-the-stationary phase. So that's the gas

chromatography part.

And then the two gas chromatography instruments that we use, one is mass spectrometry, which is the detector; and the other one is flame-ionization detection, which is the other detector.

The mass spectrometer, once everyone is separated, they go into -- in this case, change it to cars. They go into this instrument, and then the instrument or the cars break apart into different pieces. So you have a tires, the doors, the mufflers -- everything that would make up a Ford Taurus or a Ford Bronco or something.

You would be able to take -- from those pieces of the car, you would be able to put back that Taurus back together. In this case, we get different spikes of different numbers, being the molecular weight of the material; and then as material gets broken down and breaks off different chains of the material. Very similar idea as the car; you can still put the car back together; you can still identify it by its hood or whatnot.

The other one is the flame-ionization detection. After the separation, it goes through a flame. And this is more of a separatory technique. And all it does is give a burst of light. And that light is detected at a certain retention time.

Q. So based on your analysis, your education, your experience, could you tell the jury what your conclusion is about the identity of Exhibit 28.

A. That it's oxymetholone.

Q. Oh.

A. I'm sorry. 29?

Q. Yeah, 29.

A. Oxymetholone.

Q. Okay. Thank you.

And then I'm going to show you -- I was looking at the wrong one here -- what's also marked as Plaintiff's Exhibit 93, a second page.

What does that indicate?

Oh, you can't see it. There we go.

A. It's methandienone.

Q. Okay. And did you go through the same process with this methandienone?

A. Very similar. There is only one unit opposed to the two units. So the weighing was very similar except for I only used one bag.

Q. Okay. And what is your conclusion about Exhibit 28?

A. That it contains methandienone.

Q. Okay. What kind of methandienone?

A. What kind?

Q. I guess, is it a powder?

A. Oh, yes, it's a powder.

Q. Thanks.

What was it contained in?

A. It was contained in a Ziploc bag.

Q. What was the gross weight of that?

A. The gross weight of the packaging and Exhibit 28 originally was 532.3 grams.

Q. And what was the net weight?

A. 496.9 grams.

Q. And what do we mean, just so that the jury knows -- I'm zooming in. It says "net weight," and then it says "496.9, plus or minus .2g."

What does that mean?

A. That is the uncertainty of measurement. Similar to if you were to get on a scale and then get right back off and then get back on, it might change. Now, your mass didn't change in a matter of seconds; it's just the uncertainty that the scale has.

Similar to if had you a cup of sugar, you take away couple grains, it's still a cup of sugar; it's just the uncertainty based off of metrology that they have done in headquarters that they come up with this number.

Q. Thank you.

So based on your review of Exhibits 28 and 29, are those consistent with the readouts in Plaintiff's Exhibit 93?

I'm sorry about that focus.

A. Yes.

Q. Okay. And the identity of those substances are methandienone and oxymetholone, as reflected in that report?

A. Yes, sir.

Q. Now, I just have a couple more questions. And that is: When you test what are suspected as controlled substances, do you know anything about them before they come to you?

A. Sometimes they are suspected, but we treat everything as an unknown. I have received evidence where they -- on the report that we receive, it said that it was cocaine, and it would end up being flour.

Q. So is that -- is it fair to say that, based on that, sometimes you get negatives when you test things?

A. Yes, sir.

Q. Are there any repercussions or anything if you get a negative?

A. No, sir.

Q. And did you know anything about this substance, about who it was purported to belong to or anything like that?

A. No, sir.

MR. WHEAT: Thank you. I have -- just a second. Nothing further for Mr. Dumke.

THE COURT: Cross.

MR. RICHERT: Thank you.

CROSS-EXAMINATION

BY MR. RICHERT:

Q. Mr. Dumke, I am showing you again Exhibit 93.

In the middle part of it, it says "Date accepted by the

laboratory."

What date is that?

A. October 30, 2017.

Q. And it was tested what day?

A. On March 12, 2018.

Q. Do you know the reason why it was in the laboratory at the end of October last year and tested in March of this year?

A. Our laboratory has a very large backlog. So we typically only start analyzing things when it's considered a rush request.

Q. So, based upon that, would someone have contacted you to ask you to do the testing on these?

A. The person asking to do the rush request submits a form to our upper management.

Q. I'm sorry. I said "contact you."

Someone would contact the lab --

A. Yes.

Q. -- and ask that something be analyzed?

A. Yes, sir.

Q. Do you know if that's what happened here?

A. Yes. I have seen the rush request form.

Q. In fact, that's what happened here?

A. Yes.

Q. And at the top of the -- at the top of the page, top left just below the black line, "HSI Idaho Falls," do you know what that means?

A. That that was the submitting agency.

Q. Homeland Security? Is that what that is?

A. Oh, yes, sir. Sorry.

Q. Would that -- would you have known where -- who the submitting agency was when you did your reports?

A. Yes, sir.

Q. And are you the person that -- once the report is generated, do you then send the report to the submitting agency?

A. My supervisor sends the report.

Q. Is that Mr. Ealy?

A. Yes, sir.

Q. I don't know if Mr. Wheat asked you: How long have you been doing this?

A. For four years, sir.

Q. At the same lab?

A. Yes, sir.

Q. And that's a government lab, is it not?

A. Yes, sir.

MR. RICHERT: That's all the questions that I have.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. WHEAT:

Q. One other thing, Mr. Dumke.

The case number reflected on this report, what is that case number again?

A. It's 201780910004201.

Q. Okay. Is that the accurate case number?

A. No, sir.

Q. Okay. Could you tell us about that.

A. So when I received the case and I was looking over the document, we have a DEA evidence list, so it's a submitting form agent -- that we get from the agencies. It said "2017," which is the year, the first four numbers, but the bag said "2018."

So I contacted Special Agent Robertson to confirm is this, indeed, the exhibits that you were meaning to send. And he cleared it up that it was just more of an administrative error; that he wrote down the year that it was seized as opposed to the fiscal year.

Q. Okay. So what date does the fiscal year start?

A. 2018. Oh, the day? October 1.

Q. Okay. So you tested these on October 30th?

A. No. They were received by the laboratory October 30.

Q. Okay. What day were they tested again?

A. I started testing them on March 12, 2018.

Q. Okay. Okay. So what's the date reflected on the bag, then -- or the case number? Sorry.

A. The case number on this bag is 2018, and then all the other numbers are the same.

Q. Okay. So, based on that, can you just tell the jury why you're still sure, despite that case number that has a different

digit in there -- it's just one digit different -- why you're still sure that this report reflects those exhibits.

A. The -- Homeland Security also does another case number thing. DEA doesn't do it, so I don't understand what these numbers mean. But it was on the submitting form, these correct numbers, FH135, so forth. But those did match up.

Q. Okay. And so the 2017 was just a 2017 instead of 2018; is that fair to say?

A. Yes, sir.

MR. WHEAT: Okay. Thank you.

THE COURT: Anything else?

RECROSS-EXAMINATION

BY MR. RICHERT:

Q. Maybe just because I need some clarification. I think you indicated you did the testing March 12 of this year.

A. Yes, sir.

Q. I can't find that date on this. Can you point it out?

A. The date is actually on Exhibits 28 and 29. When I open the bag, I marked the date.

Q. At the bottom right corner is dated March 19th, 2018.

What does that reflect?

A. That's the completion date.

Q. So it took -- it was a seven-day process?

A. I had to wait for my supervisor to get back from leave, or could have been I was waiting for a standard. At this time, I

couldn't speculate why it took a week.

Q. Well, typically, how long would it take?

A. If all instruments are working properly, meaning they weren't broken, it would probably take a day.

MR. RICHERT: That's all the questions I have.

THE COURT: All right. I assume there is nothing else.

MR. WHEAT: Yes, nothing further.

THE COURT: Is it Officer Dumke? As a chemist, do you have that --

THE WITNESS: No.

THE COURT: Dr. Dumke, though.

THE WITNESS: Yes. Thank you.

THE COURT: All right. Dr. Dumke, you may step down.

I assume he is not subject to recall.

MR. WHEAT: I don't think so, Your Honor.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MR. WHEAT: We are going to call Scott Hellstrom from the Idaho State Police. Your Honor, there are two bins of evidence that Mr. Hellstrom will bring in. We have also talked about making sure that we wait until things are --

THE COURT: Thank you. And he can have those with him there. And then -- I assume they're marked. You can have him reference them and can describe them before he shows them to the

jury; and, of course, they need to be admitted.

Sir, would you step before the clerk and be sworn.

MR. WHEAT: Can I just have a second?

THE COURT: Yes.

SCOTT HELLSTROM, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Please take a seat in the witness stand.

MR. WHEAT: Your Honor?

THE COURT: Yes.

MR. WHEAT: Would you mind an opportunity for me to do a little bit of housecleaning before we admit more exhibits? Can I take the exhibits that are up there that have been admitted?

THE COURT: Yeah. That would be fine. Mr. Metcalf can help you, too, however.

MR. WHEAT: Can we approach?

THE COURT: Yes.

MR. WHEAT: Thank you.

THE CLERK: Please state your complete name, and spell your name for the record.

THE WITNESS: Scott Hellstrom, H-E-L-L-S-T-R-O-M.

THE COURT: Mr. Wheat, you may inquire of the witness.

MR. WHEAT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WHEAT:

Q. Mr. Hellstrom, could you tell the jury what you do for

work.

A. I'm a forensic scientist for the Idaho State Police Forensic Services in the controlled substance discipline.

Q. What does -- what do you do for your job?

A. I test substances that are brought in from law enforcement agencies throughout the state to determine if they contain controlled substances or drugs that are scheduled either by the state or federally; and if those are present, then identifying what they are.

As part of that, I also help in maintaining the instruments and verifying that the chemicals and tests we use are in working order.

Q. Where precisely do you work at?

A. In the Pocatello laboratory.

Q. To get that job, do you have some training and experience that helped you qualify for it?

A. Yes.

Q. What is that training and experience?

A. Before being hired, I attended and graduated from Weber State University in Ogden, Utah. There I earned my associate's in applied science as a chemical laboratory technician and also a bachelor's of science with a double major. The first was in criminal justice system with a laboratory forensic emphasis and then the second in chemistry.

Q. Do you have some on-the-job training, as well, that comes

with that?

A. Yes. After being hired, I went through the internal training program. This involves reading the policies and procedures of the lab, learning -- reading articles and journals about the instruments and types of tests that are used.

I assisted with some cases, supervised how they were done. I then went through a section of training that we call "Hands of the Analyst." And an analyst who is already experienced and fully trained would check out cases and sign the reports and watch me as I handled the evidence. I would open it and perform the weighing and testing.

After all of that was completed, I received a competency test. And this was ten samples prepared by another scientist, and I receive it as a case and had to test those items and correctly identify any controlled substances that were there.

Q. Do you have training and experience -- or if you have stated it, you can say so -- relating to identification of anabolic steroids?

A. Yes.

Q. What is that training and experience?

A. A part of the -- part of that training, the in-house training, involved the different types of drugs. I had to have some experience before my comp test seeing a variety, including steroids and how they were tested. And since then, through casework, different cases, seen different types of steroids in a

few different forms.

Q. Okay. Now, are you familiar with -- well, I'm going to actually just put up something for you here.

If I could mute the jury for a second, please, Your Honor.

THE COURT: It is.

Q. BY MR. WHEAT: You can turn to your own binder there in front of you, Mr. Hellstrom.

Do I call you "Mr. Hellstrom," or is there a specific title?

A. That works.

Q. Okay. Thanks.

THE COURT: Is that the binder you wanted him to have?

MR. WHEAT: Can you show me the front of it? That's the one. Yeah. Thank you.

THE COURT: I think Mr. Wheat is also going to show it to you on the screen in front of you.

THE WITNESS: Okay.

Q. BY MR. WHEAT: I am showing you what is marked as Plaintiff's Exhibit 92. Can you see that?

A. Yes.

Q. Do you recognize Plaintiff's Exhibit 92?

A. I do.

Q. Okay. How do you recognize it?

A. It has the agency information there at the top, and there is also a place with my name.

Q. Okay.
A. I did lose it, though. It's not on my screen.
Q. That power button is really close to the top of the page. Apologies.
Well, if you look at your binder, will you look at Plaintiff's Exhibit 92.
A. Okay. Found it.
Q. How many pages are associated with Plaintiff's Exhibit 92?
A. Six.
THE COURT: Counsel, I think we have some confusion. You filed a supplemental exhibit list, and I think Ms. Bracke and I are operating off the old list.
Just so we're clear, Exhibit 89 is the CBP log; is that correct?
MR. WHEAT: That is correct.
THE COURT: And Exhibit 90 is the photo, and 91 is the Seacats report?
MR. WHEAT: That's correct.
THE COURT: And I think 92 -- well, 93 is Dr. Dumke's lab report, and Exhibit 92 is Mr. Hellstrom's report; is that right?
MR. WHEAT: That is correct, Your Honor. Thank you for clarifying.
THE COURT: All right.
MR. WHEAT: Your Honor, I'm sorry. I can't get

that -- that machine to zoom out like it usually does.

THE COURT: Do you want to zoom in or zoom out?

MR. WHEAT: Zoom out. I can't see the whole page on there.

THE COURT: It may be that it won't zoom out. It should zoom out more than that.

MR. WHEAT: Okay.

THE COURT: There may be a reason why it won't.

MR. WHEAT: I think we can work with that.

Q. BY MR. WHEAT: Mr. Hellstrom, you indicated that those were -- okay. So tell us again, just to refresh my memory, what Plaintiff's Exhibit 92 is.

A. These are two different reports that were issued with the results of testing that I performed, and it has our lab information, as well as my name and signature on them.

Q. Okay. And in what case did you do this in?

A. Our lab case number is P2017-2578.

Q. And is there an agency case number?

A. Yes.

Q. What is that?

A. That is 17-P22116.

Q. And who is the suspect reflected on that?

A. The suspect is Travis M. Newbold.

Q. Does this fairly and accurately depict the results of the tests you have done?

A. Yes.

MR. WHEAT: I move to admit Plaintiff's Exhibit 92.

THE COURT: Any objection?

MR. RICHERT: Just for clarification, if I may.

There are two reports, one generated in September of this year and one generated in December of last year; is that correct?

THE WITNESS: Correct.

MR. RICHERT: But they are both Exhibit 92?

THE WITNESS: Yes.

MR. RICHERT: No objection.

THE COURT: All right. Exhibit 92 will be admitted.

(Government's Exhibit 92 admitted.)

THE COURT: Do you wish to publish it to the jury?

MR. WHEAT: Yes, please, Your Honor.

Q. BY MR. WHEAT: Mr. Hellstrom, could you please tell the jury your process for testing something that you get in your lab for the presence of anabolic steroids.

A. Yes. When I receive an item, I first make note of the packaging type and the seal and open it up and note of any internal packaging and a description of what it looks like.

For solid substances, like powders, sometimes with pills, plants, I weigh it and note the weight, as well, and also a weight after testing so there is a reflection of how much the sample was consumed for analysis.

Liquids are not weighed, but still a description of it being a liquid and any type of internal packaging that it's in.

For items that are suspected of being anabolic steroids, after having that initial weight, if applicable, on a solid, I take two samples and dissolve that in -- each one separately into a solvent. And that solvent I analyze on an instrument we call it the GC-MS -- it's a gas chromatograph-mass spectrometer -- and get two results off the two different samples that are then compared to standards that we have in our lab.

Q. Okay. And what else do you do?

A. Once I have those results compared to a standard, I can make a conclusion that I use to put -- I put in my report, generate that report.

Any remaining sample is sealed back up into the packaging, and I return it to our evidence specialists, who store it in a vault until it's released back to the agency.

Q. Do you maintain a way of identifying the substance you tested later on after you tested it?

A. Yes.

Q. What is that method?

A. I will mark it with initials, the date that I put my initials on, and the case number.

Q. Okay. And did you follow that with -- I'm looking at several lines. You can see on page -- the first page, it says

"page 1 of 3." And where I'm zooming in, it says, on the left-hand side of the paper, "lab item number" and then "2"?

A. Yes.

Q. Okay. Could you tell the jury about what the things on this mean. So I'm pointing at lab item No. 2. What does that No. 2 mean?

A. That's the item number that's assigned when the case is received by our lab.

Q. And who assigns that?

A. The lab item?

Q. Yeah.

A. That's just assigned. When we generate the case number for it, then each item is given a number with it.

Q. Okay. And then the agency exhibit, what is that?

A. The agency who submits it has also put a unique number on it for their tracking.

Q. Okay. And then what's the description?

A. The description is the evidence that I saw when I opened it. So in this case, it has a weight and then a description of it as a white powder.

Q. What does this mean when it says "conclusions and interpretations"?

A. That will be what I found to be present in that substance.

Q. Okay. Well, I'm going to ask you to take a look at this and I'm going to ask you about, first of all, lab item No. 2 on

the page that says "1 of 3" that has the yellow sticker. And it says "Agency Exhibit P193654."

Do you have that with you, the physical exhibit?

A. There are some items over -- not right in front of me but near me.

Q. Okay. Would you mind retrieving it. And if you would do me a favor, Mr. Hellstrom, when you pick it up and bring it to you, could you see to it that you kind of do it discreetly so the jury doesn't see what you're picking up as much as possible.

And you can pick that whole container up, if it will fit on the witness stand with you. You're free to make yourself comfortable there with that.

Could you indicate what you're looking at.

A. This is that item. It's our item 2, our lab's number, and it's a paper bag.

Q. Okay. And what's contained in the paper bag?

A. It has a bag with the powder in it.

Q. Okay. How do you know that?

A. There is a description both on the evidence and then also the lab number that corresponds with my report and its description.

Q. Okay. On the outer bag? On the outer bag?

A. Yeah, there is a description on the bag.

Q. Okay. What's the outer bag?

A. The brown paper bag, the sandwich bag.

Q. And what was that found to be?
A. That it contained oxandrolone.
Q. What is oxandrolone?
A. An anabolic steroid.
Q. And is it a Schedule 3 controlled substance?
A. Yes.
Q. Okay. I'm going to ask you to pick up item No. 4.
Do you have that with you?
A. Yes.
Q. What is item No. 4?
A. It's also a brown paper bag.
Q. And what -- what is the identity of item No. 4?
A. That it contained testosterone propionate.

MR. WHEAT: Okay. Your Honor, I just -- if I could just have a second. I just realized that these came up in a sealed condition. Could we have a quick sidebar?

THE COURT: Yes.

MR. WHEAT: Thank you.

(At sidebar on the record.)

MR. WHEAT: I'm sorry. They came in with evidence tape on them, and they just need to be unsealed, really. But that takes kind of like a blade, which is going to be downstairs. I didn't realize they were still sealed when they came in, I guess.

THE COURT: Do you want to take a five-minute recess?

MR. WHEAT: Then we can just open them up real quick downstairs.

MR. RICHERT: Okay.

THE COURT: Do you need -- is there a real need why they have to be opened up?

MR. WHEAT: I mean, it depends on you. I'm not going to contest the identity of the --

MR. RICHERT: I'm not going to.

THE COURT: Can just we proceed without opening it?

MR. WHEAT: I mean, as long as we have a stipulation that the bag contains that powder described, I guess.

MR. RICHERT: All right.

THE COURT: That's fine.

(Sidebar concluded.)

THE COURT: Just to keep the record clear, Mr. Wheat, we agreed upon a stipulation at the sidebar which maybe the jury ought to know about, so why it is we're not actually going to open the bag.

Do you want to just state what that is, just roughly, and I'll see if Mr. Richert agrees?

MR. WHEAT: Yes, I will, Your Honor.

So the bags are sealed with evidence tape. And that evidence tape is -- contains -- you know, inside the bag there is another bag that's described as the exhibit. We have stipulated that the item described here is the same as what's on

the outside of the bag.

THE COURT: Is that item No. 4?

MR. WHEAT: Yes. And I would submit, both of these reports, the items described are what's contained in there.

THE COURT: Is that correct?

MR. RICHERT: That's correct.

THE COURT: All right. Ladies and gentlemen, that's been stipulated by counsel. Therefore, you are to accept that as having been -- as being true and as having been proven without the need for any evidence on that point.

Go ahead, Mr. Wheat.

Q. BY MR. WHEAT: Well, I'm going to ask you this: Mr. Hellstrom, have you reviewed the exhibits today reflected on this report?

A. Yes.

Q. And do you recognize them to be accurately reflected on this report with the bags that you have examined?

A. Yes.

Q. Okay. I'm going to ask you to go through this a little bit quicker. I'm going to direct your attention to your report where it says 7.1, 7.2, and 7.3.

What's that say?

A. The description is: "Previously analyzed." And the conclusion is a note to "See report No. 1."

Q. Okay. Is note No. 1 contained in Plaintiff's Exhibit 92?

A. Yes.

Q. Okay. I'm looking at a page that says -- well, what do you see there in front of you?

A. Another report issued for this case.

Q. Which report is that?

A. This is report No. 1.

Q. So that is report No. 1 referenced in report No. 2?

A. Correct.

Q. Okay. So looking at item 7.1, 7.2, and 7.3, what is -- what is the name? Did you determine the identity of that substance?

A. For 7.1, -2, and -3, yes, I did.

Q. Okay. What is that?

THE COURT: Counsel, just a moment. Where is item 7.1?

THE WITNESS: It's not on the screen.

MR. WHEAT: Oh, I'm sorry.

THE COURT: All right. Thank you.

Q. BY MR. WHEAT: Okay. 7.1, 7.2, and 7.3, what are the identity of the substances in those exhibits?

A. 7.1 contains testosterone propionate. 7.2 contains trenbolone and enanthate. And 7.3 contains testosterone cypionate.

Q. Are testosterone propionate, trenbolone enanthate, and trenbolone cypionate anabolic steroids?

A. Yes.

Q. Are they Schedule 3 controlled substances?

A. Yes.

Q. I'm going to do this a little backwards, and I'm going to direct you back to report No. 1. Okay? And I'm going to see that there is a lab item No. 1.

Do you have lab item No. 1 with you?

A. Yes.

Q. What's in lab item No. 1?

A. It is a white powder.

Q. Is that the same thing marked as Plaintiff's Exhibit 1?

A. Yes.

Q. Okay. Could you tell us the same thing about lab item No. 2.

A. It is a white powder as well.

Q. Okay. What's the identity of item No. 2?

A. No. 2, the first time it came into the lab, we didn't have a standard available, and so it wasn't confirmed. That's why it was -- that's why there is a report No. 2; additional testing was performed. And lab item 2 contains oxandrolone.

Q. Okay. And what's contained in item No. 1, by the way?

A. Oxymetholone.

Q. Okay. And are oxymetholone and oxandrolone Schedule 3 controlled substances?

A. Yes.

Q. And are they referred to as -- are they what we would call anabolic steroids?

A. Yes.

Q. Okay. So did you test Exhibit No. 2 again?

A. Yes, I did.

Q. Is that reflected in report No. 2?

A. It is.

Q. Okay. Do you see that up there on the screen now?

A. Yeah, it's there.

Q. What did Exhibit No. 2 test for?

A. Oxandrolone.

Q. Okay. I would like to direct your attention to lab item No. 3.

And what is the identity of lab item No. 3?

A. 3 was a white powder that contains testosterone and testosterone cypionate.

Q. And lab item No. 3, is that marked as Exhibit 3?

A. Yes.

Q. And testosterone and testosterone cypionate, are those anabolic steroids?

A. Yes.

Q. And are they Schedule 3 controlled substances?

A. Yes.

Q. Okay. What was the weight of those again?

A. 3 was 261.28 grams.

Q. Okay. I'm going to direct your attention to lab item No. 4 and ask you the same question.

A. Lab item 4 is 46.4 grams of white powder that contains testosterone.

Q. Is testosterone a Schedule 3 controlled substance?

A. It is.

Q. Is it an anabolic steroid?

A. Yes.

Q. Okay. Thank you. Same thing with No. 5, please, Mr. Hellstrom.

What's lab item No. 5?

A. Lab item 5 is 158.44 grams of a white powder that contains nandrolone decanoate.

Q. What is nandrolone decanoate?

A. It's a Schedule 3 anabolic steroid.

Q. Okay. And is that marked as Exhibit 5?

A. Yes.

Q. Okay. Same question as with No. 6. Could you take a look at No. 6.

What's item No. 6?

A. Item 6 is 702.10 grams of a yellow powder.

Q. And did you test that?

A. I did.

Q. Did you detect a controlled substance?

A. No.

Q. And is that marked as Exhibit 6? Oh, it's not, is it?
A. There is a sticky note with a "6" but not the exhibit sticker.

MR. WHEAT: Okay. We'll mark that later, Your Honor. I would move to admit this as Plaintiff's Exhibit 6.

THE COURT: Has that been identified? I'm a little confused. We were going through the report, and now you are moving to admit Exhibit 6?

MR. WHEAT: I'm sorry, Your Honor. No.

Q. BY MR. WHEAT: It's marked with a sticky note that says "6," Mr. Hellstrom?
A. Correct.

MR. WHEAT: Okay. I think that's identity enough for now, Your Honor. We are going to have more identification later.

THE COURT: All right. Fine.

Q. BY MR. WHEAT: Okay. I'm going to ask you the same question about item 7.1.

THE COURT: Now, just to be clear, item Nos. 1, 2, 3, 4, 5, and 6, the witness has indicated that they are the same as Exhibit Nos. 1 through 6. And I assume you have those -- the witness has those exhibits even though they are not admitted. Is that correct?

MR. WHEAT: That's correct, Your Honor.

THE COURT: All right. I just wanted to clarify that

for the record. I assume they are up there with him on the witness stand.

MR. WHEAT: Yes. Yes, they are.

THE COURT: All right. Go ahead and proceed.

Q. BY MR. WHEAT: You have looked at these physical exhibits that are marked with 1 through 6; correct?

A. Yes.

Q. Okay. You testified about -- and correct me if I'm wrong -- 7.1, 7.2, and 7.3, as reflected in this report; correct?

A. Yes.

Q. And did you examine those and determine that they were marked as Exhibits 7.1, 7.2, and 7.3?

A. Yes, they are.

Q. Okay. What are those described as? 7.1, starting there, what's the description there?

A. "Yellow capped sealed vial labeled 'TP' with an oily liquid."

Q. Okay. And what did it test for?

A. Testosterone propionate.

Q. And 7.2, what's the description there?

A. 7.2, "Green capped sealed vial with oily liquid."

Q. What did it test for?

A. Trenbolone enanthate.

Q. And same question with 7.3.

A. "A brown capped sealed vial with oily liquid."

Q. And just to clarify for the record, as well, did you just handle 7.1, 7.2, 7.3 as marked?

A. Yes.

Q. And what are the identities of the substances in those, in 7.1, for example?

A. 7.1 was testosterone propionate.

Q. And what was 7.2?

A. Trenbolone enanthate.

Q. And what was 7.3?

A. Testosterone cypionate.

Q. Are those anabolic steroids?

A. Yes.

Q. Are they Schedule 3 controlled substances?

A. Yes.

Q. And I'm going to jump back, and I'm going to ask you this question to clarify.

Why do we have two reports instead of one here, Mr. Hellstrom?

A. The first time the case was submitted, all the items were there. Only some of them were tested; and a few of those tested, the substances weren't confirmed because we didn't have the right standards in the lab.

And at a later date, we were notified that more items needed to be tested, and it was -- those items were submitted

and tested, and a few more standards were purchased by our lab to confirm some of those that had been unable to be confirmed the first time.

Q. What's a standard, by the way?

A. The standards we receive from a supplier, a chemical supplier, or some are specialized in certain types of controlled substances, like steroids. And they have manufactured it and have a certificate authenticating what it is.

We receive that; we do our own additional authentication, and then we can compare the results that we test on unknown samples to the results we get from testing the standards to see that they match up.

Q. Okay. And I'm going to direct your attention to item 7.4 and ask you to take a look at the physical exhibit.

Are you looking at 7.4?

A. Yes.

Q. Is it marked as 7.4?

A. Yes.

Q. Okay. And what does 7.4 contain?

A. Methasterone.

Q. What is methasterone?

A. A Schedule 3 anabolic steroid.

Q. What's the description of that?

A. There were two sealed glass vials with an oily liquid, and one was tested.

Q. Okay. I'm going to ask you to pick up 7.5, please, as reflected on the report.

And the physical exhibit is marked 7.5, Plaintiff's Exhibit 7.5. What is it?

A. It's eight sealed glass vials with oily liquid, and one was analyzed.

Q. What did it analyze as?

A. It contains trenbolone enanthate.

Q. And are methasterone and trenbolone enanthate anabolic steroids?

A. Yes.

Q. Are they Schedule 3 controlled substances?

A. Yes.

Q. Could you take a look at 7.6.

What is item 7.6?

A. 7.6 is six sealed glass vials with oily liquid, and one was analyzed.

Q. And is 7.6 marked as 7.6?

A. Yes.

Q. Okay. And what did that test for?

A. Methasterone.

Q. Okay. Schedule 3 controlled substance?

A. Yes.

Q. Anabolic steroid?

A. Yes.

Q. Okay. I'm going to ask you to look at 7.7.
What is item 7.7?
A. 7.7 is 42 sealed glass vials with an oily liquid, and one was analyzed.
Q. Okay. And are you looking at the physical exhibit?
A. Yes.
Q. Okay. And what is it contained in? You said there are 42 glass vials. What are they inside?
A. The one I tested contains boldenone undecylenate.
Q. Okay. What is that?
A. A Schedule 3 anabolic steroid.
Q. Okay. And I guess I meant: What are those -- are those 42 sealed glass vials in a bag or something?
A. Yes, they are all in one bag.
Q. Thank you. I'm going to direct your attention next toward 7.8.
THE COURT: Can you slide that down for the jury.
MR. WHEAT: I sure can.
THE COURT: Thank you. And I assume, ladies and gentlemen, you can see that.
Q. BY MR. WHEAT: What is 7.8?
A. 7.8 is a Ziploc bag with 17 sealed glass vials with oily liquid, and one of them was analyzed.
Q. Did you detect a controlled substance?
A. No.

Q. And is it marked as 7.8?
A. Yes.
Q. Okay. Thanks.
Can you please pick up the physical Exhibit 7.9. What is Exhibit 7.9?
A. 7.9 is a Ziploc bag with 20 sealed glass vials with oily liquid, and one was analyzed.
Q. And is the physical exhibit identified as 7.9?
A. Yes.
Q. Okay. And what did it test as?
A. Nandrolone decanoate.
Q. One of the vials; correct?
A. Yes.
Q. Okay. You didn't test all 20?
A. Just one.
Q. Okay. Do they all look the same?
A. Yes.
Q. Okay. 7.10, if I could direct your attention there to that physical exhibit. What is item 7.10?
A. 7.10 is a Ziploc bag with five sealed glass vials with an oily liquid.
Q. And is the physical exhibit marked as 7.10?
A. Yes.
Q. Okay. And what did it test for?
A. Analyzed one that contains testosterone and clostebol.

Q. What are testosterone and clostebol?
A. They are Schedule 3 anabolic steroids.
Q. Okay. And I'm going to ask you to examine item 7.11 next as depicted in your report.
What is item 7.11?
A. 7.11 is a Ziploc bag with a sealed glass vial with oily liquid.
Q. Any controlled substances detected in that item?
A. No.
Q. Is it marked as 7.11?
A. Yes.
Q. Okay. Thank you. I'm going to have you look at 7.12.
What is item 7.12?
A. It is a Ziploc bag. It has 11 sealed glass vials with oily liquid, and one was analyzed.
Q. What did it test as?
A. Oxandrolone.
Q. And what's oxandrolone?
A. A Schedule 3 anabolic steroid.
Q. I'm going to have you -- is it physically marked as 7.12?
A. Yes.
Q. I'm going to have you look at 7.13.
What is item 7.13?
A. It's a Ziploc bag with three sealed glass vials with oily liquid.

Q. And did you analyze one of those?
A. Yes.
Q. What did it analyze as?
A. As containing testosterone cypionate.
Q. Is that an anabolic steroid?
A. Yes.
Q. Is that a Schedule 3 controlled substance?
A. Yes.
Q. Okay. Is it marked as 7.13?
A. Yes.
Q. Okay. I'm going to have you look at item 7.14.
What is item 7.14?
A. It is a Ziploc bag that has a vial of a liquid in it.
Q. Okay. And what is that liquid? Did it test as anything?
A. Methandienone.
Q. Is methandienone a Schedule 3 controlled substance?
A. It is.
Q. And an anabolic steroid?
A. Correct.
Q. Is that physical exhibit marked as 7.14?
A. Yes.
Q. Thank you. I'm turning the page here, Mr. Hellstrom, and I'm looking at item 8.
Were there any -- were there any controlled substances detected in item 8?

A. No.

Q. Okay. And what is item 8, by the way?

A. I'll have to grab it.

Q. That's fine.

A. Item 8 is a brown paper bag, and inside is 147.15 grams of a white powder.

Q. Was it identified as a controlled substance?

A. No.

Q. Okay. Is it marked as Exhibit 8?

A. Yes.

Q. Okay. Unless there is an objection, I'm going to have you look at items 11, 12, 13, 14, and 15. And if you could, please just identify that they are properly marked. And if you have identified those substances and can testify to that, would you please do so.

What is item 11 as reflected in your report?

A. 11 is a brown paper bag that has a white powder inside.

Q. How much white powder?

A. 68.67 grams.

Q. What was the identity of that white powder?

A. Methasterone.

Q. Is it marked as item 11?

A. Yes.

Q. Okay. How about item 12? What is item 12?

A. 12 is a brown paper bag, and it has a Ziploc inside that

has a liquid in it.

Q. Okay. And did that liquid test for anything?

A. Yes.

Q. What did it test for?

A. Boldenone undecylenate.

Q. Is that a Schedule 3 controlled substance?

A. Yes.

Q. An anabolic steroid?

A. Yes.

Q. And is that physically marked as item 12?

A. Yes.

Q. Okay. I'm going to have you look at item 13.

What is item 13?

A. 13 is a paper bag that has 348.43 grams of white powder.

Q. What did it test as?

A. Testosterone enanthate.

Q. Is that marked as item 13 physically?

A. Yes.

Q. Okay. And testosterone enanthate, is that a Schedule 3 controlled substance?

A. Yes.

Q. An anabolic steroid?

A. Yes.

Q. Okay. Could you look at item 14, please.

What is item 14?

A. Item 14 is a paper bag that had 26.41 grams of white powder.

Q. And is that marked as item 14, that bag?

A. Yes.

Q. Okay. What did it test for?

A. Testosterone propionate.

Q. Is that an anabolic steroid and a Schedule 3 controlled substance?

A. Yes.

Q. Okay. Can you look at item 15.

What is item 15?

A. Item 15 is a paper bag that contained 61.21 grams of a powder.

Q. Okay. And did that powder test for something?

A. Yes. It was another that the instrument showed something was there, possibly controlled, but I didn't have a standard available for any type of a confirmation.

Q. Okay. Thanks, Mr. Hellstrom.

And I'm going to ask you about just one more exhibit here. I'm directing your attention to -- it says report No. 1 in the corner, it says "page 2 of 3" at the bottom. On report No. 1, there is a number 10 there, item 10.

Would you look at item 10.

A. I don't see an item 10.

Q. Is it not up there?

THE COURT: Counsel, for what it's worth -- well, maybe you're trying to make a point -- but at least my exhibit list shows the No. 10 as blank. So I don't know if that's --

Q. BY MR. WHEAT: Did you find it?

A. I don't see it.

Q. Well, is there an item No. 10 that you tested?

A. Yes.

Q. Okay. What did it test as?

A. Item 10 is a white powder that had methandienone.

Q. Okay. And is methandienone a Schedule 3 controlled substance and an anabolic steroid?

A. Yes.

Q. Okay.

THE COURT: But, to be clear, the witness has not tied that to a marked exhibit at this point?

MR. WHEAT: That is correct, Your Honor. We'll take a look at that.

Q. BY MR. WHEAT: And so just to summarize again for the jury why there is two reports here.

A. Some items were tested the first time it was submitted, and it was submitted a second time to test some additional items.

Q. Okay. Thank you very much.

MR. WHEAT: For now, I'll pass Mr. Hellstrom until I find No. 10.

THE COURT: You intend -- I'm sorry. I thought maybe

you were done with the witness. I apologize.

MR. WHEAT: Oh, no. I'm sorry, Your Honor. We do intend to find No. 10. But if there is cross-examination between our finding No. 10 -- I think there is multiple items, and I think it's just on its way up.

THE COURT: Okay. But you are or you are not done with the witness at this time?

MR. WHEAT: I'm done with the witness at this time, subject to -- if I could just have permission to introduce No. 10 at a later time.

THE COURT: If you do, I'll allow Mr. Richert to reopen his cross as well.

MR. WHEAT: Thanks.

THE COURT: Are you offering -- the Exhibits 1 through 15 have been identified, but you are not offering them yet at this time?

MR. WHEAT: You know, Your Honor, conditionally I would offer them into evidence. I would offer those as exhibits, those marked exhibits.

THE COURT: 1 through 6, 7, 7.1, 7.2 -- excuse me. 1 through 6, 7.1, 7.2, 7.3, 7.4 through 7.14, and Exhibits 8, 9. And what other ones?

MR. WHEAT: Exhibits 11, 12, 13, 14, and 15, the exception being Exhibit 10.

THE COURT: All right. Is there any objection to

those exhibits?

MR. RICHERT: No.

THE COURT: All right. Those exhibits will be admitted.

(Government's Exhibits 1 through 6, 7.1 through 7.14, 8, 9, and 11 through 15 admitted.)

THE COURT: And they can be published to the jury. But since they are tangible exhibits, I assume you can just hold them up to the jury, if you want to.

MR. WHEAT: Yes, Your Honor. May I just write the page numbers on these pages?

THE COURT: As long as it's not the original.

MR. WHEAT: Okay. Yeah, that is the original. Okay. I won't mess with it. We'll submit that into evidence.

And we do have Exhibit 10. Can we please present this?

Q. BY MR. WHEAT: What are you handling right now, Mr. Hellstrom?

A. Item 10.

Q. Okay. Is that the item 10 that you described in your report?

A. Yes.

Q. And what was it again?

A. A paper bag, and inside was 140.79 grams of a white powder that contains methandienone.

Q. Okay. So this is reflected in your report?

A. Yes.

Q. And is it marked as -- with a "10" on it?

A. It has a Post-it note with a "10" but not the yellow sticker with the "10."

MR. WHEAT: Okay. Thank you very much. Nothing further.

THE COURT: And you're offering Exhibit 10 as well?

MR. WHEAT: Yes, please, Your Honor.

THE COURT: Is there any objection to that?

MR. RICHERT: No.

THE COURT: All right. Exhibit 10 will also be admitted.

(Government's Exhibit 10 admitted.)

THE COURT: Cross-examination, Mr. Richert.

MR. WHEAT: Thank you.

CROSS-EXAMINATION

BY MR. RICHERT:

Q. Mr. Hellstrom, you indicated the training that you had and the education that you had. It sounds to me that when you were in college seeking your degree, you were looking specifically for this kind of a job in law enforcement.

A. Forensics was what I was hoping for.

Q. I think you told us it was a criminal justice bachelor's degree with a chemical co-degree?

A. Yes, double major.

Q. So you got the degree in chemistry plus criminal justice?
A. Correct.
Q. Which suggests to me that you -- for your education, you wanted to have the education to do exactly what you're doing.
A. Yes.
Q. To work in a police lab?
A. Correct.
Q. That's what you are doing.
When did you start with the ISP lab?
A. I'm sorry. When?
Q. Mm-hmm.
A. I started in the summer of 2011.
Q. Now, as far as identifying steroids, I think you-- I'll just kind of go to this case. You told us you used the gas chromatography-mass spectrometry, infrared spectroscopy.
That's one machine?
A. The first one is the gas chromatography-mass spectrometry; that kind of works as two instruments, but they are together. And I use those for steroids.
The infrared could be, but I don't use it for steroids.
Q. Now, it's interesting the way you say that.
When the materials came into your lab and you were given the materials to analyze, you were told that it was suspected to be steroids?
A. Yeah, it was marked as they were suspected that way.

Q. So you were just trying to confirm what the suspicion was?

A. I was trying to determine if there was a steroid in it and, if so, what specific steroid it was.

Q. So were you trying to determine whether or not -- you see some of these that aren't steroids. Were you trying to determine what they were?

A. If -- if there was -- so, for example, there was one that had nothing confirmed in it. The instrument -- the results indicated there was something there, but it wasn't controlled. And so we don't have a standard on hand to confirm it, so we don't report it.

Q. In any event, when you were asked to do the testing, you were simply testing to confirm if it's a steroid and what kind of steroid?

A. Correct.

Q. Now, I said there was a test called infrared spectroscopy, and I was looking at a different exhibit.

You did not use that test, I think you told us.

A. Correct; I did not.

Q. If I told you that we had a chemist from the Drug Enforcement Administration who says he used that test, why would he use it?

A. It's an instrument we have available. One of the benefits of why I like to use it is it's a faster, easier test for a typical sample. It doesn't do as well or as easily with things

that are mixed or -- so, for example, the liquids, the oils, if it's something dissolved in that, the oils would interfere more with it.

I could have used it with the powders. But the standards that we have that I have prepared are ready to use on the other instrument, not on that instrument. So I would have to order more standards in order to use that one.

Q. And these standards, are these kind of graphical standards?

A. No. It's the actual substance, vials that have -- sometimes it's a powder; sometimes it's already dissolved into a solvent.

Q. But when you run the test, the GC-MS test, that spits out graphs, does it not?

A. Correct.

Q. Spikes and valleys?

A. Yes.

Q. Based upon different parts of the analysis?

A. Yes.

Q. So there is also something called the flame test or something close to that.

Does that sound familiar?

A. There is -- there is two things similar to that. There is a flame test, and there is also like a part of the instrument can be a flame ionization. And I have heard of both of those.

Q. Did you use those?

A. I did not in this.

Q. So the fellow from the DEA, he says he did that.

Why would he do that?

A. The flame -- a flame ionization can be used with the mass spectrometer. We have one in our lab, but it's only used for our alcohol testing and other volatiles that are in blood or in other liquids.

Q. Would it be --

A. But I don't use that specific test for drug testing.

Q. Would it be scientifically valuable to run more than one test or use more than one test when you are testing to see what the substance is?

A. That's why I do two samples. There are some substances I will do different tests. For example, we have some color tests that can be used, but there is not as many -- some of the steroids don't work with those color tests, so I didn't use those. I just used two samples on the instrument.

Q. So that was a yes or a no?

A. It can be, but it's not always necessary.

Q. Certainly, you did not do that?

A. I used one test but twice.

Q. You used the gas spectrometer -- whatever -- GC-MS?

A. Correct.

Q. You did two samples, but that's the only instrument that you used?

A. Correct.

Q. Now, in Exhibit 92, you were first given the material to sample in October -- on October 26, 2017?

A. That's -- that's when they came into our lab. That's not when I received it.

Q. I'm sorry. It came to your lab?

A. Yes.

Q. It must have sat there for a period of time before it got to you.

A. Correct.

Q. Is that standard?

A. Yes. Our goal is to have cases done within four weeks. So if it was at four weeks, I would have it about three weeks later. Sometimes we're more behind that. At this time, we were probably more behind that because we just spent a couple weeks moving to a new lab.

Q. In fact, you actually prepared this analysis, this report, on December 22, 2017?

A. Yes.

Q. And with the No. 2 report, the evidence came to the lab when?

A. The second submission was August 16 of this year.

Q. So when you analyzed in December, did the samples then go -- the materials then go somewhere?

A. Yes.

Q. Where did they go?

A. When I was done, I returned them to our evidence specialists, and they locked them in our vault. And then it was returned -- I don't know the date right off, but it returned to the agency.

Q. And then the second sample when you got -- the lab got the materials in August of this year, your report is dated what?

A. That second report is from September 21st of this year.

Q. About three weeks ago?

A. Yes.

Q. And do you know whether -- excuse me. Do you know the investigating officer, Mr. Edwards?

A. I have seen the name before, but I don't know whether or not I have met him in person.

Q. You don't personally know him?

A. I wouldn't recognize him just running into him.

Q. Okay. And do you know -- I don't know if you will. Do you know who requested the second analysis?

A. I don't recall if I was told who. There may have been a note when it came in, but I don't know who, if I was told.

Q. But, again, now you really know that the materials are steroids?

A. Yes.

Q. So you're still trying to confirm that?

A. The second time, I wasn't running tests on the -- to

confirm the same ones. They were either items that I had not tested the first time or that I had tested but didn't confirm because we didn't have the right standards in our lab.

Q. You told us you've got some training dealing with anabolic steroids. Did I hear that right?

A. Yes.

Q. And the training was, what, on the job?

A. For the steroid training, it was all on the job, yes.

Q. Now, did you -- in that training, did you learn whether or not steroids, anabolic steroids, lose potency over time?

A. I did not.

Q. Do you know that?

A. I don't.

Q. Is there any way that you're aware of that these materials could have been tested to determine how old they were?

A. Not that I'm aware of.

MR. RICHERT: That's all the questions I have.

THE COURT: Any redirect?

MR. WHEAT: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. WHEAT:

Q. So, Mr. Hellstrom, as contained in your report, what's your level of scientific confidence that these are the substances reflected in your report?

A. When following our procedures, I'm confident in the

results.

Q. And did you follow the procedures?

A. Yes.

Q. Okay. Is it your testimony, based on your expertise, that these are the appropriate identities of these items tested?

A. Yes.

Q. And did all of these items test positive that are indicated in the report as testing positive for anabolic steroids?

A. Some did not.

Q. Okay. But the ones that are indicated that did, are they mixtures and substances containing a detectable amount of anabolic steroids?

A. Yes.

MR. WHEAT: Thank you.

THE COURT: Anything else?

MR. RICHERT: No. Thank you.

THE COURT: All right. You may step down. Is it Mr. Hellstrom?

THE WITNESS: Yes.

THE COURT: Thank you very much for being here.

I assume the witness will be released, not subject to recall.

MR. WHEAT: Correct, yeah. Thanks.

THE COURT: Call your next witness. We are going to recess as close to 5:00 as possible but let's use the time

between now and then, if we can. Call your next witness.

MR. WHEAT: Yes, please, Your Honor. Thanks. That would be Special Agent Marcel Korvela from U.S. Postal Service Investigations.

THE COURT: Special Agent Korvela, would you please come forward, step before Ms. Bracke. She will place you under oath and then direct you from there.

MARCEL ANDREAS KORVELA, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Please take a seat in the witness stand.

Please state your complete name, and spell your name for the record.

THE WITNESS: Marcel Andreas Korvela. Marcel, M-A-R-C-E-L; Korvela, K-O-R-V-E-L-A.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. WHEAT:

Q. Special Agent Korvela, good afternoon.

Could you please tell the jury what you do for work.

A. I'm a United States postal inspector. We are federal agents from the postal service, and we investigate crimes involving the mail.

An example of some of the things we investigate would be mail theft, mail fraud, drugs in the mail. We deal with suspicious and unknown substances and powders that go through the mail. You know, the big thing would be anthrax; everybody

has heard of that.

We deal with dangerous mail, which would be possible explosives in the mail. We deal with physical security of the post office. We handle workplace violence issues with postal employees and customers as well.

So we have a wide variety of investigations that we conduct.

Q. Are you familiar with the investigation involving Travis Newbold?

A. Yes, sir.

Q. How are you familiar with the investigation?

A. Back in October of 2017, I was contacted by Special Agent Robertson regarding a parcel which was referred to him by CBP.

Q. Okay. What did you do when you were contacted by Special Agent Robertson?

A. The first contact was approximately October 10th, 2017. And he had contacted me regarding a referral, and he requested I do an address check for the address to which the parcel was destined.

Q. Did you do an address check?

A. Yes.

Q. What were the results of that address check?

A. So I contacted the post office here in Pocatello, and they indicated that a Travis Newbold was the primary person there receiving mail.

They also provided some secondary names, Cameron Kenny Miller and a James Wheeler, but they specified that Travis Newbold was the primary mail recipient there.

Q. Thank you.

A. And that was for 551 West Pine here in Pocatello.

Q. Okay. After you identified the address and those who were identified as receiving mail at the address, what did you do next?

A. The next plan was to execute a controlled delivery.

Q. And could you just briefly tell us what a controlled delivery is.

A. Sure. Sure. A controlled delivery is a technique or tool by which something illicit is detected and allowed to move forward and be delivered under the surveillance and control of law enforcement for the purpose of retaining that evidence back against someone or somebody who is maybe responsible for that illicit item.

Q. So did you arrange that in this case?

A. Yes. It was planned, yes.

Q. Okay. How did you notify Mr. Newbold about the package?

A. So on October 24th, the day before the delivery, a notice left slip, or what's called a "PS-49 slip," was left in Mr. Newbold's mailbox. And then again, on the morning of the 25th, there was a second notice that was placed in his mailbox that notified him there was a parcel available at the post

office to pick up.

Q. So two notifications?

A. Yes, sir.

Q. Two days in a row?

A. Yes, sir.

Q. Okay. I'm showing you part of what's marked as Plaintiff's Exhibit 30.

A. Okay.

Q. Do you recognize Plaintiff's Exhibit 30?

A. I do.

Q. What is it?

A. That's the notice left slip, and that was the one left on the afternoon of the 24th.

Q. Did you say something about PS3849?

A. Yes. That's just -- that's just a postal term for the name of the form.

Q. Is that written on the form?

A. It is on the bottom left.

Q. Okay. And is that the same slip that was left for Mr. Newbold?

A. Yes, sir.

Q. And I'm showing you the second part of Plaintiff's Exhibit 30.

And do you recognize that?

A. Yes, sir.

Q. What is that?
A. That is the slip that was left the morning of the 25th in Mr. Newbold's mailbox notifying him that a parcel from China was available for pickup at the post office on Clark Street.
Q. I'm going to flip it over and show you the back.
What's on the back there?
A. That would be a place where a customer can sign for the parcel.
Q. Okay. And is there a signature and a printed name there?
A. Yes, sir.
Q. What is that?
A. It's a signature of Travis Newbold and then a print of -- that says "T. Newbold" on the printed section of it. And the delivery address says "551 West Pine."
Q. Okay. Thank you. Now, I'm going to ask you this: Did he come in, and did he pick that up?
A. Yes, sir.
Q. And I have been talking about Plaintiff's Exhibit 31. I'm so sorry. The two slips, PS3849 -- I'm so sorry -- that you just identified, those are part of, just for the record, Plaintiff's Exhibit 31.
Just disregard my references to "30."
Did you examine the package these came in?
A. I saw the package, yeah.
Q. You saw it?

A. Yeah. I didn't examine it as far as like look inside or anything like that, no.
Q. Okay. But did you examine the outside of the package?
A. Yes, sir.
Q. Did you examine who the package was addressed to?
A. Yes, sir.
Q. Who was it addressed to?
A. It was addressed to Travis at 551 West Pine in Pocatello, Idaho.
Q. Okay. So what did you do after you identified the package, the mail recipients, sent the delivery slips? What happened next?
A. So on the morning of the 25th, like I said, when the slip was dropped off, myself and two other agents were set up in the post office in case Mr. Newbold came and picked up the parcel.
Q. Okay. And what happened?
A. Approximately 10:20, 10:25 the morning of October 25th, Mr. Newbold came in to come pick up his parcel.
Q. How do you know he came in?
A. We were notified, and we had notified the postal employees if somebody came in from this address, to come and let us know. Because typically what happens when you come to the post office with a slip to pick up a parcel, the postal employees will go back to the shelf where it's stored.
And in this case, you know, we were watching, and we

had -- we had possession of the parcel, and so the parcel was back with us. So they knew ahead of time if somebody came in for that address, to come and notify us.

Q. And did someone come and notify you that he was present?

A. Yes, sir.

Q. And what did you do with that information? Who was it, I should say?

A. It was a supervisor. Her name was Clara Sutherland.

Q. Okay. What did you do when Clara Sutherland told you that?

A. The HSI agent, he handed the parcel to Clara, and Clara brought it back up front. And at that point, the transaction took place to where the parcel was delivered to Mr. Newbold.

Q. Did you witness the transaction?

A. I did not.

Q. Okay. And then did you see what happened after that?

A. What I saw is we -- we were set up in the workroom floor area of the post office. And when Mr. Newbold exited the customer window area, we came out a will-call or a Dutch door that's connected to the hallway there in the post office. So we exited that door. And at that point, Mr. Newbold was being apprehended by law enforcement.

Q. And do you know where this package was addressed from China?

A. No. Not off the top of my head, no.

Q. Okay. If you examined it, would it refresh your memory?

A. Sure.

Q. Okay. Thanks. I'm going to hand you what's marked with --

THE COURT: Mr. Metcalf, if you could help us out.

Q. BY MR. WHEAT: I'm going to have you look at the package first.

A. Yep.

Q. Okay. And what do you see there?

A. I see what looks like a parcel without the shipping label, obviously.

Q. Okay. Do you have the shipping label up there in front of you too?

A. Yes, sir.

Q. What is it contained in, I guess?

A. It contains information of who the parcel may be from, and then it also shows who it's addressed to.

Q. Okay.

A. And there is also a tracking number on there.

Q. And do you know whether that tracking number on the shipping label is associated with the package?

A. Yes.

Q. And where does it say it's from?

A. China.

MR. WHEAT: Okay. Thank you. Nothing further.

THE COURT: Cross.

CROSS-EXAMINATION

BY MR. RICHERT:

Q. Mr. Korvela?

A. Yes.

Q. As I understand the -- where you were and how things were set up for this controlled delivery, you were in the back of the post office, out of the sight from Mr. Newbold?

A. Correct.

Q. That's correct?

A. Correct.

Q. Okay. And then there were two other agents with you with the package?

A. Correct.

Q. So if Mr. Newbold comes to the counter there in the post office, he would have -- he fills out that form at the counter?

A. Correct.

Q. So he fills it out -- I guess he signs it?

A. Yeah.

Q. And when he does that, he cannot see you or the package?

A. Correct.

Q. And then once that he has signed that, I guess it was Ms. Sutherland who then went back to tell you that he -- no, I guess it would be the other way around.

When Mr. Newbold came in with the form, she told you he is here?

A. Correct. And then also, we had a radio back there, and we were -- we were told that he was spotted coming into the post office.

Q. And then once you're notified, Ms. Sutherland comes back, retrieves the package, and then goes back up front?

A. Yeah. So what the process was, she would have brought the -- she brought the slips back and said that he was -- he was there. And then she brought the parcel back up and completed the process so Mr. Newbold could have the parcel delivered to him, which would include the signature and also -- yeah, it would include the signature, his signature.

Q. Now, this package, which is the same package as opened, at the time you had it, it was not open; correct?

A. No. It was sealed.

Q. And there is no way to see into what's in that package unless it's opened?

A. Correct.

Q. You indicated to us that the address on Pine Street was occupied by more than Mr. Newbold. Well, I should say it more technically: People other than Mr. Newbold received mail at that address?

A. Correct.

Q. And we know a Ms. Millward and Mr. Wheeler.

A. Those are the names given to me by the post office.

Q. Do we assume if someone receives mail at a residence, that

maybe they have a -- they might live there?

A. It is possible. But also people move and do not file change-of-address orders and whatnot. So there is not a 100 percent guarantee that someone might be there.

Q. Now, this PS-49 slip which notified Mr. Newbold to come get the package, the one that was placed there on the 24th, what if Mr. Newbold came down on the 24th? Where was the package?

A. I'm not 100 percent sure. I'm guessing it would have been in evidence.

Q. But not at the post office?

A. No.

Q. And the one dated the 24th tells Mr. Newbold, if he read it, that the package would be ready the following day, does it not?

A. I believe I saw that, yes.

Q. And I think you told us -- maybe it was a different witness -- that the form that was placed at Mr. Newbold's house on the 24th was done so late -- later in the day.

A. Correct.

Q. Was that so that he didn't come down to the post office?

A. It was -- I'm not sure of the exact time. I'm not sure of the exact time it was delivered. But it was in the afternoon, yes.

Q. And the post office closes around 5:00, does it not?

A. I'm not sure of the exact time the window closes -- 5:00 or

5:30. I'm not exactly sure, no.

Q. You didn't -- when you saw Mr. Newbold being arrested in the lobby there, you didn't see immediate law enforcement zooming in on him?

A. No. My understanding was they came from the parking lot.

Q. But by the time you got from the back to the lobby, he had already been detained?

A. Correct.

MR. RICHERT: That's all the questions I have.

THE COURT: Any redirect?

MR. WHEAT: No, Your Honor. Thanks.

THE COURT: All right. Special Agent Korvela, you may step down.

I assume Agent Korvela may also be released from any subpoena.

MR. WHEAT: That's correct.

THE COURT: All right. You're released. Thank you.

Mr. Wheat, good timing. I think this would be a good time to take the evening recess.

Ladies and gentlemen we will reconvene at 8:30 tomorrow morning. I tried to keep track of where you are from. And the only reason I did that was to determine whether or not we need to make accommodations for you. I assume some of you at least are staying in hotels here.

If it was a close call for any of you as to whether to

drive and you would prefer to have stayed here, I can intercede or intervene with the jury commissioner to allow that even though I think the standard is something like 70 miles. But given our early start, I would certainly be willing to discuss with her having you stay tonight and tomorrow night and/or tomorrow night, if that would make it easier for you, since we start fairly early tomorrow and on Friday.

As we take this recess, I'm going to remind you to follow the court's admonition concerning juror conduct. It becomes even more important as you leave the courthouse because you may be confronted with friends or family who will be curious about what the case is about. And you really can't say anything more than the court's -- "The judge has told me I can't talk about it." Even telling them anything about the case might actually be problematic. So it is really critical that you follow my admonition in that regard.

Likewise, don't conduct any outside inquiry or investigation. Don't look up anabolic steroids on Google. Don't look at any sites or locations that may have been mentioned during the trial testimony.

Don't -- I don't think there is any news accounts as far as I know. But be careful, just in case there are, not to listen to any local news that might report on the case. Basically, just follow each and every portion of the court's more extended admonition concerning juror conduct.

And proceed directly to your vehicle and then try to report back tomorrow morning probably about 20 minutes after so we can try to start promptly at 8:30. And then come directly to, I assume, the jury assembly room on the first floor.

LAW CLERK: Yes.

THE COURT: And then we'll proceed then.

Counsel, I don't think there is anything we need to take up. Sometime tomorrow we may want to talk about jury instructions, but I think at this point, we can just start at 8:30 with the jury. Is that correct?

MR. RICHERT: I believe so.

MR. WHEAT: That's accurate, yes.

THE COURT: Ladies and gentlemen, we will be in recess until 8:30 tomorrow morning.

(Court recessed at 5:02 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Tamara Hohenleitner, Federal Official Realtime Court Reporter, in and for the United States District Court for the District of Idaho, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 27th day of February, 2019.

/S/ TAMARA I. HOHENLEITNER

TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
FEDERAL OFFICIAL COURT REPORTER

## $

**$700** [1] - 32:12

## '

**'TP'** [1] - 122:17

## 1

**1** [29] - 25:17, 25:19, 26:1, 75:20, 88:22, 90:14, 90:15, 101:15, 112:1, 113:1, 116:24, 116:25, 117:6, 117:7, 118:5, 118:6, 118:7, 118:9, 118:11, 118:21, 121:19, 121:21, 122:6, 132:20, 132:21, 134:14, 134:20, 135:5
**10** [33] - 4:12, 5:16, 7:23, 7:24, 9:1, 9:5, 9:14, 11:3, 11:7, 35:9, 35:23, 56:12, 132:22, 132:23, 132:24, 133:3, 133:6, 133:9, 133:24, 134:3, 134:4, 134:10, 134:24, 135:15, 135:18, 135:19, 136:2, 136:3, 136:4, 136:7, 136:11, 136:13
**100** [3] - 69:16, 155:3, 155:8
**1040** [2] - 91:2, 92:19
**10:20** [3] - 42:16, 56:3, 150:17
**10:25** [1] - 150:17
**10:30** [1] - 56:3
**10th** [1] - 146:16
**11** [7] - 128:14, 130:12, 130:16, 130:17, 130:22, 134:23, 135:6
**12** [9] - 99:5, 101:19, 102:15, 130:12, 130:24, 130:25, 131:10, 134:23
**12:22** [1] - 11:9
**13** [6] - 130:12, 131:12, 131:13, 131:14, 131:17, 134:23
**14** [6] - 130:12, 131:24, 131:25, 132:1, 132:3, 134:23
**140.79** [1] - 135:23
**147.15** [1] - 130:5
**15** [9] - 85:21, 94:8, 130:12, 132:10, 132:11, 132:12, 134:15, 134:23, 135:6
**15-minute** [1] - 85:16
**158.44** [1] - 120:12
**16** [1] - 141:22
**17** [2] - 4:2, 126:22
**17-P22116** [1] - 109:21
**181491234** [1] - 73:4
**19** [1] - 88:20
**19th** [1] - 102:20
**1:00** [5] - 4:7, 4:12, 4:13, 4:14, 5:7
**1:10** [1] - 4:16
**1:15** [1] - 11:9

## 2

**2** [25] - 25:18, 25:21, 26:6, 74:12, 74:13, 75:20, 88:22, 112:2, 112:5, 112:6, 112:25, 113:14, 117:7, 117:12, 118:14, 118:16, 118:17, 118:19, 118:20, 119:4, 119:6, 119:10, 121:19, 132:21, 141:20
**20** [4] - 66:21, 127:6, 127:14, 158:2
**2001** [1] - 34:23
**2002** [1] - 34:24
**2011** [1] - 137:12
**2015** [1] - 6:3
**2017** [19] - 13:15, 13:16, 26:23, 27:21, 35:23, 37:24, 51:7, 68:18, 68:20, 68:24, 72:13, 99:3, 101:7, 102:7, 141:3, 141:18, 146:12, 146:16
**201780910004201** [1] - 101:1
**2018** [9] - 4:2, 88:20, 99:5, 101:8, 101:15, 101:19, 101:22, 102:7, 102:20
**205** [4] - 55:4, 55:6, 55:7, 75:21
**21st** [1] - 142:8
**22** [1] - 141:18
**24th** [8] - 31:2, 41:4, 147:21, 148:13, 155:6, 155:7, 155:12, 155:18
**25** [3] - 31:3, 37:24, 51:7
**25th** [9] - 27:21, 31:18, 38:6, 38:7, 39:16, 147:24, 149:2, 150:13, 150:17
**26** [1] - 141:3
**26.41** [1] - 132:1
**261.28** [1] - 119:25
**27** [10] - 43:11, 43:14, 43:15, 43:17, 44:13, 44:24, 45:3, 45:4, 70:8, 70:10
**28** [12] - 48:17, 48:19, 48:21, 48:22, 50:4, 50:6, 50:8, 95:25, 96:18, 97:3, 97:20, 102:18
**29** [15] - 48:18, 48:19, 49:10, 50:4, 50:6, 50:8, 91:20, 91:21, 91:22, 91:24, 91:25, 96:3, 96:4, 97:20, 102:18
**2g** [1] - 97:9

## 3

**3** [37] - 25:6, 25:7, 25:22, 26:10, 27:8, 75:20, 77:17, 112:1, 113:1, 114:5, 117:12, 118:2, 118:23, 119:13, 119:14, 119:15, 119:17, 119:22, 119:25, 120:5, 120:15, 121:19, 123:14, 124:22, 125:12, 125:22, 126:11, 128:2, 128:19, 129:7, 129:16, 131:6, 131:19, 132:7, 132:21, 133:10
**30** [12] - 46:3, 46:5, 46:19, 46:22, 46:24, 70:20, 99:3, 101:17, 148:7, 148:9, 148:23, 149:22
**30th** [1] - 101:16
**31** [9] - 39:5, 39:6, 39:8, 39:22, 39:25, 40:2, 40:15, 149:18, 149:21
**348.43** [1] - 131:14
**3:00** [1] - 66:21
**3:03** [1] - 85:22
**3:21** [1] - 85:22

## 4

**4** [7] - 114:7, 114:10, 114:12, 116:2, 120:1, 120:3, 121:20
**404(b** [1] - 6:4
**41** [1] - 4:19
**42** [3] - 126:3, 126:7, 126:12
**46.4** [1] - 120:3
**496.9** [2] - 97:6, 97:8

## 5

**5** [12] - 26:23, 68:18, 68:20, 68:24, 72:13, 83:2, 83:6, 120:9, 120:11, 120:12, 120:16, 121:20
**518** [3] - 54:25, 55:1, 75:20
**532.3** [1] - 97:4
**551** [12] - 27:6, 28:2, 38:18, 39:10, 39:12, 40:20, 42:3, 43:19, 47:15, 147:5, 149:14, 150:8
**5:00** [3] - 144:25, 155:24, 155:25
**5:02** [1] - 158:15
**5:30** [1] - 156:1

## 6

**6** [17] - 31:13, 32:12, 120:18, 120:19, 120:20, 120:21, 121:1, 121:2, 121:5, 121:8, 121:11, 121:20, 121:21, 122:6, 134:20, 134:21, 135:5
**61.21** [1] - 132:12
**68.67** [1] - 130:19

## 7

**7** [2] - 31:13, 134:20
**7-1/2** [1] - 94:7
**7.1** [16] - 116:21, 117:9, 117:12, 117:15, 117:19, 117:21, 121:18, 122:9, 122:13, 122:15, 123:3, 123:6, 123:7, 134:20, 134:21, 135:5
**7.10** [4] - 127:18, 127:19, 127:20, 127:22
**7.11** [4] - 128:3, 128:5, 128:6, 128:10
**7.12** [3] - 128:12, 128:13, 128:20
**7.13** [3] - 128:22, 128:23, 129:9
**7.14** [5] - 129:11, 129:12, 129:20, 134:21, 135:5
**7.2** [12] - 116:21, 117:9, 117:19, 117:21, 122:9, 122:13, 122:21, 122:22, 123:3, 123:8, 134:20, 134:21
**7.3** [10] - 116:21, 117:9, 117:19, 117:22, 122:9, 122:13, 122:25, 123:3, 123:10, 134:21
**7.4** [5] - 124:13, 124:15, 124:17, 124:19, 134:21
**7.5** [3] - 125:1, 125:3, 125:4
**7.6** [5] - 125:14, 125:15, 125:16, 125:18
**7.7** [3] - 126:1, 126:2, 126:3
**7.8** [4] - 126:16, 126:21, 126:22, 127:1
**7.9** [4] - 127:4, 127:5, 127:6, 127:8
**70** [1] - 157:3
**702.10** [1] - 120:21
**796** [2] - 54:17, 75:20
**7th** [1] - 90:9

## 8

**8** [7] - 129:23, 129:25, 130:2, 130:5, 130:9, 134:21, 135:5
**80** [6] - 52:3, 52:4, 52:6, 52:18, 52:21, 52:23
**81** [7] - 52:25, 53:11, 53:13, 53:24, 54:2, 54:4, 54:15
**82** [8] - 52:25, 53:11, 53:13, 53:24, 54:2, 54:4, 54:24, 54:25
**83** [7] - 52:25, 53:11, 53:14, 53:24, 54:2, 54:4, 55:3
**83201** [1] - 47:15
**89** [7] - 72:3, 72:11, 74:4, 74:7, 74:9, 83:4, 108:13
**8:30** [4] - 156:20, 158:3, 158:10, 158:14

## 9

**9** [2] - 134:21, 135:5
**90** [10] - 61:21, 75:10, 75:11, 75:13, 75:14, 76:8, 76:11, 76:13, 82:7, 108:16
**901** [1] - 8:11
**91** [4] - 76:18, 76:22, 78:2, 108:16
**92** [13] - 107:19, 107:21, 108:6, 108:8, 108:19, 108:20, 109:12, 110:2, 110:9, 110:12, 110:13, 116:25, 141:2
**93** [13] - 87:23, 87:24, 88:1, 88:3, 88:5, 88:25, 89:3, 89:6, 89:8, 96:8, 97:21, 98:24, 108:19
**989.7** [1] - 93:6
**9:00** [2] - 55:17, 55:21

## A

**ability** [2] - 19:7, 31:10
**able** [7] - 29:7, 51:5, 54:19, 79:9, 79:13, 95:12, 95:13
**abnormal** [1] - 69:11
**absence** [2] - 6:6, 6:18
**absent** [1] - 5:21
**absolutely** [1] - 64:19
**academy** [3] - 35:9, 35:11, 35:14
**accept** [2] - 36:7, 116:8
**accepted** [3] - 27:22, 91:8, 98:25
**accident** [2] - 6:6, 6:19
**accidentally** [1] - 92:12
**accommodate** [1] - 29:15
**accommodations** [1] - 156:23
**accomplish** [3] - 6:14, 13:19, 26:5
**according** [1] - 78:20
**account** [1] - 29:18
**accounts** [3] - 21:13, 29:7, 157:21
**accurate** [2] - 101:2, 158:12
**accurately** [10] - 39:17, 44:18, 46:15, 49:21, 52:14, 53:20, 88:16, 92:7, 109:24, 116:16
**acknowledge** [2] - 9:17, 22:9
**acknowledges** [1] - 9:14
**acquired** [1] - 87:1
**acted** [1] - 6:13
**acting** [1] - 16:5
**actively** [1] - 17:18
**activities** [2] - 87:1, 88:17
**actual** [4] - 81:2, 93:3, 93:4, 139:9
**add** [3] - 12:1, 21:19, 81:24
**added** [1] - 76:16
**addition** [2] - 13:5, 28:15
**additional** [4] - 35:11, 118:19, 124:9, 133:21
**address** [25] - 23:12, 36:19, 38:18, 39:10, 39:14, 39:20, 40:18, 40:19, 42:2, 44:10, 47:14, 70:1, 146:18, 146:20, 146:22, 147:6, 147:7, 149:14, 150:21, 151:3, 154:18, 154:21, 155:3
**addressed** [13] - 27:5, 28:3, 32:19, 38:17, 39:15, 47:12, 47:13, 70:1, 150:5, 150:7, 150:8, 151:22, 152:16
**addressee** [1] - 46:11
**adds** [3] - 6:25, 7:4
**adequately** [1] - 79:9
**Administration** [4] - 86:21, 86:23, 87:10, 138:21
**administrative** [1] - 101:11
**admission** [2] - 44:25, 76:8
**admit** [13] - 7:12, 39:22, 46:18, 50:3, 52:17, 53:23, 74:3, 78:2, 88:24, 104:10, 110:2, 121:5, 121:8
**admitted** [31] - 17:1, 17:4, 39:25, 40:2, 44:23, 45:3, 45:4, 46:22, 46:24, 50:6, 50:8, 52:21, 52:23, 54:2, 54:4, 67:17, 74:7, 74:9, 76:11, 76:13, 89:3, 89:6, 104:1, 104:12, 110:12, 110:13, 121:22, 135:4, 135:6, 136:12, 136:13
**admitting** [1] - 8:13
**admonish** [1] - 85:17
**admonition** [7] - 4:23, 20:3, 20:6, 85:19, 157:9, 157:16, 157:25
**admonitions** [1] - 22:13
**advice** [1] - 16:5
**affinity** [1] - 94:25
**affinity-to-the-stationary** [1] - 94:25
**affixed** [3] - 43:2, 43:25, 75:24
**afternoon** [6] - 11:13, 34:11, 38:5, 145:17, 148:13, 155:22
**agencies** [9] - 30:23, 30:24, 30:25, 31:20, 32:1, 35:10, 37:17, 101:7, 105:6
**agency** [13] - 63:1, 76:14, 89:17, 91:14, 100:1, 100:5, 100:8, 107:24, 109:18, 111:17, 112:14, 112:15, 142:5
**Agency** [1] - 113:2
**agency's** [1] - 89:22
**agent** [14] - 34:24, 35:1, 35:13, 42:9, 44:7, 50:14, 59:21, 59:22, 59:23, 62:7, 66:19, 66:20, 101:7, 151:10
**Agent** [35] - 27:16, 27:17, 33:14, 33:16, 34:11, 35:16, 35:20, 39:4, 40:14, 41:17, 42:4, 42:22, 43:12, 46:4, 48:13, 48:17, 49:16, 51:22, 52:24, 53:10, 54:11, 55:7, 55:9, 55:10, 55:16, 65:12, 66:23, 101:9, 145:3, 145:5, 145:17, 146:12, 146:15, 156:12, 156:14
**agents** [7] - 27:25, 28:18, 37:15, 63:2, 145:20, 150:14, 153:11
**ago** [4] - 7:23, 9:14, 10:25, 142:9
**agree** [2] - 12:8, 16:17
**agreed** [3] - 25:4, 29:23, 115:16
**agreeing** [1] - 9:23
**agreement** [7] - 9:10, 13:16, 13:18, 25:19, 26:1, 26:4
**agreements** [1] - 28:24
**agrees** [1] - 115:20
**ahead** [9] - 9:6, 33:22, 45:12, 64:24, 70:20, 72:1, 116:11, 122:4, 151:2
**Air** [2] - 26:25, 35:13
**airplane** [2] - 85:4, 85:5
**alcohol** [1] - 140:6
**alleged** [1] - 12:22
**Alliance** [1] - 28:23
**allow** [5] - 10:14, 61:5, 64:20, 134:11, 157:2
**allowed** [1] - 147:13
**allowing** [1] - 10:13
**allows** [1] - 6:4
**alluded** [1] - 30:16
**Alpha** [1] - 73:4
**amount** [1] - 144:11
**amounts** [2] - 62:13, 65:14
**Amy** [11] - 8:5, 8:6, 9:10, 9:11, 10:9, 25:9, 28:20, 28:21, 28:22, 28:24
**anabolic** [65] - 6:3, 6:7, 6:8, 6:12, 12:23, 13:17, 13:23, 14:1, 14:7, 24:21, 24:23, 24:24, 24:25, 25:7, 25:10, 25:17, 25:20, 25:21, 25:22, 26:8, 26:10, 27:9, 28:4, 28:6, 28:16, 28:17, 28:25, 29:23, 29:24, 29:25, 30:11, 31:21, 31:23, 31:25, 36:1, 43:18, 87:17, 106:18, 110:18, 111:3, 114:4, 117:25, 119:2, 119:20, 120:7, 120:15, 123:12, 124:22, 125:9, 125:24, 126:11, 128:2, 128:19, 129:5, 129:18, 131:8, 131:22, 132:7, 133:11, 143:4, 143:10, 144:8, 144:12, 157:18
**analysis** [8] - 27:9, 61:20, 72:15, 95:23, 110:25, 139:17, 141:17, 142:18
**Analyst** [1] - 106:8
**analyst** [1] - 106:8
**analyze** [6] - 86:24, 111:6, 125:7, 129:1, 129:3, 137:23
**analyzed** [14] - 51:15, 51:17, 78:21, 79:13, 99:17, 116:23, 125:6, 125:17, 126:4, 126:23, 127:7, 127:25, 128:15, 141:23
**Analyzed** [1] - 88:10
**analyzing** [2] - 88:15, 99:9
**ANDREAS** [1] - 145:8
**Andreas** [1] - 145:12
**ANDREW** [1] - 33:23
**Andrew** [1] - 34:6
**Andy** [3] - 27:16, 27:17, 33:14
**anomalies** [2] - 68:14, 68:15
**anomaly** [2] - 69:11, 80:14
**anonymous** [1] - 8:5
**answer** [5] - 18:19, 58:7, 61:2, 64:1, 66:1
**answered** [2] - 18:13, 18:15
**anthrax** [1] - 145:25
**anticipation** [1] - 59:4
**anticipatory** [1] - 51:3
**apart** [1] - 95:8
**apologies** [1] - 108:4
**apologize** [4] - 33:22, 54:22, 75:8, 134:1
**appear** [1] - 70:24
**appeared** [1] - 82:1
**applicable** [1] - 111:4
**applied** [1] - 105:21
**applies** [4] - 20:15, 20:25, 21:1, 24:15
**apply** [1] - 12:8
**appreciate** [2] - 33:21, 47:1
**appreciation** [1] -

4:18
**apprehended** [1] - 151:21
**approach** [3] - 38:23, 43:7, 104:15
**approached** [1] - 21:7
**appropriate** [2] - 7:18, 144:5
**area** [7] - 56:7, 71:17, 72:17, 81:22, 84:2, 151:17, 151:18
**argue** [1] - 9:11
**argument** [3] - 4:14, 7:14, 8:9
**arguments** [2] - 16:20, 24:16
**arise** [1] - 14:20
**arises** [1] - 30:16
**arrange** [2] - 38:19, 147:18
**arrest** [5] - 7:24, 50:24, 57:5, 62:24, 63:4
**arrested** [9] - 7:17, 7:23, 27:22, 31:7, 31:15, 31:19, 51:13, 60:3, 156:2
**arrive** [3] - 42:11, 42:12, 42:15
**arrives** [1] - 85:1
**articles** [1] - 106:4
**aside** [2] - 27:7, 69:9
**assembly** [2] - 22:3, 158:4
**assigned** [4] - 78:18, 90:19, 112:7, 112:12
**assigns** [1] - 112:9
**assist** [1] - 24:3
**assistance** [1] - 16:5
**assisted** [2] - 57:4, 106:6
**associate's** [1] - 105:20
**associated** [5] - 9:11, 28:23, 77:11, 108:8, 152:20
**assume** [17] - 57:14, 58:16, 59:9, 63:14, 85:11, 103:6, 103:15, 103:24, 121:21, 122:1, 126:19, 135:8, 144:21, 154:25, 156:14, 156:23, 158:4
**assuming** [1] - 66:15
**athletes** [1] - 30:13
**attached** [1] - 87:5
**attempt** [2] - 37:9, 59:6
**attempted** [1] - 11:2
**attended** [1] - 105:19
**attention** [11] - 22:15, 23:20, 52:2, 52:25, 116:20, 119:12, 120:1, 124:13, 126:15, 127:18, 132:20
**attentive** [1] - 23:25
**attorney** [1] - 22:7
**Attorney's** [1] - 36:4
**attorneys** [5] - 16:20, 16:21, 21:24, 22:10, 24:15
**August** [3] - 61:8, 141:22, 142:7
**authenticating** [1] - 124:8
**authentication** [1] - 124:9
**available** [5] - 118:18, 132:17, 138:23, 147:25, 149:4
**avoid** [3] - 12:2, 21:23, 21:25
**aware** [3] - 62:7, 143:14, 143:16

## B

**bachelor** [1] - 87:11
**bachelor's** [2] - 105:22, 136:23
**background** [1] - 37:13
**backlog** [1] - 99:8
**backwards** [1] - 118:4
**bad** [1] - 30:12
**bag** [45] - 47:20, 49:7, 49:8, 49:15, 91:14, 94:2, 96:17, 97:1, 101:8, 101:20, 101:22, 102:19, 113:15, 113:16, 113:17, 113:22, 113:23, 113:24, 113:25, 114:11, 115:11, 115:18, 115:23, 115:24, 116:1, 126:13, 126:14, 126:22, 127:6, 127:20, 128:6, 128:14, 128:24, 129:13, 130:5, 130:17, 130:25, 131:14, 132:1, 132:3, 132:12, 135:23
**bagged** [1] - 49:17
**bags** [36] - 44:17, 45:15, 45:17, 45:18, 47:20, 47:22, 47:23, 47:24, 47:25, 48:3, 48:4, 48:5, 48:7, 48:10, 49:1, 49:18, 49:21, 49:22, 49:24, 50:1, 52:7, 53:15, 53:20, 71:3, 71:8, 92:22, 92:25, 93:1, 93:19, 93:22, 93:23, 93:24, 115:22, 116:17
**based** [19] - 14:19, 14:20, 17:16, 20:13, 23:11, 23:18, 32:24, 61:15, 71:9, 79:10, 94:23, 95:23, 97:17, 97:20, 98:9, 99:10, 101:24, 139:17, 144:4
**bases** [1] - 9:8
**basic** [1] - 87:14
**basis** [1] - 69:14
**beauty** [4] - 70:23, 70:25, 71:4, 71:5
**become** [1] - 87:9
**becomes** [1] - 157:9
**bed** [1] - 17:21
**began** [1] - 50:15
**begin** [3] - 11:13, 23:8, 24:6
**beginning** [2] - 13:15, 22:2
**begins** [1] - 23:3
**behind** [3] - 57:10, 141:14, 141:15
**believable** [1] - 19:18
**belong** [1] - 98:16
**belonging** [1] - 28:19
**below** [2] - 89:23, 99:24
**belt** [5] - 69:8, 78:12, 80:10, 81:7, 81:9
**bench** [1] - 90:23
**benefits** [1] - 138:23
**better** [2] - 54:7, 54:23
**between** [9] - 13:16, 17:12, 18:5, 26:2, 28:20, 28:21, 134:4, 145:1
**beyond** [17] - 13:4, 13:8, 13:14, 13:22, 14:5, 14:16, 14:18, 14:24, 15:3, 15:11, 15:21, 15:25, 25:15, 29:9, 32:25, 33:2, 65:22
**bias** [1] - 19:15
**big** [3] - 47:25, 48:1, 145:25
**binder** [12] - 51:22, 51:24, 52:1, 52:2, 53:5, 67:13, 72:2, 76:17, 87:22, 107:6, 107:12, 108:5
**bins** [1] - 103:20
**bit** [4] - 42:22, 45:21, 104:10, 116:19
**black** [1] - 99:24
**blacked** [1] - 83:21
**blade** [1] - 114:22
**blank** [1] - 133:3
**blogs** [1] - 20:23
**blood** [1] - 140:6
**boldenone** [2] - 126:9, 131:5
**book** [1] - 75:12
**Border** [6] - 26:23, 35:24, 53:15, 66:24, 67:24, 68:7
**bottle** [1] - 28:14
**bottom** [7] - 40:22, 40:23, 44:3, 88:10, 102:20, 132:21, 148:18
**box** [25] - 36:16, 43:22, 43:23, 43:25, 44:12, 46:9, 48:23, 48:25, 49:19, 52:7, 52:9, 52:10, 52:11, 52:14, 59:6, 59:7, 64:5, 65:1, 70:12, 70:15, 72:16, 75:15, 77:2, 81:15
**Bracke** [4] - 33:22, 67:4, 108:11, 145:6
**brand** [2] - 92:25, 93:23
**brand-new** [2] - 92:25, 93:23
**break** [3] - 45:7, 84:19, 95:8
**breaks** [1] - 95:16
**Brian** [1] - 25:14
**brief** [4] - 4:14, 8:9, 13:10, 75:16
**briefly** [5] - 8:14, 54:8, 65:9, 143:19, 147:10
**bring** [3] - 92:16, 103:21, 113:7
**bringing** [1] - 13:25
**brings** [1] - 13:1
**broken** [2] - 95:16, 103:4
**Bronco** [1] - 95:11
**brought** [12] - 4:7, 6:11, 12:16, 13:23, 26:7, 40:9, 42:8, 105:5, 151:11, 154:6, 154:7, 154:8
**brown** [6] - 113:25, 114:11, 123:1, 130:5, 130:17, 130:25
**build** [1] - 32:23
**building** [4] - 56:15, 58:25, 59:11, 84:10
**built** [1] - 32:18
**bunch** [5] - 24:24, 24:25, 25:3, 28:11, 28:12
**burden** [1] - 13:7
**burst** [1] - 95:21
**business** [2] - 28:22, 28:23
**button** [1] - 108:3
**buy** [1] - 37:3
**BY** [62] - 34:10, 34:25, 39:4, 40:14, 41:17, 43:12, 44:12, 45:14, 46:25, 48:16, 49:18, 50:10, 52:24, 53:10, 54:11, 54:24, 55:15, 58:20, 63:20, 64:4, 64:15, 64:21, 64:25, 65:11, 66:8, 67:21, 72:11, 74:10, 75:9, 76:14, 76:22, 78:10, 80:6, 84:23, 86:17, 88:1, 89:7, 90:11, 91:7, 91:21, 98:23, 100:22, 102:13, 104:24, 107:6, 107:18, 109:10, 110:16, 116:12, 117:19, 121:10, 121:17, 122:5, 126:21, 133:4, 133:18, 135:16, 136:17, 143:21, 145:16, 152:5, 153:2

## C

**cage** [11] - 73:8, 73:10, 73:14, 73:25, 78:14, 78:15, 81:20, 81:22, 82:12, 84:1, 84:3
**cakes** [1] - 68:17
**calculation** [1] - 10:23
**California** [2] - 50:21, 87:4
**Cameron** [1] - 147:1
**cannot** [4] - 18:15, 49:12, 153:19
**capped** [3] - 122:17, 122:22, 123:1
**capsules** [2] - 25:12, 28:11

**capture** [1] - 10:19
**car** [4] - 22:6, 95:12, 95:17
**careful** [7] - 14:21, 14:23, 15:2, 15:10, 15:20, 15:24, 157:22
**carefully** [1] - 20:4
**carrier** [1] - 38:22
**cars** [2] - 95:7, 95:8
**CARVER** [2] - 86:9, 86:14
**Carver** [2] - 86:13, 86:14
**case** [90] - 4:25, 5:1, 5:3, 5:5, 6:7, 7:17, 7:22, 8:1, 9:24, 10:4, 11:17, 11:24, 12:6, 12:10, 12:16, 13:11, 16:3, 16:19, 18:24, 19:1, 19:14, 20:10, 20:12, 20:13, 20:14, 20:16, 20:20, 20:21, 21:1, 21:6, 21:8, 21:14, 21:18, 22:25, 23:24, 24:15, 29:3, 30:16, 31:23, 32:2, 32:17, 36:5, 59:22, 59:23, 60:13, 62:7, 66:19, 66:20, 70:18, 70:22, 77:14, 91:1, 92:19, 92:22, 92:24, 93:15, 93:18, 93:20, 94:7, 94:13, 94:24, 95:7, 95:14, 100:24, 101:2, 101:5, 101:21, 101:22, 101:25, 102:3, 106:14, 109:16, 109:17, 109:18, 111:23, 112:7, 112:12, 112:19, 117:4, 123:20, 137:14, 147:18, 150:15, 150:25, 157:12, 157:14, 157:22, 157:23
**Case** [1] - 89:19
**cases** [5] - 35:3, 106:6, 106:9, 106:25, 141:12
**casework** [1] - 106:25
**cash** [3] - 32:11, 62:13, 65:14
**caused** [2] - 30:25, 63:11
**CBP** [3] - 49:3, 108:13, 146:13
**cell** [3] - 51:19, 60:3, 60:9
**center** [1] - 91:7
**Center** [2] - 26:25, 31:5
**certain** [5] - 10:20, 25:24, 68:10, 95:22, 124:6
**certainly** [4] - 7:14, 8:16, 140:20, 157:4
**certificate** [1] - 124:8
**certified** [1] - 78:19
**chains** [1] - 95:16
**chance** [3] - 5:10, 5:13, 69:2
**change** [5] - 12:1, 95:7, 97:13, 155:3
**change-of-address** [1] - 155:3
**changed** [1] - 9:19
**charge** [2] - 13:8, 59:21
**charges** [5] - 6:7, 12:17, 12:24, 12:25, 13:3
**Charlie** [1] - 73:4
**chat** [1] - 20:23
**chats** [2] - 66:2, 66:11
**cheap** [1] - 42:25
**check** [5] - 15:15, 106:9, 146:18, 146:20, 146:22
**checked** [1] - 70:24
**chemical** [4] - 50:22, 105:21, 124:5, 136:24
**chemicals** [1] - 105:11
**chemist** [5] - 86:20, 86:22, 87:10, 103:9, 138:20
**chemistry** [6] - 27:12, 87:11, 87:12, 87:15, 105:24, 137:1
**chemists** [1] - 29:12
**child** [1] - 35:3
**China** [21] - 24:21, 25:9, 27:4, 27:19, 28:22, 29:1, 30:17, 41:2, 43:1, 47:11, 62:17, 75:3, 83:10, 83:15, 83:23, 84:24, 85:2, 85:3, 149:3, 151:23, 152:23
**chooses** [1] - 24:12
**chromatograph** [1] - 111:7
**chromatograph-mass** [1] - 111:7
**chromatography** [8] - 94:3, 94:13, 94:16, 94:18, 95:1, 95:2, 137:15, 137:17
**chromatography-mass** [3] - 94:3, 137:15, 137:17
**circle** [1] - 91:5
**circumstances** [2] - 11:1, 33:3
**circumstantial** [9] - 17:6, 17:9, 17:23, 18:3, 18:6, 32:16, 32:17, 32:23, 32:25
**city** [1] - 47:8
**Clara** [4] - 151:8, 151:9, 151:10
**clarification** [2] - 102:14, 110:4
**clarify** [3] - 121:25, 123:2, 123:17
**clarifying** [1] - 108:23
**Clark** [3] - 42:19, 42:20, 149:4
**classic** [1] - 32:17
**clear** [7] - 9:2, 47:23, 47:24, 108:13, 115:15, 121:19, 133:14
**cleared** [1] - 101:11
**clearly** [1] - 90:2
**CLERK** [11] - 4:10, 15:7, 15:14, 33:24, 34:4, 67:7, 86:10, 104:6, 104:18, 145:9, 158:5
**clerk** [4] - 33:17, 67:4, 86:8, 104:2
**click** [1] - 80:20
**clients** [1] - 32:14
**close** [7] - 23:19, 34:19, 44:8, 108:3, 139:20, 144:25, 156:25
**closes** [2] - 155:24, 155:25
**closing** [1] - 24:16
**clostebol** [2] - 127:25, 128:1
**clothing** [1] - 68:17
**CN** [2] - 75:2, 83:8
**co** [1] - 136:24
**co-degree** [1] - 136:24
**cocaine** [2] - 31:24, 98:7
**coconspirator's** [1] - 9:24
**coconspirators** [1] - 7:16
**code** [1] - 74:25
**coincided** [1] - 94:6
**coincides** [1] - 94:12
**college** [1] - 136:20
**College** [1] - 87:12
**color** [2] - 140:14, 140:16
**combine** [1] - 26:21
**combining** [1] - 94:8
**comfortable** [2] - 58:24, 113:12
**coming** [1] - 154:2
**commentary** [1] - 21:14
**commercially** [1] - 71:5
**commingled** [1] - 49:23
**commissioner** [1] - 157:2
**common** [5] - 14:19, 19:22, 22:20, 83:12, 83:13
**communicate** [2] - 20:18, 20:19
**communicating** [2] - 20:25, 21:2
**communications** [3] - 25:3, 51:10, 51:11
**comp** [1] - 106:23
**compare** [1] - 124:10
**compared** [3] - 9:23, 111:9, 111:12
**compel** [2] - 15:6, 16:3
**competency** [1] - 106:12
**complete** [6] - 34:4, 67:8, 86:11, 91:25, 104:18, 145:10
**completed** [4] - 20:10, 88:20, 106:12, 154:8
**completely** [1] - 7:3
**completion** [1] - 102:22
**composite** [1] - 94:7
**concern** [2] - 8:13, 8:16
**concerned** [1] - 8:2
**concerning** [3] - 85:18, 157:9, 157:25
**concluded** [1] - 115:14
**conclusion** [7] - 32:23, 32:24, 90:18, 95:24, 96:18, 111:13, 116:24
**conclusions** [1] - 112:21
**condition** [1] - 114:16
**conditionally** [1] - 134:17
**conduct** [9] - 4:23, 7:16, 20:2, 20:3, 85:18, 146:7, 157:9, 157:17, 157:25
**confess** [1] - 31:22
**confidence** [1] - 143:23
**confident** [1] - 143:25
**confirm** [10] - 29:12, 50:18, 101:9, 124:2, 138:1, 138:10, 138:13, 142:24, 143:1, 143:2
**confirmation** [1] - 132:17
**confirmed** [5] - 28:4, 118:18, 123:22, 124:2, 138:8
**confronted** [1] - 157:11
**confused** [1] - 121:7
**confusion** [2] - 12:3, 108:10
**conjunction** [2] - 37:14, 37:17
**connected** [1] - 151:19
**connection** [1] - 10:25
**consciously** [1] - 71:11
**consider** [7] - 16:12, 16:14, 16:19, 17:5, 18:3, 18:24, 21:12
**consideration** [6] - 14:21, 14:23, 15:3, 15:11, 15:20, 15:25
**considered** [2] - 17:3, 99:9
**considering** [1] - 19:5
**consistent** [3] - 77:20, 77:21, 97:21
**consists** [1] - 16:15
**conspiracy** [9] - 6:7, 6:13, 7:19, 7:21, 9:9, 10:3, 12:18, 13:12, 25:20
**constant** [1] - 90:5
**constantly** [1] - 90:7
**constitutes** [1] - 8:11
**Constitution** [2] - 32:24, 33:8
**construction** [1] - 30:9
**consulting** [1] - 21:15

**consumed** [1] - 110:25
**contact** [6] - 21:9, 21:23, 33:5, 99:14, 99:15, 146:16
**contacted** [7] - 36:4, 99:10, 101:9, 146:12, 146:14, 146:17, 146:23
**contain** [4] - 27:8, 30:21, 105:6, 124:19
**contained** [14] - 12:24, 28:13, 96:25, 97:1, 113:16, 114:2, 114:13, 116:4, 116:25, 118:21, 126:7, 132:12, 143:22, 152:14
**container** [1] - 113:10
**containing** [3] - 47:20, 129:4, 144:11
**contains** [15] - 96:19, 115:11, 115:23, 117:21, 117:22, 118:20, 119:15, 120:3, 120:12, 125:8, 126:9, 127:25, 135:24, 152:15
**contemporaneous** [3] - 8:19, 8:24, 9:4
**contents** [14] - 44:11, 50:11, 50:12, 52:15, 61:15, 69:9, 70:25, 71:1, 71:2, 77:1, 77:2, 77:24, 82:13, 92:21
**contest** [1] - 115:7
**continuation** [1] - 7:19
**continue** [2] - 20:6, 81:9
**continues** [2] - 18:2, 81:10
**continuing** [1] - 81:14
**contractor** [1] - 30:9
**contradicted** [1] - 19:17
**control** [9] - 11:20, 12:4, 18:8, 29:22, 37:11, 58:9, 59:24, 79:4, 147:14
**controlled** [61] - 6:3, 8:6, 12:19, 12:20, 12:21, 12:22, 13:13, 13:21, 14:4, 26:9, 27:14, 27:18, 32:2, 36:12, 36:17, 37:3, 37:4, 37:5, 37:6, 37:21, 37:25, 39:14, 42:5, 44:19, 50:16, 50:17, 50:21, 71:12, 78:25, 86:24, 87:7, 98:3, 105:3, 105:7, 106:15, 114:5, 118:2, 118:24, 119:22, 120:5, 120:24, 123:14, 124:6, 125:12, 125:22, 126:24, 128:8, 129:7, 129:16, 129:24, 130:7, 131:6, 131:20, 132:7, 132:16, 133:10, 138:9, 147:9, 147:10, 147:12, 153:6
**conversations** [7] - 8:21, 8:25, 23:6, 28:20, 28:21, 65:15, 65:18
**conveyor** [7] - 69:7, 78:12, 80:10, 80:11, 80:12, 81:7, 81:9
**conveyor-driven** [1] - 80:11
**convict** [1] - 33:10
**conviction** [4] - 6:2, 6:16, 6:19, 6:23
**convinced** [6] - 14:17, 14:24, 15:3, 15:11, 15:21, 15:25
**cookies** [1] - 68:17
**coordinate** [1] - 50:25
**coordinated** [3] - 27:14, 27:18, 44:19
**copy** [5] - 11:14, 75:25, 76:23, 77:8, 82:19
**corner** [7] - 40:22, 40:23, 40:24, 47:7, 89:15, 102:20, 132:21
**Correct** [17] - 82:2, 82:9, 82:15, 83:7, 83:11, 121:12, 137:7, 138:15, 138:19, 140:23, 141:1, 141:10, 153:10, 153:13, 153:20, 155:19, 156:8
**correct** [44] - 41:5, 57:10, 57:21, 57:24, 58:6, 62:24, 63:12, 66:17, 68:2, 79:8, 80:15, 81:4, 83:6, 92:15, 102:5, 108:14, 108:15, 108:18, 108:22, 110:7, 110:8, 116:5, 116:6, 117:8, 121:23, 121:24, 122:6, 122:8, 122:10, 127:12, 129:19, 133:16, 137:2, 139:14, 144:23, 153:8, 153:9, 153:16, 154:1, 154:13, 154:17, 154:22, 156:16, 158:10
**correctly** [5] - 9:13, 15:16, 15:18, 37:2, 106:15
**correspond** [1] - 77:14
**corresponds** [1] - 113:20
**corroborate** [1] - 10:3
**counsel** [14] - 5:7, 5:18, 7:6, 24:11, 24:13, 34:2, 44:22, 63:25, 66:15, 108:10, 116:8, 117:14, 133:1, 158:7
**Counsel** [2] - 4:11, 66:15
**counsel's** [1] - 46:23
**count** [4] - 12:18, 12:19, 12:20, 74:10
**Count** [8] - 25:17, 25:18, 25:19, 25:21, 25:22, 26:1, 26:6, 26:10
**counter** [10] - 31:14, 57:9, 57:22, 58:25, 59:2, 59:17, 59:18, 90:5, 153:14, 153:15
**country** [3] - 30:18, 47:10, 74:25
**counts** [4] - 12:22, 14:11, 25:16, 30:3
**couple** [6] - 31:18, 49:8, 71:3, 97:15, 98:2, 141:15
**course** [9] - 11:25, 20:17, 21:22, 22:12, 59:20, 60:1, 87:14, 87:15, 104:1
**Court** [1] - 158:15
**court** [10] - 9:13, 10:8, 14:13, 16:23, 21:10, 22:9, 23:16, 23:25, 34:1, 86:24
**court's** [5] - 8:16, 85:17, 157:9, 157:13, 157:24
**courthouse** [3] - 21:25, 22:5, 157:10
**courtroom** [3] - 5:6, 22:11, 66:20
**coworker** [1] - 48:11
**coworkers** [1] - 35:22
**created** [2] - 75:24, 76:24
**creates** [2] - 61:13, 61:14
**crimes** [3] - 6:5, 13:10, 145:20
**criminal** [7] - 12:16, 16:3, 34:14, 35:10, 105:23, 136:23, 137:1
**critical** [3] - 4:20, 20:18, 157:15
**cross** [11] - 24:12, 24:13, 55:11, 55:12, 65:23, 80:3, 98:20, 134:3, 134:12, 136:14, 152:25
**CROSS** [6] - 55:14, 80:5, 98:22, 102:12, 136:16, 153:1
**cross-examination** [5] - 55:11, 65:23, 80:3, 134:3, 136:14
**CROSS-EXAMINATION** [6] - 55:14, 80:5, 98:22, 102:12, 136:16, 153:1
**cross-examine** [2] - 24:12, 24:13
**culture** [1] - 22:17
**cup** [2] - 97:15, 97:16
**curious** [2] - 81:5, 157:11
**custodian** [1] - 90:22
**custody** [4] - 11:4, 50:20, 58:13, 60:18
**customer** [3] - 40:18, 149:7, 151:18
**customers** [1] - 146:5
**Customs** [8] - 26:23, 34:23, 35:24, 53:15, 66:24, 67:24, 68:7, 72:19
**customs** [1] - 30:17
**cypionate** [6] - 117:23, 117:25, 119:16, 119:19, 123:11, 129:4

## D

**D-U-M-K-E** [1] - 86:14
**daily** [1] - 69:13
**dangerous** [1] - 146:2
**data** [3] - 10:19, 51:19, 89:25
**date** [20] - 37:23, 41:3, 51:6, 69:24, 70:12, 70:15, 72:19, 79:22, 88:19, 92:5, 99:2, 101:14, 101:20, 102:17, 102:18, 102:19, 102:22, 111:22, 123:24, 142:4
**Date** [2] - 91:8, 98:25
**dated** [5] - 44:4, 75:16, 102:20, 142:7, 155:12
**dates** [1] - 39:15
**days** [2] - 31:18, 148:4
**DEA** [10] - 49:9, 49:23, 50:21, 86:3, 87:14, 90:9, 101:6, 102:4, 140:2
**deal** [3] - 145:23, 146:2, 146:3
**dealing** [1] - 143:4
**decanoate** [3] - 120:13, 120:14, 127:11
**December** [3] - 110:6, 141:18, 141:23
**decide** [7] - 12:7, 12:10, 18:7, 19:1, 20:9, 20:13, 23:23
**decided** [2] - 30:19, 30:24
**deciding** [4] - 16:14, 16:19, 18:24, 19:1
**decision** [3] - 7:20, 16:4, 23:18
**decisions** [3] - 22:23, 22:24, 23:1
**declaration** [1] - 70:24
**declare** [1] - 70:22
**defendant** [28] - 6:11, 7:17, 7:19, 12:18, 12:24, 13:23, 13:25, 14:7, 14:8, 14:17, 14:25, 15:4, 15:5, 15:6, 15:12, 15:22, 16:1, 16:2, 16:3, 16:5, 16:8, 16:11, 16:12, 24:20, 29:22, 66:18
**defendant's** [5] - 6:1, 7:24, 16:6, 26:20, 28:1
**degree** [4] - 136:20, 136:24, 137:1
**delay** [1] - 60:24
**deliberate** [3] - 12:5,

24:17, 54:8
**deliberation** [1] - 21:1
**deliberations** [7] - 11:21, 12:4, 14:15, 16:10, 20:10, 23:4, 23:9
**deliberative** [1] - 23:5
**deliver** [2] - 37:9, 38:22
**delivered** [5] - 29:20, 147:14, 151:12, 154:9, 155:22
**delivery** [30] - 6:2, 6:17, 27:14, 27:18, 27:22, 36:12, 36:18, 37:4, 37:5, 37:7, 37:21, 37:25, 38:10, 39:14, 39:18, 41:20, 42:2, 42:5, 44:19, 50:16, 50:17, 50:21, 55:18, 147:9, 147:11, 147:12, 147:21, 149:14, 150:11, 153:6
**demeanor** [1] - 19:11
**deny** [1] - 6:1
**Department** [8] - 27:25, 34:14, 34:16, 35:2, 37:20, 60:10, 63:3, 63:7
**depict** [7] - 39:17, 44:18, 46:15, 49:21, 52:14, 53:20, 109:24
**depicted** [1] - 128:4
**describe** [5] - 45:17, 47:22, 65:2, 65:18, 103:25
**described** [9] - 52:10, 52:11, 64:25, 115:11, 115:24, 115:25, 116:4, 122:15, 135:19
**describes** [1] - 12:25
**description** [15] - 14:10, 32:22, 75:16, 110:21, 111:1, 112:17, 112:18, 112:19, 113:19, 113:21, 113:23, 116:23, 122:16, 122:21, 124:23
**designated** [1] - 22:3
**designed** [2] - 14:11, 28:8
**despite** [1] - 101:25
**destination** [1] - 79:2
**destined** [3] - 36:19, 43:19, 146:19
**detail** [1] - 14:13
**detailed** [1] - 11:20
**detained** [1] - 156:7
**detect** [2] - 120:24, 126:24
**detectable** [1] - 144:11
**detected** [4] - 95:22, 128:8, 129:25, 147:13
**detection** [3] - 94:14, 95:4, 95:19
**Detective** [1] - 64:6
**detectives** [1] - 27:24
**detector** [2] - 95:3, 95:5
**determination** [1] - 80:13
**determine** [14] - 27:2, 28:5, 71:11, 73:22, 79:9, 84:14, 105:6, 117:10, 122:12, 138:2, 138:4, 138:6, 143:15, 156:22
**determined** [5] - 27:3, 27:8, 27:9, 30:22, 35:25
**device** [1] - 61:16
**dictionaries** [1] - 21:15
**difference** [2] - 17:12, 92:25
**different** [22] - 10:23, 35:3, 71:7, 71:20, 78:5, 94:23, 95:9, 95:14, 95:16, 101:25, 102:1, 106:22, 106:25, 107:1, 109:13, 111:8, 138:17, 139:17, 140:14, 155:16
**difficult** [1] - 8:5
**digit** [3] - 90:7, 102:1
**digits** [2] - 74:22, 90:9
**digress** [1] - 17:11
**dire** [1] - 4:3
**DIRECT** [5] - 34:9, 67:20, 86:16, 104:23, 145:15
**direct** [21] - 7:6, 17:6, 17:7, 18:3, 18:6, 22:9, 32:16, 52:2, 52:24, 59:23, 65:23, 67:5, 116:20, 118:5, 119:12, 120:1, 124:13, 126:15, 127:18, 145:7
**directed** [3] - 57:24, 58:3, 60:2
**directing** [1] - 132:20
**direction** [2] - 9:12, 45:8
**directions** [1] - 85:18
**directly** [5] - 6:17, 22:2, 22:6, 158:1, 158:3
**discipline** [1] - 105:3
**discreetly** [1] - 113:8
**discuss** [4] - 4:24, 7:9, 21:9, 157:4
**discussed** [2] - 16:9, 48:23
**discussing** [1] - 20:21
**discussion** [1] - 8:19
**discussions** [1] - 65:13
**dislikes** [1] - 12:12
**display** [3] - 40:16, 41:13, 47:6
**displayed** [3] - 54:12, 54:14, 54:24
**disregard** [4] - 16:22, 18:23, 18:25, 149:22
**dissolve** [1] - 111:5
**dissolved** [2] - 139:2, 139:10
**distinction** [1] - 18:5
**distract** [1] - 23:24
**distribute** [9] - 6:9, 12:21, 14:4, 14:9, 25:23, 26:11, 30:1, 32:3, 33:5
**distributed** [2] - 34:2, 66:3
**distribution** [2] - 6:15, 32:6
**division** [2] - 67:25, 68:9
**document** [6] - 73:9, 73:19, 77:7, 77:11, 78:2, 101:6
**documents** [1] - 28:13
**done** [18] - 16:24, 29:15, 30:13, 35:3, 61:8, 62:23, 62:24, 63:7, 78:23, 97:17, 106:6, 109:25, 134:1, 134:6, 134:8, 141:12, 142:2, 155:18
**door** [7] - 31:1, 31:4, 31:15, 59:14, 151:18, 151:20
**doors** [1] - 95:9
**double** [2] - 105:22, 136:25
**doubt** [18] - 13:4, 13:8, 13:14, 13:22, 14:6, 14:16, 14:18, 14:19, 14:24, 15:4, 15:12, 15:21, 16:1, 25:15, 29:9, 32:25, 33:2
**down** [17] - 42:8, 43:9, 45:6, 49:12, 66:13, 71:25, 74:10, 85:10, 94:19, 95:16, 101:12, 103:14, 126:17, 144:17, 155:7, 155:20, 156:13
**downstairs** [2] - 114:23, 115:2
**Dr** [3] - 103:12, 103:14, 108:19
**drawn** [2] - 16:8, 28:9
**drive** [1] - 157:1
**driven** [2] - 80:11, 85:6
**dropped** [1] - 150:14
**drops** [1] - 17:15
**Drug** [4] - 86:20, 86:22, 87:10, 138:20
**drug** [7] - 14:2, 35:4, 35:8, 35:12, 50:22, 140:9
**drugs** [6] - 32:7, 35:12, 92:14, 105:7, 106:22, 145:23
**Dumke** [13] - 86:3, 86:7, 86:13, 86:14, 86:18, 87:21, 89:7, 98:19, 98:24, 100:23, 103:9, 103:12, 103:14
**DUMKE** [1] - 86:9
**Dumke's** [1] - 108:19
**duplicate** [1] - 61:14
**during** [20] - 11:25, 12:13, 14:12, 17:22, 17:23, 20:16, 21:21, 21:23, 22:1, 22:11, 23:6, 27:13, 34:25, 50:23, 56:5, 59:20, 60:1, 64:7, 66:2, 157:20
**Dutch** [1] - 151:18
**duties** [1] - 11:18
**duty** [7] - 12:5, 14:25, 15:4, 15:13, 15:22, 16:1, 20:17

## E

**EA181491234CN** [2] - 41:8, 74:15
**ealy** [1] - 100:10
**early** [3] - 29:13, 157:4, 157:7
**earned** [1] - 105:20
**easier** [2] - 138:24, 157:6
**easily** [1] - 138:25
**Echo** [1] - 73:4
**education** [4] - 95:23, 136:19, 137:3, 137:4
**Edwards** [2] - 64:6, 142:12
**effectively** [1] - 10:13
**effort** [1] - 9:4
**eight** [3] - 35:11, 35:14, 125:5
**either** [6] - 18:4, 18:6, 71:13, 94:20, 105:7, 143:1
**electronic** [6] - 20:22, 76:23, 76:24, 77:8, 82:19, 90:21
**electronically** [1] - 89:25
**electronics** [1] - 68:17
**element** [1] - 13:7
**elements** [7] - 13:10, 13:14, 13:22, 14:5, 14:10, 25:24, 29:9
**email** [2] - 20:22, 35:23
**emailed** [2] - 53:16, 78:21
**emphasis** [1] - 105:23
**employed** [1] - 30:8
**employees** [5] - 57:10, 69:7, 146:5, 150:20, 150:23
**employer** [2] - 21:3, 21:5
**empty** [6] - 25:12, 28:10, 28:11, 93:1, 93:23
**enanthate** [8] - 117:22, 117:24, 122:24, 123:9, 125:8, 125:9, 131:16, 131:19
**encounter** [2] - 22:7, 22:11
**end** [17] - 11:19, 12:1, 14:12, 20:10, 22:5, 23:2, 23:4, 23:17, 30:2, 34:23, 54:7, 74:17, 74:23, 74:24, 85:19, 98:7, 99:7
**Enforcement** [4] - 86:20, 86:22, 87:10, 138:21

**enforcement** [23] - 27:15, 29:19, 30:23, 30:25, 31:19, 32:1, 37:11, 56:6, 56:10, 58:9, 58:13, 59:12, 60:9, 61:5, 63:1, 78:6, 87:1, 105:5, 136:21, 147:15, 151:21, 156:3
**ensure** [1] - 23:10
**entail** [1] - 69:6
**entailed** [1] - 63:14
**enter** [1] - 16:9
**entire** [6] - 23:14, 61:16, 90:24, 91:1, 91:2, 91:14
**entirely** [2] - 7:18, 12:15
**entirety** [1] - 15:17
**entries** [1] - 83:22
**equipment** [1] - 25:1
**error** [1] - 101:11
**escort** [1] - 5:17
**establish** [1] - 64:18
**evaluate** [1] - 12:6
**evening** [5] - 17:20, 17:22, 17:24, 18:1, 156:19
**event** [2] - 81:2, 138:12
**events** [3] - 19:9, 26:18
**eventually** [1] - 94:20
**Evidence** [1] - 6:4
**evidence** [111] - 6:4, 7:8, 7:12, 7:18, 8:13, 9:4, 10:21, 12:6, 12:10, 12:14, 13:2, 13:6, 13:9, 14:12, 14:21, 14:22, 14:24, 15:3, 15:11, 15:21, 15:25, 16:14, 16:16, 16:18, 16:19, 17:1, 17:3, 17:4, 17:6, 17:9, 17:23, 18:4, 18:6, 18:7, 18:8, 18:9, 18:10, 18:11, 18:22, 18:23, 18:25, 19:18, 19:20, 19:24, 20:13, 21:11, 22:25, 23:11, 23:18, 23:22, 24:3, 24:8, 24:9, 24:11, 24:13, 24:14, 26:13, 26:21, 29:2, 29:5, 29:10, 29:17, 30:2, 31:7, 31:9, 31:10, 31:11, 32:5, 32:6, 32:8, 32:10, 32:17, 32:20, 32:21, 32:23, 32:25, 33:6, 36:10, 40:4, 42:8, 45:11, 48:10, 49:7, 49:8, 49:15, 50:15, 52:12, 60:10, 60:13, 67:16, 90:6, 90:21, 98:6, 101:6, 103:21, 106:10, 111:16, 112:18, 113:19, 114:20, 115:22, 115:23, 116:10, 134:18, 135:14, 141:20, 142:2, 147:15, 155:9
**evidentiary** [1] - 62:8
**exact** [4] - 56:12, 155:21, 155:22, 155:25
**exactly** [7] - 31:20, 68:21, 69:15, 70:5, 80:7, 137:4, 156:1
**EXAMINATION** [16] - 34:9, 55:14, 65:10, 66:7, 67:20, 80:5, 84:22, 86:16, 98:22, 100:21, 102:12, 104:23, 136:16, 143:20, 145:15, 153:1
**examination** [5] - 55:11, 65:23, 80:3, 134:3, 136:14
**examine** [10] - 24:12, 24:13, 46:4, 69:2, 122:12, 128:3, 149:23, 150:1, 150:3, 150:5
**examined** [11] - 35:25, 68:23, 70:15, 70:17, 70:25, 71:1, 71:13, 79:10, 79:23, 116:17, 151:25
**example** [9] - 7:2, 29:11, 37:9, 69:14, 123:6, 138:7, 139:1, 140:14, 145:22
**except** [5] - 31:6, 33:6, 66:18, 83:22, 96:16
**exception** [1] - 134:24
**exclude** [2] - 6:1, 11:2
**excluded** [1] - 66:16
**excuse** [9] - 25:18, 27:17, 34:7, 51:25, 65:16, 66:24, 78:9, 134:20, 142:11
**excused** [3] - 4:17, 5:19, 85:11
**execute** [2] - 51:5, 147:9
**exhibits** [18] - 16:16, 45:5, 48:12, 50:3, 67:15, 101:10, 102:2, 104:10, 104:11, 116:13, 117:20, 121:22, 122:5, 134:19, 135:1, 135:3, 135:8
**Exhibits** [14] - 48:17, 48:19, 50:4, 50:8, 52:25, 53:24, 54:4, 97:20, 102:18, 122:13, 134:14, 134:21, 134:23, 135:5
**existence** [2] - 10:2, 22:9
**exit** [1] - 94:22
**exited** [2] - 151:17, 151:20
**expects** [1] - 24:9
**experience** [11] - 22:15, 34:25, 35:7, 87:9, 87:16, 95:23, 105:15, 105:18, 106:16, 106:20, 106:23
**experienced** [1] - 106:8
**expertise** [1] - 144:4
**experts** [1] - 27:11
**explain** [2] - 37:6, 60:24
**explained** [2] - 12:16, 37:9
**exploitation** [1] - 35:3
**explosives** [1] - 146:3
**exposed** [2] - 20:15, 23:15
**express** [3] - 4:17, 5:1, 20:11
**extended** [2] - 85:17, 157:24
**extract** [1] - 51:18
**extraction** [5] - 60:16, 61:6, 61:12, 61:20, 66:9
**extremely** [1] - 22:24
**eyebrows** [1] - 64:2

**F**

**Facebook** [1] - 20:23
**facility** [1] - 46:1
**fact** [14] - 6:24, 7:10, 8:18, 16:8, 16:9, 17:7, 17:10, 18:4, 19:24, 29:24, 33:4, 71:11, 99:21, 141:17
**facts** [9] - 12:7, 16:14, 16:17, 16:19, 17:10, 17:25, 19:1, 19:21
**fair** [4] - 23:11, 91:15, 98:9, 102:8
**fairly** [11] - 9:25, 39:17, 44:18, 46:15, 49:21, 52:14, 53:20, 88:16, 92:7, 109:24, 157:7
**fairness** [1] - 23:13
**falling** [1] - 17:15
**Falls** [3] - 50:14, 89:14, 99:24
**familiar** [8] - 35:17, 35:20, 74:20, 75:2, 107:2, 139:21, 146:8, 146:11
**family** [3] - 21:2, 21:5, 157:11
**far** [4] - 59:18, 137:13, 150:1, 157:21
**faster** [1] - 138:24
**favor** [1] - 113:7
**FBI** [1] - 77:14
**federal** [2] - 6:4, 145:19
**federally** [1] - 105:8
**feet** [1] - 59:16
**fellow** [6] - 20:9, 20:25, 23:8, 23:23, 24:5, 140:2
**few** [7] - 10:25, 11:17, 20:2, 29:3, 107:1, 123:21, 124:1
**FH135** [1] - 102:6
**field** [3] - 78:18, 87:20
**fifth** [1] - 19:15
**file** [2] - 77:15, 155:2
**filed** [2] - 7:11, 108:11
**fills** [2] - 153:15, 153:17
**final** [4] - 12:3, 14:13, 14:14, 79:2
**finally** [1] - 19:21
**financial** [1] - 35:5
**fine** [7] - 5:9, 34:3, 54:6, 104:13, 115:13, 121:16, 130:4
**finger** [1] - 91:4
**finish** [1] - 63:22
**finished** [2] - 33:1, 88:14
**firmly** [1] - 14:17
**first** [32] - 9:8, 13:15, 13:23, 14:7, 16:15, 16:20, 19:7, 22:22, 24:6, 31:22, 33:12, 55:16, 76:7, 78:1, 81:23, 90:7, 90:25, 101:8, 105:22, 110:19, 111:25, 112:25, 118:17, 123:20, 124:3, 133:20, 137:17, 141:2, 143:2, 146:16, 152:6, 158:4
**firsthand** [1] - 29:6
**fiscal** [3] - 90:8, 101:13, 101:14
**fishy** [1] - 30:20
**fit** [1] - 113:10
**five** [5] - 4:8, 90:7, 90:9, 114:25, 127:20
**five-digit** [1] - 90:7
**five-minute** [1] - 114:25
**flagged** [1] - 83:15
**flame** [9] - 94:13, 95:4, 95:19, 95:20, 139:19, 139:23, 139:24, 140:4
**flame-ionization** [3] - 94:13, 95:4, 95:19
**flip** [1] - 149:5
**flipped** [1] - 41:21
**floor** [3] - 45:6, 151:16, 158:4
**flour** [1] - 98:8
**flown** [1] - 85:4
**focus** [3] - 35:1, 41:16, 97:22
**foil** [1] - 71:8
**folder** [10] - 75:24, 76:1, 76:3, 76:16, 77:9, 77:13, 82:17, 82:18, 82:21, 82:24
**folks** [1] - 78:5
**follow** [12] - 13:9, 14:11, 22:16, 35:11, 57:2, 83:13, 85:17, 111:24, 144:2, 157:8, 157:15, 157:24
**follow-on** [1] - 35:11
**following** [8] - 13:14, 13:22, 14:5, 16:18, 19:6, 20:6, 143:25, 155:13
**Force** [1] - 35:13
**Ford** [2] - 95:10, 95:11
**forecast** [1] - 17:21
**foreign** [2] - 68:4, 68:5
**Forensic** [1] - 105:3
**forensic** [11] - 51:18, 61:5, 61:13, 61:14,

61:19, 86:20, 86:22, 87:9, 87:15, 105:2, 105:23
**forensically** [1] - 51:21
**forensics** [1] - 136:22
**form** [15] - 4:25, 20:11, 20:24, 25:10, 29:11, 41:18, 99:12, 99:20, 101:6, 102:5, 148:16, 148:17, 153:15, 153:24, 155:17
**forms** [1] - 107:1
**forth** [1] - 102:6
**forward** [2] - 145:6, 147:14
**forwarded** [1] - 35:23
**foundation** [3] - 10:22, 63:21, 64:17
**four** [5] - 87:14, 100:14, 101:8, 141:12, 141:13
**four-month** [1] - 87:14
**fourth** [2] - 16:22, 19:13
**frame** [2] - 10:11, 56:5
**Francisco** [6] - 26:24, 35:24, 36:6, 67:25, 68:1
**frankly** [1] - 5:2
**fraud** [1] - 145:23
**free** [2] - 6:23, 113:11
**freedom** [1] - 33:9
**freezer** [1] - 9:16
**freezes** [2] - 8:23, 10:20
**friction** [1] - 94:21
**Friday** [1] - 157:7
**friends** [2] - 94:19, 157:11
**front** [14] - 51:22, 57:16, 72:2, 72:25, 74:22, 87:22, 107:7, 107:13, 107:16, 113:4, 117:3, 151:11, 152:11, 154:5
**full** [3] - 24:21, 24:23, 28:10
**fully** [1] - 106:9
**function** [2] - 80:22, 80:25

## G

**gas** [10] - 94:2, 94:13, 94:16, 94:18, 94:25, 95:2, 111:7, 137:14, 137:17, 140:22
**GC** [5] - 94:3, 94:14, 111:7, 139:12, 140:22
**GC-MS** [4] - 94:3, 111:7, 139:12, 140:22
**generally** [3] - 61:12, 71:5, 78:17
**generate** [4] - 82:24, 88:14, 111:14, 112:12
**generated** [8] - 76:25, 77:1, 77:5, 77:6, 78:4, 100:8, 110:5, 110:6
**gentlemen** [13] - 4:6, 5:19, 11:13, 11:16, 24:19, 25:6, 29:2, 40:7, 85:16, 116:7, 126:20, 156:20, 158:13
**Georgia** [1] - 35:15
**given** [11] - 18:5, 23:20, 27:18, 39:20, 65:24, 79:15, 112:13, 137:22, 141:2, 154:24, 157:4
**glass** [13] - 28:8, 124:24, 125:5, 125:16, 126:3, 126:8, 126:13, 126:22, 127:6, 127:20, 128:6, 128:14, 128:24
**goal** [1] - 141:12
**Google** [1] - 157:18
**Government** [1] - 12:17
**government** [25] - 6:23, 7:11, 8:2, 9:21, 10:5, 10:13, 10:24, 12:17, 13:1, 13:4, 13:7, 13:11, 13:13, 13:21, 14:4, 14:18, 24:11, 24:13, 33:14, 55:8, 66:19, 66:23, 86:2, 100:17
**GOVERNMENT'S** [5] - 33:23, 67:6, 86:9, 104:5, 145:8
**government's** [1] - 9:8
**Government's** [38] - 39:5, 39:6, 39:8, 39:22, 40:2, 40:15, 43:14, 43:15, 43:17, 44:13, 45:4, 46:5, 46:24, 48:17, 48:19, 48:21, 48:22, 49:10, 50:8, 52:23, 53:23, 54:4, 70:8, 70:10, 74:3, 74:9, 75:10, 75:11, 75:14, 76:8, 76:13, 76:18, 76:22, 78:2, 89:6, 110:13, 135:5, 136:13
**grab** [1] - 130:3
**grabbed** [1] - 31:6
**graduated** [1] - 105:19
**grains** [1] - 97:16
**grams** [20] - 75:20, 75:21, 91:2, 92:20, 93:6, 94:8, 97:4, 97:6, 119:25, 120:3, 120:12, 120:21, 130:5, 130:19, 131:14, 132:1, 132:12, 135:23
**grand** [1] - 42:6
**graphical** [1] - 139:8
**graphs** [1] - 139:13
**grass** [1] - 17:19
**gray** [1] - 17:20
**great** [2] - 34:8, 67:18
**Green** [1] - 122:22
**green** [5] - 72:19, 82:4, 82:5, 82:7, 82:16
**gross** [7] - 90:24, 91:12, 92:19, 93:13, 93:17, 97:2, 97:3
**Gross** [2] - 91:9, 91:11
**ground** [1] - 94:9
**groups** [1] - 23:6
**guarantee** [1] - 155:4
**guess** [20] - 7:13, 18:18, 33:8, 35:1, 58:20, 68:12, 76:7, 77:10, 77:20, 81:1, 85:1, 85:3, 96:22, 114:24, 115:11, 126:12, 152:14, 153:17, 153:21, 153:23
**guessing** [2] - 31:13, 155:8
**guide** [1] - 14:15
**guilt** [3] - 14:18, 16:7, 33:3
**guilty** [17] - 13:3, 13:4, 13:12, 13:20, 14:3, 14:17, 14:25, 15:1, 15:4, 15:5, 15:12, 15:22, 15:23, 16:1, 16:2, 30:3, 32:19
**gummy** [1] - 92:23
**guy** [2] - 57:7, 62:3
**guys** [2] - 94:20, 94:22

## H

**H-E-L-L-S-T-R-O-M** [1] - 104:20
**hallway** [1] - 151:19
**hand** [16] - 11:14, 15:2, 15:10, 15:24, 16:11, 17:17, 39:1, 40:22, 40:23, 40:24, 46:2, 59:7, 89:15, 112:2, 138:10, 152:2
**handed** [6] - 39:4, 43:12, 43:13, 46:2, 48:16, 151:10
**handle** [6] - 26:14, 29:6, 43:23, 55:12, 123:3, 146:4
**handled** [1] - 106:10
**handling** [2] - 44:13, 135:16
**Hands** [1] - 106:7
**hands** [2] - 78:11, 94:19
**handwriting** [1] - 49:7
**hard** [6] - 8:15, 10:22, 75:25, 76:23, 77:8, 82:19
**hardest** [1] - 22:16
**harmless** [1] - 71:12
**head** [4] - 31:14, 56:24, 65:4, 151:24
**headquarters** [1] - 97:17
**heads** [1] - 8:10
**heads-up** [1] - 8:10
**hear** [15] - 4:13, 5:11, 7:14, 8:9, 8:14, 16:24, 19:8, 29:3, 29:11, 29:14, 30:10, 33:19, 37:2, 65:20, 143:5
**heard** [9] - 16:23, 17:8, 22:25, 25:16, 26:17, 67:22, 79:22, 139:24, 146:1
**hearsay** [4] - 8:12, 63:18, 64:11, 78:5
**held** [2] - 31:13, 91:18
**Hellstrom** [20] - 103:19, 103:21, 104:20, 104:25, 107:7, 107:8, 109:10, 110:16, 113:7, 116:13, 120:10, 121:11, 123:19, 129:22, 132:18, 133:23, 135:17, 136:18, 143:22, 144:18
**HELLSTROM** [1] - 104:5
**Hellstrom's** [1] - 108:20
**help** [15] - 6:13, 13:9, 13:19, 14:11, 22:22, 23:21, 24:8, 25:4, 26:5, 27:11, 28:24, 48:14, 104:14, 105:10, 152:4
**helped** [1] - 105:16
**helpful** [1] - 90:4
**heroin** [1] - 31:25
**Hillsdale** [1] - 87:12
**himself** [1] - 57:24
**hired** [2] - 105:19, 106:2
**hmm** [1] - 137:11
**hold** [3] - 45:8, 49:12, 135:8
**holding** [2] - 94:19, 94:21
**home** [1] - 28:1
**Homeland** [8] - 27:25, 33:15, 34:14, 34:15, 34:16, 35:2, 100:2, 102:3
**hood** [1] - 95:18
**hopefully** [1] - 40:10
**hoping** [1] - 136:22
**hotels** [1] - 156:24
**hour** [2] - 4:15, 11:8
**hours** [1] - 9:20
**house** [20] - 24:24, 25:3, 25:8, 25:11, 28:12, 28:14, 29:21, 31:17, 31:19, 31:20, 32:11, 32:19, 55:18, 62:5, 62:8, 62:11, 62:14, 62:18, 106:21, 155:17
**housecleaning** [1] - 104:10
**HSI** [4] - 79:3, 89:14, 99:24, 151:10
**hypothetical** [1] - 17:12

## I

**Idaho** [14] - 27:6, 30:23, 36:11, 42:21, 47:15, 50:14, 50:15,

70:1, 70:5, 89:14, 99:24, 103:20, 105:2, 150:9
**idea** [1] - 95:17
**identification** [4] - 28:13, 87:16, 106:17, 121:14
**identified** [11] - 49:20, 93:8, 121:6, 127:8, 130:7, 130:14, 134:15, 147:6, 147:7, 149:20, 150:10
**identify** [4] - 57:24, 95:18, 106:15, 130:13
**identifying** [3] - 105:8, 111:18, 137:13
**identities** [2] - 123:5, 144:5
**identity** [12] - 29:12, 50:19, 95:25, 97:24, 114:12, 115:7, 117:10, 117:20, 118:16, 119:14, 121:13, 130:20
**ignore** [3] - 18:18, 18:20, 18:23
**illegal** [1] - 31:25
**illicit** [2] - 147:13, 147:17
**image** [2] - 61:13, 61:14
**imagine** [1] - 10:18
**immediate** [1] - 156:3
**immediately** [3] - 7:16, 23:16, 62:24
**immigration** [1] - 35:5
**impact** [1] - 6:22
**impaneled/sworn** [1] - 4:3
**impartial** [5] - 14:21, 14:23, 15:2, 15:20, 15:24
**import** [11] - 6:7, 12:19, 13:13, 13:17, 25:4, 25:9, 25:20, 26:3, 28:25, 29:23, 29:24
**important** [5] - 9:25, 20:11, 22:24, 32:21, 157:10
**importation** [3] - 6:8, 12:19, 13:20
**imported** [2] - 25:17, 25:21
**in-house** [1] - 106:21
**incident** [1] - 77:14
**inclined** [1] - 6:1
**include** [2] - 154:10, 154:11
**included** [3] - 30:11, 56:8, 63:9
**includes** [1] - 20:21
**including** [4] - 4:19, 20:22, 21:2, 106:23
**incoming** [2] - 68:4, 68:5
**increases** [1] - 90:7
**increasing** [1] - 90:10
**indeed** [2] - 18:4, 101:10
**independent** [1] - 94:4
**indicate** [11] - 5:22, 15:16, 17:2, 29:8, 47:3, 47:5, 66:9, 77:16, 77:24, 96:10, 113:13
**indicated** [18] - 5:25, 30:14, 30:25, 31:24, 41:5, 45:14, 66:3, 82:16, 83:5, 102:15, 109:10, 121:20, 136:18, 138:9, 144:7, 144:10, 146:24, 154:18
**indicates** [4] - 8:22, 28:21, 40:19, 83:9
**indicating** [2] - 12:14, 48:1
**indication** [5] - 61:22, 61:25, 62:10, 62:16, 64:9
**indications** [2] - 62:8, 62:13
**indicative** [1] - 9:9
**indictment** [3] - 12:25, 13:1
**indirect** [1] - 17:9
**individual** [1] - 8:7
**infer** [1] - 17:25
**inference** [1] - 16:7
**influenced** [2] - 12:11, 24:4
**inform** [3] - 38:15, 78:10
**informally** [1] - 5:25
**Information** [1] - 89:24
**information** [12] - 8:24, 9:21, 20:16, 23:16, 35:22, 36:3, 45:24, 46:11, 107:24, 109:15, 151:6, 152:15
**informed** [2] - 38:2, 38:4
**infrared** [6] - 78:18, 94:4, 94:16, 137:15, 137:20, 138:16
**initial** [3] - 70:15, 72:19, 111:4
**initialed** [1] - 75:16
**initials** [5] - 70:12, 76:6, 92:5, 111:22, 111:23
**innocence** [1] - 13:6
**innocent** [1] - 13:3
**inquire** [4] - 67:11, 86:15, 104:21, 145:14
**inquiry** [1] - 157:17
**inside** [27] - 36:21, 44:6, 44:9, 44:14, 44:16, 45:15, 45:25, 46:8, 48:5, 49:8, 53:21, 59:19, 70:12, 70:15, 71:8, 73:25, 75:17, 75:19, 77:9, 115:23, 126:8, 130:5, 130:17, 130:25, 135:23, 150:1
**inspect** [5] - 68:4, 68:12, 69:9, 69:13, 69:19
**inspected** [1] - 71:16
**inspecting** [1] - 69:25
**Inspection** [2] - 37:15, 37:19
**inspection** [1] - 69:12
**inspector** [2] - 71:9, 145:19
**inspectors** [2] - 38:21, 42:10
**instance** [1] - 91:14
**instead** [2] - 102:7, 123:18
**instruct** [4] - 16:22, 17:2, 17:3, 24:14
**instruction** [3] - 18:2, 20:7, 21:12
**instructions** [16] - 4:24, 11:14, 11:15, 11:19, 11:20, 11:22, 12:1, 12:2, 12:3, 14:13, 14:14, 14:15, 20:14, 22:16, 28:15, 158:9
**instrument** [11] - 95:8, 111:6, 132:15, 138:8, 138:23, 139:6, 139:23, 140:17, 140:24
**instruments** [5] - 95:2, 103:3, 105:10, 106:5, 137:18
**insult** [1] - 22:14
**intellectual** [1] - 35:6
**intend** [2] - 133:25, 134:3
**intended** [2] - 37:10, 37:12
**intending** [2] - 13:19, 26:5
**intends** [1] - 55:8
**intent** [13] - 6:5, 6:9, 6:13, 6:14, 6:18, 12:20, 14:4, 14:8, 25:23, 26:11, 30:1, 32:3
**interacted** [1] - 5:5
**intercede** [1] - 157:1
**interest** [1] - 19:13
**interested** [2] - 36:5, 79:3
**interesting** [1] - 137:21
**interfere** [1] - 139:2
**internal** [3] - 106:2, 110:21, 111:2
**international** [2] - 37:8, 67:25
**Internet** [2] - 20:23, 21:16
**interpretations** [1] - 112:22
**interrupted** [1] - 92:12
**intervene** [1] - 157:2
**interview** [3] - 63:9, 63:14, 64:7
**interviewed** [3] - 50:24, 63:4, 63:10
**introduce** [3] - 25:9, 28:25, 134:9
**intuitive** [1] - 29:11
**investigate** [2] - 145:20, 145:22
**investigating** [1] - 142:12
**investigation** [12] - 21:17, 35:17, 35:20, 37:13, 50:23, 59:20, 59:21, 59:24, 60:1, 146:8, 146:11, 157:18
**Investigations** [4] - 34:15, 36:11, 50:15, 145:4
**investigations** [6] - 35:4, 35:5, 35:8, 146:6
**investigator** [1] - 34:14
**investigators** [1] - 35:10
**investigatory** [1] - 51:8
**invited** [1] - 27:19
**involuntarily** [1] - 7:20
**involved** [8] - 8:1, 8:4, 8:5, 10:19, 21:3, 23:5, 31:23, 106:22
**involves** [2] - 20:16, 106:3
**involving** [3] - 35:17, 145:21, 146:8
**ionization** [5] - 94:13, 95:4, 95:19, 139:24, 140:4
**ISP** [1] - 137:9
**issue** [3] - 12:23, 61:1, 61:3
**issued** [4] - 31:17, 61:5, 109:13, 117:4
**issues** [2] - 20:16, 146:4
**item** [75] - 17:4, 77:1, 77:6, 110:19, 112:2, 112:5, 112:7, 112:10, 112:13, 112:25, 113:14, 114:7, 114:10, 114:12, 115:25, 116:2, 117:9, 117:14, 118:6, 118:7, 118:9, 118:13, 118:16, 118:20, 118:21, 119:12, 119:14, 119:17, 120:1, 120:3, 120:11, 120:12, 120:20, 120:21, 121:18, 121:19, 124:13, 125:15, 126:2, 127:19, 128:3, 128:5, 128:8, 128:13, 128:23, 129:11, 129:12, 129:23, 129:25, 130:2, 130:5, 130:16, 130:22, 130:24, 131:10, 131:12, 131:13, 131:17, 131:24, 131:25, 132:1, 132:3, 132:10, 132:11, 132:12, 132:22, 132:23, 132:24, 133:6, 133:9, 135:18, 135:19, 147:17
**items** [17] - 25:13, 75:17, 75:18, 106:14, 111:3, 113:4, 116:4, 123:20, 123:24, 123:25, 130:12, 133:20, 133:21, 134:4, 143:1, 144:5, 144:7
**itself** [3] - 46:13,

90:24, 93:14

## J

**James** [1] - 147:2
**jeopardizes** [1] - 23:13
**job** [13] - 27:1, 68:10, 68:11, 68:18, 68:20, 79:18, 85:2, 105:4, 105:15, 105:25, 136:21, 143:7, 143:8
**joined** [2] - 13:18, 26:4
**JONATHAN** [2] - 86:9, 86:13
**Jonathan** [2] - 86:3, 86:13
**journals** [1] - 106:4
**judge** [4] - 31:18, 32:15, 32:22, 157:13
**Judge** [1] - 31:24
**July** [2] - 60:21, 61:8
**jump** [1] - 123:16
**jumped** [1] - 15:8
**juror** [8] - 20:3, 21:6, 22:11, 23:12, 23:15, 85:18, 157:9, 157:25
**Juror** [1] - 4:19
**jurors** [12] - 11:11, 11:18, 20:3, 20:10, 20:25, 22:16, 23:5, 23:8, 23:23, 24:5, 30:13, 40:12
**Jury** [5] - 4:3, 4:4, 5:21, 11:10, 85:23
**jury** [79] - 4:3, 4:12, 4:15, 4:19, 5:1, 5:17, 11:16, 15:19, 20:17, 21:7, 22:3, 23:3, 23:23, 24:1, 24:16, 24:18, 24:19, 34:12, 35:7, 37:6, 37:25, 38:8, 40:1, 40:13, 42:6, 44:23, 45:9, 45:10, 46:23, 47:25, 49:11, 49:12, 50:7, 52:22, 53:1, 53:6, 54:3, 54:5, 54:7, 54:18, 54:23, 67:16, 67:22, 72:5, 72:14, 74:8, 75:6, 76:12, 76:19, 78:10, 79:11, 85:24, 86:18, 89:4, 89:13, 90:1, 90:17, 94:15, 95:24, 97:7, 101:24, 104:1, 104:25, 107:4, 110:14, 110:17, 112:4, 113:9, 115:16, 126:17, 133:18, 135:7, 135:9, 145:18, 157:2, 158:4, 158:8, 158:10
**jury's** [1] - 41:12
**justice** [3] - 105:23, 136:23, 137:1

## K

**K-O-R-V-E-L-A** [1] - 145:13
**keep** [7] - 20:8, 22:22, 23:22, 44:7, 79:17, 115:15, 156:21
**keeping** [1] - 32:4
**Kenny** [1] - 147:1
**kept** [6] - 73:7, 76:3, 76:4, 76:5, 76:14, 77:7
**kilograms** [4] - 54:17, 54:25, 55:4, 55:6
**kind** [25] - 8:23, 9:25, 10:4, 16:8, 26:8, 28:7, 29:4, 32:18, 47:24, 59:24, 68:5, 72:18, 80:8, 80:9, 82:17, 83:20, 96:20, 96:21, 113:8, 114:22, 136:21, 137:14, 137:18, 138:13, 139:8
**kinds** [1] - 32:15
**knowing** [3] - 8:3, 13:18, 26:4
**knowingly** [4] - 6:11, 13:23, 14:7, 26:6
**knowledge** [6] - 6:5, 6:10, 6:17, 9:19, 61:12, 74:21
**known** [1] - 100:4
**knows** [1] - 97:7
**Korvela** [8] - 145:3, 145:5, 145:12, 145:13, 145:17, 153:3, 156:12, 156:14
**KORVELA** [1] - 145:8

## L

**lab** [50] - 29:11, 49:9, 49:23, 50:21, 78:21, 88:6, 88:7, 88:9, 89:12, 89:13, 99:15, 100:15, 100:17, 106:4, 108:20, 109:14, 109:17, 110:17, 111:10, 112:2, 112:5, 112:8, 112:10, 112:25, 113:20, 118:6, 118:7, 118:9, 118:13, 118:17, 118:20, 119:12, 119:14, 119:17, 120:1, 120:3, 120:11, 120:12, 123:23, 124:1, 137:6, 137:9, 137:22, 140:5, 141:4, 141:6, 141:16, 141:20, 142:6, 143:3
**lab's** [1] - 113:14
**label** [6] - 70:18, 70:19, 72:25, 152:9, 152:11, 152:20
**labeled** [1] - 122:17
**labels** [1] - 50:11
**laboratory** [17] - 27:9, 28:4, 71:21, 87:5, 88:8, 88:17, 90:8, 90:9, 91:8, 92:17, 99:1, 99:6, 99:8, 101:17, 105:14, 105:21, 105:23
**Laboratory** [1] - 89:24
**lack** [3] - 6:6, 6:18, 14:22
**ladies** [13] - 4:6, 5:19, 11:13, 11:16, 24:19, 25:6, 29:2, 40:7, 85:16, 116:7, 126:19, 156:20, 158:13
**large** [3] - 62:13, 65:13, 99:8
**larger** [1] - 92:20
**last** [10] - 9:20, 10:12, 15:9, 15:17, 58:11, 83:6, 90:6, 90:9, 99:7, 110:6
**late** [2] - 38:6, 155:18
**LAW** [4] - 4:10, 15:7, 15:14, 158:5
**law** [35] - 7:17, 9:25, 12:8, 12:9, 12:10, 15:6, 16:3, 18:5, 20:14, 23:10, 24:15, 27:14, 29:19, 30:23, 30:25, 31:19, 32:1, 35:5, 37:11, 56:6, 56:10, 58:9, 58:13, 59:11, 60:9, 61:5, 63:1, 78:5, 87:1, 105:5, 136:21, 147:15, 151:21, 156:3
**lawyer** [4] - 16:6, 18:9, 18:10, 18:11
**lay** [1] - 10:21
**layman's** [1] - 61:13
**lead** [1] - 33:3
**learn** [3] - 21:17, 28:21, 143:9
**learned** [2] - 7:2, 25:8
**learning** [1] - 106:4
**least** [10] - 10:17, 22:21, 26:11, 28:22, 66:4, 83:14, 91:5, 94:7, 133:2, 156:23
**leave** [6] - 5:20, 22:5, 23:25, 59:6, 102:24, 157:10
**leaves** [1] - 14:16
**ledgers** [4] - 32:3, 32:5, 62:10, 65:13
**left** [19] - 15:7, 16:4, 24:1, 40:23, 45:6, 47:7, 59:11, 78:11, 89:15, 92:14, 99:23, 112:2, 147:22, 148:12, 148:18, 148:19, 149:2
**left-hand** [3] - 40:23, 89:15, 112:2
**legal** [1] - 21:11
**letters** [3] - 68:6, 74:17, 74:22
**level** [1] - 143:23
**light** [3] - 19:20, 95:21, 95:22
**likewise** [3] - 18:19, 22:5, 157:17
**limine** [3] - 5:8, 6:1, 7:11
**limited** [3] - 17:1, 17:4, 17:5
**LIMS** [3] - 89:23, 89:24, 90:20
**line** [3] - 15:9, 44:5, 99:24
**lines** [2] - 74:11, 111:25
**link** [1] - 8:22
**liquid** [23] - 25:11, 28:7, 92:23, 93:15, 111:2, 122:18, 122:22, 123:1, 124:24, 125:5, 125:16, 126:3, 126:23, 127:7, 127:21, 128:7, 128:15, 128:25, 129:13, 129:14, 131:1, 131:2
**liquids** [3] - 111:1, 139:1, 140:7
**list** [6] - 44:17, 73:1, 101:6, 108:11, 108:12, 133:3
**listen** [6] - 20:4, 21:13, 29:17, 32:20, 157:22
**listening** [1] - 22:18
**live** [2] - 9:18, 155:1
**lived** [1] - 29:21
**lives** [1] - 30:8
**living** [3] - 34:12, 67:23, 86:19
**load** [1] - 69:7
**loads** [1] - 80:12
**lobby** [2] - 156:3, 156:6
**local** [2] - 31:18, 157:23
**located** [3] - 56:17, 58:14, 84:4
**location** [2] - 21:19, 21:20
**locations** [1] - 157:19
**locked** [2] - 78:12, 142:3
**locks** [1] - 8:23
**log** [7] - 72:16, 72:21, 72:23, 83:5, 84:3, 108:13
**logbook** [10] - 71:17, 72:13, 72:14, 72:16, 73:10, 73:14, 73:15, 73:25, 83:21
**logged** [4] - 71:16, 73:16, 73:21, 83:9
**logos** [1] - 9:12
**logs** [2] - 69:1, 69:2
**loitering** [1] - 21:25
**look** [49] - 10:12, 10:22, 17:14, 27:2, 29:6, 30:18, 32:1, 32:3, 36:15, 38:13, 42:24, 45:7, 51:11, 53:7, 61:15, 63:20, 66:11, 68:11, 68:14, 68:25, 70:4, 70:10, 72:21, 72:24, 73:15, 79:6, 80:13, 87:22, 108:5, 112:24, 120:18, 124:14, 125:14, 126:1, 127:16, 128:12, 128:22, 129:11, 130:12, 131:12, 131:24, 132:10, 132:23, 133:17, 150:1, 152:5, 157:18, 157:19
**looked** [5] - 30:19, 43:22, 49:1, 51:9, 122:5
**looking** [22] - 40:21,

40:22, 53:4, 67:15, 74:11, 80:19, 81:12, 81:13, 88:1, 91:3, 96:7, 101:5, 111:24, 113:13, 117:2, 117:9, 124:15, 126:5, 129:23, 136:20, 138:17
**looks** [6] - 41:25, 72:12, 77:4, 83:8, 110:21, 152:9
**lose** [2] - 108:2, 143:10
**Louisiana** [1] - 87:13
**lousy** [1] - 83:20
**lunch** [1] - 5:13

## M

**machine** [8] - 80:9, 80:16, 80:20, 80:25, 81:3, 81:6, 109:1, 137:16
**mail** [24] - 36:14, 36:19, 37:8, 37:10, 45:25, 67:25, 68:4, 68:5, 68:14, 69:10, 81:24, 145:21, 145:23, 145:25, 146:2, 146:3, 146:25, 147:3, 147:7, 150:11, 154:20, 154:25
**Mail** [1] - 26:25
**mailbox** [3] - 147:23, 147:24, 149:3
**maintain** [1] - 111:18
**maintaining** [2] - 37:10, 105:10
**major** [2] - 105:22, 136:25
**management** [1] - 99:13
**Management** [1] - 89:24
**manner** [1] - 19:11
**manufactured** [1] - 124:7
**Marcel** [3] - 145:3, 145:12
**MARCEL** [2] - 145:8, 145:13
**March** [8] - 6:3, 13:15, 88:20, 99:5, 99:7, 101:19, 102:15, 102:20
**mark** [2] - 111:22, 121:4
**marked** [45] - 39:5, 43:10, 43:13, 44:13, 46:3, 46:5, 48:17, 53:11, 53:13, 75:9, 76:17, 96:8, 102:19, 103:24, 107:18, 118:11, 119:17, 120:16, 121:1, 121:10, 122:6, 122:13, 123:3, 124:17, 125:3, 125:18, 127:1, 127:22, 128:10, 128:20, 129:9, 129:20, 130:9, 130:13, 130:22, 131:10, 131:17, 132:3, 133:15, 134:19, 136:2, 137:25, 148:6, 152:2
**markings** [2] - 49:1, 49:2
**mass** [8] - 94:3, 95:3, 95:6, 97:13, 111:7, 137:15, 137:17, 140:4
**match** [7] - 39:15, 41:9, 46:12, 75:25, 77:5, 102:6, 124:12
**matches** [1] - 32:12
**material** [17] - 86:25, 89:18, 91:25, 92:21, 92:23, 93:1, 93:3, 93:4, 93:6, 93:14, 93:24, 94:2, 94:8, 95:15, 95:16, 141:2
**materials** [9] - 21:16, 33:25, 92:24, 137:22, 137:23, 141:24, 142:7, 142:21, 143:14
**matter** [4] - 5:3, 17:23, 21:9, 97:14
**Matthew** [2] - 26:24, 67:10
**MATTHEW** [2] - 67:6, 67:10
**meal** [2] - 4:7
**mean** [24] - 38:9, 45:23, 51:17, 64:1, 64:2, 68:15, 70:3, 70:16, 72:18, 74:20, 75:4, 89:16, 91:12, 93:12, 93:20, 97:7, 97:10, 102:5, 112:5, 112:6, 112:21, 115:6, 115:10
**meaning** [2] - 101:10, 103:3
**means** [5] - 18:24, 20:22, 71:14, 94:16, 99:25
**meant** [1] - 126:12
**meantime** [1] - 4:24
**measurement** [1] - 97:11
**mechanics** [1] - 43:9
**mechanism** [1] - 80:20
**media** [3] - 20:24, 21:3, 21:13
**members** [1] - 21:2
**memory** [5] - 19:9, 24:3, 109:11, 151:25
**mention** [1] - 7:9
**mentioned** [7] - 21:19, 21:20, 21:21, 32:22, 37:1, 45:20, 157:20
**merits** [1] - 20:20
**mesh** [1] - 94:10
**mess** [1] - 135:14
**messages** [1] - 8:21
**messaging** [1] - 20:23
**met** [3] - 5:25, 56:25, 142:14
**Metcalf** [10] - 4:9, 5:17, 11:14, 15:8, 22:4, 39:1, 43:8, 48:14, 104:13, 152:4
**methamphetamine** [1] - 31:24
**methandienone** [15] - 27:10, 47:21, 48:22, 49:17, 88:22, 96:12, 96:14, 96:19, 96:20, 97:25, 129:15, 129:16, 133:9, 133:10, 135:24
**methasterone** [5] - 124:20, 124:21, 125:9, 125:21, 130:21
**method** [1] - 111:21
**methodology** [1] - 92:13
**metrology** [1] - 97:17
**mic** [1] - 44:8
**microphone** [1] - 34:18
**microphones** [1] - 33:18
**mics** [1] - 33:20
**middle** [2] - 74:22, 98:25
**midmorning** [1] - 42:16
**might** [14] - 8:1, 11:22, 18:21, 29:13, 33:4, 49:23, 54:19, 66:9, 80:22, 97:13, 155:1, 155:4, 157:14, 157:23
**miles** [2] - 47:2, 157:3
**Miller** [1] - 147:2
**Millward** [1] - 154:23
**mind** [5] - 5:4, 20:8, 22:22, 104:9, 113:6
**minus** [1] - 97:9
**minute** [1] - 114:25
**minutes** [5] - 4:8, 11:17, 66:22, 85:21, 158:2
**mislead** [1] - 15:19
**missed** [1] - 94:11
**mistake** [2] - 6:6, 6:18
**mistrial** [1] - 23:14
**mixed** [1] - 139:1
**mixing** [1] - 28:16
**mixtures** [1] - 144:11
**molecular** [1] - 95:15
**moment** [4] - 17:11, 17:16, 91:18, 117:14
**money** [3] - 32:13, 62:16, 65:14
**monitor** [3] - 40:9, 53:7, 76:20
**month** [1] - 87:14
**months** [9] - 7:23, 7:24, 9:1, 9:5, 9:14, 10:25, 11:3, 60:14, 60:19
**morning** [10] - 17:14, 38:7, 55:18, 147:23, 149:2, 150:13, 150:17, 156:21, 158:2, 158:14
**mortar** [1] - 94:9
**most** [1] - 29:10
**mostly** [1] - 19:21
**motion** [2] - 6:1, 7:11
**motions** [2] - 4:13, 5:8
**move** [17] - 29:4, 39:22, 44:25, 46:18, 50:3, 52:17, 53:23, 74:3, 76:7, 78:1, 81:20, 82:3, 88:24, 110:2, 121:5, 147:13, 155:2
**moving** [3] - 36:12, 121:8, 141:16
**MR** [220] - 5:9, 5:12, 8:15, 9:7, 10:8, 24:19, 30:7, 33:13, 33:25, 34:7, 34:10, 34:25, 38:23, 38:25, 39:3, 39:4, 39:22, 39:24, 40:5, 40:14, 41:15, 41:17, 43:7, 43:9, 43:11, 43:12, 44:12, 44:25, 45:2, 45:13, 45:14, 46:18, 46:21, 46:25, 48:12, 48:15, 48:16, 49:18, 50:3, 50:5, 50:9, 50:10, 52:17, 52:20, 52:24, 53:4, 53:9, 53:10, 53:23, 54:1, 54:6, 54:11, 54:20, 54:22, 54:24, 55:7, 55:13, 55:15, 58:18, 58:20, 63:18, 63:20, 63:21, 63:22, 63:24, 64:4, 64:11, 64:13, 64:15, 64:17, 64:21, 64:25, 65:6, 65:9, 65:11, 65:22, 66:5, 66:8, 66:12, 66:17, 66:23, 67:2, 67:12, 67:18, 67:21, 70:20, 72:5, 72:8, 72:10, 72:11, 74:3, 74:6, 74:10, 75:6, 75:9, 76:7, 76:10, 76:14, 76:21, 76:22, 78:1, 78:4, 78:7, 78:9, 78:10, 80:2, 80:4, 80:6, 84:17, 84:23, 85:7, 85:9, 85:13, 86:2, 86:5, 86:17, 87:25, 88:1, 88:24, 89:2, 89:5, 89:7, 90:3, 90:11, 91:7, 91:21, 98:18, 98:21, 98:23, 100:19, 100:22, 102:10, 102:13, 103:5, 103:8, 103:16, 103:19, 104:3, 104:7, 104:9, 104:15, 104:17, 104:22, 104:24, 107:6, 107:13, 107:18, 108:15, 108:18, 108:22, 108:25, 109:3, 109:7, 109:9, 109:10, 110:2, 110:4, 110:9, 110:11, 110:15, 110:16, 114:14, 114:18, 114:20, 115:1, 115:3, 115:6, 115:8, 115:10, 115:12, 115:21, 116:3, 116:6, 116:12, 117:17, 117:19, 121:4, 121:9, 121:10, 121:13, 121:17, 121:24, 122:3, 122:5, 126:18, 126:21, 133:4, 133:16, 133:18, 133:23, 134:2, 134:8, 134:13, 134:17, 134:23,

135:2, 135:10, 135:13, 135:16, 136:5, 136:8, 136:10, 136:15, 136:17, 143:17, 143:19, 143:21, 144:14, 144:16, 144:23, 145:2, 145:16, 152:5, 152:24, 153:2, 156:9, 156:11, 156:16, 158:11, 158:12
**MS** [4] - 94:3, 111:7, 139:12, 140:22
**mufflers** [1] - 95:10
**multiple** [2] - 92:3, 134:4
**must** [18] - 12:10, 12:11, 13:11, 13:13, 13:21, 14:5, 16:18, 17:5, 18:17, 18:18, 18:20, 18:24, 20:8, 20:13, 20:15, 21:8, 23:4, 141:8
**mute** [2] - 75:6, 107:4
**mylar** [2] - 44:17, 45:18

## N

**name** [26] - 25:14, 34:4, 34:5, 34:13, 40:17, 40:18, 40:25, 67:8, 67:23, 79:22, 86:11, 88:10, 92:3, 104:18, 104:19, 107:25, 109:15, 117:10, 142:13, 145:10, 148:15, 149:9, 151:8
**named** [1] - 25:9
**names** [3] - 9:11, 147:1, 154:24
**nandrolone** [3] - 120:13, 120:14, 127:11
**narrative** [2] - 77:17, 78:20
**nature** [1] - 11:23
**near** [1] - 113:5
**necessarily** [1] - 19:25
**necessary** [1] - 140:19
**need** [15] - 4:13, 7:8, 7:9, 26:1, 45:9, 64:18, 75:12, 102:14, 104:1, 114:21, 115:4, 116:10, 156:22, 158:7
**needed** [2] - 87:1, 123:25
**needles** [1] - 28:8
**needlessly** [1] - 7:6
**negative** [1] - 98:13
**negatives** [1] - 98:10
**net** [9] - 93:3, 93:6, 93:12, 93:14, 93:16, 93:22, 93:25, 97:5, 97:8
**Net** [1] - 93:10
**never** [1] - 13:6
**new** [7] - 90:6, 92:25, 93:1, 93:19, 93:23, 93:24, 141:16
**Newbold** [80] - 6:24, 7:10, 7:22, 9:9, 11:4, 12:18, 13:1, 13:2, 13:5, 13:12, 13:18, 13:20, 14:3, 24:12, 24:20, 25:8, 25:17, 25:18, 25:19, 26:2, 26:3, 26:6, 26:10, 27:13, 27:18, 28:14, 28:19, 28:20, 28:24, 29:20, 29:22, 30:8, 30:24, 31:6, 32:10, 33:8, 33:9, 35:18, 38:2, 38:16, 38:20, 42:1, 42:11, 50:24, 56:2, 56:21, 57:19, 57:22, 58:16, 60:3, 61:22, 63:4, 64:4, 64:9, 65:15, 79:20, 109:23, 146:9, 146:24, 147:3, 147:20, 148:20, 149:12, 149:13, 150:15, 150:18, 151:12, 151:17, 151:20, 153:7, 153:14, 153:24, 154:9, 154:19, 154:20, 155:5, 155:7, 155:12, 156:2
**Newbold's** [12] - 6:2, 8:21, 28:13, 28:14, 29:21, 31:19, 39:20, 51:4, 55:18, 147:23, 149:3, 155:17
**news** [3] - 21:13, 157:21, 157:23
**next** [19] - 4:8, 24:6, 50:18, 70:9, 73:10, 73:14, 73:25, 81:17, 86:1, 93:8, 103:18, 126:15, 128:3, 144:24, 145:1, 147:8, 147:9, 150:12
**night** [2] - 157:5, 157:6
**nine** [1] - 74:22
**none** [2] - 19:4, 54:1
**nonpresence** [1] - 86:25
**normal** [2] - 68:16, 69:10
**normally** [1] - 40:7
**Nos** [2] - 121:19, 121:21
**note** [13] - 11:11, 11:22, 23:24, 85:24, 110:19, 110:20, 110:23, 116:24, 116:25, 121:2, 121:10, 136:3, 142:20
**note-taking** [1] - 23:24
**noted** [1] - 17:18
**notes** [8] - 5:23, 23:21, 23:22, 23:25, 24:1, 24:2, 24:3, 24:4
**nothing** [12] - 55:9, 66:5, 80:2, 81:24, 85:7, 94:11, 98:19, 103:6, 103:8, 136:5, 138:8, 152:24
**notice** [6] - 27:19, 31:1, 57:22, 147:21, 147:24, 148:12
**notification** [1] - 36:2
**notifications** [1] - 148:2
**notified** [6] - 123:24, 147:25, 150:20, 154:4, 155:5
**notify** [5] - 21:5, 23:16, 147:20, 151:3, 151:4
**notifying** [1] - 149:3
**November** [1] - 73:4
**number** [51] - 19:25, 27:5, 39:13, 41:5, 41:7, 41:9, 43:2, 46:11, 46:12, 56:5, 56:12, 61:24, 73:3, 74:11, 74:18, 74:21, 77:14, 77:15, 77:16, 77:19, 77:21, 78:5, 89:19, 89:22, 89:23, 90:5, 90:7, 90:10, 91:3, 91:19, 97:18, 100:24, 100:25, 101:2, 101:21, 101:22, 101:25, 102:3, 109:17, 109:18, 111:23, 112:2, 112:7, 112:12, 112:13, 112:15, 113:14, 113:20, 132:22, 152:18, 152:19
**numbered** [1] - 75:20
**numbers** [12] - 43:21, 44:2, 72:22, 75:25, 77:5, 77:14, 95:14, 101:8, 101:23, 102:5, 102:6, 135:11

## O

**oath** [2] - 67:5, 145:7
**object** [1] - 18:12
**objection** [27] - 18:13, 18:14, 18:17, 18:20, 39:23, 45:1, 46:20, 50:4, 52:19, 53:25, 58:18, 63:18, 63:21, 64:3, 64:11, 64:17, 64:23, 65:25, 74:5, 76:9, 78:3, 89:1, 110:3, 110:11, 130:11, 134:25, 136:9
**objections** [1] - 16:21
**obligation** [1] - 20:6
**observations** [1] - 23:8
**observed** [3] - 17:17, 17:24, 17:25
**obtained** [1] - 60:22
**obviously** [3] - 4:20, 66:18, 152:10
**occasion** [1] - 30:10
**occupied** [1] - 154:19
**occur** [1] - 11:25
**October** [28] - 4:2, 10:12, 13:16, 26:23, 27:21, 31:2, 31:3, 35:23, 37:24, 41:4, 51:7, 68:18, 68:20, 68:24, 72:13, 83:2, 83:6, 99:3, 99:7, 101:15, 101:16, 101:17, 141:3, 146:12, 146:16, 147:21, 150:17
**offense** [1] - 6:10
**offer** [3] - 24:13, 134:18
**offered** [1] - 11:23
**offering** [5] - 7:25, 44:24, 134:14, 134:15, 136:7
**offers** [1] - 18:9
**office** [44] - 24:21, 27:20, 27:21, 27:23, 30:25, 31:3, 31:5, 38:10, 38:17, 42:8, 42:9, 42:10, 42:17, 42:18, 50:13, 55:16, 56:3, 56:6, 56:19, 56:21, 56:22, 57:9, 57:15, 59:6, 63:2, 76:4, 87:3, 87:5, 146:4, 146:23, 148:1, 149:4, 150:15, 150:22, 151:17, 151:19, 153:7, 153:15, 154:3, 154:24, 155:10, 155:20, 155:24
**Office** [1] - 36:4
**officer** [2] - 71:20, 142:12
**Officer** [11] - 26:23, 66:24, 67:1, 67:3, 67:14, 67:22, 70:7, 72:2, 75:12, 86:7, 103:9
**officers** [4] - 7:2, 29:12, 29:19, 56:6
**offices** [1] - 51:16
**oftentimes** [1] - 32:6
**Ogden** [1] - 105:20
**oils** [2] - 139:1, 139:2
**oily** [13] - 122:17, 122:22, 123:1, 124:24, 125:5, 125:16, 126:3, 126:22, 127:6, 127:21, 128:6, 128:14, 128:24
**old** [4] - 6:19, 9:25, 108:12, 143:15
**on-the-job** [1] - 105:25
**once** [13] - 30:22, 31:19, 59:4, 77:1, 78:17, 78:20, 81:5, 94:6, 95:6, 100:7, 111:12, 153:21, 154:4
**one** [89] - 4:15, 8:16, 8:22, 10:17, 12:18, 12:19, 12:20, 16:24, 17:10, 17:14, 17:25, 22:16, 24:1, 27:3, 30:13, 32:16, 35:22, 38:6, 39:16, 40:14, 44:2, 44:3, 49:7, 49:24, 51:15, 57:4, 59:23, 60:6, 60:7, 66:4, 66:19, 69:7, 73:2, 75:3, 75:4, 75:20, 75:21, 78:17, 78:19, 79:12, 80:18, 83:14, 83:19, 84:20, 94:2, 94:3, 94:10,

95:3, 95:4, 95:19, 96:8, 96:15, 96:17, 100:23, 102:1, 107:14, 110:5, 110:6, 111:5, 123:18, 124:25, 125:5, 125:16, 126:3, 126:9, 126:14, 126:23, 127:7, 127:12, 127:15, 127:25, 128:15, 129:1, 132:19, 137:16, 137:17, 138:7, 138:23, 139:7, 140:5, 140:10, 140:11, 140:21, 148:12, 155:6, 155:12

**ones** [5] - 28:10, 134:22, 143:1, 144:10

**open** [11] - 20:8, 22:22, 31:15, 69:9, 92:20, 102:18, 106:10, 110:20, 115:1, 115:18, 154:13

**opened** [12] - 48:25, 70:25, 71:1, 81:23, 81:25, 83:25, 92:3, 93:21, 112:18, 115:5, 154:12, 154:16

**opening** [6] - 24:7, 24:10, 24:18, 65:24, 115:9

**operating** [1] - 108:12

**opinions** [3] - 5:1, 12:12, 20:12

**opportunity** [4] - 19:7, 23:12, 61:19, 104:9

**opposed** [3] - 93:12, 96:15, 101:12

**option** [1] - 46:23

**orange** [2] - 38:14

**order** [11] - 13:9, 13:12, 13:20, 14:3, 18:22, 25:24, 34:8, 43:1, 105:12, 139:6, 139:7

**ordered** [3] - 21:9, 31:9, 61:23

**orders** [3] - 62:16, 65:14, 155:3

**origin** [2] - 47:8, 47:10

**original** [4] - 36:16, 36:18, 135:12, 135:13

**originally** [1] - 97:3

**originated** [1] - 74:25

**origins** [1] - 83:18

**otherwise** [1] - 33:7

**ought** [1] - 115:17

**outcome** [1] - 19:13

**outer** [4] - 59:13, 113:22, 113:24

**outline** [1] - 24:8

**outside** [9] - 13:24, 22:11, 23:15, 56:15, 59:14, 86:6, 116:1, 150:3, 157:17

**outweighs** [1] - 6:22

**overcast** [1] - 17:20

**overhead** [2] - 40:15, 89:7

**overly** [1] - 24:4

**overrule** [2] - 18:13, 65:25

**overruled** [1] - 64:23

**overview** [1] - 94:15

**own** [7] - 21:18, 24:2, 26:20, 93:19, 94:4, 107:6, 124:9

**owned** [1] - 8:6

**oxandrolone** [7] - 114:2, 114:3, 118:20, 118:23, 119:11, 128:17, 128:18

**oxymetholone** [14] - 27:10, 47:20, 49:24, 88:23, 90:16, 92:11, 93:9, 94:5, 94:12, 96:1, 96:5, 97:25, 118:22, 118:23

## P

**p.m** [5] - 11:9, 85:22, 158:15

**P193654** [1] - 113:2

**P2017-2578** [1] - 109:17

**package** [128] - 24:21, 24:23, 25:6, 25:10, 27:3, 27:4, 27:7, 27:13, 27:16, 27:19, 27:20, 27:22, 28:3, 29:20, 30:16, 30:19, 31:1, 31:4, 31:7, 31:8, 31:12, 31:13, 32:18, 33:6, 35:25, 36:2, 36:7, 36:10, 36:13, 36:15, 36:19, 36:21, 36:22, 37:1, 37:10, 38:1, 38:4, 38:11, 38:17, 41:10, 42:23, 42:24, 42:25, 43:2, 43:4, 43:18, 44:19, 45:14, 45:20, 46:12, 46:16, 47:16, 48:5, 48:23, 49:22, 50:10, 50:12, 50:17, 50:20, 51:4, 52:12, 52:15, 53:17, 53:21, 56:13, 57:17, 58:5, 58:8, 58:22, 59:1, 61:23, 62:1, 62:17, 62:21, 63:9, 63:11, 63:16, 69:25, 70:6, 70:22, 71:7, 71:15, 74:25, 75:23, 76:5, 76:6, 76:15, 77:11, 77:21, 77:24, 78:11, 78:16, 78:23, 79:3, 79:4, 79:14, 79:23, 80:19, 81:24, 82:3, 83:15, 83:25, 84:1, 84:24, 91:15, 91:16, 92:16, 92:21, 147:20, 149:23, 149:24, 150:3, 150:5, 150:10, 151:22, 152:5, 152:20, 153:12, 153:19, 154:5, 154:12, 154:15, 155:6, 155:7, 155:13

**packaged** [1] - 71:5

**packages** [19] - 27:1, 30:18, 68:6, 68:13, 69:8, 69:13, 69:19, 69:22, 69:25, 70:4, 79:6, 80:12, 80:16, 81:11, 82:11, 82:13, 83:9, 83:18, 83:23

**packaging** [14] - 90:24, 91:1, 91:2, 91:13, 91:25, 92:5, 92:20, 93:21, 97:3, 110:20, 110:21, 111:2, 111:15

**packing** [10] - 44:6, 44:9, 44:17, 45:21, 45:22, 45:23, 46:8, 46:15, 46:25, 47:3

**page** [16] - 7:12, 73:24, 77:17, 91:7, 96:9, 99:23, 108:3, 109:3, 111:25, 112:1, 113:1, 117:2, 129:22, 132:21, 135:11

**pages** [2] - 108:8, 135:11

**paid** [4] - 31:10, 32:4, 32:10, 61:25

**paper** [12] - 112:2, 113:15, 113:16, 113:25, 114:11, 130:5, 130:17, 130:25, 131:14, 132:1, 132:12, 135:23

**papers** [1] - 71:24

**paragraph** [1] - 15:17

**paraphernalia** [2] - 24:25, 28:12

**parcel** [18] - 38:2, 39:13, 146:13, 146:18, 147:25, 149:3, 149:8, 150:15, 150:18, 150:23, 151:1, 151:10, 151:12, 152:9, 152:15, 154:8, 154:9

**parcels** [1] - 37:8

**pardon** [1] - 84:6

**parking** [2] - 21:25, 156:5

**part** [23] - 19:3, 30:11, 36:17, 37:13, 41:14, 41:15, 60:13, 63:9, 70:14, 72:12, 72:25, 79:17, 89:7, 95:1, 98:25, 105:10, 106:21, 139:23, 148:6, 148:22, 149:20

**partial** [1] - 15:10

**particular** [6] - 13:8, 71:7, 71:15, 77:6, 78:19, 83:16

**parties** [6] - 16:17, 16:24, 19:16, 21:24, 22:10, 23:10

**parts** [3] - 36:12, 89:13, 139:17

**party** [4] - 22:7, 23:11, 24:9

**pass** [1] - 133:23

**passage** [1] - 8:3

**passed** [2] - 70:23, 94:9

**past** [1] - 8:23

**Patrol** [2] - 26:23, 66:24

**pay** [4] - 23:19, 31:11, 62:17, 62:21

**paying** [1] - 22:15

**payments** [1] - 32:13

**pen** [1] - 91:4

**pending** [2] - 4:13, 5:8

**people** [13] - 21:3, 25:23, 26:2, 29:7, 29:20, 29:23, 30:14, 30:17, 31:1, 31:3, 56:10, 154:20, 155:2

**per** [1] - 79:6

**percent** [3] - 61:21, 155:4, 155:8

**perform** [1] - 106:10

**performed** [2] - 109:14, 118:20

**perhaps** [3] - 17:20, 17:21, 54:19

**period** [3] - 60:14, 60:18, 141:8

**permission** [1] - 134:9

**permitted** [2] - 7:12, 18:11

**person** [13] - 14:9, 20:21, 26:12, 28:5, 30:1, 32:8, 60:8, 66:4, 66:9, 99:12, 100:7, 142:14, 146:24

**person's** [1] - 29:18

**personal** [1] - 12:11

**personally** [3] - 17:8, 79:25, 142:15

**personnel** [1] - 56:10

**persons** [1] - 13:16

**pestle** [1] - 94:9

**Ph.D** [1] - 87:12

**Pharmacy** [1] - 28:24

**phase** [2] - 24:6, 94:25

**phone** [18] - 8:21, 20:22, 25:3, 25:8, 28:18, 28:19, 51:12, 51:15, 51:19, 60:4, 60:9, 60:15, 60:16, 60:18, 61:4, 61:15, 65:16, 66:2

**photo** [2] - 52:7, 108:16

**photograph** [4] - 56:25, 57:1, 80:21, 81:2

**photographs** [5] - 26:15, 53:13, 53:15, 53:16, 80:17

**photos** [1] - 53:2

**physical** [15] - 26:13, 48:12, 65:3, 65:5, 113:3, 122:5, 124:14, 125:3, 126:5, 127:4, 127:8, 127:19, 127:22, 129:20, 146:3

**physically** [3] - 128:20, 131:10, 131:17

**pick** [19] - 27:19, 38:11, 42:11, 42:12, 42:15, 59:18, 63:11, 90:20, 92:14, 92:16, 113:7, 113:10, 114:7, 125:1, 127:4, 148:1, 149:16, 150:18, 150:23

**picked** [12] - 4:18, 4:20, 4:22, 24:21,

24:23, 25:2, 27:13, 50:13, 51:5, 63:11, 70:23, 150:15
**picking** [1] - 113:9
**pickup** [1] - 149:4
**picture** [1] - 54:23
**pictures** [2] - 53:11, 53:13
**pieces** [3] - 10:3, 95:9, 95:12
**pill** [1] - 28:11
**pills** [1] - 110:22
**Pine** [13] - 27:6, 28:2, 38:18, 39:10, 39:12, 40:20, 42:3, 43:19, 47:15, 147:5, 149:14, 150:8, 154:18
**place** [16] - 13:24, 22:3, 26:16, 28:16, 35:15, 37:21, 37:23, 40:17, 51:6, 67:4, 81:7, 81:18, 107:25, 145:6, 149:7, 151:12
**placed** [6] - 36:10, 49:2, 50:14, 147:24, 155:6, 155:17
**places** [1] - 92:3
**Plaintiff's** [31] - 46:3, 52:3, 52:4, 52:6, 52:17, 52:25, 72:3, 72:11, 87:22, 88:1, 88:3, 88:5, 88:24, 89:8, 96:8, 97:21, 107:19, 107:21, 108:6, 108:8, 109:12, 110:2, 116:25, 118:11, 121:5, 125:3, 148:6, 148:9, 148:22, 149:18, 149:21
**plan** [3] - 5:13, 50:16, 147:9
**planned** [1] - 147:19
**plants** [1] - 110:23
**plastic** [4] - 46:8, 47:23, 47:24, 71:8
**plastics** [1] - 71:6
**plays** [1] - 11:5
**Pleasanton** [1] - 87:4
**pled** [1] - 13:2
**plus** [3] - 91:25, 97:8, 137:1
**Pocatello** [17] - 27:6, 27:25, 30:8, 31:5, 37:19, 42:10, 42:21, 43:19, 47:15, 55:17, 60:10, 63:2, 63:7, 105:14, 146:23, 147:5, 150:8
**point** [12] - 11:1, 15:9, 53:8, 70:4, 81:20, 102:17, 116:10, 133:2, 133:15, 151:11, 151:20, 158:9
**pointed** [1] - 32:21
**pointing** [3] - 89:14, 91:7, 112:5
**points** [1] - 17:12
**police** [2] - 60:18, 137:6
**Police** [9] - 28:1, 36:11, 37:19, 50:15, 60:10, 63:2, 63:7, 103:20, 105:2
**policies** [1] - 106:3
**Port** [1] - 67:24
**portion** [4] - 83:5, 83:22, 90:8, 157:24
**portions** [1] - 94:1
**positive** [4] - 36:1, 78:25, 144:7, 144:8
**possess** [2] - 6:14, 33:5
**possessed** [5] - 14:7, 14:8, 25:22, 26:10, 29:25
**possession** [6] - 6:8, 12:20, 14:3, 32:2, 90:22, 151:1
**possible** [6] - 8:12, 14:18, 113:9, 144:25, 146:2, 155:2
**possibly** [3] - 70:2, 70:3, 132:16
**post** [39] - 24:20, 27:20, 27:21, 27:23, 30:25, 31:3, 31:4, 31:5, 38:10, 38:17, 42:8, 42:10, 42:17, 42:18, 50:13, 55:16, 56:2, 56:6, 56:19, 56:21, 56:22, 57:9, 57:15, 59:6, 146:4, 146:23, 147:25, 149:4, 150:15, 150:22, 151:17, 151:19, 153:7, 153:14, 154:2, 154:24, 155:10, 155:20, 155:24
**Post** [1] - 136:3
**Post-it** [1] - 136:3
**postage** [1] - 57:22
**postal** [14] - 36:18, 38:5, 38:8, 38:13, 38:21, 42:10, 57:10, 69:7, 145:19, 145:20, 146:4, 148:15, 150:20, 150:23
**Postal** [4] - 37:14, 37:16, 37:19, 145:3
**posted** [1] - 55:18
**potency** [1] - 143:10
**potential** [1] - 30:13
**pouches** [1] - 71:8
**pounds** [3] - 25:7, 27:8
**powder** [30] - 27:8, 71:3, 82:1, 84:14, 92:23, 92:24, 93:15, 96:22, 96:23, 112:20, 113:17, 115:11, 118:10, 118:15, 119:15, 120:3, 120:12, 120:21, 130:6, 130:17, 130:18, 130:20, 131:14, 132:2, 132:13, 132:14, 133:9, 135:23, 139:10
**powdered** [3] - 25:11, 28:3, 28:6
**powders** [3] - 110:22, 139:4, 145:24
**power** [1] - 108:3
**practical** [1] - 61:3
**preceding** [2] - 17:24, 18:1
**precipitation** [1] - 17:15
**precisely** [2] - 68:25, 105:13
**preclude** [1] - 9:3
**prefer** [1] - 157:1
**prejudice** [2] - 7:4, 19:15
**prejudices** [1] - 12:12
**prejudicial** [2] - 6:22, 10:14
**preliminary** [6] - 4:23, 5:22, 11:19, 11:22, 14:11, 14:14
**prepared** [4] - 36:11, 106:13, 139:5, 141:17
**prescription** [1] - 28:14
**presence** [4] - 4:19, 4:20, 86:25, 110:18
**present** [17] - 4:4, 8:2, 11:10, 11:12, 13:6, 24:11, 48:13, 64:19, 67:13, 70:7, 70:20, 85:23, 85:25, 105:8, 112:23, 135:15, 151:4
**presented** [6] - 9:21, 24:14, 38:5, 39:9, 39:12
**presenter** [3] - 40:4, 45:11, 67:16
**press** [1] - 21:3
**presumed** [1] - 13:3
**presumption** [1] - 16:7
**presumptive** [1] - 36:1
**pretty** [2] - 9:23, 69:23
**previous** [1] - 17:20
**Previously** [1] - 116:23
**previously** [1] - 49:19
**primary** [2] - 146:24, 147:3
**principle** [1] - 10:1
**print** [1] - 149:12
**printed** [3] - 77:9, 149:9, 149:13
**probation** [3] - 6:24, 7:2, 7:10
**probative** [2] - 6:21, 7:5
**problem** [1] - 8:20
**problematic** [1] - 157:15
**problems** [1] - 7:14
**procedure** [2] - 70:14, 78:24
**procedures** [3] - 106:4, 143:25, 144:2
**proceed** [9] - 11:12, 11:24, 22:2, 22:6, 45:12, 115:9, 122:4, 158:1, 158:6
**proceedings** [1] - 23:13
**process** [12] - 4:21, 12:7, 23:5, 23:15, 37:13, 49:16, 80:8, 96:13, 102:23, 110:17, 154:6, 154:9
**processed** [2] - 49:16, 50:1
**product** [1] - 32:4
**products** [5] - 65:16, 70:23, 70:25, 71:4, 71:5
**program** [2] - 30:11, 106:3
**prohibited** [1] - 14:2
**projector** [6] - 40:8, 53:2, 53:6, 54:10, 67:17, 76:19
**promptly** [1] - 158:3
**proof** [7] - 14:16, 17:7, 17:10, 32:16, 32:17
**properly** [4] - 21:12, 73:21, 103:3, 130:13
**property** [1] - 35:6
**propionate** [6] - 114:13, 117:21, 117:24, 122:20, 123:7, 132:6
**prosecuting** [1] - 36:5
**Protection** [4] - 35:24, 53:16, 67:24, 68:7
**prove** [19] - 6:18, 10:2, 13:2, 13:6, 13:11, 13:13, 13:21, 14:5, 14:18, 18:4, 25:15, 25:24, 26:1, 26:6, 26:13, 26:14, 26:17, 26:19, 32:2
**proven** [1] - 116:9
**proves** [1] - 13:4
**provided** [2] - 39:9, 147:1
**proving** [2] - 6:5, 13:7
**PS-49** [2] - 147:22, 155:5
**PS3849** [2] - 148:14, 149:19
**publish** [4] - 47:1, 54:8, 89:4, 110:14
**published** [8] - 40:1, 46:22, 50:7, 52:22, 54:3, 74:7, 76:11, 135:7
**publishing** [1] - 44:23
**puddles** [1] - 17:19
**pull** [1] - 69:9
**purchased** [1] - 124:1
**purely** [1] - 14:20
**purported** [2] - 9:10, 98:16
**purpose** [11] - 6:5, 6:14, 13:18, 13:19, 17:1, 17:2, 17:4, 17:5, 26:4, 41:13, 147:15
**push** [1] - 71:13
**pushed** [1] - 71:16
**put** [33] - 5:3, 9:4, 28:9, 29:8, 31:1, 31:4, 36:18, 40:4, 40:14, 48:10, 49:25, 54:18, 62:23, 69:10, 71:17, 72:16, 75:16, 75:23, 79:13, 81:15, 84:3, 88:12, 91:14, 92:24, 93:1, 93:23, 95:13, 95:17, 107:3, 111:13, 111:22, 112:15

**putting** [4] - 41:13, 47:2, 47:6, 89:7
**puzzle** [1] - 29:8

**Q**

**qualify** [1] - 105:16
**Quantico** [2] - 87:14, 87:20
**questions** [13] - 16:21, 19:6, 57:7, 65:6, 65:13, 84:17, 84:19, 84:20, 98:2, 100:19, 103:5, 143:17, 156:9
**quick** [5] - 29:4, 75:7, 94:15, 114:16, 115:1
**quicker** [1] - 116:20
**quite** [2] - 29:3, 59:14
**quiz** [1] - 80:8

**R**

**R-O-B-E-R-T-S-O-N** [1] - 34:6
**radio** [1] - 154:1
**rain** [1] - 17:22
**rained** [2] - 17:23, 18:1
**rainfall** [1] - 32:22
**raining** [2] - 17:16, 17:18
**raised** [2] - 16:7, 64:2
**rather** [1] - 14:14
**Raws** [1] - 28:23
**ray** [20] - 26:25, 27:1, 30:19, 68:13, 68:14, 68:22, 69:5, 69:6, 69:8, 69:14, 69:20, 69:24, 70:23, 80:9, 80:13, 80:16, 80:20, 80:22, 81:3, 81:25
**reach** [2] - 32:24, 79:1
**reached** [1] - 36:6
**react** [2] - 64:15, 64:25
**reacted** [1] - 64:14
**reaction** [3] - 64:9, 65:3, 65:5
**read** [5] - 11:15, 21:13, 24:1, 73:2, 155:12
**readable** [1] - 42:1
**reading** [3] - 11:13, 106:3, 106:4
**readouts** [1] - 97:21
**ready** [3] - 11:12, 139:5, 155:13
**real** [5] - 7:13, 8:13, 75:6, 115:1, 115:4
**realize** [2] - 10:24, 114:23
**realized** [1] - 114:15
**realizing** [1] - 40:11
**really** [6] - 11:23, 108:3, 114:21, 142:21, 157:12, 157:15
**reason** [6] - 14:19, 23:3, 60:24, 99:6, 109:8, 156:22
**reasonable** [17] - 13:4, 13:8, 13:14, 13:22, 14:5, 14:16, 14:19, 14:24, 15:4, 15:12, 15:21, 16:1, 19:19, 25:15, 29:9, 32:25, 33:2
**reasons** [3] - 8:7, 8:12, 22:21
**rebagged** [1] - 49:8
**recalled** [2] - 55:12, 85:12
**receipts** [1] - 62:20
**receive** [7] - 21:11, 36:13, 98:7, 106:14, 110:19, 124:5, 124:9
**received** [31] - 12:6, 16:16, 18:9, 18:14, 18:16, 20:14, 35:22, 35:23, 36:2, 36:10, 36:15, 37:1, 39:13, 41:10, 44:19, 47:16, 49:25, 50:10, 50:13, 52:8, 52:12, 87:11, 87:12, 94:6, 98:6, 101:5, 101:17, 106:12, 112:8, 141:5, 154:20
**receives** [1] - 154:25
**receiving** [2] - 146:25, 147:7
**recently** [2] - 7:13, 11:3
**recess** [10] - 4:6, 11:8, 20:5, 85:16, 85:21, 114:25, 144:25, 156:19, 157:8, 158:13
**Recess** [2] - 11:9, 85:22
**recessed** [1] - 158:15
**recesses** [1] - 23:25
**recipient** [2] - 37:12, 147:3
**recipients** [1] - 150:11
**recognize** [40] - 39:6, 39:8, 39:11, 43:4, 43:15, 43:20, 43:21, 46:5, 46:10, 48:7, 48:9, 48:10, 48:19, 48:21, 48:24, 49:4, 49:6, 49:11, 52:4, 70:10, 72:11, 72:22, 75:11, 75:13, 75:22, 76:5, 76:22, 77:10, 79:25, 88:3, 88:9, 89:9, 91:22, 92:2, 107:21, 107:23, 116:16, 142:16, 148:9, 148:24
**recognized** [1] - 56:23
**recommend** [1] - 72:3
**reconvene** [1] - 156:20
**record** [18] - 10:1, 10:5, 11:11, 18:23, 34:5, 67:9, 76:14, 78:6, 85:24, 86:12, 89:25, 104:19, 114:19, 115:15, 122:1, 123:2, 145:11, 149:20
**records** [6] - 32:10, 32:13, 32:14, 79:15, 79:17, 82:20
**RECROSS** [1] - 66:7
**RECROSS-EXAMINATION** [1] - 66:7
**redacted** [3] - 72:12, 73:24, 83:17
**redirect** [4] - 65:8, 100:20, 143:18, 156:10
**REDIRECT** [4] - 65:10, 84:22, 100:21, 143:20
**refer** [3] - 69:11, 70:14, 72:15
**reference** [3] - 21:16, 90:11, 103:25
**referenced** [1] - 117:7
**references** [1] - 149:22
**referral** [1] - 146:17
**referred** [4] - 20:4, 75:15, 119:1, 146:13
**referring** [1] - 42:18
**reflect** [1] - 102:21
**reflected** [12] - 97:25, 100:24, 101:20, 109:22, 116:13, 116:16, 119:6, 122:9, 125:2, 130:16, 135:25, 143:24
**reflection** [1] - 110:24
**reflects** [1] - 102:2
**refresh** [2] - 109:11, 151:25
**regard** [2] - 6:24, 157:16
**regarding** [3] - 35:24, 146:13, 146:17
**regular** [1] - 36:16
**related** [2] - 35:8, 44:4
**relating** [1] - 106:17
**relation** [1] - 85:1
**relationship** [1] - 10:10
**released** [4] - 111:17, 144:21, 156:14, 156:17
**relevant** [1] - 6:17
**rely** [1] - 24:2
**remain** [2] - 13:5, 66:19
**remained** [2] - 50:20, 60:13
**remaining** [1] - 111:15
**remarks** [1] - 77:18
**remember** [3] - 23:7, 23:21, 70:5
**remembering** [1] - 43:21
**remind** [3] - 20:5, 22:13, 157:8
**remote** [4] - 5:3, 6:20, 8:10, 10:14
**removed** [3] - 7:20, 9:23, 49:22
**rent** [1] - 32:12
**reopen** [1] - 134:12
**repeat** [3] - 20:5, 23:7, 85:18
**repercussions** [1] - 98:12
**replied** [1] - 71:21
**report** [53] - 21:9, 42:18, 76:1, 78:4, 88:14, 88:20, 89:12, 89:14, 92:8, 97:25, 98:6, 100:7, 100:8, 100:9, 100:24, 102:2, 108:17, 108:20, 111:13, 111:14, 113:20, 116:14, 116:17, 116:20, 116:24, 117:4, 117:5, 117:6, 117:7, 118:5, 118:19, 119:6, 121:7, 122:9, 125:2, 128:4, 130:16, 132:20, 132:21, 135:20, 135:25, 138:11, 141:17, 141:20, 142:7, 142:8, 143:22, 143:24, 144:8, 157:23, 158:1
**reports** [12] - 88:6, 88:7, 88:9, 88:16, 88:21, 100:5, 106:9, 109:13, 110:5, 116:4, 123:18, 133:19
**represent** [3] - 25:14, 88:16, 92:7
**request** [4] - 37:2, 99:9, 99:12, 99:20
**requested** [2] - 142:18, 146:17
**require** [2] - 11:25, 23:14
**required** [2] - 14:17, 24:10
**requirements** [1] - 8:11
**requires** [6] - 6:10, 6:12, 23:10, 26:6, 32:24, 33:8
**resealed** [3] - 49:1, 84:1, 92:4
**research** [1] - 21:15
**reserve** [1] - 55:12
**reservist** [1] - 35:14
**residence** [3] - 38:5, 51:4, 154:25
**respective** [1] - 93:19
**respond** [2] - 21:8, 87:1
**response** [1] - 90:20
**responsibility** [1] - 79:2
**responsible** [1] - 147:16
**rest** [5] - 5:14, 5:19, 23:8, 28:16, 29:14
**restate** [3] - 15:9, 15:17, 63:24
**restrictions** [2] - 23:10, 23:13
**result** [1] - 23:14
**results** [12] - 71:20, 78:21, 78:22, 109:14, 109:24, 111:8, 111:12, 124:10, 124:11, 138:8, 144:1,

146:22
**retaining** [1] - 147:15
**retention** [1] - 95:22
**retrieve** [1] - 66:25
**retrieves** [1] - 154:5
**retrieving** [1] - 113:6
**return** [4] - 4:22, 21:12, 44:10, 111:16
**returned** [3] - 142:2, 142:4
**review** [2] - 61:19, 97:20
**reviewed** [2] - 53:10, 116:13
**Richert** [10] - 10:7, 30:6, 33:11, 55:11, 66:6, 80:3, 85:8, 115:20, 134:11, 136:14
**RICHERT** [51] - 10:8, 30:7, 39:24, 45:2, 46:21, 50:5, 52:20, 54:1, 55:13, 55:15, 58:20, 63:20, 63:22, 63:24, 64:4, 64:13, 64:15, 64:21, 64:25, 65:6, 65:22, 66:8, 66:12, 74:6, 76:10, 78:4, 80:4, 80:6, 84:17, 85:9, 89:2, 98:21, 98:23, 100:19, 102:13, 103:5, 110:4, 110:9, 110:11, 115:3, 115:8, 115:12, 116:6, 135:2, 136:10, 136:17, 143:17, 144:16, 153:2, 156:9, 158:11
**right-hand** [2] - 40:22, 40:24
**rights** [1] - 35:6
**roadmap** [1] - 11:23
**Robertson** [31] - 27:16, 27:17, 33:14, 33:16, 34:6, 34:11, 35:16, 35:21, 39:4, 40:14, 41:17, 42:4, 42:23, 43:12, 44:7, 46:4, 48:13, 48:17, 51:22, 52:24, 53:10, 54:11, 55:7, 55:9, 55:10, 55:16, 65:12, 101:9, 146:13, 146:15
**ROBERTSON** [1] - 33:23
**Roedel** [1] - 49:16
**role** [2] - 68:3, 68:8
**roll** [1] - 69:8
**room** [8] - 20:23, 22:3, 22:19, 23:23, 24:1, 24:16, 86:5, 158:4
**roughly** [4] - 4:7, 11:7, 69:16, 115:19
**routinely** [2] - 79:17, 80:23
**row** [1] - 148:4
**rubber** [2] - 28:8, 28:11
**rule** [3] - 9:2, 22:21, 23:3
**Rule** [2] - 6:4, 8:11
**rules** [3] - 18:8, 18:11, 22:25
**ruling** [2] - 10:16, 11:5
**run** [3] - 68:13, 139:12, 140:10
**running** [5] - 26:25, 68:22, 69:14, 142:16, 142:25
**rush** [3] - 99:9, 99:12, 99:20

**S**

**safe** [2] - 28:12, 29:22
**sample** [5] - 110:25, 111:15, 138:25, 141:3, 142:6
**samples** [8] - 106:13, 111:5, 111:9, 124:11, 140:13, 140:17, 140:24, 141:23
**San** [6] - 26:24, 35:24, 36:6, 67:25, 68:1
**sandwich** [1] - 113:25
**sat** [1] - 141:8
**satisfy** [1] - 8:11
**saw** [19] - 17:8, 26:17, 29:7, 48:7, 56:22, 56:24, 58:11, 58:22, 79:9, 80:17, 81:3, 81:5, 82:1, 112:18, 149:24, 149:25, 151:16, 155:15, 156:2
**scale** [3] - 53:19, 97:12, 97:14
**scales** [1] - 54:12
**scene** [1] - 26:15
**schedule** [1] - 125:22
**Schedule** [18] - 114:5, 118:2, 118:23, 119:22, 120:5, 120:15, 123:14, 124:22, 125:12, 126:11, 128:2, 128:19, 129:7, 129:16, 131:6, 131:19, 132:7, 133:10
**scheduled** [1] - 105:7
**schedules** [1] - 29:15
**science** [3] - 87:11, 105:21, 105:22
**scientific** [1] - 143:23
**scientifically** [1] - 140:10
**scientist** [2] - 105:2, 106:13
**scope** [1] - 65:22
**Scott** [2] - 103:19, 104:20
**SCOTT** [1] - 104:5
**screen** [10] - 7:12, 7:23, 11:2, 40:8, 53:8, 54:18, 107:16, 108:2, 117:16, 119:8
**Seacats** [1] - 108:17
**seal** [4] - 72:16, 75:15, 82:4, 110:20
**sealed** [21] - 49:15, 82:7, 111:15, 114:16, 114:23, 115:22, 122:17, 122:22, 123:1, 124:24, 125:5, 125:16, 126:3, 126:13, 126:22, 127:6, 127:20, 128:6, 128:14, 128:24, 154:14
**search** [19] - 28:1, 28:2, 28:18, 31:17, 31:18, 50:25, 51:2, 51:3, 51:5, 51:12, 51:14, 60:21, 60:22, 61:4, 62:5, 62:23, 62:24, 63:1, 66:3
**searched** [1] - 31:20
**searches** [1] - 26:16
**searching** [1] - 21:15
**seat** [5] - 33:24, 67:7, 86:10, 104:6, 145:9
**seated** [2] - 4:5, 21:6
**second** [28] - 13:17, 13:25, 14:8, 16:16, 16:20, 19:9, 23:3, 34:8, 38:12, 46:2, 71:23, 71:24, 78:7, 90:8, 96:9, 98:18, 104:3, 105:24, 107:4, 114:15, 133:21, 141:22, 142:6, 142:8, 142:18, 142:25, 147:24, 148:22
**secondary** [1] - 147:1
**seconds** [4] - 31:6, 31:14, 33:6, 97:14
**section** [4] - 77:17, 77:18, 106:7, 149:13
**secure** [6] - 71:17, 72:17, 73:8, 73:25, 82:12, 84:1
**security** [1] - 146:3
**Security** [8] - 27:25, 33:15, 34:15, 34:17, 35:2, 100:2, 102:3
**See** [1] - 116:24
**see** [60] - 6:25, 8:16, 11:5, 11:7, 16:24, 17:14, 19:8, 26:14, 29:5, 31:24, 32:7, 36:4, 40:10, 40:13, 41:22, 45:9, 49:13, 54:16, 54:19, 56:21, 58:3, 61:17, 61:22, 61:25, 62:3, 62:10, 62:13, 62:16, 62:20, 69:8, 69:22, 70:6, 74:18, 79:3, 80:17, 80:19, 90:2, 92:4, 96:11, 107:19, 109:3, 111:25, 113:8, 113:9, 115:20, 117:3, 118:5, 119:8, 124:11, 126:20, 132:24, 133:5, 138:4, 140:11, 151:15, 152:8, 152:9, 153:19, 154:15, 156:3
**seeing** [1] - 106:23
**seeking** [2] - 7:11, 136:20
**seem** [1] - 42:1
**sees** [1] - 30:14
**seize** [2] - 60:9, 79:1
**seized** [6] - 60:10, 62:8, 62:10, 62:13, 77:2, 101:12
**seizure** [8] - 75:24, 75:25, 76:24, 77:4, 77:6, 82:19, 82:21, 82:24
**selection** [1] - 5:2
**self** [1] - 30:8
**self-employed** [1] - 30:8
**selling** [2] - 32:4, 65:16
**send** [3] - 46:1, 100:8, 101:10
**sender** [2] - 47:3, 47:5
**sender's** [2] - 40:17, 40:25
**sends** [1] - 100:9
**sense** [3] - 14:20, 19:22, 27:11
**sent** [11] - 27:16, 30:17, 30:22, 43:18, 49:9, 50:1, 51:15, 51:18, 53:17, 71:21, 150:11
**sentence** [1] - 15:14
**separate** [3] - 93:22, 94:1, 94:20
**separated** [2] - 94:23, 95:6
**separately** [1] - 111:5
**separation** [1] - 95:20
**separatory** [1] - 95:21
**September** [2] - 110:5, 142:8
**served** [2] - 28:1, 28:2
**Service** [5] - 34:23, 37:15, 37:16, 37:19, 145:3
**service** [5] - 10:17, 21:7, 36:18, 57:10, 145:20
**Services** [1] - 105:3
**services** [1] - 8:23
**session** [1] - 16:23
**set** [7] - 27:7, 37:2, 37:17, 71:24, 150:14, 151:16, 153:6
**setup** [1] - 58:25
**seven** [4] - 73:1, 83:22, 102:23
**seven-day** [1] - 102:23
**seventh** [1] - 19:19
**several** [2] - 9:20, 111:25
**Severson** [1] - 22:4
**shelf** [1] - 150:24
**Shenzhen** [1] - 47:9
**ship** [1] - 36:7
**shipped** [4] - 36:16, 36:24, 48:23, 50:21
**shipping** [5] - 36:16, 70:18, 152:9, 152:11, 152:20
**shortchange** [1] - 77:20
**shortly** [2] - 27:24, 63:4
**shot** [1] - 33:9

**shot's** [1] - 7:24
**shots** [2] - 7:12, 11:2
**show** [13] - 8:1, 24:9, 45:10, 47:25, 53:2, 72:1, 75:9, 76:17, 83:4, 96:7, 107:13, 107:15, 149:5
**showed** [2] - 9:5, 132:15
**showing** [5] - 7:25, 98:24, 107:18, 148:6, 148:22
**shown** [3] - 10:20, 18:21, 22:15
**shows** [4] - 55:22, 103:25, 133:3, 152:16
**side** [7] - 18:10, 24:7, 41:12, 46:8, 69:7, 84:8, 112:2
**sidebar** [5] - 7:9, 114:16, 114:19, 115:14, 115:16
**sieve** [1] - 94:10
**sifting** [1] - 53:19
**sight** [1] - 153:7
**sign** [3] - 58:3, 106:9, 149:7
**signature** [8] - 41:23, 41:24, 109:15, 149:9, 149:12, 154:10, 154:11
**signed** [4] - 39:16, 58:16, 58:23, 153:21
**signs** [2] - 59:4, 153:17
**silent** [1] - 13:5
**silver** [1] - 45:18
**similar** [6] - 95:17, 96:15, 96:16, 97:11, 97:15, 139:22
**simply** [5] - 4:24, 12:25, 20:5, 24:8, 138:13
**single** [1] - 6:2
**sit** [1] - 22:17
**site** [4] - 76:4, 84:5, 84:7, 84:9
**sites** [1] - 157:19
**sitting** [2] - 53:18, 70:9
**situation** [2] - 22:17, 71:10
**six** [3] - 83:22, 108:9, 125:16
**sixth** [1] - 19:17
**sky** [2] - 17:15, 17:20
**slide** [4] - 94:18, 94:19, 94:22, 126:17
**slightly** [1] - 54:7
**slip** [27] - 27:22, 38:5, 38:8, 38:10, 38:13, 41:13, 41:20, 44:6, 44:9, 45:21, 45:22, 45:23, 45:24, 46:8, 46:15, 46:25, 47:3, 55:18, 55:21, 147:22, 148:12, 148:19, 149:2, 150:13, 150:23, 155:5
**slips** [7] - 39:9, 39:11, 39:18, 40:15, 149:19, 150:11, 154:7
**smuggling** [2] - 35:4, 35:12
**Snapchat** [1] - 20:24
**social** [1] - 20:24
**soft** [1] - 33:19
**soft-spoken** [1] - 33:19
**solely** [1] - 12:10
**solid** [2] - 110:22, 111:4
**solvent** [3] - 111:6, 139:11
**someone** [17] - 9:10, 25:9, 28:20, 32:3, 32:7, 42:11, 59:7, 80:12, 82:25, 83:1, 99:10, 99:15, 147:16, 151:4, 154:25, 155:4
**sometime** [3] - 55:17, 61:8, 158:8
**sometimes** [7] - 18:22, 98:5, 98:10, 110:22, 139:10, 141:14
**somewhat** [1] - 8:5
**somewhat-anonymous** [1] - 8:5
**somewhere** [7] - 56:3, 81:7, 81:16, 82:3, 84:10, 84:12, 141:24
**soon** [2] - 88:14, 90:19
**sorry** [34] - 5:11, 5:12, 42:6, 42:18, 47:2, 65:20, 71:23, 73:12, 73:13, 75:8, 76:23, 77:2, 79:12, 80:18, 83:19, 83:20, 91:8, 91:20, 93:21, 96:3, 97:22, 99:14, 100:3, 101:21, 108:25, 114:20, 117:17, 121:9, 133:25, 134:2, 137:10, 141:6, 149:19
**sort** [2] - 10:21, 64:9
**sorts** [1] - 68:6
**sound** [1] - 139:21
**sounds** [1] - 136:19
**special** [5] - 34:24, 35:1, 35:13, 37:15, 50:14
**Special** [31] - 27:16, 27:17, 33:14, 34:11, 35:16, 39:4, 40:14, 41:17, 42:4, 42:22, 43:12, 46:4, 48:13, 48:16, 49:16, 51:22, 52:24, 53:10, 54:11, 55:7, 55:9, 55:10, 65:12, 66:23, 101:9, 145:3, 145:5, 145:17, 146:12, 146:14, 156:12
**specialist** [1] - 51:18
**specialists** [2] - 111:16, 142:3
**specialized** [1] - 124:6
**specific** [5] - 27:5, 64:1, 107:8, 138:3, 140:9
**specifically** [1] - 136:20
**specified** [1] - 147:2
**spectrometer** [5] - 78:19, 95:6, 111:8, 140:5, 140:22
**spectrometry** [5] - 94:3, 94:16, 95:3, 137:15, 137:17
**spectroscopy** [4] - 94:4, 94:17, 137:15, 138:16
**speculate** [4] - 9:15, 18:18, 18:21, 103:1
**speculation** [2] - 14:20, 58:18
**spell** [5] - 34:4, 67:8, 86:11, 104:18, 145:10
**spent** [1] - 141:15
**spikes** [2] - 95:14, 139:15
**spits** [1] - 139:12
**spoken** [1] - 33:19
**spotted** [1] - 154:2
**stand** [8] - 33:24, 45:6, 67:7, 86:10, 104:6, 113:11, 122:2, 145:9
**standard** [8] - 102:25, 111:12, 118:18, 124:4, 132:16, 138:10, 141:11, 157:3
**standards** [10] - 111:9, 123:23, 124:1, 124:5, 124:11, 139:4, 139:7, 139:8, 143:3
**stands** [1] - 89:24
**start** [13] - 5:16, 22:23, 23:15, 55:13, 70:4, 94:20, 99:9, 101:14, 137:9, 157:4, 157:7, 158:3, 158:9
**started** [4] - 34:22, 34:24, 101:19, 137:12
**starting** [1] - 122:15
**State** [7] - 36:11, 50:15, 51:3, 87:13, 103:20, 105:2, 105:20
**state** [8] - 34:4, 67:8, 86:11, 104:18, 105:6, 105:8, 115:19, 145:10
**statement** [4] - 24:7, 24:10, 24:18
**statements** [3] - 9:24, 16:20, 65:24
**States** [20] - 12:17, 13:17, 13:24, 14:1, 25:5, 25:10, 25:14, 25:18, 25:20, 25:22, 26:3, 26:7, 28:25, 29:24, 29:25, 34:23, 37:14, 37:15, 145:19
**station** [1] - 81:15
**stationary** [1] - 94:25
**stay** [3] - 5:18, 44:8, 157:5
**stayed** [2] - 42:9, 157:1
**staying** [1] - 156:24
**step** [11] - 8:15, 33:16, 66:13, 67:3, 85:10, 86:7, 103:14, 104:2, 144:17, 145:6, 156:13
**steps** [2] - 50:18, 51:8
**steroid** [20] - 6:12, 24:25, 114:4, 120:7, 120:15, 124:22, 125:24, 126:11, 128:19, 129:5, 129:18, 131:8, 131:22, 132:7, 133:11, 138:2, 138:3, 138:13, 138:14, 143:8
**steroids** [77] - 6:3, 6:8, 6:9, 6:11, 6:14, 6:17, 8:1, 12:23, 13:17, 13:23, 14:1, 14:7, 24:22, 24:23, 24:24, 25:2, 25:4, 25:7, 25:10, 25:11, 25:12, 25:17, 25:20, 25:21, 25:23, 26:3, 26:7, 26:8, 26:11, 27:10, 28:4, 28:6, 28:7, 28:16, 28:17, 28:25, 29:23, 29:25, 30:1, 30:12, 30:21, 30:22, 31:21, 31:23, 31:25, 33:4, 36:1, 43:19, 87:17, 106:18, 106:24, 106:25, 110:18, 111:3, 117:25, 119:2, 119:20, 123:12, 124:7, 125:10, 128:2, 137:13, 137:19, 137:20, 137:24, 138:5, 140:16, 142:22, 143:5, 143:10, 144:8, 144:12, 157:18
**sticker** [3] - 113:1, 121:3, 136:4
**stickers** [1] - 44:2
**sticky** [2] - 121:2, 121:10
**still** [14] - 8:4, 8:5, 8:6, 34:1, 81:15, 94:12, 95:17, 95:18, 97:16, 101:25, 102:2, 111:1, 114:23, 142:24
**sting** [1] - 30:24
**stipulated** [2] - 115:25, 116:8
**stipulation** [2] - 115:10, 115:16
**stop** [1] - 60:2
**stopped** [2] - 59:11, 59:17
**stoppers** [2] - 28:8, 28:11
**storage** [1] - 10:19
**store** [1] - 111:16
**stored** [1] - 150:24
**story** [3] - 26:21, 26:22, 29:14
**strangers** [1] - 22:17
**stream** [2] - 69:11, 81:25
**street** [3] - 17:19, 56:18, 57:14
**Street** [8] - 28:2, 31:5, 38:18, 39:10, 42:19, 42:20, 149:4, 154:18
**strength** [1] - 94:21
**strengths** [2] - 94:23, 94:24
**stricken** [1] - 18:22
**strong** [1] - 10:2
**struggling** [1] - 8:8
**stuff** [8] - 32:18,

68:16, 68:17, 69:1, 69:10, 72:15, 94:12
**subject** [5] - 66:13, 85:19, 103:15, 134:9, 144:21
**submission** [1] - 141:22
**submit** [2] - 116:3, 135:14
**submits** [2] - 99:12, 112:15
**submitted** [8] - 20:12, 88:8, 92:1, 92:2, 123:20, 123:25, 133:20, 133:21
**submitting** [7] - 89:17, 91:14, 100:1, 100:5, 100:8, 101:6, 102:5
**subpoena** [1] - 156:15
**subsequent** [1] - 50:24
**Substance** [1] - 93:8
**substance** [36] - 6:3, 6:12, 12:19, 12:20, 12:21, 12:23, 13:13, 13:21, 13:25, 14:4, 26:9, 32:2, 71:12, 78:20, 79:1, 92:8, 92:10, 98:15, 105:3, 111:18, 112:23, 114:5, 117:11, 120:5, 120:24, 125:22, 126:24, 129:7, 129:16, 130:7, 131:6, 131:20, 132:8, 133:11, 139:9, 140:12
**substances** [29] - 7:25, 29:13, 31:25, 50:19, 86:24, 87:7, 88:8, 97:24, 98:3, 105:5, 105:7, 106:15, 110:22, 117:20, 118:2, 118:24, 119:22, 123:5, 123:14, 123:22, 124:7, 125:12, 128:8, 129:24, 130:14, 140:13, 143:23, 144:11, 145:24
**substantial** [1] - 32:13
**substantially** [2] - 6:22, 7:3
**subtraction** [1] - 93:2
**sugar** [2] - 97:15, 97:16
**suggest** [3] - 19:22, 33:2, 59:1
**suggests** [1] - 137:3
**summarize** [2] - 65:21, 133:18
**summarized** [1] - 10:9
**summary** [1] - 13:10
**summer** [1] - 137:12
**supervised** [1] - 106:6
**supervisor** [4] - 90:19, 100:9, 102:24, 151:8
**supplemental** [1] - 108:11
**supplier** [2] - 124:5, 124:6
**suppose** [1] - 5:15
**supposed** [1] - 74:1
**surprised** [2] - 63:20, 64:2
**surveillance** [1] - 147:14
**suspect** [2] - 109:22, 109:23
**suspected** [5] - 98:3, 98:5, 111:3, 137:23, 137:25
**suspicion** [1] - 138:1
**suspicious** [4] - 27:2, 27:4, 81:6, 145:24
**sustain** [3] - 18:14, 18:17, 18:19
**sustained** [4] - 58:19, 63:19, 64:3, 64:12
**Sutherland** [4] - 151:8, 151:9, 153:22, 154:4
**sworn** [5] - 16:15, 33:17, 67:4, 86:8, 104:2
**SWORN** [5] - 33:23, 67:6, 86:9, 104:5, 145:8
**sympathy** [1] - 12:12
**system** [6] - 36:20, 77:8, 90:9, 90:20, 91:6, 105:23
**System** [1] - 89:24

**T**

**table** [2] - 81:18, 81:19
**tan** [1] - 42:25
**tangible** [1] - 135:8
**tape** [18] - 42:25, 72:16, 72:18, 72:19, 72:20, 75:15, 75:22, 75:24, 76:5, 76:6, 82:4, 82:5, 82:7, 82:16, 114:21, 115:22, 115:23
**targeting** [1] - 68:22
**tarmac** [1] - 85:6
**Taurus** [2] - 95:10, 95:13
**technical** [2] - 27:11, 94:24
**technically** [1] - 154:20
**technician** [1] - 105:21
**technique** [2] - 95:21, 147:12
**technology** [1] - 61:1
**temporary** [1] - 36:10
**ten** [1] - 106:13
**term** [2] - 82:23, 148:15
**terms** [1] - 61:13
**test** [45] - 50:22, 78:18, 87:7, 92:13, 94:5, 98:3, 98:10, 105:5, 106:13, 106:14, 106:23, 119:4, 119:10, 120:22, 122:19, 122:23, 124:10, 125:20, 127:10, 127:14, 127:24, 128:16, 129:14, 131:2, 131:4, 131:15, 132:5, 132:14, 133:8, 133:21, 138:16, 138:18, 138:21, 138:24, 139:12, 139:19, 139:23, 140:9, 140:11, 140:21, 144:7
**tested** [27] - 28:5, 30:20, 71:20, 72:15, 72:17, 92:8, 94:2, 94:10, 99:4, 99:7, 101:16, 101:18, 106:24, 111:19, 123:21, 123:22, 123:25, 124:1, 124:25, 126:9, 133:6, 133:20, 143:2, 143:15, 144:5
**testified** [5] - 19:8, 19:10, 77:12, 77:22, 122:8
**testify** [10] - 10:13, 16:4, 16:9, 16:11, 17:16, 17:22, 19:25, 86:24, 130:14
**testifying** [2] - 7:1, 19:12
**testimony** [13] - 16:12, 16:13, 16:15, 16:21, 17:7, 19:2, 19:5, 19:17, 19:19, 23:20, 144:4, 157:20
**testing** [18] - 71:13, 84:14, 94:1, 99:11, 101:19, 102:15, 106:11, 109:14, 110:17, 110:24, 118:19, 124:11, 138:12, 138:13, 140:6, 140:9, 140:11, 144:8
**testosterone** [19] - 114:13, 117:21, 117:22, 117:24, 119:15, 119:16, 119:19, 120:4, 120:5, 122:20, 123:7, 123:11, 127:25, 128:1, 129:4, 131:16, 131:19, 132:6
**tests** [8] - 36:1, 105:11, 106:5, 109:25, 140:14, 140:16, 142:25
**text** [2] - 8:21, 20:22
**THE** [195] - 4:5, 4:11, 5:11, 5:15, 5:22, 8:18, 10:7, 10:16, 11:11, 15:8, 15:15, 30:5, 33:11, 33:16, 33:24, 34:3, 34:4, 34:6, 34:18, 34:20, 34:21, 34:22, 38:24, 39:1, 39:23, 39:25, 40:3, 40:7, 41:14, 43:8, 43:10, 44:7, 44:9, 44:22, 45:1, 45:3, 45:5, 46:20, 46:22, 48:14, 49:12, 49:14, 50:4, 50:6, 52:19, 52:21, 53:1, 53:6, 53:25, 54:2, 54:5, 54:10, 54:18, 54:21, 55:11, 58:19, 63:19, 63:23, 63:25, 64:12, 64:14, 64:18, 64:23, 65:2, 65:4, 65:8, 65:24, 66:2, 66:6, 66:13, 66:18, 67:1, 67:3, 67:7, 67:10, 67:11, 67:15, 70:21, 72:7, 72:9, 74:5, 74:7, 75:8, 76:9, 76:11, 76:19, 78:3, 78:8, 80:3, 84:18, 85:8, 85:10, 85:14, 85:24, 86:4, 86:7, 86:10, 86:13, 86:15, 87:24, 89:1, 89:3, 90:1, 90:4, 90:5, 91:4, 91:18, 91:20, 98:20, 100:20, 102:11, 103:6, 103:9, 103:11, 103:12, 103:13, 103:14, 103:17, 103:18, 103:23, 104:4, 104:6, 104:8, 104:13, 104:16, 104:18, 104:20, 104:21, 107:5, 107:12, 107:15, 107:17, 108:10, 108:16, 108:19, 108:24, 109:2, 109:5, 109:8, 110:3, 110:8, 110:10, 110:12, 110:14, 114:17, 114:25, 115:4, 115:9, 115:13, 115:15, 116:2, 116:5, 116:7, 117:14, 117:16, 117:18, 121:6, 121:16, 121:19, 121:25, 122:4, 126:17, 126:19, 133:1, 133:14, 133:25, 134:6, 134:11, 134:14, 134:20, 134:25, 135:3, 135:7, 135:12, 136:7, 136:9, 136:11, 136:14, 143:18, 144:15, 144:17, 144:19, 144:20, 144:24, 145:5, 145:9, 145:12, 145:14, 152:4, 152:25, 156:10, 156:12, 156:17, 158:6, 158:13
**theft** [1] - 145:23
**thereafter** [1] - 27:24
**therefore** [6] - 6:20, 20:11, 20:15, 21:24, 32:19, 116:8
**thick** [1] - 48:2
**thinks** [1] - 18:10
**third** [3] - 16:17, 16:21, 19:11
**thoughts** [2] - 5:23, 23:7
**thousands** [2] - 69:17, 79:6
**three** [13] - 6:16, 6:19, 12:22, 14:10,

23:6, 25:15, 30:3, 48:4, 48:5, 68:9, 128:24, 141:13, 142:9
**throughout** [2] - 20:8, 105:6
**tied** [1] - 133:14
**timing** [1] - 156:18
**tip** [1] - 33:20
**tipped** [1] - 33:18
**tires** [1] - 95:9
**title** [1] - 107:9
**today** [5] - 9:13, 9:18, 29:13, 43:5, 116:13
**together** [9] - 10:4, 22:18, 22:20, 29:8, 79:13, 88:13, 95:13, 95:18, 137:18
**tomorrow** [7] - 156:20, 157:5, 157:6, 157:7, 158:2, 158:8, 158:14
**tonight** [1] - 157:5
**took** [11] - 5:23, 26:16, 53:16, 87:13, 90:23, 94:1, 94:7, 102:23, 103:1, 151:12
**tool** [1] - 147:12
**top** [12] - 40:24, 44:3, 47:7, 65:4, 74:13, 76:1, 99:23, 107:24, 108:3, 151:24
**total** [3] - 93:5, 93:25, 94:8
**touch** [1] - 29:5
**touched** [1] - 92:6
**tough** [1] - 54:22
**toward** [2] - 91:7, 126:15
**towards** [1] - 33:20
**track** [2] - 32:4, 156:21
**tracking** [24] - 27:5, 39:13, 41:5, 41:7, 41:9, 43:2, 43:21, 44:2, 46:11, 46:12, 61:24, 72:22, 72:25, 73:2, 74:11, 74:17, 74:21, 77:16, 77:19, 77:21, 112:16, 152:18, 152:19
**trained** [2] - 71:10, 106:9
**training** [23] - 35:1, 35:7, 68:10, 68:13, 71:9, 87:9, 87:16, 87:19, 87:20, 105:15, 105:18, 105:25, 106:3, 106:7, 106:16, 106:20, 106:21, 106:22, 136:18, 143:4, 143:7, 143:8, 143:9
**transaction** [2] - 151:11, 151:13
**transcript** [2] - 15:16, 23:19
**transfer** [1] - 90:21
**Travis** [15] - 12:18, 27:5, 29:22, 30:8, 35:17, 40:18, 41:25, 47:13, 79:20, 109:23, 146:8, 146:24, 147:2, 149:12, 150:8
**treat** [1] - 98:5
**trenbolone** [7] - 117:22, 117:24, 117:25, 122:24, 123:9, 125:8, 125:9
**trial** [22] - 11:19, 11:25, 12:2, 12:14, 14:12, 20:8, 21:4, 21:22, 21:23, 22:1, 22:12, 23:2, 23:4, 23:6, 23:11, 23:14, 23:17, 23:19, 24:6, 85:20, 157:20
**tried** [1] - 156:21
**truck** [1] - 60:7
**true** [1] - 116:9
**truth** [1] - 19:23
**try** [6] - 21:17, 32:2, 49:12, 57:8, 158:1, 158:3
**trying** [7] - 10:19, 133:2, 138:1, 138:2, 138:4, 138:5, 142:24
**tube** [1] - 94:21
**turn** [9] - 31:14, 40:9, 41:12, 53:1, 54:5, 67:16, 72:1, 76:19, 107:6
**turned** [3] - 27:21, 30:20, 53:6
**turning** [1] - 129:22
**twice** [1] - 140:21
**Twitter** [1] - 20:24
**two** [47] - 4:13, 5:8, 9:8, 13:16, 17:13, 22:21, 23:6, 26:2, 32:15, 33:20, 42:9, 44:2, 44:17, 49:18, 49:24, 50:1, 74:17, 74:22, 74:23, 74:24, 84:20, 93:18, 93:22, 93:23, 93:25, 94:1, 95:2, 96:15, 103:20, 109:13, 110:5, 111:5, 111:8, 123:18, 124:24, 133:19, 137:18, 139:22, 140:13, 140:17, 140:24, 148:2, 148:4, 149:19, 150:14, 153:11
**type** [3] - 110:20, 111:2, 132:17
**types** [4] - 106:5, 106:22, 106:25, 124:6
**typical** [2] - 78:23, 138:25
**typically** [3] - 99:8, 103:2, 150:22

## U

**U.S** [4] - 6:11, 36:4, 37:19, 145:3
**ultimately** [1] - 61:4
**unable** [1] - 124:2
**unavoidable** [3] - 6:25, 7:3, 7:7
**uncertainty** [3] - 97:11, 97:14, 97:16
**unclear** [1] - 80:7
**undecylenate** [2] - 126:9, 131:5
**under** [4] - 11:1, 67:4, 145:6, 147:14
**undercover** [1] - 32:8
**Union** [1] - 62:20
**unique** [1] - 112:15
**unit** [4] - 93:18, 93:20, 94:4, 96:15
**United** [20] - 12:17, 13:17, 13:24, 14:1, 25:5, 25:10, 25:14, 25:18, 25:20, 25:22, 26:3, 26:7, 28:25, 29:24, 29:25, 34:23, 37:14, 37:15, 145:19
**units** [4] - 93:18, 93:25, 94:8, 96:16
**University** [2] - 87:13, 105:20
**unknown** [4] - 71:3, 98:6, 124:10, 145:24
**unless** [5] - 9:19, 13:3, 71:11, 130:11, 154:16
**unmarked** [1] - 71:8
**unsealed** [1] - 114:21
**unusual** [2] - 68:16, 69:9
**up** [90] - 4:15, 5:8, 5:15, 8:10, 12:15, 17:14, 17:18, 24:21, 24:23, 25:2, 27:13, 27:19, 34:1, 37:2, 37:18, 38:11, 40:15, 41:13, 42:11, 42:12, 42:15, 44:8, 45:6, 45:9, 47:6, 48:25, 50:13, 51:5, 54:7, 59:19, 63:11, 70:24, 71:1, 71:13, 71:16, 72:16, 75:25, 77:5, 78:12, 80:12, 82:4, 82:8, 84:20, 90:21, 91:18, 92:14, 92:16, 92:20, 93:21, 94:5, 94:9, 95:10, 97:18, 98:8, 101:11, 102:6, 104:11, 107:3, 110:20, 111:15, 113:7, 113:9, 113:10, 114:7, 114:15, 115:1, 115:5, 119:8, 122:1, 124:12, 125:1, 127:4, 132:25, 134:5, 135:9, 148:1, 149:16, 150:14, 150:15, 150:18, 150:23, 151:11, 151:16, 152:11, 153:6, 154:5, 154:8, 157:18, 158:8
**upper** [2] - 89:15, 99:13
**urge** [1] - 23:19
**USA** [1] - 47:15
**Utah** [1] - 105:20

## V

**valleys** [1] - 139:15
**valuable** [1] - 140:10
**value** [3] - 6:21, 9:22, 10:2
**variety** [3] - 8:7, 106:23, 146:6
**vault** [3] - 90:20, 111:17, 142:3
**vehicle** [2] - 22:3, 158:1
**verdict** [4] - 12:15, 20:9, 21:12, 24:17
**verified** [1] - 36:4
**verifying** [1] - 105:11
**version** [2] - 54:7, 77:8
**vestibule** [1] - 59:13
**vial** [5] - 122:17, 122:22, 123:1, 128:6, 129:13
**vials** [17] - 25:12, 28:7, 124:24, 125:5, 125:16, 126:3, 126:8, 126:13, 126:22, 127:6, 127:12, 127:20, 128:14, 128:24, 139:9
**view** [1] - 58:5
**viewed** [2] - 49:4, 49:6
**violates** [1] - 23:12
**violence** [1] - 146:4
**Virginia** [1] - 87:14
**visible** [1] - 40:10
**visit** [1] - 21:21
**voice** [1] - 44:7
**voir** [1] - 4:3
**volatiles** [1] - 140:6

## W

**W-O-N-G** [1] - 67:10
**wait** [2] - 102:24, 103:22
**waited** [1] - 42:11
**waiting** [2] - 72:17, 102:25
**wake** [1] - 17:14
**walk** [2] - 56:22, 84:12
**walked** [1] - 57:2
**wants** [2] - 8:2, 10:14
**warrant** [14] - 28:1, 28:2, 28:18, 31:17, 50:25, 51:2, 51:3, 51:4, 51:5, 51:12, 51:14, 60:21, 61:4, 66:3
**watch** [3] - 21:13, 40:8, 106:10
**watched** [1] - 22:20
**watching** [2] - 22:18, 150:25
**water** [1] - 94:18
**Wayback** [1] - 10:17
**ways** [1] - 71:12
**weather** [1] - 17:21
**web** [1] - 7:12
**Weber** [1] - 105:19
**website** [19] - 7:24, 8:4, 8:6, 8:17, 8:19, 8:22, 9:3, 9:5, 9:12, 9:13, 9:16, 9:18, 9:20, 10:10, 10:12, 10:20, 11:2, 21:20, 21:21
**websites** [2] - 8:23, 20:23
**week** [1] - 103:1
**weeks** [8] - 35:9, 35:11, 35:14, 141:12, 141:13, 141:15, 142:9
**weigh** [6] - 12:5, 82:11, 82:12, 91:1, 92:25, 110:23

**weigh-by** [1] - 92:25
**weighed** [6] - 91:2, 92:25, 93:1, 93:23, 93:24, 111:1
**weighing** [2] - 96:16, 106:11
**weight** [32] - 18:5, 18:7, 19:24, 90:24, 91:9, 91:11, 91:12, 91:13, 91:16, 92:19, 93:2, 93:3, 93:6, 93:10, 93:12, 93:13, 93:14, 93:16, 93:17, 93:22, 93:25, 95:15, 97:2, 97:3, 97:5, 97:8, 110:23, 110:24, 111:4, 112:19, 119:24
**weights** [6] - 54:12, 54:14, 75:17, 75:18, 82:10, 82:14
**West** [12] - 27:6, 28:2, 38:18, 39:10, 39:12, 40:20, 42:3, 43:19, 47:15, 147:5, 149:14, 150:8
**Western** [1] - 62:20
**wet** [1] - 17:19
**whatnot** [3] - 7:2, 95:18, 155:3
**whatsoever** [3] - 31:8, 31:9, 31:10
**Wheat** [18] - 8:14, 10:11, 24:18, 25:14, 30:5, 30:16, 30:24, 33:12, 45:10, 53:1, 86:1, 90:1, 100:12, 104:21, 107:15, 115:15, 116:11, 156:18
**wheat** [1] - 33:18
**WHEAT** [169] - 5:9, 5:12, 8:15, 9:7, 24:19, 33:13, 33:25, 34:7, 34:10, 34:25, 38:23, 38:25, 39:3, 39:4, 39:22, 40:5, 40:14, 41:15, 41:17, 43:7, 43:9, 43:11, 43:12, 44:12, 44:25, 45:13, 45:14, 46:18, 46:25, 48:12, 48:15, 48:16, 49:18, 50:3, 50:9, 50:10, 52:17, 52:24, 53:4, 53:9, 53:10, 53:23, 54:6, 54:11, 54:20, 54:22, 54:24, 55:7, 58:18, 63:18, 63:21, 64:11, 64:17, 65:9, 65:11, 66:5, 66:17, 66:23, 67:2, 67:12, 67:18, 67:21, 70:20, 72:5, 72:8, 72:10, 72:11, 74:3, 74:10, 75:6, 75:9, 76:7, 76:14, 76:21, 76:22, 78:1, 78:7, 78:9, 78:10, 80:2, 84:23, 85:7, 85:13, 86:2, 86:5, 86:17, 87:25, 88:1, 88:24, 89:5, 89:7, 90:3, 90:11, 91:7, 91:21, 98:18, 100:22, 102:10, 103:8, 103:16, 103:19, 104:3, 104:7, 104:9, 104:15, 104:17, 104:22, 104:24, 107:6, 107:13, 107:18, 108:15, 108:18, 108:22, 108:25, 109:3, 109:7, 109:9, 109:10, 110:2, 110:15, 110:16, 114:14, 114:18, 114:20, 115:1, 115:6, 115:10, 115:21, 116:3, 116:12, 117:17, 117:19, 121:4, 121:9, 121:10, 121:13, 121:17, 121:24, 122:3, 122:5, 126:18, 126:21, 133:4, 133:16, 133:18, 133:23, 134:2, 134:8, 134:13, 134:17, 134:23, 135:10, 135:13, 135:16, 136:5, 136:8, 136:15, 143:19, 143:21, 144:14, 144:23, 145:2, 145:16, 152:5, 152:24, 156:11, 156:16, 158:12
**Wheeler** [2] - 147:2, 154:23
**white** [14] - 112:20, 118:10, 118:15, 119:15, 120:3, 120:12, 130:6, 130:17, 130:18, 130:20, 131:14, 132:1, 133:9, 135:23
**whole** [9] - 24:24, 24:25, 25:3, 28:9, 28:11, 28:12, 29:2, 109:3, 113:10
**wide** [1] - 146:6
**will-call** [1] - 151:18
**willing** [1] - 157:4
**window** [2] - 151:18, 155:25
**Windows** [1] - 61:15
**Windows-based** [1] - 61:15
**Winmill** [1] - 31:24
**wish** [5] - 23:21, 66:15, 76:19, 89:3, 110:14
**withdraw** [1] - 7:20
**withdrawn** [1] - 78:9
**witness** [41] - 16:13, 16:15, 17:7, 17:8, 19:3, 19:5, 19:7, 19:13, 19:15, 19:22, 22:8, 33:12, 33:24, 38:24, 45:6, 53:7, 63:25, 64:19, 67:7, 84:21, 85:11, 86:1, 86:5, 86:10, 103:18, 104:6, 104:21, 113:11, 121:20, 121:22, 122:2, 133:14, 134:1, 134:7, 134:8, 144:21, 144:24, 145:1, 145:9, 151:13, 155:17
**WITNESS** [27] - 33:23, 34:6, 34:20, 34:22, 44:9, 49:14, 65:4, 66:2, 67:6, 67:10, 70:21, 86:9, 86:13, 90:5, 91:20, 103:11, 103:13, 103:17, 104:5, 104:20, 107:17, 110:8, 110:10, 117:16, 144:19, 145:8, 145:12
**witness's** [4] - 19:9, 19:11, 19:17, 19:19
**witnessed** [1] - 49:15
**witnesses** [10] - 7:1, 16:25, 19:25, 21:24, 22:10, 26:17, 29:4, 29:5, 29:18, 66:15
**woke** [1] - 17:18
**woman** [1] - 29:19
**Wong** [9] - 26:24, 66:24, 67:1, 67:3, 67:10, 67:14, 67:22, 72:2, 80:7
**WONG** [1] - 67:6
**words** [4] - 6:10, 20:2, 26:20, 27:12
**workouts** [1] - 30:11
**workplace** [1] - 146:4
**workroom** [1] - 151:16
**works** [3] - 30:14, 107:10, 137:18
**worth** [1] - 133:1
**wrap** [1] - 84:20
**wrapped** [1] - 42:25
**write** [2] - 73:5, 135:10
**writing** [3] - 20:21, 44:1, 73:6
**written** [10] - 11:20, 23:19, 39:15, 41:1, 42:2, 72:23, 73:13, 82:10, 93:7, 148:17
**wrongs** [1] - 6:5
**wrote** [1] - 101:12

## X

**X-ray** [20] - 26:25, 27:1, 30:19, 68:13, 68:14, 68:22, 69:5, 69:6, 69:8, 69:14, 69:20, 69:24, 70:23, 80:9, 80:13, 80:16, 80:20, 80:22, 81:3, 81:25

## Y

**Yang** [1] - 47:7
**year** [17] - 10:12, 60:21, 61:10, 83:6, 90:8, 99:7, 101:8, 101:12, 101:13, 101:14, 102:15, 110:6, 141:22, 142:7, 142:8
**years** [4] - 6:16, 6:19, 68:9, 100:14
**yellow** [4] - 113:1, 120:21, 122:17, 136:3
**yesterday** [1] - 5:25
**yourself** [3] - 19:6, 23:22, 113:11
**yourselves** [2] - 4:25, 29:6

## Z

**Ziploc** [12] - 92:22, 93:22, 93:23, 97:1, 126:22, 127:6, 127:20, 128:6, 128:14, 128:24, 129:13, 130:25
**zoom** [10] - 40:11, 54:19, 75:11, 90:1, 109:1, 109:2, 109:3, 109:5, 109:6
**zooming** [3] - 97:8, 112:1, 156:4